UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA for the
use and benefit of GLF CONSTRUCTION
CORPORATION, a Florida profit
corporation,

       Plaintiff,

v.

       Case No: 8:17-cv-01932-T-36AAS
       Consolidated with:
       Case No. 8:17-cv-02650-T-36TGW

FEDCON JOINT VENTURE, a Florida
joint venture, DAVID BOLAND, INC., a
Florida profit corporation, JT
CONSTRUCTION ENTERPRISE
CORPORATION, and WESTERN
SURETY COMPANY,

       Defendants.
_____

FEDCON JOINT VENTURE,

       Counter-Plaintiff,

v.

GLF CONSTRUCTION CORPORATION
and FIDELITY AND DEPOSIT
COMPANY OF MARYLAND

       Counter-Defendants.
_____/

# O R D E R

This cause comes before the Court on GLF Construction Corporation's Dispositive Motion

for Partial Summary Judgment and Incorporated Memorandum in Support, Doc. 68, Defendants'

Motion for Partial Summary Judgment, Doc. 72, and GLF Construction Corporation and Fidelity

and Deposit Company of Maryland's Dispositive Motion for Summary Judgment and Incorporated

Memorandum in Support, Doc. 74. The motions are fully briefed and ripe for adjudication. The Court heard oral argument on the motions. Docs. 83, 91, 92, 102, 103, 105, 109. Having considered the parties' submissions and being fully advised in the premises, the Court will deny the motions.

## I.    INTRODUCTION

### A.  Background and Facts[1]

These two Miller Act actions (Case Nos. 8:17-cv-1932-T-36AAS and 8:17-cv-2650-T-36TGW) stem from two separate construction projects to repair and raise substandard levees along a section of the Mississippi River in Plaquemines Parish, Louisiana for the United States Army Corps of Engineers (the "Corps"). Doc. 101 ¶¶7–8. Each case pertains to a separate contract with the United States of America, acting by and through the Corps, that was awarded to Defendant/Counter-Plaintiff FEDCON Joint Venture ("FEDCON") for such work.[2] Doc. 101 ¶¶7–8. In both cases, FEDCON entered into a written subcontract agreement with Plaintiff/Counter-Defendant GLF Construction Corporation ("GLF") for a portion of the work. *Id.* at ¶¶8–9. Further, in both cases, FEDCON, as principal, and Western Surety Company ("Western"), as surety, executed and delivered to the Corps a payment bond in accordance with each contract with the United States and the Miller Act, 40 U.S.C. §§ 3131. *Id.* at ¶¶ 11, 13. Similarly, pursuant to the terms of each subcontract agreement, GLF, as principal, and Counter-Defendant Fidelity and Deposit Company of Maryland ("F&D"), as surety, executed and delivered to FEDCON a payment and performance bond. *Id.* at ¶¶ 12, 14.

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including depositions, interrogatory responses, declarations, and exhibits, as well as the parties' Joint Stipulation of Undisputed Material Facts and those facts listed in their Joint Pretrial Statement as facts that are admitted and will not require proof at trial.

[2] FEDCON is a Florida-based joint venture comprised of Defendant David Boland, Inc. and JT Construction Enterprise Corporation. Doc. 101 ¶2.

### i. The 2.2 Project

On October 18, 2013, FEDCON was awarded a contract with the United States of America, acting by and through the Corps, known as Resilient Features, WBV, HSDRRS, Mississippi River Levee, Oak Point to Augusta, WBV-MRL 2.2 Plaquemines Parish, Louisiana (the "2.2 Project"). *Id.* at ¶7. The 2.2 Project called for FEDCON to repair and raise substandard levees along the section of the Mississippi River between the cities of Oak Point and Augusta, Louisiana. *Id.* Pursuant to the prime contract with the Corps, FEDCON, as principal, and Western, as surety, executed and delivered a payment bond to the Corps, in accordance with the contract and the Miller Act, 40 U.S.C. §§ 3131. *Id.* at ¶11. Significantly, GLF entered into a written subcontract agreement with FEDCON on January 22, 2014 (the "2.2 Project Subcontract Agreement"). *Id.* at ¶9. The 2.2 Project Subcontract Agreement provides, in part, that it includes "the Prime Contract between the Owner and the Contractor, including all general, supplementary, and special conditions, drawings, specifications, addenda and forms." *Id.* at ¶17. Significantly, the 2.2 Project Subcontract Agreement also provides, in part, that "others" would perform the following work: "(C) Construction and maintenance of a temporary access road approximately 12' wide . . . (E) Construction and maintenance of two (2) temporary work platforms on the protected side of the levee. The temporary work platforms will be approximately 30' wide . . . ." *Id.* at ¶19. Pursuant to FEDCON's coordination and scheduling of its subcontractors' performance of work, the construction of the access road, the construction of temporary flood protection, and the degrading of the levee and construction of the work platform was to be performed by HDB Construction, Inc., one of FEDCON's subcontractors. Doc. 134 ¶19. These tasks were predecessor work activities to GLF's performance of its work, including driving sheet pilings, driving pipe pilings, and forming concrete T-walls (involving furnishing and placing steel rebar, which was performed

by a separate subcontractor on each project and also served as a predecessor activity to GLF's pouring of the T-walls). *Id.*

FEDCON terminated the 2.2 Project Subcontract Agreement. Doc. 101 ¶27. Before such termination, on October 30, 2015, FEDCON placed the Corps on notice of a differing site condition at a work front, known as "Work Front Two," behind a Chevron plant on the 2.2 Project. *Id.* at ¶20. On April 7, 2016, the Corps, through its contracting officer, Jeffrey Falati, issued a letter to FEDCON, which acknowledged FEDCON's claim for the differing site conditions behind the Chevron plant. *Id.* at ¶20. The Corps labeled this change as "CIN-019." *Id.* A few days later, on April 11, 2016, FEDCON sent correspondence to GLF, informing GLF that the Corps had recognized FEDCON's claim that a different site condition existed behind the Chevron plant. *Id.* at ¶21.

On or about May 23, 2016, FEDCON issue a notice of default (the "Notice of Default") to GLF and directed GLF to submit a plan setting forth how it intended to proceed with work from Monolith 076 south. *Id.* at ¶22. GLF responded to the Notice of Default on May 24, 2016, and F&D, as surety on the payment and performance bond responded to the Notice of Default on May 26, 2016. Doc. 101 ¶¶23–24. Approximately four days after issuing the Notice of Default, on or about May 27, 2016, FEDCON issued a notice to GLF of its termination of the 2.2 Project Subcontract Agreement (the "Notice of Termination"). *Id.* at ¶25. F&D and GLF responded to the Notice of Termination on May 31, 2016, and June 1, 2016, respectively. *Id.* at ¶¶26–27. Thereafter, on June 9, 2016, FEDCON filed a lawsuit against both GLF and F&D in Florida's Ninth Judicial Circuit Court, but F&D did not receive notice of the lawsuit until June 15, 2016. *Id.* at ¶28. By letter dated June 11, 2016, F&D acknowledged receipt of documents from FEDCON and requested further documentation from FEDCON. Docs. 74 at 4; 74-8 at 1; 91 at 7. Approximately two years

following GLF's termination, the Corps issued CIN-019 for the 2.2 Project on May 3, 2018, which extended the contraction completion dates by 224 calendar days. Doc. 101 ¶31. The revised contract completion date for the 2.2 Project included the 224-day extension. *Id.* at ¶32. Finally, GLF submitted six requests for equitable adjustments to FEDCON for alleged additional costs incurred by GLF on the 2.2 Project. *Id.* at ¶29.

### ii.  1.2a Project

On December 5, 2013, FEDCON was also awarded a contract with the United States of America, acting by and through the Corps, known as Resilient Features, WBV, HSDRRS, Mississippi River Levee, Augusta to Oakville (A), WBV-MRL 1.2a, Plaquemines Parish, Louisiana (the "1.2a Project"). *Id.* at ¶8. The 1.2a Project called for FEDCON to repair and raise the substandard levees on a different portion of the Mississippi River than the 2.2 Project, this time between the cities of Augusta and Oakville, Louisiana. *Id.* As with the 2.2 Project, FEDCON, as principal, and Western, as surety, executed and delivered to the Corps a payment bond for the 1.2a Project, in accordance with the contract and the Miller Act, 40 U.S.C. §§ 3131. *Id.* at ¶13. Also like the 2.2 Project, FEDCON entered into a written subcontract agreement with GLF for work on the 1.2a Project on April 3, 2014 (the "1.2a Project Subcontract Agreement"). *Id.* at ¶10. GLF submitted a total of three requests for equitable adjustment to FEDCON relating to alleged additional costs GLF incurred on the 1.2a Project. Doc. 101 ¶30.

### B.  The Lawsuits

GLF filed a lawsuit for the 2.2 Project, which includes three counts: (1) a Miller Act Payment Bond claim pursuant to 40 U.S.C. § 3133(b)(3) against FEDCON Joint Venture ("FEDCON"), David Bolan, JT Construction Enterprise Corporation, and Western Surety Company (collectively "Defendants") for damages resulting from FEDCON's various purported

breaches of the 2.2 Project Subcontract Agreement; (2) a breach of contract claim against FEDCON, David Boland, and JT Construction, in which GLF alleges that FEDCON breached the 2.2 Project Subcontract Agreement by, *inter alia*, improperly default terminating the 2.2 Project Subcontract Agreement, failing to compensate GLF for additional costs incurred, and interfering with GLF's ability to timely perform its work; and (3) an unjust enrichment claim, pleaded in equity and in the alternative, against FEDCON, David Boland, and JT Construction, in which GLF alleges that FEDCON was unjustly enriched as a result of GLF's provision of labor, materials, and equipment on the 2.2 Project. *GLF Constr. Corp. v. FEDCON Joint Venture, et al.*, No. 8:17-cv-02650-T-36TGW (M.D. Fla.) (hereinafter, "*GLF II*"), Doc. 1 ¶¶37–59.

In turn, FEDCON filed a counterclaim against GLF and F&D. *GLF II*, Doc. 66. The counterclaim contains two counts: one count against GLF for its alleged material breach of the 2.2 Project Subcontract Agreement "in a number of ways," including GLF's failure to maintain the project schedule and failing and refusing to abide by FEDCON's proper directive to recommence its work (Count I); and one count against F&D for its alleged breach of the payment and performance bond for failing to complete performance of the work under the 2.2 Project Subcontract Project Agreement (Count II). *Id.* at ¶¶28–39.

GLF also filed a lawsuit against Defendants regarding its work on the 1.2a Project. Docs. 1, 38. The operative, amended complaint for the 1.2a Project raises the same causes of action as the complaint for the 2.2 Project: (1) a Miller Act Bond Payment claim, pursuant to 40 U.S.C. § 3133(b), against Defendants for damages resulting from FEDCON's various purported breaches of the 1.2a Project Subcontract Agreement; (2) breach of contract against FEDCON, David Boland, and JT Construction Enterprise Corporation, in which GLF alleges, among other things, that FEDCON breached the 1.2a Project Subcontract Agreement by impacting GLF's ability to

timely perform the work through active interference and by failing to compensate GLF for additional costs incurred; and (3) an unjust enrichment claim against FEDCON, David Boland, and JT Construction Enterprise Corporation, pleaded in equity and in the alternative, for FEDCON's purported unjust enrichment as a result of GLF's provision of labor, materials, and equipment for the 1.2a Project. Doc. 38 ¶¶32–50.

FEDCON filed a counterclaim against GLF and F&D, which, like the counterclaim for the 2.2 also contains two claims: (1) one claim of breach of contract against GLF, in which FEDCON alleges that GLF breached the 1.2a Project Subcontract Agreement in a number of ways, including failing to maintain the project schedule; and (2) one claim for breach of bond against F&D, which FEDCON alleges that F&D failed to fulfill its obligations under the bond.[3] Doc. 13 ¶¶19–29. The Court consolidated these two cases on May 9, 2018. Doc. 45.

## II.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the

---

[3] FEDCON did not file another counterclaim after GLF filed its amended complaint. Nonetheless, the Court does not find that GLF's amended complaint mooted FEDCON's counterclaim. "While an amendment to a complaint requires revisions to an answer, it does not necessitate revisions to a counterclaim." *Hayden v. Ariz. Pool & Fountain Guys, LLC*, No. CV-16-00840-PHX-SRB, 2016 WL 9456363, at *1 (D. Ariz. Aug. 2, 2016) (discussing the differences between answers and counterclaims).

moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. But, a party cannot defeat summary judgment by relying on conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x. 852, 858 (11th Cir. 2006). Summary judgment should be granted only if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion, but simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed. *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). The Court must consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *Id.* The Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quoting *Bricklayers Int'l Union,*

*Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017 (5th Cir. 1975)). Cross-motions may, however, be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the controlling legal theories and material facts. Id. at 1555-56.

## III. ANALYSIS

### A. GLF's Motion for Partial Summary Judgment

GLF's Motion for Partial Summary Judgment focuses exclusively on the 2.2 Project. Doc. 68. GLF requests the Court to grant summary judgment in its favor on Count I of FEDCON's counterclaim (Breach of Contract) and on Count II of GLF's complaint (Breach of Contract). *Id.* at 2. For the reasons set forth below, this motion is due to be denied.

The Court begins by reviewing the relevant facts. Exhibit A to the 2.2 Project Subcontract Agreement, which lists the work to be performed by GLF, provides that GLF shall furnish all labor, materials, and equipment necessary to provide the required materials, manpower, and equipment to work two independent work fronts simultaneously. Doc. 68-1 at Ex. A. This exhibit also lists work to be performed by "others." *Id.* Two pertinent items are included on this list of work to be performed by "others":

. . .

(C) construction and maintenance of a temporary access road approximately 12' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee.

. . .

(E) construction and maintenance of two (2) temporary work platforms on the protected side of the levee. The temporary work platforms will be approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile, and will be removed and extended in segments for the entire length of the levee as the work progresses.

*Id.*

The parties stipulate that, per FEDCON's coordination and scheduling of its subcontractors' performance of the work, the construction of the access road, the construction of temporary flood protection, and the degrading of the levee and construction of the work platform, which was to be performed by HDB Construction, Inc., were predecessor activities to GLF's performance. Doc. 134 ¶19. A portion of GLF's work was to be performed adjacent to a petrochemical plant owned by Chevron, which was an area referred to as "Work Front Two."[4] *GLF II*, Doc. 1¶18. According to GLF, the relevant work in this area occurred at the southern end of the 2.2 Project and included a transition section from Monolith 072 to Monolith 075, as well as the remaining work from Monolith 076 to Monolith 118.[5] *Id.* at ¶30. GLF alleges that the construction of Monolith 072 to Monolith 075 left twelve feet of space between the end of the t-wall and the edge of the work platform and access road, which was insufficient space for GLF to remove its cranes if such became necessary during the course of the construction. *Id.* Consequently, GLF purportedly notified FEDCON that Monolith 072 to Monolith 075 would have to be constructed last so that GLF's crane equipment would not be trapped on site. *Id.* Further, the work from Monolith 076 south to the terminus of the 2.2 Project allegedly required the construction of the twelve-foot access road and approximately thirty-foot work platform, as set forth above. *Id.* at ¶31. GLF alleges the work from Monolith 076 to the end of the 2.2 Project was placed on hold while GLF "awaited a plan from FEDCON as to how the access road and work platform were going to be engineered, designed[,] and constructed by FEDCON." *Id.*

---

[4] GLF alleges that Work Front Two was an area that required it to use "low-profile specialized equipment" due to Chevron's construction of an overhead pipe leading to a dock on the Mississippi River. *GLF II*, Doc. 1 ¶18.

[5] A Monolith is typically a sixty-foot section of concrete t-wall. *GLF II*, Doc. 1 ¶30.

As previously mentioned, the parties stipulate that FEDCON placed the Corps on notice of a different site condition at the portion of Work Front Two behind the Chevron plant on October 30, 2015. Doc. 101 ¶19. This letter from FEDCON to the Corps explained:

> During investigations into the layout of the work platform and access road it has been determined that the Chevron Fence ("fence") and Chevron Water Pipeline ("pipeline") encroach into the Temporary Work Area Easement ("easement") beginning at approximately Wall Baseline Station 41+00 to 45+00 and then again at approximately from Wall Baseline Station 49+50 past 62+00.

> The fence is identified on Sheet Identification ("Sheet") G-04 as F2 and the pipeline is identified as P4. The locations are depicted on Sheet C-102 and are indicated to be outside of the easement. However, utilizing the Construction Easement coordinates as listed on Sheet G-04 the easement was staked out and verified that the fence and pipeline conflict with the easement.

> . . .

> The access road will be required to be constructed on the flood side of the temporary flood protection and will be subject to flooding. It will require additional fill to stabilize the surface and will require more frequent maintenance. Furthermore, a secondary access to the work platform will be required to allow for maintenance of the cranes, demobilization of the cranes, and delivery of reinforcing steel to the work front. Our subcontractors have provided notification that they will seek compensation for these impacts.

Doc. 68-4 at 1–2.

Following a letter from GLF to FEDCON on February 12, 2016, FEDCON wrote to GLF on February 17, 2016, stating that resuming the work at Work Front Two did not require access through Chevron's plant and did not involve any of the issues that GLF had raised relating to access through Chevron's plant. FEDCON asserted that GLF did not have a "reasonable basis" not to "recommence the work at [Work Front Two]" and accordingly provided GLF with seventy-two hours' notice and curative period to cure its purported default, pursuant to Paragraph 8.A of the 2.2 Project Subcontract Agreement, by mobilizing and recommencing the work at Work Front

Two.[6] Doc. 92-1 at Ex. A-2. Similarly, in response to another letter from GLF, FEDCON pushed back on GLF's assertion that there was no access to facilitate the remaining work at Work Front Two, stating that the temporary access road "extends to the work front and will be advanced as the work front moves forward" because "the supports for Chevron's pipe bridges limits the available width to place the work platform and temporary access road."[7] Doc. 92-1 at Ex. A-3. FEDCON once again provided GLF with the opportunity to cure its purported default by confirming in writing, within seventy-two hours of GLF's receipt of the letter, that it intended to recommence and diligently prosecute the work at Work Front Two. *Id.*

The parties stipulate that the Corps, through Jeffrey Falati as the contracting officer, issued a letter to FEDCON on April 7, 2016, which acknowledged FEDCON's claim for a differing site condition behind the Chevron plant and labeled this changed as "CIN-019." Doc. 101 ¶20. The letter stated:

> [This letter is in] [r]eference [to] yesterday's meeting held at the [Corps] District office discussing the protected side construction easement and its relative location to Chevron's fence and utilities. The Government acknowledges that the field surveyed locations of the protected side construction easement from approximate wall line station 45+00 to approximate wall line station 62+00 differ from the layout shown on contract drawing C-102.

---

[6] Paragraph 8.A of the 2.2 Project Subcontract Agreement, which is discussed in more detail in III(C) below, provides, in relevant part, that if GLF breaches or fails to perform any of its obligations and undertakings in the 2.2 Project Subcontract Agreement, including, without limitation, any time: "(5) Failing to proceed with the Work in the sequence directed by [FEDCON]; (6) Failing to prosecute the Work with promptness and diligence; (7) Causing stoppage, delay, or interference to the work of [FEDCON] or another subcontractor; [or] (8) Failing the perform the Work in compliance with the Contract Documents . . . then in any such events, each of which shall constitute a material breach or default of [GLF], [FEDCON] shall have the right, to the extent permitted by law, and in addition to any other rights and remedies provided by law, or under this Subcontract Agreement, after giving seventy-two (72) hours written notice and curative period to any or all of the following remedies or courses of action without further notice." Doc. 68-1 at 4.

[7] Furthermore, Boland claimed in the letter that "similar conditions existed" from Monoliths 001 to 008 and 061 to 072, "where the limited available width on the protected side of the levee required that the temporary access road extend to the work front and then move in the same direction as the work front." Doc. 92-1 at Ex. A-3. Because GLF allegedly "performed its work at those locations without any issues," Boland asserted that GLF's basis for raising this contention was meritless. *Id.*

You are requested to submit a proposal detailing the cost and time impacts associated with this drawing discrepancy. In accordance with DFARS 252.243-7001, Pricing of Contract Modifications, your proposal should be broken down in sufficient detail for the analysis of the elements of labor, equipment, materials, supplies, and include appropriate markups, any contract time changes and impacts as a result of this change. If a subcontractor's quotation is used, it must also be sufficiently detailed for analysis of the aforementioned elements. This change is assigned CIN-019; any further correspondence relative thereto should make reference to this number. Please furnish your proposal for this modification to this office within two weeks from the date of this letter.

Doc. 68-6 at 2. A subsequent e-mail from Jeffrey Falati to FEDCON and Boland clarified that the affected stations were "~42+00 to ~45+00 and ~50+00 to ~62+00" instead. Docs. 68-7 at 5. The e-mail further stated that "[a]ny potential cost or time impacts will be negotiated accordingly, but work onsite shall not cease." *Id.*

FEDCON subsequently sent a letter to GLF on April 11, 2016, which specifically requested GLF to furnish FEDCON with GLF's proposal for CIN-019, as directed by the Corps' letter and e-mail above, by April 19, 2016. Doc. 68-7 at 1; 92-1 at Ex. A-4. The letter also included the access plan for the work from Monolith 072 southwards and specifically stated that deliveries of steel material from Monolith 072 to approximately Monolith 085 would "be by way of the temporary access road leading to the work front." *Id.* FEDCON instructed GLF that its letter constituted a notice to proceed and directed GLF "to proceed promptly with the accomplishment of the changed work by recommencing the work of [Work Front Two] at Monolith 072 in order to ensure the work between Baseline Station 480+00 and 487+00, that is required to performed outside of hurricane season, is completed" before the commencement of hurricane season on June 1, 2016. *Id.*

A fiery exchange of correspondence between GLF and FEDCON followed. GLF generally refused to perform the requisite work at Work Front Two, while FEDCON generally instructed GLF to resume such work. For example, in a letter dated April 20, 2016, FEDCON asserts that

there was "absolutely no justifiable reason for GLF not to have proceeded with the work as directed" in FEDCON's April 11, 2016 letter. Doc. 92-1 at Ex. A-5. FEDCON further claimed that none of the reasons in GLF's prior letter, to which FEDCON's letter was directed, served as valid reasons why GLF could not resume work at Monolith 072 and, even if such reasons were valid, issues would not arise until the work advanced to Monolith 086, which would not occur for at least six weeks. *Id.* FEDCON further instructed that the plan presented in the April 11, 2016 letter was being implemented because it was the most "cost effective" and had the "least impactful solution." *Id.* FEDCON advised that "[a]n equitable adjustment will be made and change order will be issued in accordance with Paragraph 10 of the [2.2 Project] Subcontract Agreement for any reasonable cost and time impacts that GLF incurs as a result of [the Corps'] acknowledgement of the differing site condition and resulting change to work." *Id.* FEDCON concludes the letter by providing GLF with seventy-two-hours' written notice and curative period per Paragraph 8.A of the 2.2 Project Subcontract Agreement to "cure the default by mobilizing and recommencing the work" at Work Front Two. *Id.*

Another letter from FEDCON, dated May 16, 2016, countered GLF's contentions that GLF's equipment would be "trapped" in an area following completion of the work and that GLF's performance of the work was predicated on the availability of 600-foot increments of work platform, which FEDCON had not provided. Doc. 92-1 at Ex. A-7. In response to these contentions, FEDCON asserted that there would be sufficient width available for GLF to remove its equipment after Monolith 072 was constructed and the work platform at Monolith 072 was "approximately 600 feet in length." *Id.* Nonetheless, FEDCON advised that GLF would have to commence its work at Monolith 076, which was allegedly the first monolith south of the area where work could be performed only during months outside of hurricane season, because "GLF

did not commence the work at Monolith 072 as previously directed and because it will undoubtedly be unable to recommence the work prior to the beginning of the hurricane season." *Id.* FEDCON enclosed a change order for the changed work, entitled "Subcontract Change Order Number 15," with the letter, although FEDCON clearly viewed such change order as neither necessary nor required. *Id.*

FEDCON issued the Notice of Default to GLF approximately seven days later, on or about May 23, 2016. Doc. 101 ¶22. The Notice of Default directed GLF to provide a plan describing its intention to proceed with the work from Monolith 076 to the southern end of the 2.2 Project. Doc. 68-8 at 1. The Notice of Default also reiterated FEDCON's position that GLF's failure to recommence the work at Monolith 072 had resulted in the work between Monoliths 072 and 075 being delayed until the conclusion of hurricane season on November 30, 2016, which resulted in a six-month delay to the schedule for the 2.2 Project. *Id.* FEDCON warned that it would declare the 2.2 Project Subcontract Agreement to be materially breached by GLF and terminated pursuant to Paragraph 8.A, unless GLF cured its default within seventy-two hours by providing a written plan "demonstrating [] and committing to" the recommencement of the work at Work Front Two from Monolith 076 southwards. *Id.*

GLF alleges that, following the issuance of the Notice of Default, it instructed FEDCON that preparing the plan for the work was FEDCON's responsibility and GLF was ready, willing, and able to undertake the work. *GLF II*, Doc. 1 ¶33. On or about May 27, 2016, FEDCON issued its notice of termination of the 2.2 Project Subcontract Agreement (the "Notice of Termination"). Doc. 101 ¶25. In relevant part, the Notice of Termination provided:

> Despite repeated directives from FEDCON, GLF has failed and refused to recommence the work south of Monolith 071. GLF's refusal to recommence the work as directed by FEDCON is a

material breach of the Subcontract Agreement and has resulted in significant delay to the Project Schedule.

Your letter of 26 May 2016 clearly confirms that, despite the claim of being "ready, willing and able" to proceed with the work, GLF has no intention of doing so absent FECON's acquiescence to GLF's demand to be immediately paid for its yet undetermined and unsupported costs of addressing the changed work conditions due to the differing site condition. The terms of the Subcontract Agreement do not mandate that FEDCON submit to such an unwarranted demand as a condition to GLF's recommencement of the work.

. . .

Accordingly, it is clear that GLF's position that it will not recommence work without the issuance of a change order that contains a price acceptable to GLF is a further material breach of the Subcontract Agreement.

Doc. 68-9 at 1.

The crux of GLF's argument in its motion is that there are no genuine issues of material fact as to these claims that could preclude entry of summary judgment in favor of GLF on these claims, as FEDCON's termination of the 2.2 Project Subcontract Agreement was wrongful. *Id.* at 8. Specifically, GLF asserts that FEDCON's termination of the 2.2 Project Subcontract Agreement based on GLF's alleged failure to maintain the project schedule and failure and refusal to abide by proper directives to recommence performance was improper because (i) GLF's requests for time extensions were pending at the time of termination; and (ii) FEDCON received a 224-day time extension as a result of the differing site condition and thus owed a commensurate time extension to GLF. *Id.*

GLF contends that it was owed an extension of time commensurate with the Corps' provision of an extension of time to FEDCON due to the differing site conditions at Work Front Two at the time FEDCON terminated the 2.2 Project Subcontract Agreement. *Id.* at 13. GLF further contends it had requests for time extensions and additional compensation pending at the

time of termination and the Corps had acknowledged the existence of the differing site condition, which subsequently led to the 224-day extension under CIN-019. *Id.* Thus, according to GLF, FEDCON terminated the 2.2 Project Subcontract Agreement for purported lack of progress and delay in schedule months before the expiration of the 2.2 Project Subcontract Agreement based on the Corps' extension of time and when GLF's requests for time extensions were pending and had not been resolved or responded to. *Id.* In sum, GLF argues, the pending nature of the request for an extension of time due to the access impediments arising from different site conditions at the time of FEDCON's termination renders such termination improper. *Id.* at 16.

In response, FEDCON asserts that it terminated the 2.2 Project Subcontract Agreement because GLF "willfully refus[ed] to comply with its obligations under the contract documents" and held "its work hostage unless FEDCON agreed to pay GLF excess payments to perform its agreed-upon work," rather than "merely falling behind on its work." Doc. 92 at 10. According to FEDCON, it had initially notified GLF of the differing site condition at Work Front Two and directed GLF to proceed with the work at Monolith 074, which it had stopped in July of 2015, on February 29, 2016. *Id.* at 4–5. GLF had apparently refused to abide by this directive. *Id.* at 5. The Corps acknowledged the differing site condition at Workfront 2 on April 7, 2016. *Id.* FEDCON asserts that it issued written directives to GLF to proceed with the work south of Monolith 071 on April 20, 2016, May 2, 2016, May 16, 2016, and May 23, 2016. *Id.* at 6. FEDCON maintains that it terminated the 2.2 Project Subcontract Agreement after GLF failed to respond with a written confirmation that it would remobilize, but it subsequently provided GLF another opportunity to supply its written commitment to proceed with the work, yet GLF purportedly failed to respond in accordance with the last demand and FEDCON's directive. *Id.* at 6. FEDCON asserts that it developed an alternative access plan to the relevant construction site, which utilized an available

road located on the Chevron plant. *Id.* FEDCON purportedly provided this plan to GLF pursuant to Paragraphs 10.A and 10.B of the 2.2 Project Subcontract Agreement, in conjunction with a directive to recommence work south of Monolith 071 (thereafter modified to south of Monolith 076), but GLF refused to perform its obligation and "demand[ed] to be paid an additional $500,000 per month, with a maximum payment of $5,000,000 in addition to existing contract balances pursuant to a written change order." *Id.* at 11. FEDCON further avers that GLF's cited case law is inapplicable and the evidence demonstrates that a time extension would have had no impact on GLF's refusal to perform its work because it was in severe financial trouble.

As the moving party, GLF carries the burden of establishing the absence of a genuine dispute as to any material fact and that it is entitled to judgment as a matter of law on its breach of contract claim and FEDCON's breach of contract counterclaim. GLF frames its argument by asserting that FEDCON's termination of the 2.2 Project Subcontract Agreement for GLF's lack of progress and scheduling deficiencies was wrongful because FEDCON failed to consider time extensions owed to GLF. Consequently, GLF asserts in its motion that FEDCON terminated GLF "for lack of progress and being behind on schedule" and that GLF was "owed time when it was terminated allegedly for non-performance that would result in delayed completion." Doc. 68 at 13, 16. As FEDCON highlights in its response, GLF's argument that FEDCON terminated the 2.2 Project Subcontract Agreement for GLF's lack of progress and falling behind on the 2.2 Project schedule is designed to trigger a line of case law from the United States Court of Federal Claims on which GLF relies.

The United States Court of Federal Claims has recognized that, in the context of the United States default-terminating a public contract with a contractor, "default-termination is a 'drastic sanction,' which should be imposed (or sustained) only for good grounds and on 'solid evidence.'"

*CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 371 (Fed. Cl. 1999) (quoting *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Fed. Cl. 1969)). This line of cases involves a specific burden-shifting framework. Indeed, the cases highlight that "[t]he *government* is charged with the burden of proving whether a default termination is justified." *Id.* (emphasis added) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987); *Fla. Engineered Constr. Prods. Corp. v. United States*, 41 Fed. Cl. 534, 538 (Fed. Cl. 1998)). "Once the *government* has satisfied this burden, the *contractor* is charged with showing that its failure was excusable." *Id.* (emphasis added) (citing *Fla. Engineered Cost. Prods. Corp.*, 41 Fed. Cl. at 538–39)).

GLF cites to cases where the *government* terminated a contract as a result of the *contractor*'s lack of progress and delay in schedule. Indeed, these cases involve contracts between the government and a contractor, rather than a contractual relationship between a contractor and a subcontractor. *E.g.*, *J.D. Hedin Constr. Co.*, 408 F.2d at 425; *Lassiter v. United States*, 60 Fed. Cl. 265, 265 (Fed. Cl. 2004); *Hannon Elec. Co. v. United States*, 31 Fed. Cl. 135, 138 (Fed. Cl. 1994). For example, in *CJP Contractors*, the General Services Administration awarded a contract to a contractor, which called for the replacement of a heating system at a General Services Administration facility in Virginia. 45 Fed. Cl. at 346–47. Pursuant to the contract's terms, the work was divided into two phases: Phase A, which the contractor was required to complete within 170 days of the notice to proceed, and Phase B, which the contractor was required to complete within 310 days of the notice to proceed. *Id.* at 347. General Services Administration default terminated the contract prior to the contract's completion date due to the contractor's purported failure to timely make progress on the work. *Id.* at 363. The default termination letter to the contractor briefly mentioned General Services Administration's prior instruction for the contractor to diligently pursue the work and cure its lack of performance, as well as the contractor's

insufficient response to a prior show cause letter. *Id.* GLF relies on this line of cases to argue that terminating a contractor for default based on late completion of a project is improper when there are pending requests for extension of time and that "numerous courts" have recognized that "an owner must decide all pending requests for extension[s] of time, and analyze the resulting schedule, before attempting to terminate a contractor for failing to keep up with the construction schedule."[8] Doc. 68 at 10, 12.

The Court questions the applicability of the line of cases from the United States Court of Federal Claims. Unlike the cited cases, in which the contractual relationship was between the Government and the contractor, the contractual relationship here was between contractor and sub-contractor. Furthermore, the 2.2 Project Subcontract Agreement provides that it is governed by the laws of Florida. Doc. 68-1 at 12. Besides comparing FEDCON's termination of the 2.2 Project Subcontract Agreement for "lack of progress and being behind on schedule" to similar terminations in the cited cases, GLF does not provide any convincing argument to demonstrate

---

[8] To support this later proposition, GLF cites two cases beyond the United States Court of Federal Claims. GLF first cites to *Commercial Contractors, Inc. v. United States Fidelity & Guaranty Company*, in which the former Fifth Circuit analyzed, under applicable Alabama law and specific provisions of a masonry subcontract, the subcontractor's argument that certain provisions of the subcontract were either waived or modified to provide extensions for delays caused by the contractor, other subcontractors, or bad weather. 524 F.2d 944, 951–55 (5th Cir. 1975). The subcontract contained a provision that gave the contractor the right to terminate if the subcontractor failed to prosecute its work according to the schedule. *Id.* at 955. In reversing the district court's holding and remanding the case for a new trial, the former Fifth Circuit explained that, assuming extensions were granted, the jury would be required to focus on whether the subcontractor would have performed its remaining working during the time period created by the extensions. *Id.* The federal appellate court explained that the contractor's termination would be wrongful if the jury determined that the subcontractor "would have performed the remainder of its work during the allowable extension period." Given the reliance on Alabama law and the express terms of the subcontract, the subcontractor's arguments, and the procedural posture of the case, the Court does not find this case persuasive for the proposition that FEDCON's termination of the 2.2 Project Subcontract Agreement was improper on the basis of any pending time extensions received or owed to GLF. GLF also cites *Indiana & Michigan Electric Company v. Terre Haute Industries, Inc.*, in which the Court of Appeals of Indiana upheld a trial court's finding that an owner breached a contract by discharging the contractor when the contractor was within the time afforded for an extended schedule. 507 N.E.2d 588, 599 (Ind. Ct. App. 1987). This holding was based, in part, on the appellate court's agreement with the contractor that ambiguities existed in the contract, which was governed by Indiana law. *Id.* at 598. The holding was also based on the contractor's inability to commence work until after the owner awarded the contract, which was several weeks past the contract's commencement date. *Id.* at 592, 598. In addressing this late award, the Indiana Court of Appeals recognized that "a custom in the industry that, where this is a late award, the completion date is shifted by the number of days of the delay of the award of the contract." *Id.* at 598. The facts of this case are distinguishable.

that the law regarding public contracts between the government and a contractor applies to the instant action, rather than Florida law. Indeed, GLF does not even address Florida law in its motion for summary judgment. GLF avers instead, without providing any support, that "such issues between an owner and contractor is no different from the existence of such issues between a contractor and subcontractor[,] such as FEDCON and GLF." Doc. 68 at 11.

GLF seemingly attempts to cure this deficiency through its reply, where it points to an unreported case from the United States District Court for the Eastern District of New York to argue that "at least one Federal District Court has applied the [rule that termination is improper where a time extension is pending] under circumstances where a subcontractor was terminated by a contractor on a Government project for alleged untimely completion, while the contractor sought and later received a time extension." Doc. 102 at 7 (citing *United States ex rel. W.P. Schaefer Construction Co., Inc. v. Veterans Contracting Group, Inc.*, No. 1:11-cv-4189, 2013 WL 6579752, at *1 (E.D.N.Y. Dec. 16, 2013)).

In *W.P. Schaefer Construction*, the United States Department of Veterans Affairs entered into a contract with Veterans Contracting Group, Inc. ("VCG") for VCG to restore two roads in a cemetery. 2013 WL 6579752, at *1. VCG subcontracted most of the work under the contract to W.P. Schaefer Construction Co., Inc. ("Schaefer"). *Id.* Schaefer encountered several delays during the course of its performance. *Id.* at *3–4. VCG sent a notice to cure to Schaefer on July 28, 2010, claiming that several items of work were "behind schedule" in violation of the Subcontract's "time is of the essence" clause. *Id.* at *4. A notice of default followed, but VCG did not terminate the subcontract at that time. *Id.* On September 3, 2010, the deadline for completion of the work, VCG requested an additional forty-eight days to complete the project from the government, attesting that several *bona fide* reasons supported the delay. *Id.* Notwithstanding this letter to the

government, VCG sent another notice to cure to Schaefer on September 6, 2010, which once again asserted that Schaefer had fallen behind schedule on numerous items of work and provided Schaefer with forty-eight hours to cure. *Id.* at *5. VCG thereafter terminated the subcontract on September 13, 2010, stating that Schaefer had "fallen behind schedule," in contravention of the Subcontract's "time is of the essence" clause. *Id.* at *6 (internal quotation marks omitted).

Schafer claimed that VCG's termination of the subcontract constituted a breach, whereas VCG responded that it terminated Schaefer for cause. *Id.* at *1. Following a bench trial, the court issued its findings of fact and conclusions of law. *Id.* Therein, the court analyzed the facts under New York law and ultimately concluded that VCG's termination was a breach of the subcontract. *Id.* at *7. In analyzing New York law, the court first looked to the doctrine of repudiation and, because the subcontract did not include a completion date or a progress schedule, principles for determining a reasonable time for performance. *Id.* at *6. The court recognized that the delays suffered by Schafer were not initially contemplated by the parties when they entered into the subcontract and were not attributable to any lack of diligence on behalf of Schaefer. *Id.* On this basis, the court found that VCG's termination of the subcontract was not justified by a purported breach of the "time is of the essence" clause. *Id.* More significantly, the court recognized that, under New York law, a covenant of good faith and fair dealing in the course of contract performance is implicit in all contracts, which prevents either party to a contract from engaging in conduct that has the effect of destroying or injuring the right of the other party to receive "the fruits of the contract." *Id.* (quoting *Dalton v. Educ. Testing Serv.* 663 N.E.2d 289, 291–92 (N.Y. 1995)) (internal quotation marks omitted). Because VCG represented to the government that the delays were due to unforeseen circumstances and used such representation to secure additional time for performance at the same time that it accused Schafer of unreasonably delaying performance, the

court held that VCG was obligated by good faith and fair dealing to acknowledge the unforeseen circumstances in the enforcement of the subcontract. *Id.* The court concluded that VCG's termination of the subcontract constituted a breach. *Id.* at *7.

Thus, like other cases that GLF relies on its motion, the relevant contract in *W.P. Schaefer Construction* was terminated as a result of a party purportedly falling behind on schedule. Unlike other cases that GLF relies on, however, in recognizing that VCG breached the subcontract and failed to acknowledge the unforeseen delays in its enforcement of the subcontract, the court relied on principles of good faith and fair dealing in the course of performance under New York law. The district court's reliance on New York law in examining the subcontract at issue, rather than any cases analyzing contracts between the government and a contractor from the United States Court of Federal Claims, is telling. Such reliance on New York law undercuts GLF's argument that "the existence of such issues between an owner and contractor is no different from the existence of such issues between a contractor and a subcontractor such as FEDCON and GLF." Doc. 68 at 11. Furthermore, although this case is offered for the proposition that termination is improper where a time extension is pending, the case does not apply the default termination standard from *CJP Contractors* and related cases that GLF emphasizes as applicable in its motion. Indeed, the court did not rely on any cases from the United States Court of Federal Claims, despite the existence of a claim pursuant to the Miller Act, like the instant action. 2013 WL 6579752, at *1.

To the extent that GLF now seeks to rely on principles of good faith and fair dealing, Florida law also recognizes an implied covenant of good faith and fair dealing in every contract. *Burger King Corp v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999), *cert denied* 528 U.S. 948 (1999). "This covenant is intended to protect 'the reasonable expectations of the contracting parties in light of their express agreement." *Id.* (quoting *Barnes v. Burger King Corp.*, 932 F. Supp.

1420, 1438 (S.D. Fla. 1996)). GLF does not provide any argument regarding an implied covenant of good faith and fair dealing, nor does it point to any cases applying Florida law in similar circumstances. Ultimately, this unreported case from a court outside of this Circuit, in which the court relied on New York law in reaching its holding, is not binding upon the Court and, upon consideration, the Court does not find the case persuasive for the proposition that FEDCON improperly terminated the 2.2 Project Subcontract Agreement because it failed to consider any time extensions owed to GLF. Nor does the Court find persuasive the line of cases from the United States Court of Federal Claims—both those cited by GLF and those analyzed by the Court upon its own review—as those cases all involved contracts between the government and a contractor. GLF has not sufficiently demonstrated the applicability of those cases to the instant action.

Regardless, even if the Court found GLF's cited cases to be persuasive, GLF fails to demonstrate the absence of a genuine dispute of material fact regarding whether GLF received or was owed any time extensions, thereby precluding summary judgment. GLF's assertions of fact to establish that *GLF* allegedly received or was owed time extensions either do not support that GLF received or was owed time extensions, or such assertions are sufficiently addressed by FEDCON in response to GLF's motion for summary judgment and present a genuine issue of material fact. Accordingly, GLF's motion for summary judgment is due to be denied.

### B. Defendants' Motion for Partial Summary Judgment

Defendants also move for "summary judgment on GLF's claims for damages arising out of GLF's usage of crane mat[t]ing due to alleged inadequate work platform construction on both construction projects." Doc. 72 at 2. "Crane mats" are "large pieces of timber similar to large and long railroad ties that are placed together on the ground and are used to support cranes." *Id.* at 6 n.2. To provide a surface on which GLF's cranes could operate, the Motion contends FEDCON

contractually agreed to provide the previously discussed work platforms under both the 2.2 Project and the 1.2a Project. *Id.* at 6. According to the motion, GLF has brought claims against FEDCON and Western for the procurement, utilization, and movement of certain crane matting that allegedly was required due to inadequate work platform construction in the following amounts: $794,876.38 for the 2.2 Project and $773,533.84 for the 1.2a Project.[9] *Id.* at 6. *Id.* Upon consideration, this motion is due to be denied.

Defendants make four arguments to establish their purported entitlement to summary judgment. First, Defendants rely on the contractual language of the 2.2 Project Subcontract Agreement and 1.2a Project Subcontract Agreement to assert that the subcontracts clearly do not place responsibility for crane mats on FEDCON. *Id.* at 12. Defendants argue that, as neither Subcontract Agreement explicitly addresses which entity had the responsibility to provide the crane matting, the provision of crane matting must be (a) part of the "materials," "equipment," or other machinery necessary to complete the work under the Subcontract Agreements; or (b) provided by "others" under Section III of the description of work. Doc. 72 at 12. Second, Defendants argue that even if the Subcontract Agreements were unclear, there is no genuine dispute of material fact that GLF accepted the responsibility to provide crane mats. (Doc. 72 at 13). Here, the Motion relies on record evidence to demonstrate that GLF always intended to provide the crane mats from the inception of both projects until their completion. *Id.*

Third, Defendants assert that GLF failed to provide timely notice of claims under Paragraph 10.B of the Subcontract Agreements, excerpted below, or it waived any claim for crane

---

[9] Lorenzo Ellis stated in his affidavit in opposition to Defendants' motion that the amount for the 2.2 Project REA should be revised to $820,776.11 and the amount for the 1.2a Project REA should be revised to $1,006,864.55. Doc. 84-1 ¶17. As his justification for such amendment, he explained that, following his review of Defendants' motion, he recognized that he included the original cost of the crane mats that were included in the estimate and bid in his calculation of the cost of crane mats and such original cost should be removed from the amounts included in the REAs. *Id.* at ¶16.

matting. *Id.* at 14. To question how nineteen months could have passed without any complaint or claim from GLF that it never expected to use crane mats, Defendants highlight that GLF did not make a claim for crane matting until April of 2016. *Id.* Defendants also make condition precedent and waiver arguments. *Id.* at 16–17. Finally, Defendants conclude by asserting that GLF fabricated its crane matting claim to FEDCON to offset substantial losses. *Id.* at 17.

GLF counters that Defendants' motion is fundamentally flawed because GLF's crane matting "claim," as described in the motion, is a request for equitable adjustment ("REA") for *additional* costs incurred due to FEDCON's alleged failure to construct the work platforms in accordance with the Subcontract Agreements. Doc. 83 at 2. GLF maintains that its utilization of crane mats during the entire course of performance during both projects resulted from FEDCON's material breach, and GLF never intended to utilize the crane mats for the entire course of performance. *Id.* at 5. GLF also attacks the motion's reliance on pre-contractual negotiations, citing the Subcontract Agreements' merger clause. GLF also attacks several of the motion's alleged "undisputed facts" individually with testimony from Lorenzo Ellis and Kenneth Yerk. *Id.* at 7–11.

Next, GLF argues that a genuine issue of material facts exists as to whether FEDCON is responsible for the cost of the additional crane mats that GLF was required to purchase in November of 2014 and thereafter, as well as associated labor and equipment costs for moving the crane mats on the purportedly improperly constructed platform. *Id.* at 12. If FEDCON's failure to provide properly constructed work platforms necessitated the need for GLF to utilize crane mats throughout the work, GLF argues, then additional costs associated with FEDCON furnishing the crane mats serves as an element of damages that GLF is entitled to recover, notwithstanding whether the Subcontract Agreements initially provided for FEDCON to furnish the crane mats. *Id.*

GLF concludes its response by arguing that it was not required to provide "timely" notice of the crane mat handling claims or, alternatively, it provided such notice to the extent required. *Id.* at 12–18. Again, GLF stresses that its use of the crane mats stemmed from FEDCON's breach. *Id.* at 12–13. GLF maintains that it provided "continuous notice" to FEDCON "regarding FEDCON's failure to construct the work platforms" in accordance with the Subcontract Agreements. *Id.* Contrary to Defendants' argument, GLF avers that the notice provisions of Paragraph 10.B of the Subcontract Agreements do not bar GLF's claims for additional costs, and Paragraph 13.B applies instead.

The Court begins its analysis by examining the plain language of the Subcontract Agreements. Defendants contend that the Subcontract Agreements clearly do not place responsibility for crane mats on FEDCON. "Under Florida law, contract interpretation begins with [the] plain meaning of words used, and words are 'to be given their natural, ordinary meaning.'" *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251 (S.D. Fla. 2017) (quoting *Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1371 (S.D. Fla. 2016)). Courts often turn to dictionary definitions for guidance to determine a term's common usage or ordinary meaning. *Id.* "It is well-established that the parties' intent governs contract construction and interpretation." *Id.* (internal quotation marks omitted). A court should aim to give effect to the parties' intent in accordance with "reason and probability as gleaned" from the contract and its purpose. *Id.* (quoting *Feldkamp v. Long Bay Partners, LLC*, 773 F. Supp. 2d 1273, 1280–81 (M.D. Fla. 2011) (internal alterations and quotation marks omitted). The intention of the parties, when not clearly expressed, may also be demonstrated by conduct. *Hirsch*, 232 F. Supp. 3d at 1251 (quoting *Smart v. Brownlee*, 195 So.2d 4, 5 (Fla. 4th DCA 1967)). Contract interpretation is generally a question of law, as "[q]uestions of fact arise only when an ambiguous contract term forces the court to turn to extrinsic

evidence of the parties' intent, such as precontract negotiations, to interpret the disputed term."

*Lawyers Title Ins. Corp. v. JDC (America) Corp.*, 52 F.3d 1575, 1580 (11th Cir. 1995) (applying

Florida law). In other words, "[t]he initial determination of whether a contract term is ambiguous

is a question of law for the court, and, if the facts of the case are not in dispute, the court will also

be able to resolve the ambiguity as a matter of law." *Escobar v. United Auto Ins. Co.*, 898 So.2d

952, 954 (Fla. 3d DCA 2005).

"An agreement is ambiguous if as a whole or by its terms and conditions it can reasonably

be interpreted in more than one way." *Nationstar Mortg. Co. v.* Levine, 216 So. 3d 711, 715 (Fla.

4th DCA 2017). There are two types of contractual ambiguities: "patent" ambiguities and "latent"

ambiguities." *Id.* Whereas patent ambiguities appear "on the face of the document," latent

ambiguities "do not become clear until extrinsic evidence is introduced and requires parties to

interpret the language in two or more possible ways." *Id.* "A significant difference between patent

ambiguities and latent ambiguities is that extrinsic evidence is *normally* not admissible to construe

the former because its admittance 'would allow a trial court to rewrite a contract with respect to a

matter the parties clearly contemplated when they drew their agreement.'" *Id.* (emphasis in

original) (quoting *Emergency Assocs. of Tampa, P.A. v. Sassano*, 664 So.2d 1000, 1002 (Fla. 2d

DCA 1995). A latent ambiguity "arises where the language employed is clear and intelligible and

suggests but a simple meaning, but some extrinsic fact or extraneous evidence creates a necessity

for interpretation or a choice among *two or more possible meanings*." *Mac-Gray Servs., Inc. v.*

*Savannah Assocs. of Sarasota*, LLC, 915 So.2d 657, 659 (Fla. 2d DCA 2005) (emphasis added)

(internal quotation marks omitted). A disputed issue of material fact will necessarily exist if a

contract contains a latent ambiguity affecting a disputed contract provision. *Id.* Unlike patent

ambiguities, with a few exceptions, extrinsic evidence is admissible for the purpose of resolving a

latent ambiguity. *Id.* "Typically, the parol evidence rule provides that evidence outside of the contractual language 'may be considered *only when* the contract language contains a latent ambiguity.'" *Fi-Evergreen Woods, LLC v. Robinson*, 135 So.3d 331, 336 (Fla. 5th DCA 2013) (emphasis added) (quoting *Duval Motors Co. v. Rogers*, 73 So.3d 261, 265 (Fla. 1st DCA 2011)).

Moreover, a contract's silence on parties' rights *may* create a latent ambiguity. *S. Crane Rentals, Inc. v. City of Gainesville*, 429 So.2d 771, 773 (Fla. 1st DCA 1983) ("[S]ilence can create a latent ambiguity in a contract under certain factual situations."); *Jenkins v. Eckerd Corp.*, 913 So.2d 43, 56 (Fla. 1st DCA 2005) ("Silence can create a latent ambiguity in some circumstances."). Specifically, Florida's Second District Court of Appeal has recognized:

> If a contract is clear, complete and unambiguous, there is no need for judicial construction. But even the most cautious drafting, and the most exhaustive imagination, rarely covers every possible contingency. If a contract fails to specify *the rights or duties of the parties under certain conditions or in certain situations*, then the occurrence of such condition or situation reveals an insufficiency in the contract not apparent from the face of the document. This insufficiency is called a latent ambiguity, and although (as previously noted) the Florida rule is that courts will not construe patent ambiguity, they are frequently called upon to determine what the parties would have included in their contract had they anticipated an occurrence which they in fact overlooked. In doing so, the function of the court is to ascertain, insofar as possible, the intent of the parties. Extrinsic evidence is not only admissible on that issue, but is frequently required where the instrument itself does not provide sufficiency insight into intent.

*Hunt v. First Nat'l Bank of Tampa*, 381 So. 2d 1194, 1197 (Fla. 2d DCA 1980) (emphasis added) (internal citations omitted). In *Hunt*, a lease addendum, which the parties executed simultaneously with the lease, provided that "rent was not to accrue until such time as [the] lessee completed its 'planned construction' [] on the demised premises of a small shopping center complementing the adjacent Kash N' Karry supermarket." *Id.* at 1196. Applying the rule above, the court found that the addendum contained latent ambiguities, thereby precluding summary judgment, because it did

not provide answers to: "(1) with respect to the moratorium on rent until completion of the planned construction, what happens if the construction is never completed; [and] (2) what happens if, instead of commencing and completing construction of the shopping center, appellee uses the premises for other purposes." *Id.* at 1196–97.

Here, Exhibit A to both Subcontract Agreements states that GLF "shall furnish and pay for all labor, materials, testing, scaffolding, machinery, transportation, tools, apparatus, shop drawings, samples, services, and equipment necessary to perform and satisfactorily complete the work as depicted on the contract drawings and set forth in the following section(s) of the specifications." Docs. 72-1 at Ex. A; 72-2 at Ex. A. In other words, GLF's obligation to furnish and pay for such items is tied to the contract drawings and certain sections of specifications. The parties have not provided any argument that the contract drawings address crane mats, nor have the parties provided the listed specifications. Nonetheless, Exhibit A lists GLF's responsibilities "for clarification." *Id.* As Defendants point out, these responsibilities include "all labor, materials, and equipment necessary to provide all required . . . manpower, materials, and equipment to work two independent work fronts simultaneously." *Id.* This provision does not explicitly address crane mats, nor does it contain an ambiguous term. Similarly, Defendants broadly claim that GLF was required to provide all labor, materials, and equipment that was necessary for "work related to the steep sheet piling, pipe piling, concrete, and other areas of the Project." Doc. 72 at 12. This argument overgeneralizes GLF's scope of work and fails to point to any specific contractual language. Indeed, a review of the scope of work reveals that GLF was required to provide all labor, materials, and equipment necessary to provide for items such as "[t]ouchup painting of steel sheet pile, steel pipe pile, and swing gate protective coating" and "[b]urning of holes in sheet piling for reinforcing steel placement as indicated by Note 3 on Sheet Identification S-705 and S-706 of the

contract drawings" Docs. 72-1 at Ex. A; 72-2 at Ex. A. These provisions do not address crane mats, nor has any type of ambiguous term been identified.[10]

Although admitting that the Subcontract Agreements do not mention which party is responsible for providing the crane mats, Defendants claim that the provision of crane mats "must" fall under either this language or the work platform language of Exhibit A. Exhibit A separately lists work to be performed by "others," which, as previously mentioned, includes the construction and maintenance of two (2) temporary work platforms on the protected side of the levy. "Other" is defined as "being the one (as of two or more) remaining or not included" and "being the one or ones distinct from that or those first mentioned or implied." Merriam-Webster Dictionary, *Other,* https://www.merriam-webster.com/dictionary/other (last visited October 14, 2019). A review of the Subcontract Agreements demonstrates that the parties intended for this term to refer, at minimum, to a party other than GLF.[11] Using "others" to refer to GLF in a scope of work that expressly refers to GLF as "Subcontractor" would be nonsensical. Of course, Defendants cite this provision instead to establish that its language demonstrates that FEDCON does not bear

---

[10] In their reply, Defendants point to the following provision of the Subcontract Agreements to impliedly suggest that GLF bore the responsibility of providing the crane mats: "[GLF] shall furnish and pay for all labor, materials, testing, scaffolding, machinery, equipment, tools, *apparatus*, shop drawings, samples, services, and *equipment necessary to perform and satisfactorily complete the work*." Doc. 103 (emphasis in original). Defendants' paraphrasing of the provision is inaccurate and unavailing. The Subcontract Agreements state that GLF must furnish and pay for such items "to perform and satisfactorily complete the work *as depicted on the contract drawings and set forth in the following section(s) of the specifications*." Docs. 72-1 at Ex. A; 72-2 at Ex. A (emphasis added). Consequently, as discussed above, GLF's obligation is tied to the contract drawings and specification, as clarified in Exhibit A. The Subcontract Agreements do not broadly require GLF to furnish and pay for such items "necessary to perform and satisfactorily complete" all work on the Projects.

[11] This conclusion is further bolstered by the scope of work for HBD Construction, Inc. in the Subcontract Agreement between HDB Construction, Inc. and FEDCON, which tasked HDB Construction with "[c]onstruction, maintenance, and removal of two (2) temporary work platforms on the protected side of the levee as directed by [FEDCON]." Doc. 72-3 at Ex. A. Defendants push back on this evidence in their reply, contending that the agreement between FEDCON and HDB does not confer any rights on GLF. Doc. 103 at 6.

responsibility for crane mats.[12] Assuming, without deciding, that this language also excludes FEDCON from providing the specified items of work, Defendants have not explained the basis for interpreting this particular clause as including the provision of crane mats. Indeed, as discussed in more detail below, the provision of the work platforms involves a much larger factual dispute between the parties. A review of this provision demonstrates that it does not expressly address crane mats, nor has any type of ambiguous term been identified.

Therefore, it is clear that the Subcontract Agreements are silent on the provision of crane mats, not that they contain terms susceptible to more than one meaning. A court errs by admitting parol evidence to determine the intentions of the parties in drafting the contract when such contract is unambiguous. *Olive v. Tampa Educ. Cable Consortium,* 723 So.2d 883, 884 (Fla. 2d DCA 1998). *See also Sears v. James Talcott, Inc.*, 174 So.2d 776, 778 (Fla. 2d DCA 1965) ("The parol evidence rule serves as a shield to protect a valid, complete and unambiguous written instrument from any verbal assault that would contradict, add to, or subtract from it, or affect its construction."). Further, Defendants' argument does not implicate the limited circumstances in which silence may create a latent ambiguity, as Defendants assert that FEDCON never carried the responsibility to provide crane mats pursuant to the Subcontract Agreements, not that the Subcontract Agreements fail to specify "under certain conditions or in certain situations" the rights or duties of FEDCON or GLF. *Hunt*, 381 So. 2d at 1197. The basis for any alleged ambiguity here is decidedly distinct from the circumstances in *Hunt*. Additionally, the Subcontract Agreements also contain merger clauses, which provide:

> This Subcontract Agreement constitutes the entire agreement between the parties hereto and all previous oral or written agreements relating to this Subcontract Agreement and the matters

---

[12] The Court notes Defendants' representation on page six of their motion, however, that "FEDCON contractually agreed to provide the work platforms referenced above and described more fully in Exhibit 'A' to the respective 2.2 and [1.2a] Subcontract Agreements." Doc. 72 at 6.

set forth herein and declared to be null and void. Any modification of this Subcontract Agreement must be made in writing and executed by the parties to this Subcontract Agreement, except as otherwise provided in this Subcontract Agreement.

Docs. 72-1 at 12; Docs. 72-2 at 12.

"Although the existence of a merger clause does not *per se* establish that the integration of the agreement is total, a merger clause is a highly persuasive statement that the parties intended the agreement to be totally integrated and generally works to prevent a party from introducing parol evidence to vary or contradict the written terms." *Jenkins*, 913 So.2d at 53. Thus, the merger clauses in the Subcontract Agreements are highly persuasive statements for the proposition that the parties intended the agreement to be totally integrated. Given these considerations, the Court declines to rely on evidence such as pre-contractual conversations to interpret the Subcontract Agreements. As the Subcontract Agreements are silent on the provision of crane mats, the Court further declines to use contractual interpretation to impose on the parties contractual rights or duties absent from the Subcontract Agreements. *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So.2d 744, 748 (Fla. 4th DCA 1971) ("[W]here a contract is simply silent as to a particular matter, that is, its language neither expressly nor by reasonable implication indicates that the parties intended to contract with respect to the matter, the court should not, under the guise of construction, impose contractual rights and duties on the parties which they themselves omitted.")

Even if the Subcontract Agreements do not place responsibility on FEDCON for providing the crane mats, however, such absence of responsibility does not fully address the pertinent issue. Indeed, GLF asserts that its purported "crane mat" claim is actually an REA arising from FEDCON's failure to properly construct the work platforms and, consequently, it is entitled to recover such additional costs associated with the crane mats as a proper element of its damages, regardless of whether the Subcontract Agreements provided for GLF to provide initially the crane

mats.[13] GLF admits that the record facts demonstrate that it included a "minimal quantity" of crane mats in its estimate for the projects. According to GLF, whether the Subcontract Agreements called for GLF to initially provide the crane mats necessary for its work its irrelevant because its claim for crane mats arises only from FEDCON's alleged breach by failing to provide the requisite work platforms. Of course, this issue implicates a much larger genuine dispute of material fact at the heart of the case: whether the work platforms provided to GLF were not in accordance with the Subcontract Agreements and, if so, whether FEDCON shoulders any responsibility for the inadequacy of such work platforms. With respect to the 2.2 Project, the issue of such purportedly inadequate work platforms also implicates FEDCON's termination of the 2.2 Project Subcontract Agreement.

The connection between the parties' arguments here and the larger factual dispute is demonstrated by the representations of the parties through their briefing. Citing to the affidavit of Lorenzo Ellis and the deposition of Kenneth Yerk, GLF maintains that FEDCON was required to provide GLF with a compacted work platform, which it failed to do. In his affidavit, Mr. Ellis testified that FEDCON's failure to supply a "compacted stabilized work platform to GLF" resulted

---

[13] Specifically, GLF asserts that its REA includes:

> a) Costs for labor, equipment and supervision costs on days when GLF could not perform at all due to the condition of the work platforms constructed by FEDCON through its subcontractor, HDB; b) costs for the labor and equipment required to move crane mats in the unsuitable conditions of the work platforms constructed by FEDCON not in accordance with the requirements of the Subcontract; and c) costs for the purchase of additional crane mat materials beyond the initial cost included in GLF's estimate and budget, which additional crane mats were required due to, i) the need to use crane mats throughout the course of the project, ii) the need to replace crane mats that were broken due to the need to remove the crane mats stuck in the mud, and iii) costs incurred to dispose of broken crane mats, all of which were incurred due to the manner in which FEDCON, through HDB, constructed the work platforms.

Doc. 83 at 1–2. Counsel for GLF also explained during oral argument that the claim extends beyond merely crane mats and serves as one of the elements of damages for breach of contract.

in, among other consequences: (i) costs for the purchase of crane mats materials, which GLF was required to utilize throughout the extent of its work on the Projects "to try to provide a stable surface from which to operate its cranes to drive sheet piles, pipe pile and pour concrete"; and (ii) additional labor that GLF required "to remove crane mats from the muddy surface of the work platform . . . and move them ahead of the crane to allow for continued operations." Doc. 84-1 ¶9. While Mr. Ellis acknowledged that GLF's estimate for the Projects "included a minimal amount for crane mats," he stated that the provided quantities and dollar amounts for crane mats in the initial estimate was "clearly not intended to include the quantity or cost of crane mats to use with the operation of the cranes throughout the course of the work, nor was it sufficient to cover the cost of crane mats that would be needed during the entire course of the Projects." *Id.* at ¶11. Consequently, Mr. Ellis purportedly began "compiling information and documentation for the purpose of preparing various claims/Requests for Equitable Adjustment (REAs) to be submitted to [FEDCON], which included GLF's REA for costs from the manner in which [FEDCON] prepared the work platform that it provided to GLF. *Id.* at ¶13. Similarly, Kenneth Yerk testified during his deposition that GLF did not plan on using crane mats for the entire length of the Projects. Doc. 86-1 at 82:21-25, 83:1. Mr. Yerk also testified, regarding an August 26, 2014 e-mail to FEDCON representatives, that GLF was not provided with a stable work platform. *Id.* at 77:21-25.

Defendants counter in their reply that neither of the Subcontract Agreements provide for a "compacted" work platform. On this basis, Defendants contend that GLF cannot "blame such costs on FEDCON's alleged failure to provide sufficient compaction." Doc. 103 at 5. Defendants contend that GLF fails to provide any evidence to justify its position that crane mats would have

been appropriate on only part of the project.[14] Of course, these arguments necessarily involve an analysis of whether FEDCON provided proper work platforms pursuant to the Subcontract Agreements. Because GLF's purported crane mats "claim," as set forth in its request for equitable adjustment, arises from FEDCON's purported failure to properly construct the work platforms, which necessarily involves a finding that the work platforms were indeed improperly designed, constructed, engineered, or provided, the Court will deny Defendants' motion for summary judgment on such basis. A genuine dispute of material fact exists as to this issue, and Defendants have not carried their burden.

The Court must address the notice issue, despite this finding, as it has the potential to defeat GLF's claim. Turning to the notice issue, Paragraph 10.B of the Subcontract Agreements provides:

> Any claim of [GLF] for adjustment for changes in the Work or for additional time or compensation must be made in writing and delivered to [FEDCON] within ten (10) days from the date of receipt by [GLF] of the notification of a change or of the requirement to perform specific work or from the date of the event that gives rise to the claim for additional time or compensation unless [FEDCON] grants in writing an additional period of time before the date of final payment under this Subcontract Agreement. If the Owner or the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Paragraph 13 hereof; but nothing provided in this clause shall excuse [GLF] from proceeding with the prosecution of the Work as changed or as directed or required by [FEDCON]. [GLF] shall proceed with prosecution of any portion of the Work which is the subject of a claim or dispute under this paragraph.

---

[14] Defendants also seek to undercut GLF's argument by reiterating that "GLF drastically underestimated its costs on the Projects," citing their argument for the same in the motion. Doc. 103 at 6. In their motion, Defendants aver that GLF sustained a "very substantial loss on the 2.2 Project as of July 15, 2015, to the extent that its costs incurred on the job exceeded the total amount of its subcontract price, despite the fact that it had completed less than 50% of the work required under the [2.2] Project Subcontract Agreement." Doc. 72 at 17. GLF's monthly report from October of 2015 is offered in support. Doc. 72-20. Although broadly claiming that the "Project file is rife with instances were senior managers with GLF exhorted the field personnel to develop claims against FEDCON for very questionable reasons," Defendants represent that detailing such reasons is "not necessary" for the purposes of the motion. Doc. 72 at 17. Defendants contend instead that such issues "will be amply described during trial." Consequently, the Court finds this argument, as presented, unpersuasive.

Doc. 72-1 at 6.

Defendants point out that this language provides that any claim on behalf of GLF for additional compensation must be made in writing and delivered to FEDCON within ten days of GLF's receipt "of the notification of a change or of the requirement to perform specific Work or from the date of the event that gives rise to the claim for additional compensation" (unless FEDCON grants an additional period of time before the final payment date in writing). *Id.* Defendants point to an e-mail from Kenneth Yerk of GLF to Francesco Senis from September of 2014, GLF's CEO, to argue that this photograph demonstrates the "first installation of pipe piles with a GLF crane sitting on timber crane mats on the 2.2 Project."[15] Doc. 72 at 15. Notably, Lorenzo Ellis testified in his affidavit that GLF's initial production work on the project commenced in July of 2014 with driving sheet piling for the 2.2 Project. Doc. 84-1 ¶8. Defendants contend that Francesco Senis' claim letter in April of 2016, shortly before FEDCON terminated GLF, was the first instance of FEDCON receiving a claim regarding the crane mats from GLF. This letter indicates that its purpose is to provide FEDCON "with GLF's claims for additional compensation for the additional costs that have been incurred due to impacts, actions and inaction on the part of [FEDCON] in regard to our Subcontract work on the referenced project." Doc. 72-18 at 1. The referenced project is only the 1.2a Project, not both projects. *Id.* GLF's "claims" include "Crane matting due to inadequate work platform construction," which totaled $773,533.84 in an attached claim summary. *Id.* at 3, 5.

But GLF contends that notice is not required pursuant to Paragraph 10.B because Paragraph 10.B is inapplicable. Indeed, GLF asserts that crane mats are included in its damages claim against

---

[15] Mr. Yerk's e-mail informs Mr. Senis that "we have begun pile driving in 3 out of the 4 work fronts," informs him that pile driving on all four work fronts would commence the following week, and attaches photographs of cranes on crane mats. (Doc. 72-15).

FEDCON as a result of FEDCON's purported failure to construct the work platforms in accordance with the Subcontract Agreements. As such, GLF asserts that such breach of contract damages are being asserted against FEDCON pursuant to Paragraph 13.B of the Subcontract Agreements, entitled "Disputes," which provides:

> Any claim arising out of or related to the Subcontract Agreement, other than those subject to Paragraph 13A, above, shall be submitted to [FEDCON] for an initial decision it its sole discretion. Thereafter, should [GLF] disagree with [FEDCON's] decision, such claim shall be subject to non-binding mediation, to be held in Orange County, Florida, as a condition precedent to the institution of legal or equitable proceedings by either party. The parties will endeavor to resolve their claims by mediation which, unless the parties agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. No legal or equitable proceeding may be filed until the conclusion of the mediation process and [GLF] agrees that it will stay any such proceeding that is instituted until the completion of the mediation.

Docs. 72-1 at 7; 72-2 at 7.[16]

In turn, Paragraph 13.A of the Subcontract Agreements provides: "The term 'claim' as utilized in this paragraph shall include any request for monetary or other relief, claim, appeal, or action arising from [GLF] for which Owner has, or may have, responsibility." *Id.* Paragraph 13.A states that, upon GLF's written request, FEDCON will agree to prosecute all claims submitted by GLF under the contractual remedial procedures set forth in the Prime Contract on behalf of, and to the extent required by, GLF. *Id.* As shown above, such claims are excepted from Paragraph 13.B.

GLF attempts to distinguish between Paragraphs 10.B and 13.B to support this argument. GLF first contends that Paragraph 10.B "addresses claims 'for adjustments *for changes in the Work*' and contemplates the potential for the Contractor submitting such claims to the Owner

---

[16] The parties agreed to waive the pre-suit mediation requirement. Doc. 83 at 16 n.2.

insofar as the Owner has, or may have, responsibility." Doc. 83 at 16 (emphasis in original). GLF asserts that claims arising out of the Subcontract Agreements "that are not related to extra or changed work" are addressed by Paragraph 13.B, which, unlike Paragraph 10.B, does not impose a specific time frame for submission of notice. *Id.* In other words, according to GLF, Paragraph 13.B is applicable because its claims for the incurred additional costs arise from FEDCON's purported failure to provide the proper work platforms and therefore "do not involve or include extra or changed work that could be submitted to the Owner for compensation or prosecuted by the Contractor." Doc. 83 at 17. On this basis, GLF contends that it "submitted its damages claims in relation to FEDCON's failure to construct the work platforms in accordance with the Subcontracts" in April of 2016. Presumably, GLF refers to the April 29, 2016 letter from GLF President and CEO Francesco Senis to David Boland. As previously mentioned, this letter appears to address only the 1.2a Project. However, there are other e-mails or letters from GLF to FEDCON addressing work platform issues for the Projects.

Despite GLF's characterization, Paragraph 10.B addresses more than merely "extra or changed work." *Id.* The plain language of the Paragraph, as amended by the parties, demonstrates that it also addresses claims by GLF for additional compensation. Thus, while Paragraph 10.B previously addressed only claims for changes in the work, the parties amended it to include claims for additional compensation. Defendants contend that GLF's framing of its claim for crane mat costs clearly falls within the scope of 10.B because GLF seeks "additional compensation" in the form of extra costs relating to additional labor and materials.

GLF responds that, in the alternative, even if 10.B applies, it provided sufficient notice under this Paragraph. Mr. Ellis testified through his affidavit that GLF continuously provided notice to FEDCON regarding "impacts to GLF's work due to the failure by [FEDCON] to properly

construct the work platform that was to be provided" under the Subcontract Agreements. Doc. 84-1 ¶10. Several e-mails and letters are attached to the affidavit. Mr. Ellis asserts that, in addition to the attached e-mails and letters, the purportedly substandard condition of the work platforms and their effect on GLF's performance was "discussed at most jobsite subcontractor meetings" and often served as "the subject of informal discussions on site" with FEDCON's supervisory personnel. Of course, to the extent that Paragraph 10.B is applicable, such in-person conversations are insufficient because Paragraph 10.B requires written notice.

There are several significant communications among the provided e-mails and letters. These letters and e-mails address both the 1.2a Project and the 2.2 Project. Regarding the 1.2a Project, there is an e-mail from Kenneth Yerk to PJ Pearson, project manager of FEDCON, dated October 27, 2014, stating that FEDCON has failed to provide and maintain the requisite work platform. The e-mail states that GLF has requested "the need for the platform to be constructed in accordance with our agreement" several times. Doc. 84-2 at 4. The subject line of the e-mail references the 1.2a Project. This e-mail shows that GLF advised FEDCON of FEDCON's purported failure to supply the work platforms for the 1.2a Project at least on October 27, 2014, if not earlier. There is also a letter from Lorenzo Ellis to Emile Lang of FEDCON, dated June 29, 2016, regarding "the temporary work platforms and FEDCON's preparation and maintenance thereof" for the 1.2a Project. *Id.* at 26. According to the letter, GLF was performing "remedial measures to the work platform such as crane matting" to "mitigate the impact of delays to date that are FEDCON's responsibility." *Id.* The letter advises that "GLF will be seeking reimbursement for additional costs and time incurred" with respect to these issues on the 1.2a Project. Of course, these materials are in addition to the April 29, 2016 letter from Francesco Senis to David Boland, which advised of the crane matting claim for the 1.2a Project, and a June 27, 2016 e-mail from

Lorenzo Ellis to Emilie Lang, which notified FEDCON that GLF would be seeking "compensation for costs incurred as a result of [FEDCON's] failure to provide the temporary structures" per the Subcontract Agreement. Doc. 72-19.

As for the 2.2 Project, there is an e-mail from Kenneth Yerk to Mark Ferguson of FEDCON, dated April 30, 2015, advising Mr. Ferguson that FEDCON was responsible for providing a sufficient work platform to perform the work and that FEDCON had "failed to cooperate and provide such modifications to safely perform the work" at Monolith 17 for the 2.2 Project. *Id.* at 16. Significantly, the e-mail provides: "The notice and pictures, attached, adheres to our formal notice requirement in accordance with our subcontract agreement." *Id.* This letter demonstrates that GLF advised FEDCON of FEDCON's purported failure to supply the work platforms for the 2.2 Project at least on October 27, 2014, if not earlier. Also included among these materials is a letter, dated December 31, 2015, from Francesco Senis to David Boland regarding the 2.2 Project. The letter provides that "FEDCON has failed to properly design the work platform and access road and this failure has greatly impacted GLF's production." *Id.* at 19. The letter further states that FEDCON has not "corrected this condition" and that GLF believes that FEDCON's actions or inactions "equate to active interference" and GLF was "documenting the daily impacts to be submitted upon project completion." *Id.*

Ultimately, this review of the parties' arguments and accompanying materials demonstrates that the Court need not decide for purposes of this Order whether Paragraph 10.B or Paragraph 13.B is the proper avenue. Defendants have not carried their burden on summary judgment, as a genuine issue of material fact exists as to the sufficiency of the purported notices. Whether GLF's communications contain the requisite content to constitute placing FEDCON on notice of GLF's crane mat claims is genuinely disputed. Relatedly, even if Paragraphs 10.B and

13.B are not mutually exclusive and Paragraph 10.B is applicable, as Defendants argue, a genuine issue of material fact exists as to whether GLF timely provided notice to FEDCON. Defendants have not sufficiently demonstrated the absence of a genuine issue of material fact regarding GLF's purported failure to timely submit notices for the 1.2a Project and the 2.2 Project.  By way of example, Defendants claim, without specifying which Project, that, based on GLF's provided e-mails and letters, GLF was required to submit notice as early as October of 2014. Significantly, though, GLF cites this correspondence among its evidence demonstrating that GLF provided sufficient notice to FEDCON.[17] Additionally, Defendants' argument that GLF's crane mat claim is nonsensical in light of evidence of GLF's intent to supply and use crane mats from the outset of the Projects is unpersuasive. As previously mentioned, GLF contends that it seeks the crane mat related costs arising from FEDCON's purported breach of the Subcontract Agreements. "[D]amages are recoverable so long as the actual consequence of breach of contract could have been reasonably expected to follow from the breach."[18] *Bland*, 206 F. Supp. 2d at 1211. Nor does the Court find persuasive Defendants' argument that GLF's purported efforts to provide notice must fail because its "crane mat claim was not mentioned as a potential claim in GLF's monthly

---

[17] Defendants argue that GLF failed to abide by a condition precedent in the Subcontract Agreements, which was providing timely notice of claims. "A condition precedent is an act or event, other than a lapse of time, that must occur before a binding contract will arise." *Land Co. of Osceola Cnty., LLC v. Genesis Concepts, Inc.*, 169 So. 3d 243, 247 (Fla. 4th DCA 2015) (internal quotation marks omitted). "A condition may be either a condition precedent to the formation of a contract or a condition precedent to performance under an existing contract." *Id.* (internal quotation marks omitted and original emphasis removed). "Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty." *Id.* (internal quotation marks omitted and original emphasis removed). Condition precedents are generally unfavored, and courts will only construe provisions as such based on the plain, unambiguous language or by necessary implication. *Id.* In light of these applicable principles, the language of the Subcontract Agreements, Defendant's terse argument, and GLF's arguments in its response, Defendants fail to sufficiently establish the notice provision of Paragraph 10.B serves as a condition precedent.

[18] Defendants also argue that GLF waived its right "to bring a claim based on the crane mats issue" because it repeatedly took "affirmative actions consistent with the understanding that providing the crane mats was its 'obligation' under the Subcontracts at issue." Doc. 72 at 16–17. For the same reasons set forth above, the Court finds this argument unpersuasive.

project report to its parent corporation until April 2016." Doc. 72 at 17. Defendants cite the April 29, 2016 letter regarding the 1.2a Project from GLF to Boland, not GLF's parent corporation, in support of this contention. The Court has already evaluated this letter in the context of the other correspondences mentioned above.

Thus, what notice FEDCON received and whether such notice was sufficient to satisfy the requirements of the Subcontract Agreements is genuinely disputed. *See Lake Eola Builders, LLC v. The Metropolitan at Lake Eola, LLC*, No. 6:05-cv-346-Orl-31DAB, 2006 WL 1360909, at *1 (M.D. Fla. May 17, 2006) (holding that contractor's e-mails and meeting minutes containing notices of events that caused delays and, in some instances, estimates of the extent of such delays, along with memorandum from owner's project manager regarding various delay issues, raised genuine dispute of material fact as to "what notice [the owner] received and whether such notice was sufficient to satisfy the requirements of the Contract"). Accordingly, for all of the foregoing reasons, Defendants' motion for summary judgment is due to be denied.

### C. F&D's Motion for Summary Judgment[19]

F&D seeks summary judgment on "all claims asserted against F&D by FEDCON." Doc. 74 at 1–2. As previously mentioned, FEDCON filed two counterclaims against F&D: one for the 1.2a Project and one for the 2.2 Project. This motion focuses only on the 2.2 Project, however. It is undisputed that, pursuant to the terms of the 2.2 Project Subcontract Agreement, GLF, as principal, and F&D, as surety, executed and delivered to FEDCON a payment and performance bond. Doc. 101 ¶ 12. FEDCON asserted a counterclaim against F&D pursuant to this bond, alleging

---

[19] Although styled as "GLF Construction Corporation's and Fidelity and Deposit Company of Maryland's Dispositive Motion for Summary Judgment," the Court interprets the motion to be on behalf of F&D, given the arguments therein. As F&D points out, GLF joined in the motion only to the extent that "FEDCON has failed to mitigate its damages." However, the motion "concerns the issue of F&D's obligations under the bond being absolved" and "strictly relates to the claims asserted by FEDCON against the bond issued by F&D." The Court finds this reasoning persuasive and declines to strike the motion.

that F&D materially breached the terms of the bond by failing to complete performance of the work under the 2.2 Project Subcontract Agreement following FEDCON's default termination of such Agreement. *GLF II*, Doc. 66 ¶37. For the reasons set forth below, the motion is due to be denied.

A summary of the pertinent facts is warranted. FEDCON issued the Notice of Default to GLF on May 23, 2016. Doc. 101 ¶22. A copy of this letter was sent to F&D, as GLF's surety for the payment and performance bond for the 2.2 Project. Docs. 74 at 3; 91 at 2. F&D responded to the Notice of Default on May 26, 2016. Doc. 74-4. In its response to this letter, F&D explained that FEDCON had not included the requisite information required "in a situation such as this" and F&D was "uncertain as to the exact nature and severity of the current performance problems involved." *Id.* at 1. Consequently, F&D requested FEDCON to provide executed copies of the payment bond and performance bond, underlying contractual documents, job schedules, and similar information so that F&D could "understand the exact situation under the contract terms." *Id.* FEDCON issued the Notice of Termination on the following day. Doc. 74-5. A copy of the Notice of Termination was sent to F&D. Docs. 74 at 3; 74-5 at 2; 91 at 6. F&D responded to the Notice of Termination on May 31, 2016, stating that F&D had begun its investigation. Doc. 74-6 at 1. F&D also reiterated its request for the information referenced in its May 26, 2016 letter, emphasizing that F&D's receipt of such information was a crucial component of its investigation and necessary to respond appropriately to FEDCON's letter. *Id.* It is undisputed that FEDCON subsequently filed a lawsuit against both GLF and F&D in Florida's Ninth Judicial Circuit Court on June 9, 2016, but F&D did not receive notice of the lawsuit until June 15, 2016. Doc. 101 ¶28. This lawsuit included a nearly identical claim for breach of bond against F&D, which alleged that F&D materially breached the terms of the bond by failing to complete performance of the work

under the 2.2 Project Subcontract Agreement following the Agreement's termination. Doc. 74-7 ¶¶30–35.

Two days later, on June 11, 2016, F&D acknowledged receipt of a letter from FEDCON, dated May 31, 2016, which enclosed certain documentation regarding GLF's performance. Doc. 74-8 at 1. F&D emphasized that it was reviewing this documentation and continuing with its investigation of the claim. *Id.* In addition to requesting documentation from GLF, F&D requested further documentation from FEDCON. *Id.* The letter stated that F&D was "entitled to a reasonable amount of time to review the requested documents once they are produced." *Id.* On June 17, 2016, FEDCON entered into a subcontract agreement with Kirkland Concrete, LLC, pursuant to which Kirkland was required to "complete floodwall structures from Monolith 072 through Monolith 118."[20] Doc. 74-9 at Ex. A. F&D alleges that FEDCON entered into this subcontract without any notice to F&D. Doc. 74 at 4. On or about June 21, 2016, F&D conducted a site visit of the 2.2 Project. Doc. 74-10 at 24:2–16. F&D also claims that it did not have knowledge that FEDCON had contracted with Kirkland at this point. Doc. 74 at 4.

On July 20, 2016, FEDCON entered into a subcontract agreement with Bo-Mac Contractors, LTD. Doc. 74-11 at 1. This subcontract agreement's scope of work addresses sheet piling and states that the work commences at Monolith 072 and proceeds to the end of the project.[21] Doc. 74-11 at Ex. A. F&D asserts that Bo-Mac did not begin work until several weeks after

---

[20] The subcontract agreement provides that the work is limited to: "(1) concrete foundations for Monoliths 042, 043, and 044 . . . (2) concrete walls for Monoliths 039, 040, 041, 042, 043, and 44; (3) complete floodwall structures from Monolith 072 through Monolith 118; and (4) all concrete slope pavement and concrete scour protection for the entire project." Doc. 74-9 at Ex. A. The subcontract agreement also required Kirkland work to be "tied-in seamlessly with any existing work performed by others." *Id.*

[21] The subcontract agreement's scope of work further provides, "All the sheet piling at Monoliths 072, 073, and 074 and a portion of the sheet piling at Monolith 075 has been completed by others. Additionally, nine (9) of the fifteen (15) pipe piles at Monolith 072 have been driven by others. All new work performed by the Subcontractor shall be tied-in seamlessly with any existing work performed by others." Doc. 74-11 at Ex. A.

entering into this subcontract agreement.[22] Doc. 74 at 5. Furthermore, FEDCON entered into a subcontract with Anders Construction on October 27, 2016, regarding pipe piling, welding, and tension connectors for the 2.2 Project. Doc. 74–12 at Ex. A. F&D asserts that FEDCON entered into these subcontracts without providing notice to F&D. Doc. 74 at 4–5.

F&D argues that FEDCON's choice to unilaterally complete the bonded 2.2 Project Subcontract Agreement without providing notice to F&D "deprived F&D of its performance rights under the bond[,] absolving F&D of any duties under the bond." *Id.* at 2. F&D argues that FEDCON materially breached the bond by not providing F&D with the requisite opportunity to analyze or weigh its options under the bond's terms. *Id.* at 9. F&D highlights that FEDCON filed suit against F&D less than two weeks after issuing the Notice of Termination. According to F&D, FEDCON had already hired completion contractors during the infancy of F&D's investigation, as well. *Id.* Finally, F&D asserts that FEDCON's material breach caused significant prejudice to F&D and GLF, chiefly citing FEDCON's "prematurely" hired replacement contractors and acknowledgments that FEDCON would not have incurred certain damages if F&D would have been allowed to complete its investigation and obtain a replacement contractor. *Id.* at 11–12. F&D asserts that FEDCON failed to mitigate its damage as a result, which constitute the damages that FEDCON now seeks from F&D and GLF. *Id.* at 12.

FEDCON argues that F&D failed to carry its burden of demonstrating the absence of a genuine issue of material fact regarding whether F&D is excused from its obligation under the performance bond and, even if F&D carried such burden, FEDCON's submitted evidence and facts preclude summary judgment in favor of F&D. Doc. 91 at 9. FEDCON first asserts that F&D fails

---

[22] David Boland testified during his deposition that he believed that Bo-Mac did not actually mobilize to begin its performance until later on, but stated that he would ultimately "defer to the project documents." Doc. 74-13 at 158:1–9.

to demonstrate that it was not provided sufficient notice under the performance bond. In support, FEDCON highlights that the performance bond incorporates the 2.2 Project Subcontract Agreement by reference. *Id.* at 5, 12. Consequently, FEDCON argues that the 2.2 Project Subcontract Agreement, as incorporated into the performance bond, explicitly permits the action taken by FEDCON and none of the provisions require a set notice period to F&D, as surety. Doc. 91 at 12. On this basis, FEDCON maintains that it acted in strict compliance with the contract documents, including the bond. *Id.* at 13.

FEDCON also asserts that F&D fails to demonstrate that it was otherwise inhibited from exercising its options under the performance bond. According to FEDCON, nothing about the filing of the lawsuit in Florida's Ninth Judicial Circuit Court concluded F&D's investigation or affected F&D's ability to investigate GLF's default and termination. *Id.* at 16. FEDCON also points to evidence demonstrating that F&D continued its investigation through mid-August of 2016 and its decision to direct its fact-finding through discovery following the filing of the lawsuit. *Id.* F&D purportedly was not aware of the hiring of Kirkland until mid-August, and thus, FEDCON argues, such hiring could not have inhibited F&D's exercise of its options under the performance bond. *Id.*

Finally, at oral argument, F&D identified a paragraph of the bond addressing F&D's rights in the event of GLF's default as the provision of the bond which FEDCON breached. Specifically, F&D argued that the paragraph sets forth F&D's rights and FEDCON deprived F&D of such rights. While F&D makes a passing reference to this paragraph in its motion, its argument is primarily grounded in the development of Florida suretyship case law, rather than the express terms of the bond. However, as discussed above, FEDCON argues that its actions strictly complied with the express terms of the 2.2 Project Subcontract Agreement, as incorporated into the bond.

Given the nature of the claim, the Court necessarily will address the plain language of the entire agreement first.

The purpose of a performance bond, such as the bond here, "is to guarantee the completion of the contract upon default by the contractor." *Am. Home Assurance Co. v. Larkin General Hosp., Ltd.*, 593 So.2d 195, 198 (Fla. 1992). "Ordinarily a performance bond only ensures the completion of the contract." *Id.* "A bond is a contract and, therefore, a bond is subject to the general law of contracts." *Id.* at 197. "The intent of the parties to the contract should govern the construction of a contract." *Id.* Furthermore, "[i]t is a generally accepted rule of contract law that, where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing." *OBS Co. v. Pace Constr. Corp.*, 588 So. 2d 404, 406 (Fla. 1990). Courts are required to "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So.2d 80, 84 (Fla. 2000).

"[T]he surety's liability for damages is limited to the express terms of the bond. Florida courts have long recognized that the liability of a surety should not be extended by implication beyond the terms of the contract, i.e., the performance bond." *Am. Home Assurance Co.*, 593 So.2d at 198 (internal citation omitted). Indeed, upon default, "the terms of the performance bond control the liability of the surety." *Id.* "When the unambiguous language of a contract sets forth the manner in which a party must exercise a remedy in the event of a default, the party is bound by and must strictly adhere to the language." *Sch. Bd. of Escambia Cnty., Fla. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351, 1353 (N.D. Fla. 2000) (citing *Colony Square Co. v. Prudential Ins. Co. of Am.*, 843 F.2d 479, 481 (11th Cir. 1988)). "Accordingly, failure to adhere to a performance bond notification requirement is a material breach, resulting in the loss of an obligee's rights under the

bond." *Id.* (citing *Ins. Co. of N. Am. V. Metro. Dade Cnty.*, 705 So.2d 33, 35 (Fla. 3d DCA 1997)).

"[U]nder Florida law, a surety is relieved of its obligation if the obligee/contractor fails to give the notice that is required *by the bond*." *CC-Aventura, Inc. v. Weitz Co., LLC*, 492 F. App'x 54, 56 (11th Cir. 2012) (emphasis added) (citing *Dooley & Mac Constructors, Inc. v. Devs. Surety & Indemn. Co.*, 972 So.2d 893 (Fla. 3d DCA 2007)).

The bond's terms preliminarily provide that the purpose of the bond is to provide protection to FEDCON, as the contractor, in the event of a default by GLF, as the sub-contractor, under the 2.2 Project Subcontract Agreement. Doc. 74-2 at 1. This purpose is consistent with the general purpose of performance bonds. The bond next addresses the event of such default:

> [T]here shall be no liability on the part of [GLF] or [F&D] under this bond to [FEDCON], or either of them, unless [FEDCON] shall make payments to [GLF], or to [F&D] in case it arranges for completion of the [2.2 Project] Subcontract Agreement upon default of [GLF], in accordance with the terms of said Subcontract Agreement as to payments, and [FEDCON] shall perform all the other obligations required to be performed under said Subcontract Agreement at the time and in the manner therein set forth.

*Id.* Furthermore, the bond provides that the obligation is null and void if GLF:

> 1. Shall promptly and faithfully perform all of the undertakings, covenants, terms, conditions, and agreements of said [2.2 Project] Subcontract Agreement during the original term of the Subcontract Agreement and any extensions thereof; and during the life of any warranty, guaranty, and indemnification required under the Subcontract Agreement; and
>
> 2. Shall promptly pay [FEDCON] all losses, costs, and damages (including, without limitation, damages resulting from delay in the performance of the Subcontract Agreement and damages from failure to discharge warranty, guaranty, and indemnity obligations), including all litigation-related costs and attorneys' fees that [FEDCON] may suffer by reason of [GLF's] default, and shall further fully reimburse and repay [FEDCON] for all outlays and expenses that [FEDCON] may incur in curing any default or alleged default.

*Id.* Otherwise, however, the obligation remains in full force, but subject to the following relevant condition:

. . .

> 2. Whenever [GLF] shall be, or declared by [FEDCON] to be, in default under the [2.2 Project] Subcontract Agreement, [FEDCON] having performed [FEDCON's] obligation thereunder, [F&D] shall promptly cause the default to be remedied; or shall (a) complete the Subcontract Agreement in accordance with its terms and conditions; or (b) promptly obtain a bid or bids for submission to [FEDCON] for completing the Subcontract Agreement in accordance with its terms and conditions, and upon the determination by [FEDCON] and [F&D] of the lowest responsible bidder, arrange for a Subcontract Agreement, herein after called "Subcontract of Completion," between such bidder, hereinafter called "Subcontractor," and [FEDCON], and [F&D] shall make available as such work progresses (even though there should be a default or a succession of defaults under the Subcontract or Subcontracts of Completion arranged under this paragraph) sufficient funds to pay the costs of completion under the terms of said Subcontract of Completion less the balance of the subcontract price and taking into consideration other costs and damages for which [F&D] may be liable hereunder . . . .

*Id.*

The focus is on this condition not only because F&D identified this paragraph as the provision of the bond that FEDCON breached, but because FEDCON issued the Notice of Termination to GLF, terminated the 2.2 Project Subcontract Agreement for GLF's default, and made a claim to F&D for GLF's performance. As the language above shows, when GLF is in default, or is declared by FEDCON to be in default, under the 2.2 Project Subcontract Agreement, FEDCON having performed its obligation thereunder, F&D must either promptly cause the default to be remedied; or (a) complete the 2.2 Project Subcontract Agreement in accordance with the terms and conditions therein; or (b) promptly obtain a bid or bids for submission to FEDCON for completion of the 2.2 Project Subcontract Agreement in accordance with its terms and conditions and, upon the determination by both FEDCON and F&D of the lowest responsible bidder, arrange

for a subcontract agreement between such bidder and FEDCON, with F&D making available as the work progresses sufficient funds to pay the costs of completion under such subcontract agreement. These options are F&D's rights under the express terms of the bond in the event of GLF's default.

The analysis does not stop there, however, because the bond also incorporates the 2.2 Project Subcontract Agreement. Doc. 74-2 at 1. Thus, a review of any pertinent provisions of the 2.2 Project Subcontract Agreement, which must be read harmoniously, is necessary. The 2.2 Project Subcontract sets forth the procedure that FEDCON utilized to issue the Notice of Default and Notice of Termination to GLF.[23] Specifically, Paragraph 8.A of the 2.2 Project Subcontract Agreement provides:

> Should [GLF] breach or fail to perform any of its obligations and undertakings herein, including, but not limited to, at any time . . . (5) Failing to proceed with the Work in the sequence directed by [FEDCON]; (6) Failing to prosecute the Work with promptness and diligence; (7) Causing stoppage, delay, or interference to the work of [FEDCON] or another subcontractor; [or] (8) Failing to perform the Work in compliance with the Contract Documents . . . then in any such events, each of which shall constitute a material breach or default of [GLF], [FEDCON] shall have the right, to the extent permitted by law, and in addition to any other rights and remedies provided by law, or under this Subcontract Agreement, after giving seventy-two (72) hours written notice and curative period to any or all of the following remedies or courses of action without further notice.

---

[23] The 2.2 Project Subcontract Agreement also has a paragraph addressing the bonds. Doc. 74-1 at 10. This paragraph merely provides that GLF must furnish a corporate surety performance bond and payment bond at its expense in the amount of $10,517,859.50 to FEDCON on the forms provided by FEDCON. *Id.* F&D and GLF executed the performance bond utilizing the form provided. Doc. 74-2 at 1. This paragraph also states that such bond is conditioned upon, among other things, "the full and faithful performance of [the 2.2 Project Subcontract Agreement] and upon the payment by [FEDCON] of all liabilities by it incurred in the performance of [the 2.2 Project Subcontract Agreement] and to [FEDCON] of any and all damages or forfeitures which may be sustained by reason of nonperformance or malperformance on the part of [GLF] of any of the provisions, covenants, or conditions" of the 2.2 Project Subcontract Agreement. Doc. 74-1 at 10.

Doc. 74-1 at 4. This paragraph proceeds to list the following remedies available to FEDCON in such event:

> (1) Expedite the Work in any way or manner whatsoever; (2) Complete any portion of this Subcontract Agreement and the Work provided for herein; . . . or (5) Declare this Subcontract Agreement to be materially breached by [GLF] and terminated, and contract for the completion of the Work with such persons, firms, or corporations as shall be necessary in the opinion of [FEDCON]. All costs whatsoever associated with completion of the Work or failure by [GLF] for any reason shall be charged against [GLF] and its surety including ten percent (10%) overhead and five percent (5%) profit and both [GLF] and its surety, if any, agree to pay [FEDCON] those costs as well as any other damages, expenses, interest, court costs, reasonable attorneys' fees, legal assistants' fees, expert witness fees and costs whether before filing suit, after filing suit, on any appeal, or in any bankruptcy. If [GLF] is not in breach, then such termination shall be deemed a termination for convenience pursuant to Paragraph 11.B hereof.

*Id.* at 4–5.

Thus, when reading the 2.2 Project Subcontract Agreement and the bond together, it is evident that the former sets forth the procedure by which FEDCON may issue a default notice and curative period to GLF in the event of GLF's breach or failure to perform any of its obligations, which may subsequently result in FEDCON declaring GLF to have materially breached the 2.2 Project Subcontract Agreement and terminating the same. Pursuant to the bond, once GLF is in default or declared to be in default under the terms of the 2.2 Project Subcontract Agreement by FEDCON, with FEDCON having performed its obligation thereunder, F&D must proceed with its options under the bond. As explained in further detail below, however, such default does not entitle FEDCON to prevent the ability of F&D, as surety, to protect itself pursuant to the options granted to it under the bond.

The above-discussed language of the bond and the 2.2 Project Subcontract Agreement is imperative to understanding the rights granted to F&D and FEDCON thereunder. FEDCON sent

the Notice of Default to GLF on May 23, 2016.[24] The Notice of Default indicated that GLF "continue[d] to remain in default" under the terms of the 2.2 Project Subcontract Agreement for its purported failure to recommence the work south of Monolith 072. Doc. 74-3 at 1. Contending that GLF's alleged failure to recommence the work constituted a breach or failure to perform under Paragraph 8.A of the 2.2 Project Subcontract Agreement, FEDCON provided GLF with the requisite seventy-two hour notice and cure period thereunder, warning that FEDCON would declare the 2.2 Project Subcontract Agreement to be materially breached and terminated "unless GLF cure[d] its default" within such notice period. *Id.* Finally, consistent with the language of Paragraph 8.A, the letter advised that all costs incurred by FEDCON arising from GLF's purported failure to perform and default would be "charged to GLF and its surety, including ten percent overhead and five percent profit." *Id.* Thus, the letter clearly indicated that GLF was in default and FEDCON was invoking the applicable mechanism under the 2.2 Project Subcontract Agreement for addressing GLF's default.

The letter also indicates that FEDCON forwarded a copy to F&D's claims department, thereby placing F&D on notice of the default, as envisioned by the terms of the bond.[25] Indeed,

---

[24] In his declaration, offered in support of FEDCON's response to F&D's motion for summary judgment, David Boland contends that FEDCON initially notified F&D of GLF's continuing default by a letter, dated February 29, 2016. Doc. 91-1 ¶14. The content of this letter is unclear, as neither party provided the letter to the Court. Regardless, as the parties have narrowed their focus for purposes of F&D's motion for summary judgment on the Notice of Default and Notice of Termination, the Court shall do the same.

[25] Neither party directly addresses whether the Notice of Default or Notice of Termination provided the requisite notice to invoke F&D's obligations under the bond. "A declaration of default sufficient to invoke the surety's obligations under the bond must be made in clear, direct, and unequivocal language." *L&A Contracting Co. v. S. Concrete Servs., Inc.*, 17 F.3d 106, 111 (5th Cir. 1994) (applying Florida law). "Given the consequences that following a declaration of default, it is vital that the declaration be made in terms sufficiently clear, direct, and unequivocal to inform the surety that the principal has defaulted on its obligations and the surety must immediately commence performing under the terms of the bond." *Id.* As stated herein, both notices, which were sent to F&D, advised of GLF's purported default, explained the purported nonperformance, and received responses from F&D. F&D contends that the Notice of Termination demanded that "F&D discharge its obligations under the terms of the Bond." Doc. 74 at 3. To the extent that F&D seeks to argue that the notices did not provide the sufficient notice, it has not raised the issue or carried its requisite burden for demonstrating that it is entitled to summary judgment on FEDCON's breach of bond claim as a result of any failure of either notice to provide requisite notice. Accordingly, the Court will presume for purposes of this Order that the notices are sufficient in this respect. *See Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d

the parties stipulate that a copy of the Notice of Default was sent to F&D. F&D's response thereto clearly indicates that it understood the Notice of Termination to serve as notice of GLF's default. Although F&D admitted in its response letter that it was unsure as to the severity of GLF's purported performance problems, it nonetheless acknowledged the seriousness of "[n]otices of potential defaults and/or terminations." Doc. 74-4 at 1. The letter indicated that F&D had initiated an investigation, as F&D requested further information for purposes of such investigation. The letter included a reservation of rights, stating that F&D was conducting its activities "under a full reservation of rights, claims, and defenses pursuant to the terms of the bond, the contract and the law." Doc. 74-4 at 2.

The Notice of Termination likewise informed F&D that GLF had been terminated for default. One day after F&D's response letter, FEDCON issued the Notice of Termination, in which, pursuant to Paragraph 8.A, FEDCON advised that: (i) it was terminating the 2.2 Project Subcontract Agreement for GLF's default; (ii) GLF had refused to recommence the work south of Monolith 071; (iii) GLF's refusal to recommence the work constituted a material breach of the 2.2 Project Subcontract Agreement; and (iv) all costs incurred by FEDCON as a result of GLF's failure to perform, default, and termination would be charged to GLF and F&D, inclusive of ten percent overhead and five percent profit. Doc. 74-5 at 1–2. A copy of the Notice of Termination was sent to F&D. F&D responded thereafter, once again acknowledging its investigation into FEDCON's claim of GLF's nonperformance, requesting further information, and proceeding under a reservation of rights. The subsequent letter from F&D on June 11, 2016, which requested further information from FEDCON, advised FEDCON that F&D was "entitled to a reasonable amount of

---

966, 978 (5th Cir. 1981) ("It is not the duty of the trial court to ferret out every possibly theory on which a party might recover and to put the party on notice of the facts that might support such a theory.")

time to review the requested documents once they are produced." Doc. 74-8 at 1. Thus, as of June 11, 2016, F&D had not exercised its options under the bond. And, as discussed extensively above, F&D did not exercise its performance options under the bond thereafter. Of course, the parties offer opposing justifications for F&D's failure to do so. The evidence demonstrates that FEDCON entered into subcontract agreements with Kirkland, Bo-Mac, and Anders on June 17, 2016, July 20, 2016, and October 27, 2016, respectively. In his declaration, David Boland admitted that each of these subcontracts was for work previously within GLF's scope of work. Docs. 74-, 74-11, 74-12.

Placing aside any analysis regarding the *merits* of FEDCON's decision to issue the Notice of Default and Notice of Termination to GLF, FEDCON utilized the *procedure* under Paragraph 8.A of the 2.2 Project Subcontract Agreement to issue the Notice of Default and Notice of Termination to GLF and F&D. The bond, by its plain language, provides that when GLF is in default, or declared by FEDCON to be in default, under the 2.2 Project Subcontract Agreement, with FEDCON having performed its obligations thereunder, F&D must pursue one of the provided options. As FEDCON points out, neither the 2.2 Project Subcontract Agreement nor the bond expressly require FEDCON to give to F&D the type of notice allegedly absent here.[26] FEDCON argues that the analysis should end here, citing to *Dooley v. Mack Constructors, Inc. v. Developers Surety & Indemnity Co.*, 972 So.2d 893 (Fla. 3d DCA 2007), in support of its argument that the fact that FEDCON acted in strict compliance with the 2.2 Project Subcontract Agreement, which

---

[26] A harmonious reading of the 2.2 Project Subcontract Agreement and the bond also reveals that Paragraph 10.A of the 2.2 Project Subcontract Agreement, which addresses changes in the work, does not require the surety to receive notice. Doc. 74-1 at 5. Specifically, this paragraph provides, in part, that FEDCON may issue a written order changing the Contract Documents and/or the terms of the Prime Contract without invaliding the 2.2 Project Subcontract Agreement and without providing notice to F&D. *Id.*

was incorporated into the bond, disposes of F&D's arguments under Florida law. The Court disagrees.

In *Dooley*, a general contractor was the obligee on a performance bond issued by Developers Surety and Indemnity Company on behalf of a masonry subcontractor. 972 So.2d at 894. The contractor-obligee failed to notify the surety of its purported right to cure the subcontractor's default by completing the masonry work by itself or otherwise arranging for the completion of the masonry work. *Id.* The bond in *Dooley* provided, in part: "Whenever Subcontractor shall be, and declared by Obligee to be in default under the Subcontract, the Obligee having performed its obligations thereunder, the Surety may promptly remedy the default or shall promptly" perform other options. *Id.* at 894 n.1. Additionally, the subcontract, which was made part of the entire agreement, provided that the contractor had the option, but not the obligation, to notify the subcontractor that, upon its failure to satisfactorily improve the rate of progress after forty-eight hours' notice, the contractor had the right to declare the subcontract breached and take charge of and complete the performance of the work with such persons, firms, or corporations as the contractor deemed necessary. *Id.* at 895. The subcontract further provided: "The Subcontractor, *its surety, and any bond* shall be liable to all losses, *damages*, and *expenses*, including attorneys' fees and costs incurred in the prosecution or defense of any action, suit, or arbitration incurred by or resulting to the Contractor on the above account." *Id.* (emphasis added).

The majority concluded that, although the contractor's failure to notify the surety would normally have resulted in a termination of the surety's obligations, such a rule was inapplicable in light of the subcontract's language. *Id.* at 894. The majority reasoned that reading the entire agreement together as a whole demonstrated that the contractor-obligee had the option of either calling upon the surety or, as it did, cure the subcontractor's default itself and subsequently hold

the "surety, and [the] bond . . . liable to all losses, damages, and expenses," without providing notice to the surety, which the subcontract simply did not mandate. *Id.* (internal quotation marks and original emphasis omitted). Accordingly, the majority reversed the trial court's entry of summary judgment in favor of the surety and remanded with instructions to enter summary judgment for the contractor-obligee.

A sharply worded dissent criticized the majority's holding, emphasizing that the majority misconstrued the contract documents, thereby improperly converting the bond into an insurance policy. *Id.* at 896. The dissent recognized the absence of any language in the subcontract that supplanted the notice provisions of the bond. *Id.* Significantly, under the bond, if the surety did not proceed to remedy the subcontractor's default with "reasonable promptness," the surety would be deemed to be in default on the bond fifteen days after receipt of any additional written notice to the surety from the obligee demanding that the surety perform its obligations pursuant to the bond, at which point the obligee would be entitled to enforce any remedy available to it. *Id.* at 898. Thus, not only did the contractor-obligee have a contractual right and option to call upon the surety to "make good" on the subcontractor's default, but the contractor-obligee also was required under the terms of the bond to provide the surety with notice and an opportunity to cure any default or otherwise cause the subcontract to be completed before it could enforce any remedy against the surety. *Id.* The dissent emphasized that the majority's holding violated the "settled interpretive principle" in surety law, as consistently recognized by Florida courts, that a surety's liability should not be extended by implication beyond the terms of the bond. *Id.*

As F&D points out, some federal courts have expressed skepticism of the majority's holding in *Dooley*. *E.g.*, *CC-Aventura, Inc. v. Weitz Co., LLC*, No. 06-21598-CIV, 2008 WL 2937856, at *7 (S.D. Fla. July 14, 2008) ("[T]o the extent the logic in *Dooley* would lead to a

different result here, the Court rejects it. Indeed, the Court finds the dissent in that case more persuasive."), *aff'd*, 492 F. App'x at 54 (framing the issue on appeal as whether the district court erred in not following the majority opinion in *Dooley* and affirming the district court); *Fidelity & Deposit Co. of Md. v. Jefferson Cnty. Comm'n*, No. 2:09-cv-247-JHH, 2010 WL 5487397, at *7 (N.D. Ala. Nov. 17, 2010) ("Instead, like the district court in the Southern District of Florida, *see* [*CC-Aventura*], the court is more persuaded by the reasoning of the dissent in *Dooley*."). The Court does not find *Dooley* persuasive because the bond in that case expressly provided a timeframe for the surety to act—with "reasonable promptness"—whereas the bond in the instant action does not contain such language. Regardless, the nature of F&D's claim requires the Court to look beyond the express terms of the bond.

"An obligee's action that deprives a surety of its ability to protect itself pursuant to the performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." *School Bd. of Escambia Cnty., Fla. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351, 1354 (N.D. Fla. 2000). In *School Board of Escambia County*, a Florida county school board entered into a contract with Southco for certain demolition work. Southco posted a performance bond covering the work, and TIG provided the bond, which named the school board as the obligee. *Id.* at 1352. After Southco completed the work, 12,000 cubic yards of demolition debris was uncovered in deep isolated pits. *Id.* The school board issued a change order to the subsequently hired construction company and notified TIG of a potential claim. *Id.* at 1352–53. At no point did the school board notify TIG of a breach of the demolition project. *Id.* at 1353. The court held that the school board forfeited its right against TIG under the performance bond because it did not notify TIG of a breach, thereby rendering the bond null and void. *Id.* at 1354. The failure to notify TIG ran contrary to the bond's notice requirement and "deprived TIG of its contractual

right to 'minimize [its] damages.'" *Id.* (alteration in original) (quoting *Ins. Co. of N. Am. v. Metro. Dade Cnty.*, 705 So.2d 33, 35 (Fla. 3d DCA 1997)).

In *PCL Construction Services, Inc v. Hanover Insurance Company*, this Court relied on *School Board of Escambia County* to explain that if the contractor-obligee had unilaterally hired alternate contractors to complete the subcontract without first providing the surety with an opportunity to exercise its completion options under the bond, such unilateral action would discharge the surety of its obligations under the bond. No. 6:11-cv-131-Orl-18DAB, 2012 WL 13102409, at *6 (M.D. Fla. Aug. 28, 2012) (Sharp, J.). The bond contained similar language to the bond in the instant action and likewise did not expressly require the contractor-obligee to provide notice of its intent to hire alternate contractors. *Id.* at *1. After finding the contractor's letters could reasonably be interpreted as providing the surety with notice of the default and denying the surety's motion for summary judgment on that issue, the Court addressed the surety's argument that the contractor did not give the surety a "meaningful opportunity" to fulfill its obligations under the bond and thus discharged the surety of its obligations. *Id.* at *6. Relying on *School Board of Escambia County*, the Court found that material issues of fact remained as to whether the contractor acted unilaterally. *Id.* Although the Court recognized that the contractor in *School Board of Escambia County* hired replacement contractors and allowed them to begin remedial or supplemental work before providing the surety with any notice, which differed from the facts in *PCL*, such recognition did not prevent the court from applying the rule.[27] *Id.* at *7 n.7.

Here, there is a genuine issue of material fact as to whether FEDCON deprived F&D of its ability to protect itself pursuant to the performance options in the bond. F&D responded to the

---

[27] Citing *Dooley*, the court also explained that a general contractor's completion of a subcontract without providing the surety an opportunity to exercise its completion options breaches the bond and discharges the surety's liability where the bond requires notice of default. *PCL Constr. Servs., Inc.*, 2012 WL 13102409, at *6.

Notice of Default and Notice of Termination on May 26, 2016, and May 31, 2016, respectively. Both letters included reservations of rights. FEDCON filed the state court lawsuit against GLF and F&D—alleging that F&D breached the terms of the bond by "failing to complete performance of the work under the [2.2 Project] Subcontract Agreement" following the termination of the same—nine days after F&D's second letter. Doc. 74-7 ¶33. While F&D argues that FEDCON materially breached the terms of the bond by failing to provide F&D with notice prior to contracting with the alternate subcontractors to complete the bonded work, thereby depriving F&D of the opportunity to conduct a reasonable investigation, F&D relies on this lawsuit in both its motion and reply to support a broader argument that F&D was prohibited from exercising its options under the bond. Ivette Gualdron, F&D's claims counsel, testified during her deposition that the filing of the lawsuit caused F&D's investigation to take "a different course" because "everything now ha[d] to be done through the litigation." Doc. 105-1 at 17:23-25, 18:1. Ms. Gualdron testified that F&D was prevented from speaking with any FEDCON personnel. *Id.* at 20:1-5. Ms. Gualdron also testified that F&D would typically conduct an investigation by holding on-site meetings and asking for information from "both sides" and "then, you know, follow-ups." *Id.* at 18:6-21.

Almost two weeks after sending its second letter to FEDCON, F&D sent the letter that requested eight additional categories of information from FEDCON at FEDCON's "earliest convenience." Doc. 74-8 at 1. Although F&D asserted that it was entitled to a "reasonable amount of time" to review the documents upon their production to F&D—again, at FEDCON's "earliest convenience"—the letter did not provide any indication of the expected length of F&D's investigation or a timeframe for making its decision under the terms of the bond, if at all. *Id.* F&D did not learn about the state court lawsuit until July 15, 2016. Ms. Gualdron emphasized that F&D did not make any decision to conclude its investigation, which F&D continued "to the best of [its]

ability with the limited information [it] had." Doc. 105-1 at 22:1-6. Yet, when asked whether she, as the person responsible for reviewing FEDCON's provided documentation, ever followed up with anyone at FEDCON regarding the requested documents, Ms. Gualdron testified that F&D "expected" the documents to "come through discovery." Doc. 143 at 26:3-8. Indeed, as FEDCON points out, Ms. Gualdron reiterated that F&D did not make a further request for information to either FEDCON or FEDCON's counsel to allow F&D to evaluate the merits of GLF's defenses to the termination once it learned of the state court lawsuit. *Id.* at 30:1-9. This is supported by the declaration of David Boland, which FEDCON offers in opposition to F&D's motion for summary judgment. Doc. 91-1 ¶24 ("F&D did not request any documents after June 11, 2016, did not follow-up with anyone at FEDCON, or otherwise communicate its decision on the Performance Bond to FEDCON."). Further, David Boland testified that around this time, after FEDCON issued the Notice of Termination, he had a telephone conversation with Larry Kriss, who served as the initial claims counsel for F&D. *Id.* ¶22. Mr. Kriss indicated that F&D would "likely defer to the position of its principal, GLF, and therefore, would not tender performance under the bond."[28] *Id.* Thus, there is evidence that F&D declined to timely pursue its performance options under the bond, thereby undercutting F&D's narrative that FEDCON deprived F&D of its performance options under the bond.

---

[28] F&D argues that the Court should strike David Boland's declaration because this statement in inconsistent with his prior deposition testimony, pointing to testimony from Boland's April 2, 2019 deposition. Doc. 105 at 7–8. The Court declines to do so. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984). This rule "should be applied 'sparingly because of the harsh effect [it] may have on a party's case.'" *Cableview Comm'ns of Jacksonville, Inc. v. Time Warner Cable Se., LLC*, No. 3:13-cv-306-J-34JRK, 2016 WL 128561, at *4 (M.D. Fla. Jan. 12, 2016) (quoting *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)). Mr. Boland testified during his deposition that he believed he had a conversation with Mr. Kriss and it was "possibly related" to F&D's reason for "not taking any action in terms of procurement or taking over the contract," but he could not recall specifically the details of the conversation. Doc. 105-2 at 61:1-14. This declaration is not inconsistent with this testimony, as Mr. Boland explains what he previously could not recall.

As for the replacement subcontractors, FEDCON entered into a subcontract with Kirkland on June 17, 2016, entered into a subcontract with Bo-Mac Contractors, Ltd. on July 20, 2016, and entered into a subcontract with Anders Construction, Inc. on October 27, 2016. Docs. 74-9, 74-11, 74-12. David Boland testified in his deposition that he did not believe that FEDCON provided pricing information for these subcontractors to F&D. Doc. 74-14 at 82:6-8. The Kirkland subcontract, the earliest of the three subcontracts, came twenty-five days after the Notice of Default and twenty-one days after the Notice of Termination. As FEDCON points out in its response, Ivette Gualdron testified that F&D did not learn of FEDCON's subcontracts with Kirkland and Bo-Mac until mid-August of 2016. Doc. 94-1 at 59:15-22. FEDCON questions how the hiring of these subcontractors could have had any effect on F&D's decisions or investigations if it was not aware of such subcontractors until mid-August. Each of these subcontracts also contained a termination for convenience clause. Docs. 74-9 at 5, 6; 74-11 at 5, 6; 74-12 at 5, 6. Thus, FEDCON argues, it could have terminated the agreements "if F&D had accepted the tender to complete the GLF scope of work and elected to use other subcontractors." Doc. 91-1 ¶28. Furthermore, Kirkland did not mobilize on the project until August 24, 2016; Bo-Mac did not mobilize on the project until August 8, 2016; and Anders did not mobilize on the project until July 26, 2016. Doc. 91-1 ¶¶25–28. These facts undercut the argument that FEDCON's mere engaging of the replacement contractors deprived F&D of its performance rights under the bond. F&D does not adequately respond to these facts in its reply.

In light of the evidence submitted by the parties and viewing the materials in the light most favorable to FEDCON as the non-moving party, there is a genuine issue of material fact as to whether FEDCON deprived F&D of its ability to protect itself per the performance options under the bond or whether F&D declined to timely pursue its performance options under the bond

instead. F&D has not demonstrated the absence of a genuine issue of material fact or that it is entitled to judgment a matter of law as to this issue. Accordingly, F&D's motion for summary judgment is due to be denied.[29]

## IV.  CONCLUSION

Accordingly, it is **ORDERED**:

1.  GLF Construction Corporation's Dispositive Motion for Partial Summary Judgment and Incorporated Memorandum in Support, Doc. 68, is **DENIED**.

2.  Defendants' Motion for Partial Summary Judgment and Incorporated Memorandum of Law In Support, Doc. 72, is **DENIED**.

3.  GLF Construction Corporation and Fidelity and Deposit Company of Maryland's Dispositive Motion for Summary Judgment and Incorporated Memorandum in Support, Doc. 74, is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on October 18, 2019.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

---

[29] As the Court finds there is a genuine dispute of material fact as to whether FEDCON breached the bond by depriving F&D of its ability to pursue its performance rights thereunder, the Court need not address F&D's argument that such purported breach caused significant prejudice to both F&D and GLF or its request that "any potential exposure and damages claimed by FEDCON against GLF be reduced by the increased amount of damages claimed due to FEDCON's failure to mitigate." Doc. 74 at 12–13.