UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA for the
use and benefit of GLF CONSTRUCTION
CORPORATION, a Florida profit
corporation,

      Plaintiff,

v.

FEDCON JOINT VENTURE, a Florida
joint venture, DAVID BOLAND, INC., a
Florida profit corporation, JT
CONSTRUCTION ENTERPRISE
CORPORATION, and WESTERN
SURETY COMPANY,

      Defendants.

_____

FEDCON JOINT VENTURE,

      Counter-Plaintiff,

v.

GLF CONSTRUCTION CORPORATION
and FIDELITY AND DEPOSIT
COMPANY OF MARYLAND,

      Counter-Defendants.

_____/

Case No: 8:17-cv-01932-T-36AAS
Consolidated with:
Case No. 8:17-cv-02650-T-36TGW

## **O P I N I O N   A N D   O R D E R**

## I.    **INTRODUCTION**

      This cause came before the Court during a thirteen-day bench trial held in October and

December of 2019.  Following the trial, the parties attended a mediation conference on January

22, 2020 (Doc. 230) and submitted proposed findings of fact and conclusions of law on May 1, 2020.  Docs. 249, 251.

Upon due consideration of the testimony, exhibits received into evidence, argument of counsel, and the applicable law, and being fully advised in the premises, the following, issued pursuant to Federal Rule of Civil Procedure 52(a), constitutes the Court's findings of fact and conclusions of law.[1]

## II.    FINDINGS OF FACT[2]

### A.  Overview of the Parties

1.       GLF Construction Corporation ("GLF") is a corporation organized and existing under the laws of Florida, and at all times material hereto was engaged in the business of providing heavy civil contracting services.[3] GLF's principal office and place of business is in Miami, Florida. *Id.* In addition to being registered in the state of Florida, GLF is also registered to do business in Louisiana.[4]

2.       FEDCON Joint Venture ("FEDCON") is a Florida-based joint venture comprised of David Boland, Inc. and JT Construction Enterprise Corporation ("JT

---

[1] Throughout this Opinion and Order, the Court may adopt, without attribution, language proposed by one party to the dispute. In all such instances, the findings or conclusions in question have become those of the Court, based on the Court's review of the evidence and the law. To the extent that any of the Court's findings of fact may be considered conclusions of law, or vice versa, they should be considered as such.

[2] These consolidated cases involve two complex and highly technical construction projects, each composed of two work fronts, the construction of which was subject to many factors over the course of numerous months, such as completion of predecessor activities and high river restrictions. The prime contracts and subcontracts are extensive. The parties entered over 3,400 exhibits into evidence. The trial transcript spans over 2,800 pages. Unfortunately, the parties' proposed findings of fact fall short in citing to this immense record. Factual findings are proposed with improper support, incomplete support, or no support at all. Incorrect calculations of damages are offered. Exhibits that are not in evidence are cited. Trial exhibit numbers are utilized rather than document numbers on CM/ECF, requiring the Court to match the trial exhibit to the corresponding document on CM/ECF. Against this backdrop, and without the expected assistance from the parties, the Court endeavored through the record to fashion these findings of fact.

[3] *Joint Pretrial Statement*, Doc. 134 ¶1. Unless noted otherwise, all citations to the parties' Joint Pretrial Statement reference Section IX thereof, which lists those facts admitted by the parties which required no proof at trial.

[4] *Id.*

Construction"), with its principal office and place of business located in Titusville, Florida.[5] Subsequent to its formation, FEDCON registered to do business in Louisiana and began providing general contracting services.[6] David Boland, Inc. is a corporation organized and existing under the laws of Florida, with its principal office and place of business located in Titusville, Florida.[7] In addition to being registered in Florida, David Boland, Inc. is also registered to do business in Louisiana and provides general contracting services as a joint venturer of FEDCON.[8] JT Construction is a corporation organized and existing under the laws of Florida, with its principal office and place of business located in Orange City, Florida.[9] In addition to being registered in Florida, JT Construction is also registered to do business in Louisiana.[10]

      3.      Western Surety Company ("Western") is a corporation organized and existing under the laws of South Dakota, with its principal office and place of business located in Sioux Falls, South Dakota.[11] At all times material hereto, Western was duly authorized to engage in the business of executing surety bonds in Florida and Louisiana.[12] Fidelity and Deposit Company of Maryland ("F&D") is a corporation organized and existing under the laws of Illinois.[13] At all times material hereto, F&D was duly authorized to engage in the business of executing surety bonds in Maryland and is authorized to do business in Florida.[14]

### B. Overview of the Projects

---

[5] *Id.* at ¶2. Given this joint venture, the Court refers to David Boland, Inc. as "FEDCON" on occasion throughout this Opinion and Order, which is a practice also utilized by the parties in their proposed findings of fact.
[6] *Id.*
[7] *Id.* at ¶3.
[8] *Id.*
[9] *Id.* at ¶4.
[10] *Id.*
[11] *Id.* at ¶5.
[12] *Id.*
[13] *Id.* at ¶6.
[14] *Id.*

### i.  The Prime Contracts and the Subcontract Agreements

4.      On October 18, 2013, FEDCON entered into a written contract No. W912P8-14-C-0002 with the United States Army Corps of Engineers (the "Corps" or "USACE") known as Resilient Features, WBV, HSDRRS, Mississippi River Levee, Oak Point to Augusta, WBV-MRL 2.2, Plaquemines Parish, Louisiana (the "2.2 Project").[15] The 2.2 Project called for FEDCON to repair and raise substandard levees along a section of the Mississippi River between the cities of Oak Point, Louisiana and Augusta, Louisiana.[16]

5.      Pursuant to the prime contract with the Corps for the 2.2 Project (the "2.2 Project Prime Contract"), and in accordance with the Miller Act, 40 U.S.C. § 3131, FEDCON, as principal, and Western, as surety, executed and delivered a payment bond to the Corps for the 2.2 Project.[17]

6.      On January 22, 2014, FEDCON entered into a written subcontract agreement with GLF for work on the 2.2 Project (the "2.2 Project Subcontract Agreement").[18] Pursuant to the terms of the 2.2 Project Subcontract Agreement, GLF, as principal, and F&D, as surety, executed and delivered to FEDCON a payment and performance bond.[19]

7.      Similarly, on December 5, 2013, FEDCON entered into a written contract No. W912P8-14- C-0011 with the Corps known as Resilient Features, WBV, HSDRRS, Mississippi River Levee, Augusta to Oakville (A), WBV-MRL 1.2a, Plaquemines Parish, Louisiana (the "1.2a Project").[20] The 1.2a Project called for FEDCON to repair and raise substandard levees along a section of the Mississippi River between the cities of Augusta, Louisiana and Oakville,

---

[15] *Id.* at ¶7.
[16] *Id.*
[17] *Id.* at ¶11.
[18] *Id.* at ¶9.
[19] *Id.* at ¶12.
[20] *Id.* at ¶8.

Louisiana.[21]

8.      Like the 2.2 Project, FEDCON, as principal, and Western, as surety, executed and delivered to the Corps a payment bond for the 1.2a Project, pursuant to the terms of the prime contract with the Corps for the 1.2a Project (the "1.2a Project Prime Contract"), and in accordance with the Miller Act, 40 U.S.C. § 3131.[22]

9.      Also like the 2.2 Project, FEDCON entered into a written subcontract agreement with GLF for work on the 1.2a Project (the "1.2a Project Subcontract Agreement") on April 3, 2014.[23] Pursuant to the terms of the 1.2a Project Subcontract Agreement, GLF Construction, as principal, and F&D, as surety, executed and delivered to FEDCON a payment and performance bond.[24]

10.      GLF was involved in FEDCON's bid for the projects, as FEDCON teamed up with GLF to develop a joint approach for how the projects could be performed and executed.[25] FEDCON used the information gathered from meetings with GLF's personnel to develop its bid.[26] During at least one of these meetings, GLF and FEDCON discussed production, as that would determine how long the projects would take to construct and implicate FEDCON's costs for the projects.[27] GLF and FEDCON also discussed what GLF needed or wanted in terms of a work platform, an access road, and the materials and provision thereof.[28] FEDCON used the production information to develop "prebid schedules" so that it knew the duration of the project, and, in terms of GLF's requests for an access road or a temporary work platform, FEDCON

---

[21] *Id.*
[22] *Id.* at ¶13.
[23] *Id.* at ¶10.
[24] *Id.* at ¶14.
[25] *Testimony of David Boland*, Doc. 232 at 97:2–4, 22–25, 98:1–3.
[26] *Id.* at 98:8–11.
[27] *Id.* at 98:18–24.
[28] *Id.* at 99:5–7.

ensured that it priced such work accordingly.[29]

11.     Both the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement expressly incorporated the respective prime contract for the projects, providing, in a section labeled "Contract Documents":

> 1.A This Subcontract Agreement consists of the terms and provisions of this agreement including all documents or specific portions of documents referred to herein or in the Exhibits attached hereto and hereby incorporated by reference thereby making them a part hereof, the Prime Contract between the Owner and the Contractor, including all general, supplementary and special conditions, drawings, specifications, addenda, forms, and documents forming a part of said Prime Contract and any modifications to the Prime Contract subsequent to the execution of this Subcontract Agreement; all of which are hereinafter referred to as the "Contract Documents."[30]

12.     Additionally, both the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement require GLF, as subcontractor, to furnish and pay for all labor, testing, materials, scaffold, transportation, machinery, tools, apparatus, required shop drawings, services, and equipment necessary to perform certain work described in an attached Exhibit "A," which, in turn, required GLF to furnish and provide these things to complete the work as depicted on the contract drawings and set forth in specifications pertaining to concrete, sheet piling, pile load tests, steel pipe piles, and scour protection.[31]

13.     Generally, the sequence of the work on both projects involved: (a) demolition of the scour protection and degrading of the existing earthen levee; (b) construction of temporary flood protection ("TFP"), which is an earthen levee that is faced with stone to provide flood protection on a temporary basis while the levee is breached and construction is in process; (c)

---

[29] *Id.* at 99:8–15.
[30] Docs. 216-116 at 1; 216-132 at 1.
[31] Docs. 216-116 at 2; 216-117 at 1; 216-132 at 2, 15.

driving of steel sheet piles, which were used to prevent water from seeping underneath the floodwall; (d) driving of steel pipe piles; (e) placement of the stabilization slab; (f) placement of reinforcing steel and the concrete foundation on the stabilization slab; and (g) placement of reinforcing steel and the concrete wall on the foundation.[32]

14.     Per the subcontracts for each project, GLF was to provide work on two work fronts for each project.[33]

15.     In accordance with FEDCON's coordination and scheduling of the work to be performed by its subcontractors, construction of the access road, construction of the TFP, and degrading of the levee and construction of the work platform, all of which were to be performed by FEDCON's subcontractor, HDB Construction, Inc. were predecessor work activities to GLF's performance of its work activities including driving sheet pilings, driving pipe pilings and forming and pouring the concrete T-walls (furnishing and placement of steel rebar which was performed by a separate subcontractor on each project was also a predecessor activity to GLF's pouring the concrete T-walls).[34]

16.     FEDCON received both compensable and non-compensable extensions of time from the Corps on each project such that the actual completion date aligns with the adjusted contract completion date for both projects and, as a result, FEDCON was not assessed any liquidated damages by the Corps on either project.[35]

### ii.  2.2 Project

17.     The 2.2 Project involved a 6,800-foot lineal foot floodwall constructed of concrete, steel sheet piles, steel pipe piles as a foundation, concrete foundation, and a concrete

---

[32] *See Testimony of David Boland*, Doc. 232 at 87:22–25, 90:23–25, 91:1–25, 92:1–25, 93:1–19.
[33] Docs. 216-116 at 2; 216-132 at 15; *Testimony of David Boland*, Doc. 233 at 55:18–25, 56:1.
[34] Doc. 134 ¶19.
[35] *Id.* at ¶34.

wall.[36] The 2.2 Project was comprised of 118 "monoliths," which is a 60-foot section of concrete wall.[37]

18.     The 2.2 Project Prime Contract limited FEDCON to working in 500 linear foot segments during high river season, which was from December 15 to June 15.[38] This section provided: "At such time that the Mississippi River is at or above elevation +11.0 feet, NAVD 88 (2004.65) at the Carrolton gage (New Orleans District), all construction work shall cease until such time as the elevation subsides below +11.0 feet."[39] Further, delays to FEDCON's operations from ceasing work when the Mississippi River exceeded elevation +11.0 feet were subject to the provisions of Section 00700 Contract Clause, entitled "DEFAULT (FIXED-PRICE CONSTRUCTION) (FAR 52.249-10), which provided, in part, that the time for completing the work shall be extended if, in the judgment of the Contracting Officer, the findings warrant such action.[40]

19.     FEDCON was required to "leave at least 300 linear feet of continuously undisturbed existing levee or completed levee/floodwall" between each 500 linear foot segment.[41] The 2.2 Project Prime Contract similarly limited FEDCON to work in 500 linear foot segments during hurricane season, which was from June 1 to November 30.[42] The 2.2 Project Prime Contract required construction from Stations 480+00 to 487+00—approximately Monolith 063 to Monolith 075—to be performed outside of hurricane season.[43] Further, the 2.2 Project Prime Contract limited FEDCON to a maximum of three separate segments during the life of the contract and

---

[36] *Testimony of David Boland*, Doc. 232 at 81:18–22.
[37] *Id.* at 83:17–22.
[38] Doc. 216-11 at 22.
[39] Doc. 216-12 at 1.
[40] *Id.*; Doc. 216-9 at 6.
[41] Doc. 216-11 at 22.
[42] *Id.* at 23.
[43] *Id.*; *Testimony of Lorenzo Ellis*, Doc. 241 at 20:8–10; *Testimony of David Boland*, Doc. 232 at 106:20–25.

required FEDCON to leave at least 300 linear feet of continuously undisturbed existing levee, or complete levee/floodwall as depicted in the contract drawings and specifications, between each 500 linear foot segment.[44]

20.     Pursuant to the 2.2 Project Subcontract Agreement, "others" were responsible for constructing and maintaining (1) "a temporary access road approximately 12' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee"; and (2) two temporary work platforms on the protected side of the levee, which were required to be "approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile, and [to] be removed and extended in segments for the entire length of the levee as the Work progresses."[45] As examined in greater detail herein, FEDCON, as contractor, and HDB Construction, Inc., as subcontractor, entered into a subcontract agreement, dated December 26, 2013, which required HDB to construct, maintain, and remove a temporary access road and two temporary work platforms for the 2.2 Project.[46]

### iii.  1.2 Project

21.     The 1.2a Project was located approximately one mile south of the 2.2 Project.[47] The 1.2a Project was of similar construction as the 2.2 Project, although the monoliths were a little shorter in length.[48]

22.     Under the 1.2a Project Subcontract Agreement, "others" were responsible for construction and maintaining (1) "a temporary access road approximately 15' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of

---

[44] Doc. 216-12 at 22–23.
[45] Docs. 216-117 at 2; 134 ¶18.
[46] Docs. 216-114 at 14, 215-115 at 1.
[47] *Testimony of David Boland*, Doc. 232 at 81:25, 82:1.
[48] *Id.* at 81:25, 82:1–2.

the levee" and (2) two temporary work platforms, on the protected side of the levee, approximately 30 feet wide by 600 feet long and located 10 feet from the centerline of the steel sheet pile, which would be removed and extended in segments for the entire length of the levee.[49] Like the 2.2 Project, FEDCON, as contractor, and HDB Construction, Inc., as subcontractor, entered into a subcontract agreement, dated March 11, 2014, which required HDB Construction to construct, maintain, and remove a temporary access road and two temporary access roads on the protected side of the levee.[50]

23.     Also like the 2.2 Project, the 1.2a Project Prime Contract required all construction work to cease when the Mississippi River reached or exceeded elevation +11 feet until the river subsided below such elevation.[51]

### C.  Procedural History

24.     GLF filed a lawsuit for the 2.2 Project, which includes three counts: (1) a Miller Act Payment Bond claim pursuant to 40 U.S.C. § 3133(b)(3) against FEDCON, David Bolan, Inc., JT Construction, and Western for damages resulting from FEDCON's various purported breaches of the 2.2 Project Subcontract Agreement; (2) a breach of contract claim against FEDCON, David Boland, Inc., and JT Construction, in which GLF alleges that FEDCON breached the 2.2 Project Subcontract Agreement; and (3) an unjust enrichment claim, pleaded in equity and in the alternative, against FEDCON, David Boland, Inc., and JT Construction.[52]

25.     In turn, FEDCON filed a counterclaim against GLF and F&D.[53] The counterclaim contains two counts: one count against GLF for its alleged material breach of the 2.2 Project

---

[49] Doc. 216-132 at 17.
[50] Doc. 219-881 at 1, 14–15.
[51] Doc. 216-50 at 12.
[52] *GLF Constr. Corp. v. FEDCON Joint Venture, et al.*, No. 8:17-cv-02650-T-36TGW (M.D. Fla.) (hereinafter, "*GLF II*"), Doc. 1 ¶¶37–59.
[53] *GLF II*, Doc. 66.

Subcontract Agreement (Count I) and one count against F&D for its alleged breach of the payment and performance bond (Count II).[54]

26.      GLF also filed a lawsuit against FEDCON, David Boland, Inc., JT Construction, and Western regarding GLF work on the 1.2a Project.[55] The operative, amended complaint for the 1.2a Project raises the same causes of action as GLF's complaint for the 2.2 Project: (1) a Miller Act Bond Payment claim, pursuant to 40 U.S.C. § 3133(b), against FEDCON, David Boland, Inc., JT Construction, and Western for damages resulting from FEDCON's various purported breaches of the 1.2a Project Subcontract Agreement; (2) breach of contract against FEDCON, David Boland, Inc., and JT Construction; and (3) an unjust enrichment claim against FEDCON, David Boland, Inc., and JT Construction, pleaded in equity and in the alternative.[56]

27.      FEDCON also filed a counterclaim against GLF and F&D in the lawsuit for the 1.2a Project, which, like the counterclaim for the 2.2 Project, contains two claims: (1) one claim of breach of contract against GLF, in which FEDCON alleges that GLF breached the 1.2a Project Subcontract Agreement; and (2) one claim for breach of bond against F&D.[57]

28.      The Court consolidated these two lawsuits on May 9, 2018.[58] The Court held a thirteen-day bench trial from October 21, 2019 – October 24, 2019, October 28 – October 31, 2019, and December 2, 2019 – December 6, 2019.

**D.  The AZ Sheet Piling Materials and the PZ Sheet Piling Materials**

29.      Beginning with GLF's claim on the 2.2 Project arising from FEDCON's decision to substitute AZ 13-770 ("AZ") steel sheet piling materials for the specified PZ-22

---

[54] *Id.* at ¶¶28–39.
[55] Docs. 1, 38.
[56] Doc. 38 ¶¶32–50.
[57] Doc. 13 ¶¶19–29.
[58] Doc. 45 at 1–2.

("PZ") steel sheet piling materials, the parties stipulated to GLF's entitlement to receive payment of the reasonable costs that it incurred in its efforts to drive the AZ steel sheet piling materials for thirty-eight (38) days prior to FEDCON's decision not to proceed with the AZ steel sheet piling materials, switch back to the specified PZ sheet piling materials, and remove the AZ materials.[59]

30.    The Contract Specifications are based upon the use of PZ steel sheet piling materials, but the Specifications also permit FEDCON to substitute for the PZ steel sheet piling materials with an approved equal material.[60]

31.    In its estimate and bid for the 2.2 Project, FEDCON included the cost of AZ steel sheet piling material.[61] Additionally, a  purchase order by FEDCON to Skyline Steel for the AZ materials included a provision that, if it became necessary for FEDCON to purchase PZ materials instead of the AZ materials, there would be an adjustment to the purchase order in the amount of $0.36/SF.[62] As such, FEDCON realized cost savings by including the price for AZ materials in its bid for the 2.2 Project, as reflected by this language in FEDCON's purchase order.[63]

32.    After FEDCON was awarded the 2.2 Project Prime Contract, FEDCON prepared a submittal package for the AZ sheet piling material and submitted it to the Corps for approval.[64] The Corps approved the use of the AZ steel sheet piling material, subject to FEDCON demonstrating the drivability of the AZ steel sheet piling to the required tip elevation in the field.[65] FEDCON notified Skyline Steel of the qualified approval of the AZ

---

[59] Doc. 134 ¶35.
[60] *Id.* at ¶36.
[61] *Id.* at ¶37.
[62] *Id.*
[63] *Testimony of Jason Whitworth*, Doc. 234 at 191:2–23; Doc. 219-784 at 1.
[64] Doc. 134 ¶38.
[65] *Id.*

steel sheet piling materials and advised Skyline that it would be required to demonstrate the drivability of the AZ steel sheet piling materials.[66]

33.     The 2.2 Project Subcontract Agreement was based upon FEDCON furnishing GLF with the specified PZ steel sheet piling materials and provided that sheet piles in accordance with Section 31 41 16.00 12 of the Specifications would be furnished and GLF's scope of work included driving the steel sheet piling materials.[67]

34.     On March 3, 2014, FEDCON provided GLF with a copy of the Corps-approved AZ steel sheet pile submittals.[68] Prior to March 3, 2014, FEDCON had not informed GLF that it intended to submit the substitute AZ steel sheet piling materials for PZ steel sheet piling material, upon which the Specifications were based.[69]

35.     On July 15, 2014, the first delivery of AZ steel sheet piles occurred.[70] FEDCON did not perform or conduct any testing to demonstrate the drivability of the AZ sheet piling materials prior to delivery of the materials on the 2.2 Project.[71] GLF's efforts to drive the AZ sheet pile materials became the testing to confirm drivability of the materials.[72]

36.     On July 18, 2014, GLF attempted to drive the AZ steel sheet piles for the first time.[73] On August 7, 2014, GLF outlined its position to FEDCON regarding the steel sheet pile driving issue.[74] On August 15, 2014 FEDCON conducted a conference call with GLF and various consultants to discuss the AZ steel sheet pile driving issue and to arrange for a "test driving" of

---

[66] *Id.*; *Testimony of David Boland*, Doc. 233 at 156:16–19; Docs. 219-952 at 1; 219-742 at 1.
[67] Doc. 134 ¶39.
[68] *Id.* at ¶40.
[69] *Id.*
[70] *Id.* at ¶41.
[71] Doc. 199 at 1.
[72] *Id.*
[73] Doc. 134 ¶42.
[74] *Id.* at ¶43.

the AZ steel sheet piles.[75]

37.     GLF unsuccessfully attempted to drive the AZ steel sheet piling materials for several weeks.[76]  At some point between August 1, 2014, and August 17, 2014, a consultant engaged by GLF transmitted a report to GLF regarding the installation of the sheet piles.[77] GLF did not provide this report to FEDCON, and Joseph Beaird, vice president and chief operations officer of GLF, testified that GLF did not do so because he did not necessarily agree with the report's conclusion.[78] He disagreed that providing the report to FEDCON may have accelerated FEDCON's decision not to use the AZ materials.[79]

38.     After communication between GLF and FEDCON regarding the issues that GLF encountered in attempting to drive the AZ steel sheet piling materials, it was decided that representatives of FEDCON and GLF, together with consultants that had been retained by both parties, would meet on site on August 19 and 20, 2014 to observe GLF's attempts to drive the AZ steel sheet piling materials.[80]

39.     On August 20, 2014, GLF conducted the driving of the AZ steel sheet piles with representatives and consultants for FEDCON and GLF observing.[81] This field test to determine the drivability of the AZ sheet piling materials demonstrated that there were drivability issues.[82]

40.     On August 22, 2014, GLF sent a letter to FEDCON, summarizing the recent events and requesting direction.[83] On August 26, 2014, the Corps notified FEDCON that its work on the 2.2 Project was behind schedule, and FEDCON was directed to submit a

---

[75] *Id.* at ¶44.
[76] *Id.* at ¶45.
[77] Doc. 220-206 at 1–3.
[78] *Testimony of Joseph Beaird*, Doc. 239 at 34:18–25.
[79] *Id.* at 35:2–7.
[80] *Id.*
[81] *Id.* at ¶46.
[82] *Testimony of David Boland*, Doc. 233 at 157:13–17.
[83] Doc. 134 ¶48.

narrative reflecting how it was going to complete the work within the contract duration.[84] FEDCON prepared and submitted a recovery schedule that revised the sequencing and logic for the work activities and reflected a revised plan to complete within the prime contract duration.[85] These revisions mitigated a portion of the prior delays to the 2.2 Project and all of the delays associated with the change from AZ steel sheet piling to PZ steel sheet piling.[86]

41.     On August 28, 2014, FEDCON informed GLF of the plan to change the type of steel sheet piles to the PZ sheet piles and directed GLF to remove the driven AZ sheet piles.[87]

42.     After receiving FEDCON's direction to remove all of the AZ materials, GLF notified FEDCON that GLF would be submitting a Request for Change Order for all costs incurred in its attempts to drive the AZ steel sheet piling materials, as well as all of the costs for removal and stacking of the AZ steel sheet piling materials for pick up by Skyline Steel, pursuant to FEDCON's direction.[88] In response, FEDCON advised that it would issue a change order for the costs associated with the test installation, pulling, and removal of the AZ steel sheet piling.[89]

43.     On September 4, 2014, FEDCON agreed that "the withdrawal and stacking costs to remove the AZ piles" constituted "a change to GLF's contract" and that the test driving efforts on August 19, 2014 were reimbursable.[90] FEDCON also acknowledged GLF's assertion that the selection of the AZ materials and subsequent reversion to the PZ materials constituted a change to the 2.2 Project Subcontract Agreement, the cost of which GLF was evaluating, and reserved

---

[84] *Id.* at ¶47.
[85] *Id.*
[86] *Id.*
[87] *Id.* at ¶49.
[88] *Id.* at ¶50.
[89] *Id.* at ¶51.
[90] Doc. 219-854 at 1.

its judgment until GLF submitted such costs for FEDCON's assessment.[91]

44.     On September 25, 2014, all of the AZ steel sheet piles were removed from the 2.2 Project site.[92] On September 28, 2014, FEDCON advised GLF that it awaited receipt of GLF's request for equitable adjustment.[93] On November 4, 2014, FEDCON inquired as to the status of GLF's request for equitable adjustment relating to the AZ materials.[94] On the same day, GLF submitted its request for equitable adjustment ("REA") for the costs associated with its attempts to drive the AZ steel sheet piling materials and the costs associated with the removal of the AZ materials and preparation of same for pick up by Skyline Steel, which request reflected $476,733.17 in direct costs and $60,800.00 in extended general conditions for a total of $537,573.17.[95] On November 25, 2014, GLF submitted its REA binder to FEDCON.[96]

45.     On February 24, 2015 FEDCON responded to GLF's REA, in which it denied GLF's request for the costs associated with GLF's efforts to drive the AZ materials, except for the FEDCON-directed test driving on August 20 and 21, 2014, and offered $30,902.79 for the costs for test driving, removal of the AZ materials, and preparation of same for pick up by Skyline Steel.[97]

46.     GLF's claim for FEDCON's decision to change the sheet piling materials from PZ to AZ is in the amount of $469,453.06.[98] The claim includes GLF's direct costs of labor, equipment and supervision, plus reasonable mark-up in accordance with the 2.2 Project Subcontract Agreement, in connection with GLF's attempts to drive the AZ materials, and

[91] *Id.*
[92] Doc. 134 ¶52.
[93] *Id.* at ¶53.
[94] *Id.* at ¶54.
[95] *Id.* at ¶56.
[96] *Id.* at ¶55.
[97] *Id.* at ¶57.
[98] Doc. 218-766 at 2.

pursuant to FEDCON's direction to remove and stack the AZ materials once the decision was made to revert back to the specified PZ materials.[99]

47.    During trial, Lorenzo Ellis, who served as project engineer and then project manager for GLF, testified regarding the details of this claim.[100] Although Mr. Ellis did not prepare the claim, he was involved in gathering information, he provided input, and he reviewed it before GLF submitted it to FEDCON.[101]

48.    FEDCON has stipulated that it will pay GLF the reasonable costs associated with attempts to drive and remove the AZ materials.[102] However, as part of the stipulation between the parties, FEDCON has asserted its defense that portions of GLF's costs in its claim are not recoverable under the 2.2 Project Subcontract Agreement, including 1) amounts not supported by GLF's certified payroll and 2) amounts not supported by GLF's daily time sheets.[103] FEDCON maintains that other costs included in GLF's claim are either unreasonable or delay related costs and are not recoverable pursuant to the provisions in Paragraphs 6.B, 10.A, and 12.B of the 2.2 Project Subcontract Agreement.[104] FEDCON also contends that the equipment costs included in GLF's claim should be based on EP-1110 rates and not the Blue Book rates.[105] Lastly, FEDCON contends that portions of GLF's costs are delay related damages and are therefore precluded by the terms and conditions of the 2.2 Project Subcontract Agreement.[106]

49.    According to FEDCON, GLF is owed only $139,801.80, which FEDCON credited towards the amount that GLF purportedly owes FEDCON arising out of its purported

---

[99] *Testimony of Lorenzo Ellis*, Doc. 240 at 177:13–25, 178:1–3.
[100] *See id.*
[101] *Id.* at 46:6–13, 171:7–23.
[102] Doc. 134 ¶58.
[103] *Id.* at ¶35.
[104] *Id.* at ¶58.
[105] *Id.* at ¶35.
[106] *Id.*

multiple breaches of the 2.2 Project Subcontract Agreement and its termination.[107] David Boland testified that this claim is excessive for a variety of reasons. First, Mr. Boland testified that he evaluated the submitted labor component against GLF's certified (*i.e.*, sworn) payrolls and reduced any labor claim amounts that were unsupported by the certified payrolls, which he considered to be more reliable than daily reports cited in the claim.[108] Second, Mr. Boland testified the most significant reduction he made stemmed from GLF's use of Blue Book equipment rates for the equipment, rather than EP 1110 rates.[109] The Court previously advised towards the conclusion of the trial that it would utilize the EP 1110 rates, rather than the Blue Book rates.[110] Third, David Boland testified that he eliminated all delay-related damages on the basis of the "no damage for delay" provision in the 2.2 Project Subcontract Agreement.[111] FEDCON witnesses testified that delays attributed to FEDCON resulting from the use of the AZ materials were originally determined to be 45 days and that revisions to logic and sequencing in the recovery schedule submitted by FEDCON reduced this delay by 39 days.[112]

50.     However, GLF maintains that all of the costs are direct costs of the attempts to drive the AZ materials, including the costs of labor and equipment, and supervision for the performance of that work, as well as the costs associated with labor and equipment that GLF had mobilized to perform the pipe pile driving work that was scheduled by FEDCON to follow the driving of the AZ materials by 38 days.[113] GLF further maintains that, to the extent that any of the costs are deemed to be delay related costs or damages, the provisions of the 2.2 Project

---

[107] Doc. 222-307 at 1.
[108] *Testimony of David Boland*, Doc. 232 at 186:5–25, 187:1–3.
[109] *Id.* at 187:4–8.
[110] Doc. 244 at 91:14–25, 92:1–4.
[111] *Testimony of David Boland*, Doc. 232 at 187:18–25, 188:1–3.
[112] *Testimony of David Boland*, Doc. 233 at 163:11–24; *Testimony of Angela Sist*, Doc. 235 at 17:7–12.
[113] Doc. 134 ¶59.

Subcontract Agreement do not bar or preclude recovery of same.[114]

### E. Temporary Access Roads

#### i. The Subcontracts, Section 01100, and EM 385-1-1

51.    As mentioned above, both the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement, in describing the work to be performed, required "others" to construct and maintain a temporary access road.  Jason Whitworth, who served as a construction manager on the 2.2 Project and 1.2a Project for FEDCON, testified that it was FEDCON's responsibility to provide access to GLF in order for GLF to have the ability to perform its work.[115] The access roads were needed for the delivery of materials.[116]

52.    The 2.2 Project Subcontract Agreement described the temporary access road to be provided as "a temporary access road approximately 12' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee."[117] Similarly, the 1.2a Project Subcontract Agreement described the temporary access road to be provided as "a temporary access road approximately 15' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee."[118]

53.    Each subcontract agreement incorporated Section 01100 of the respective prime contract, which was the "General Provisions" section.[119] Section 01100(3) stated that the "safety provisions as specified herein refer to the Sept[ember] 2008 edition of EM 385-1-1."[120] Section 01100(3)(g) addressed "Haul Roads," providing that, "[w]henever practical, one-way haul roads

---

[114] *Id.*
[115] *Testimony of Jason Whitworth*, Doc. 234 at 115:11–14, 117:17–22, 199:14–17.
[116] *Testimony of David Boland*, Doc. 232 at 210:11–17.
[117] Doc. 216-117 at 1.
[118] Doc. 216-132 at 17.
[119] *See Testimony of David Boland*, Doc. 233 at 13:17–19.
[120] Docs. 216-316 at 4; 216-49 at 12.

shall be used on this contract."[121] The 2.2 Project Prime Contract provided that haul roads "shall be graded and otherwise maintained to keep the surface free from potholes, ruts, and similar conditions that could result in unsafe operation."[122] The 2.2 Project Prime Contract also provided:

> One-way haul roads for off-the-road equipment: e.g., belly dumps, scrapers, and off-the-road trucks shall have a minimum usable width of 25-feet. One-way haul roads for over-the-road haulage equipment only (e.g., dump trucks, etc.) may be reduced to a usable width of 15-feet. When the Contracting Officer determines that it is impractical to obtain the required width for one-way haul roads (e.g., a road on top of a levee), a usable width of not less than 10-feet may be approved by the Contracting Officer, provided a positive means of traffic control is implemented."[123]

54.     Similarly, the 1.2a Project Prime Contract stated:

> When the Contracting Officer determines that it is impractical to obtain 15' minimum width for one-way haul roads (e.g., a road on top of a levee), a usable width of not less than 10-feet may be approved by the Contracting Officer, provided a positive means of traffic control is implemented.[124]

55.     EM 385-1-1 is a Safety and Health Requirements Manual published by the Corps.[125] The parties agree that EM 385-1-1 is part of the Contract Documents for the projects.[126]

56.     Section 4 of the EM 385-1-1 is entitled "Temporary Facilities" and subsection 04.B is entitled "Access/Haul Roads."[127] Subsection 04.B requires "[a]ccess/haul roads" to be "designed in accordance with current engineering criteria" and requires the Contractor to "provide the GDA with a copy of the Access/Haul Road Plan for review and acceptance."[128] Work on the haul road is prohibited from commencing until the GDA accepts the plan.[129] This subsection also

---

[121] Docs. 216-316 at 66; 216-49 at 14.
[122] Doc. 216-316 at 7.
[123] *Id.*
[124] Doc. 216-49 at 14.
[125] *See* Doc. 216-81 at 1.
[126] *Testimony of David Boland*, Doc. 233 at 14:16–18.
[127] Docs. 216-82 at 30, 216-83 at 1.
[128] Doc. 216-83 at 1.
[129] *Id.*

sets forth the items that such plan must address, including: drainage controls, "Maintenance requirements, including roadway hardness and smoothness and dust control"; and "Equipment usage, traffic density and hours of operation."[130] Other requirements are also listed.[131]

57.     Craig Hildebrandt, vice president of operations for David Boland, Inc., refused to acknowledge the applicability of section 4.B of EM 385-1-1 to the temporary access roads constructed by FEDCON.[132]

58.     As mentioned above, FEDCON entered into subcontracts with HDB Construction for the construction, maintenance, and removal of a temporary access road for the 2.2 Project and the 1.2a Project.

59.     The subcontract between HDB Construction and FEDCON for the 2.2 Project required HDB to construct, maintain, and remove a temporary access road for the 2.2 Project as directed by FEDON, which included the following:

> 1.  A compacted, level earth surface for use by cranes, concrete trucks, and other heavy vehicles during construction.
>
> 2.  Existing soil shall be utilized as fill.
>
> 3.  Approximately 12' wide and extended the length of the levee, located adjacent to the temporary work platform.
>
> 4.  A continuous layer of separator geotextile over the compacted earth and six (6) inches of compact aggregate over the geotextile.[133]

60.     The subcontract between HDB and FEDCON for the 1.2a Project required HDB to construct, maintain, and remove a temporary access road, including entries, on the protected side of the levee as directed by FEDCON, which included:

> 1.  A stabilized, compacted, and level earth subgrade with a compact aggregate surface for use by crane, concrete trucks, and other heavy

---

[130] *Id.*
[131] *Id.* at 2–3.
[132] *Testimony of Craig Hildebrandt*, Doc. 234 at 259:5–25, 260:1–21.
[133] Doc. 216-114 at 14.

vehicles during construction.

2.  Existing soil shall be utilized as fill.

3.  Approximately 15' wide and extending the length of the levee, located adjacent to the temporary work platform.

4.  A continuous layer of separator geotextile over the stabilized and compacted earth and six (6) inches of compacted, imported aggregate over the geotextile.

5.  Maintenance of the temporary access road does not include importing of additional aggregate material beyond the six (6) inches of compacted aggregate. Should additional imported aggregate material be needed for the maintenance of the temporary access road, through no fault of the Subcontractor, a subcontract agreement change order will be issued in accordance with Item VIII of Exhibit D.[134]

61.     Thus, FEDCON determined, per its subcontract with HDB for the 2.2 Project, that the temporary access road to be provided to GLF would be constructed using a "continuous layer of separator geotextile over the compacted import soil and six (6) inches of compacted aggregate over the geotextile."[135] Similarly, FEDCON determined, per its subcontract with HDB for the 1.2a Project, that the temporary access road to be provided to GLF would be constructed using a "continuous layer of separator geotextile over the stabilized and compacted earth and six (6) inches of compacted, imported aggregate over the geotextile."[136]

62.     HDB's subcontracts for the 1.2a Project and the 2.2 Project each contained Paragraph 1.A from the subcontract agreements between GLF and FEDCON regarding "Contract Documents."[137] Alonzo Harrison, HDB's president, testified as to his belief that EM 385-1-1 applied to the scope of work, including the temporary access roads, on the basis that it was

---

[134] Doc. 219-881 at 1, 14.
[135] Doc. 216-114 at 14; *Testimony of Alonzo Harrison*, Doc. 238 at 20:9–13.
[136] Doc. 219-881 at 14; *Testimony of Alonzo Harrison*, Doc. 238 at 20:9–13.
[137] Docs. 216-114 at 1; 219-991 at 1.

incorporated by reference into HDB's subcontract.[138] Harrison also testified that HDB did not propose the scope of work to be performed regarding the construction of the temporary access road; the design belonged to FEDCON.[139]

63.     When asked whether FEDCON provided HDB with any engineering data or recommendations or design regarding the construction of the access road during HDB's time on the project or at least during the first year, Harrison indicated that FEDCON had not provided anything aside from the contract itself and an overlay of the project showing where the project was.[140]

64.     In discussing the 2.2 Project, David Boland testified that he was not aware of FEDCON engaging the services of any engineering firm to provide a design for the temporary access road that resulted in the continuous layer of separator geotextile over compacted earth and six inches of compacted aggregate over the geotextile.[141] The construction of the temporary access roads utilizing a layer of geotextile fabric and six inches of rock, as called for in both HDB subcontracts, would have come from FEDCON's preconstruction department, although he was unsure who developed the specifications.[142] Although Hildebrandt maintained that he would not normally see an engineer determining this scope of work and that HDB's subcontract was "pretty typical" in his experience, he admitted that he had not seen any engineering work that was performed in connection with the scope of work.[143]

### ii.  Early Communications between GLF and FEDCON Regarding the Access Roads

65.     On February 1, 2014, Ken Yerk, an estimator and project manager of GLF, wrote

---

[138] *Testimony of Alonzo Harrison*, Doc. 238 at 16:1–2, 21:18–20.
[139] *Id.* at 20:9–13.
[140] *Id.* at 25:24–25, 26:1–3.
[141] *Testimony of David Boland*, Doc. 233 at 7:23–25, 8:1–3.
[142] *Testimony of Craig Hildebrandt*, Doc. 234 at 258:4–18.
[143] *Id.* at 258:23–25, 259:1–4.

to FEDCON regarding "the main travel way to access the test pile area" for the 2.2 Project, which was north of the Chevron plant, explaining that "firm and unyielding access, travel ways and crane pads" were necessary.[144] In a February 12, 2014 e-mail to Whitworth regarding the 2.2 Project, Yerk emphasized that "[a]ccess roads with sufficient width and stability must be installed and maintained" and asserted GLF's position that "FEDCON/Boland is responsible for providing adequate access to the site."[145] On August 24, 2014, Yerk emphasized, in the context of the 1.2a Project, FEDCON's responsibility to provide "safe and fluid access to the project, as GLF would not "sacrifice safety for production."[146] Yerk testified that GLF's position insofar as what it needed regarding the access road never changed during his time on the projects.[147]

66. Whitworth likewise described the access road on the 2.2 Project as "vital to efficient movement of materials and receiving of deliveries" on February 18, 2014.[148] The access plan provided by FEDCON to GLF for the 2.2 Project did not have any specific information regarding any approval of the design of the access road.[149]

67. On May 5, 2014, FEDCON, through Hildebrandt, recognized the importance of the temporary access road on the 2.2 Project as the shared access road for GLF, FEDCON, and for the other subcontractors and deliveries of materials such as pipe piles, sheet piles, concrete and steel rebar that were being furnished.[150] On June 12, 2014, as GLF geared up to start sheet pile driving on the first work front of the 2.2 Project, and prior to walking the cranes, GLF notified FEDCON of deficiencies in the construction of the access road on the 2.2 Project.[151] Ellis testified

---

[144] Docs. 219-741 at 1; *Testimony of Ken Yerk*, Doc. 237 at 30:24–25 31:1–2, 12–13.
[145] Doc. 216-862 at 1.
[146] Doc. 216-223 at 1.
[147] *Testimony of Ken Yerk*, Doc. 237 at 33:9–12.
[148] Doc. 216-312 at 1.
[149] *Testimony of Joseph Beaird*, Doc. 238 at 183:22–25.
[150] *See* Doc. 219-867 at 1.
[151] Doc. 219-870 at 1; *Testimony of Lorenzo Ellis*, Doc. 240 at 74:18–22.

that, as of that date, GLF had yet to begin "any real production," yet the "roads were already rutting."[152]

### iii. FEDCON Explores Engineering Solutions

68.     In June and July of 2014, FEDCON communicated with George Bloom, P.E., an engineer of Tensar, regarding the access road for the 1.2a Project, which Bloom referred to as the "haul road."[153] Tensar, a manufacturer of materials used in access roads, manufactures TX160.[154] On June 18, 2014, Mr. Bloom issued the following design recommendations to Pearson and Childers for the temporary access road: (1) 8 inches of 610 or 57 limestone; (2) one layer of Tensar TX 160; and (3) existing stabilized subbase; but (4) "[i]f you were to exclude the TX 160, your required fill would be 25 in."[155]

69.     On July 14, 2014, Mr. Bloom provided the following additional recommendation for the "north haul road": (1) 12 inches of Limestone (#610 or 57); (2) one layer of Tensar TX160; (3) one layer of 7 oz NW Geotextile; and (4) prepared subgrade.[156]

70.     Notwithstanding these recommendations from Mr. Bloom, David Boland was unaware of any changes made to HDB's subcontract after Pearson and Childers received these recommendations.[157] Similarly, FEDCON never provided HDB with any engineering data or recommendations regarding the construction of the access road on the 2.2 Project.[158]

71.     On September 26, 2014, Hildebrandt contacted an engineer with Royal Engineering to inquire if the engineer would be able to "provide engineering service to help with"

---

[152] *Testimony of Lorenzo Ellis*, Doc. 240 at 75:11–13.
[153] Docs. 219-894 at 1, 3; 219-896 at 1; *Testimony of David Boland*, Doc. 233 at 27:4–9.
[154] *Testimony of David Boland*, Doc. 233 at 27:1–3; Doc. 219-894 at 1, 3.
[155] Doc. 219-894 at 1.
[156] Doc. 219-896 at 1.
[157] *Testimony of David Boland*, Doc. 233 at 30:7–11,
[158] *Testimony of Alonzo Harrison*, Doc. 238 at 25:24–25, 26:1–3.

the projects.[159] Around this time, GLF commenced the production of driving sheet piling on the 2.2 Project after the delay and removal of the AZ materials.[160] In his communication to Royal Engineering, Hildebrandt described the roads as being constructed with "a geotextile separator fabric and 6" of aggregate as a wearing surface on the existing subgrade" and acknowledged that "[t]his system has held up poorly to the construction traffic to date . . . and we are just beginning the project."[161] Hildebrandt explained that a large amount of rutting occurred when the subgrade became saturated from either rains or the Mississippi River's rise and that adding aggregate was only a temporary solution.[162] FEDCON was concerned that costs may become excessive based on the required maintenance that had been performed.[163] As such, FEDCON inquired whether Royal Engineering "could help in designing a modification to our existing roadway that would be economical but would provide a significant reduction in the required maintenance."[164]

72.     Hildebrandt testified that, at that time, FEDCON was allowing the access roads to be used during and after rain events, which led to significant "rutting," which required repairs and maintenance.[165] The purpose of reaching out to the engineering firm was to determine whether there could be an "improvement" or "upgrade" to the access roads such that they would be able to perform better in those events and there would be less of a wait to use the roads.[166] By virtue of two prior projects that David Boland, Inc. had performed in the New Orleans area, David Boland, Inc. was aware of the type of rain events that each of these projects could experience.[167]

73.     Royal Engineering responded with a lumpsum proposal and a scope of work that

---

[159] Doc. 219-793 at 1; *Testimony of Craig Hildebrandt*, Doc. 234 at 208:6–8.
[160] *Testimony of David Boland*, Doc. 233 at 31:22–25, 32: 1–3.
[161] Doc. 219-793 at 1.
[162] *Id.*
[163] *Id.*
[164] *Id.*
[165] *Testimony of Craig Hildebrandt*, Doc. 234 at 208:18–24.
[166] *Id.* at 208:25, 209:1–5.
[167] *Testimony of David Boland*, Doc. 233 at 32:23–25, 33:1–4.

included a "greater design effort" than FEDCON's request.[168] FEDCON asked for a revised proposal, as FEDCON wanted "something more basic with just simple cross-section that [it] could utilize."[169] FEDCON ultimately did not engage Royal Engineering's services for upgrading the access roads because Royal Engineering declined.[170]

74.     Hildebrandt also communicated with a company called Duradek to explore a polymer mat solution in conjunction with the access roads, whereby polymer mats would be connected, but this proposed solution was abandoned as a result of the vehicles traversing the access road having different wheel bases and concerns regarding those vehicles' ability to stay on a narrow track.[171]

75.     Joel Boland of David Boland, Inc. also communicated with T. Howard Hornsby, Jr., a materials engineer with Burns Cooley Dennis, Inc.[172] On October 24, 2014, Hornsby advised Joel Boland of certain methods for a stabilized roadbed.[173] Assuming the roadbed could be lime-treated, one option was to mix 12 to 18 inches of lime and place a granular surface on top of the lime-treated soils.[174] "Liming" would depend on "how wet/weak the soils" were.[175] Another option was to utilize a combination of geotextile fabric and grid with a granular material.[176] The third option was to use crane mats, but "[b]ased on the length of the job, I would imagine crane mats are out as an option due to constructability and cost.[177] Finally, he advised that "fabric/grid and stone should work no matter the condition."[178]

---

[168] *Testimony of Craig Hildebrandt*, Doc. 234 at 209:15–21.
[169] *Id.* at 210:1–8.
[170] *Id.* at 210:15–25, 211:1–8.
[171] *Id.* at 211:25, 212:1–22.
[172] *See* Doc. 216-169 at 1.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*

76.     On November 23, 2014, Hildebrandt also contacted Hornsby regarding an idea he had to enhance the subgrade soil, which involved "mix[ing] in Portland" in small sections, using a loader to scrape up 12 inches, placing Tensar structural geogrid, and then "plac[ing] the 12" back and roll[ing] the entire 18"," which he estimated could be accomplished over a 6 to 8 hour period of time.[179]

77.     On December 8, 2014, Hornsby responded with four proposed design and construction options for the temporary access roads: (1) layer of geotextile fabric and 30 inches of crushed stone; (2) Tensar geogrid and geotextile fabric and 18 inches of crushed stone; (3) 12 inches of cement treated subgrade and 16 inches of crushed stone; and (4) geogrid, geotextile, 24 inches of sand, and 6 inches of crushed stone.[180] On the same date, Mr. Hornsby sent Mr. Hildebrandt a memorandum which addressed his recommendations and included the same four options for the design of the temporary access roads for both projects.[181] In his memorandum, Mr. Hornsby stated, "The table below provides our recommended construction roadway aggregate sections (four options) based on the in-situ subgrade strengths and our understanding of the planned daily construction truck traffic."[182]

78.     The materials included in Option 1 proposed by Mr. Hornsby included the same materials that were included in the scope of work in the subcontracts between FEDCON and HDB, but the thickness of the crushed stone was five (5) times the thickness included in those subcontracts.[183]

79.     In October of 2014, Yerk requested updates regarding the status of the access

---

[179] Doc. 219-807 at 1–2.
[180] Doc. 219-806 at 1.
[181] Doc. 219-807 at 3.
[182] *Id.* at 4.
[183] *Testimony of David Boland*, Doc. 233 at 42:5–15.

28

roads for the 1.2a Project and 2.2 Project.[184] Additionally, from November of 2014 through the beginning of January of 2015, GLF reiterated the need for the access roads to be upgraded and maintained.[185] Lorenzo Ellis of GLF testified that, from the onset of the projects, GLF had notified FEDCON that the roads were "woefully inadequate" for the type of work that GLF was doing.[186]

80.     However, notwithstanding the information that FEDCON had received from Royal Engineering and Burns Cooley Dennis, as well as the previous information from Mr. Bloom of Tensar, regarding design options for the temporary access roads that had "held up poorly to the construction traffic to date," Jason Whitworth wrote to GLF on December 9, 2014, regarding the 2.2 Project and stated that the temporary access road was "consistent with typical construction of temporary access roads in the area . . . ."[187] Whitworth claimed that the parameters of the temporary access road were defined "by the confines of the project requirements which were discussed during the preconstruction meeting at length" with Jeff Falati, who "approved Fedcon's Access Plan on 8 April 2014 (revision approved on 20 June 2014)."[188] While claiming that the access road complied with FEDCON's obligations under the 2.2 Project Subcontract Agreement and was "consistent with typical construction of temporary access roads in the area," Whitworth nonetheless advised that FEDCON acknowledged that "further enhancements to the temporary access road" would allow GLF to work on days otherwise classified as adverse weather days.[189] As such, FEDCON continued to pursue "alternate engineering solutions to minimize rain impacts" to the road, despite FEDCON's belief that these enhancements were "over and above" FEDCON's obligations, and GLF would be provided "an excusable delay for those days it cannot perform

---

[184] Docs. 219-877 at 2; 219-902 at 2.
[185] Docs. 219-910 at 1; 219-918 at 1; 219-919 at 1; 217-93 at 1.
[186] *Testimony of Lorenzo Ellis*, Doc. 240 at 77:3–8.
[187] Doc. 219-879 at 1.
[188] *Id.*
[189] *Id.*

critical path activities" as a result of inability to traverse the road.[190]

81.     Whitworth admitted during trial that his statement that the temporary access road was "typical" of access roads in the area was not based on his personal knowledge, as he did not have any experience in surveying prior projects in southeastern Louisiana, except to the extent that he may have "seen things" regarding "other construction projects" during the course of "four years," although he never "specifically went out and said, hey, how did they build this?"[191] On the other hand, around this time, representatives of GLF toured other local projects and saw that the roads on other projects were usable during rain events and immediately thereafter.[192] FEDCON did not retain an engineer in January of 2015 or even within the three months after January of 2015, despite its communications with engineers.[193]

### iv.   The Corps' Response

82.     On March 6, 2015, Francesco Senis, GLF's President and CEO, wrote to Jeff Falati and objected to the temporary facilities for the 2.2 Project, including the quality of the temporary access road.[194] He forwarded previous communications from GLF to FEDCON regarding the 2.2 Project, including: an October 25, 2014 letter from GLF requesting a status update regarding FEDCON's representation that it had engaged an engineer to design an access road capable of supporting the project traffic; a November 17, 2014 letter requesting that the access roads be upgraded and maintained in accordance with Section 04.B of EM 385-1-1; and a January 19, 2015 letter with accompanying photographs depicting a deteriorating access road.[195]

83.     David Boland testified, based on his over forty years of experience as a

---

[190] *Id.*
[191] *Testimony of Jason Whitworth*, Doc. 234 at 195:3–21.
[192] *Testimony of Ken Yerk*, Doc. 237 at 58:7–14, 20–25, 59:1–17.
[193] *Id.* at 59:18–23.
[194] *See* Doc. 219-935 at 2.
[195] *Id.* at 2–12.

government contractor, that the administrative contracting officer is responsible for enforcing the provisions of EM 385.[196]

84.     In November of 2015, Joseph Beaird of GLF contacted Jeff Falati regarding the applicability of access/haul road provisions of EM 385-1-1.[197] Mr. Beaird testified that, as an engineer, he was trying to understand why Mr. Falati was not enforcing these specifications.[198] In response, Mr. Falati acknowledged that he had not encountered the haul roads topic in this context before.[199] Mr. Falati acknowledged that both the EM385-1-1 and Section 1100 address haul roads, but he advised that "[n]ormally the prime or sub maintains their roadways as appropriate to facilitate construction."[200] He also stated that "[d]ifferent contractors install their roads with different materials and maintain them differently. For the most part, the issue is left to the contractor's discretion."[201]

85.     When asked whether a contractor would be required to provide engineering work in accordance with Section 0.4B of EM 385-1-1, assuming that Section 0.4B was applicable, Mr. Falati, who testified by deposition, explained that access plans received by the Corps typically do not "go into detail in design criteria" and do not include engineering design of new roads, but instead consist of a "plan view sheet of the project with some draw in arrows" demonstrating the access.[202] Thus, to the extent that engineering work needed to be done or was done, an access plan submittal typically would not include such engineering work and access plans are often approved without engineering work.[203] As such, the Corps did not require any engineering calculations for

---

[196] *Testimony of David Boland*, Doc. 232 at 128:18–25, 129:1–2.
[197] Doc. 216-262 at 1.
[198] *Testimony of Joseph Beaird*, Doc. 239 at 28:21–25, 29:1–2.
[199] Doc. 216-262 at 1.
[200] Doc. 216-262 at 1.
[201] *Id.*
[202] *Testimony of Jeff Falati*, Doc. 235 at 203:2–16.
[203] *Id.* at 203:17–25.

the access plan submittal.[204] Of course, whether the Corps required access plans to be engineered upon submission is an issue distinct from whether the access roads, as constructed, were engineered. David Boland also recognized that the Corps did not design the access roads such that FEDCON had to submit a specific design for approval.[205]

86.     Mr. Falati also explained that the Corps typically stays out of disputes with subcontractors and prime contractors regarding haul roads, unless there is something "imminently dangerous."[206] Rather, it is the "responsibility of the prime [contractor] and subcontractor to coordinate amongst themselves."[207] The Corps did not issue a warning, citation, or complaint about the condition of the access road on either the 2.2 Project or the 1.2a Project; however, as stated, the contractor is ultimately responsible for the safety of personnel on a job site.[208]

### v.   Impact of Conditions of Access Roads

87.     There were days when the work could not proceed because of the conditions of the access roads.[209] FEDCON also shut down the access roads when it rained or when the roads were otherwise sufficiently saturated to cause issues for people to drive on them.[210] By way of an example of the impact that rain would have on the access roads, an e-mail from an HDB superintendent to FEDCON personnel, dated April 14, 2015, advised FEDCON to keep traffic off of the "temporary [h]aul roads" for at least two days after the rain stopped as a result of the "severe erosion and soft roadways" that were "tor[n] up" every time a subcontractor operated a piece of equipment or a vehicle.[211]

---

[204] *Id.* at 205:9–19.
[205] *Testimony of David Boland*, Doc. 233 at 23:25, 24:1–3.
[206] *Id.* at 204:6–20.
[207] *Testimony of Jeff Falati*, Doc. 235 at 204:21–23.
[208] *Id.* at 221:4–18.
[209] *See Testimony of Jason Whitworth*, Doc. 234 at 184:23–25, 185:1.
[210] *Testimony of Rick Batdorf*, Doc. 235 at 53:23–25, 54:1–9.
[211] Doc. 217-148 at 1.

88.     The manner in which the access roads were designed impacted HDB's maintenance obligation thereof.[212] Specifically, as a result of the rain and high water events, the subsurface would become saturated and made the roadways soft or boggy.[213] HDB's maintenance was intended to "put the grader off and scrape off the ruts," but when HDB did this, it would peel off some of the gravel, ultimately resulting in the road no longer being six inches of rock or gravel, but around five and one-half inches instead.[214]

89.     David Boland recognized that, if an access road was shut down, such as to avoid maintenance or to allow it to dry out, on a day when the weather was otherwise suitable to perform work such that no materials could be delivered, GLF would be unable to perform such work.[215] Likewise, if there were days when an access road was not shut down, but was otherwise unusable to deliver materials to GLF, despite the weather being suitable, those days were days when GLF would have been unable to perform work due to lack of materials.[216] On these days when an access road was unusable for a day or two after a rain event, FEDCON issued GLF a noncompensable time extension, as that is what FEDCON received from the Corps.[217] David Boland attributed such days when GLF could not perform due to the access road—but not due to the actual weather outside—to adverse weather.[218] GLF contended that it incurred idle equipment and manpower costs on days when its personnel should have been able to work, but for the road being impassible and FEDCON not allowing access.[219]

90.     The non-compensable days of time extension failed to address or compensate

---

[212] *Testimony of Alonzo Harrison*, Doc. 238 at 29:23–25, 30:1.
[213] *Id.* at 30:2–10.
[214] *Id.* at 30:8–17.
[215] *Testimony of David Boland*, Doc. 232 at 210:25, 211:1–5.
[216] *Id.* at 211:13–18.
[217] *Testimony of Jason Whitworth*, Doc. 234 at 185:13–19; 215:13–19; *Testimony of Lorenzo Ellis*, Doc. 240 at 73:2–7.
[218] *See Testimony of David Boland*, Doc. 232 at 216: 1–5.
[219] *Testimony of Lorenzo Ellis*, Doc. 240 at 73:11–25.

GLF for the additional costs it was incurring for operating costs including the cost of equipment and labor.[220]

91.    Subsequent to the receipt of the proposed engineering design options for the temporary access roads from Mr. Hornsby and Burns Cooley Dennis, FEDCON determined that performing any of the recommended upgrades to the access roads was cost-prohibitive because, even when accounting for any increase in the number of days that would be realized from such upgrades, there was no guarantee that roads "could be used during all rain events and after rain events."[221]

92.    In or about December of 2014, FEDCON attempted to get HDB to perform a portion of the improvements to the access roads without receiving any additional compensation.[222] FEDCON wanted HDB to perform essentially five times the original work it had performed by installing 30 inches of aggregate at no additional charge.[223] HDB declined, as it was not in a position to do that work for free.[224] In response to FEDCON's attempt, HDB also advised FEDCON that the roadways for the projects were not meeting the demands of the actual use.[225] Mr. Harrison nonetheless advised that, as the existing design was the design contracted for under the subcontracts between HDB and FEDCON, HDB was prepared to finish performing its contracted work.[226] Harrison also testified that HDB advised FEDCON that the access roads were not suitable for use by cranes, concrete trucks, and other heavy vehicles during construction.[227] HDB opined in a letter to FEDCON that FEDCON should retain an engineer to design the access

[220] *Testimony of Francesco Senis*, Doc. 236 at 79:17–25, 80:1–2.
[221] *Testimony of Craig Hildebrandt*, Doc. 234 at 213:12–24.
[222] Doc. 219-810 at 1; *Testimony of Alonzo Harrison*, Doc. 238 at 36:3–13.
[223] Doc. 219-810 at 1; *Testimony of Alonzo Harrison*, Doc. 238 at 36:12–17.
[224] *Testimony of Alonzo Harrison*, Doc. 238 at 37:2–7.
[225] Doc. 219-810 at 1.
[226] *Id.*
[227] *Testimony of Alonzo Harrison*, Doc. 238 at 65:14–22.

roads to ensure that they would be better suited for actual use.[228]

93.     GLF wrote several letters to FEDCON, in which GLF took the position that the access roads needed to be designed in accordance with Section 4.B of EM 385-1-1.[229] FEDCON took the position that GLF was incorrectly seeking to classify the temporary access roads as haul roads.[230] While GLF argued that the "haul road" provisions of Section 4.B of the EM 385-1-1 were applicable to the temporary access roads, David Boland testified that the provisions of Section 27.F.05 are more applicable to the situation.[231] That section provides:

27.F STRUCTURAL STEEL ASSEMBLY

. . .

27. F. 05 Site layout. The Controlling contractor shall ensure the following is provided and maintained:

a. Adequate access roads into and through the site for the safe delivery and movement of derricks, cranes, trucks, other necessary equipment, and the material to be erected; and means and methods for pedestrian and vehicular control. Exception: This requirement does not apply to roads outside of the construction site.

b. A firm, properly graded, drained area readily accessible to the work with adequate space for the safe storage of materials and the safe operation of the erector's equipment.

c. Pre-planning of overhead hoisting operations. All hoisting operations in steel erection shall be pre-planned.[232]

94.     Mr. Boland opined that "reinforcing steel" constituted "material to be erected" under Section 27.F.05a, defining piling that was being driven into the ground as being "erected."[233]

95.     However, not once during the course of the work on either project did FEDCON

---

[228] *Id.* at 65:20–25, 26:1.
[229] *Testimony of David Boland*, Doc. 233 at 25:10–15.
[230] *Id.* at 25:16–24.
[231] *Id.* at 20:19–23.
[232] Doc. 216-101 at 24–25.
[233] *Testimony of David Boland*, Doc. 233 at 22:4–17.

advise GLF that it believed that Section 27.F.05 of EM 385-1-1 was applicable to the access roads, as Mr. Boland maintained at trial.[234]

96.     GLF provided notice to FEDCON of the continuing impact due to the condition of the access roads during the Fall of 2015.[235] For the 1.2a Project, GLF advised FEDCON that a letter from December of 2014 served as "formal notice, reserving our right to claim for time and/or compensation, in accordance with the subcontract agreement, for delays or disruptions resulting from safety hazards associated with the access haul road."[236] GLF also provided FEDCON with photographs comparing the access roads on the 2.2 Project and 1.2a Project to another project in the area.[237]

97.     By letter dated November 3, 2015, GLF informed FEDCON that GLF would be left with no option but to demobilize from the projects until FEDCON "provides the proper access in accordance with the contract" if actions were not taken to "engineer, improve and maintain the roads on both projects which is the responsibility of FEDCON in order for production to continue."[238]

98.     On November 13, 2015, after GLF's notification that it may have to demobilize, FEDCON agreed to issue change orders to HDB for both projects to perform some reconstruction work on the access roads.[239] The scope of work that was included in the change orders issued to HDB by FEDCON was for a layer of geotextile fabric, geogrid material, and nine inches of crushed concrete.[240] This solution was similar to option 2 provided by Mr. Hornsby almost a year earlier,

---

[234] *Id.* at 25:25, 26:1–4.

[235] *Testimony of Rick Batdorf*, Doc. 235 at 65:7–12; Doc. 219-956 at 1.

[236] Doc. 218-30 at 5.

[237] *See* Doc. 219-956 at 3–4.

[238] Doc. 216-258 at 2.

[239] *Testimony of Mark Ferguson*, Doc. 234 at 84:22–25; *Testimony of Alonzo Harrison*, Doc. 238 at 37:18–22; Docs. 219-813 at 1; 219-814 at 1.

[240] Docs. 217-173 at 2; 219-813 at 1; 219-814 at 1; *Testimony of Mark Ferguson*, Doc. 234 at 84:5–25, 85:1–23.

in December of 2014, except that Mr. Hornsby recommended 18 inches of crushed stone, which was twice as much as what FEDCON provided in the change orders.[241]

99.     Notwithstanding the efforts by HDB to reconstruct the temporary access roads pursuant to the change orders received from FEDCON, GLF continued to be impacted by the conditions of the temporary access roads on both projects through its termination on the 2.2 Project on May 27, 2016, and through the completion of its work on the 1.2a Project in October 2016.[242]

100.     After FEDCON's termination of GLF on the 2.2 Project, FEDCON's replacement subcontractor, Bo-Mac Contractors, was also impacted by FEDCON's failure to properly construct and maintain the temporary access road on work front one of the 2.2 Project.[243] Dustin Talley of Bo-Mac described the access road at work front one to FEDCON as "inadequate" and "more of a dirt trail than an access road." Mr. Talley inquired regarding FEDCON's plan to improve the road and provide site access to the work front.[244] FEDCON Construction Manager Rick Batdorf acknowledged that the fill material on top of the aggregate at the southern end of the project made it difficult to traverse the access road.[245] While GLF was performing its work, fill material washed down the slope from the work platform to the temporary access road as a result of the lack of a silt fence at the bottom of the slope.[246] Bo-Mac also had problems with access as a result of this condition.[247] FEDCON attempted to address this condition through the change orders issued to HDB in November 2015 by way of the placement of silt fence at the bottom of the slope on the

---

[241] Doc. 219-806 at 1.
[242] *Testimony of Lorenzo Ellis*, Doc. 241 at 62:2–25.
[243] *Deposition of Dustin Talley*, Doc. 148 at 43:3–19, 44:23–25, 45:1–9; Docs. 219-844 at 1;  219-845 at 1. During trial, the parties agreed to submit the deposition of Dustin Talley, complete with designations and counter-designations, to the Court. Doc. 235 at 291:21–25, 292:1–25, 293:1–10.
[244] Doc. 219-844 at 1.
[245] *Testimony of Rick Batdorf*, Doc. 235 at 47:24–25, 48:1–3.
[246] *Testimony of Alonzo Harrison*, Doc. 238 at 33:24–25, 34:1–25, 35:1–8.
[247] *Testimony of Rick Batdorf*, Doc. 235 at 50:19–24.

work platform edge of the access road.[248] Mr. Talley also testified by deposition that there were issues of trucks getting stuck on, or sliding off, the road at work front two.[249] Unlike the 2.2 Project Subcontract Agreement, the subcontract agreement between Bo-Mac and FEDCON called for the provision of the temporary access road to be provided by others in the following manner: "Construction of a temporary access road and work area from which to drive pile, including maintenance of the temporary access road to ensure utilization of the temporary access road within a reasonable time after a rain event."[250]

### vi. Testimony of Lourie and Hull

101.     During trial, GLF offered the testimony of David Lourie, P.E., a geotechnical engineer, whom GLF tendered as an expert witness regarding geotechnical engineering, including design for unpaved aggregate access roads and temporary facilities.[251] Based on his personal observations of roadway sections and review of project documents, including correspondence and photographs, he opined that the access roads were inadequately designed for their intended use.[252] He testified that he gained an understanding of the intended usage of the access roads from reviewing the subcontracts between GLF and FEDCON and the subcontracts between FEDCON and HDB.[253]

102.     Mr. Lourie opined that FEDCON did not comply with the requirements for haul roads under EM 385-1-1, as FEDCON failed to design the haul roads in accordance with engineering criteria.[254] Mr. Lourie saw no evidence that FEDCON had completed any engineering

---

[248] *Id.* at 48:22–25, 49:1–9, 51:9–14.
[249] *Deposition of Dustin Talley*, Doc. 149 at 25:15–20.
[250] Doc. 219-787 at 14.
[251] *Testimony of David Lourie*, Doc. 238 at 86:1–8, 92:6–16.
[252] *Id.* at 95:5–21.
[253] *Id.* at 103:23–25, 104:1–7.
[254] *Id.* at 122:1–12.

design.[255] He opined that, in developing or designing a roadway section to serve its intended purpose, FEDCON had failed to properly consider the soil conditions and likely weather conditions in southern Louisiana, along with the types of traffic that would traverse the road for various construction activities.[256]

103.     Mr. Lourie admitted that he is neither a safety expert nor an expert on EM 385.[257] He also admitted that he was not familiar with EM 385 prior to being engaged as an expert in this case.[258] Lourie visited the projects on only one occasion in December of 2015, for an amount of time that he could not recall, and could not remember whether he visited the 1.2a Project or the 2.2 Project.[259] He was not aware of EM 385 when he conducted the site visit.[260] Because there were portions of the road that were impassible during his site visit, thereby preventing him from seeing the entirety of the subject access road, he acknowledged the possibility that some areas of the road could have been in better condition than the areas he observed.[261]

104.     GLF also offered the testimony of Donald Hull, who worked as a project manager and then as a regional manner for the Conti Group, which was involved on the WBV 4.2 Project, adjacent to the 1.2a Project and the 2.2 Project.[262] Like the 1.2a Project and the 2.2 Project, the 4.2 Project also involved temporary facilities, such as access roads and work platforms.[263] He testified that he has worked on approximately 75 projects that involved some type of temporary facilities or work platforms to execute the work.[264] GLF tendered Mr. Hull as an expert in planning and

---

[255] *Id.*
[256] *Id.*
[257] *Id.* at 137:13–16.
[258] *Id.* at 137:17–19.
[259] *Id.* at 130:16–20, 131:21–25, 132:1–16.
[260] *Id.* at 137:25, 138:1–5.
[261] *Id.* at
[262] *Testimony of Donald Hull*, Doc. 239 at 72:22–24, 73:1–7.
[263] *Id.* at 73:8–13
[264] *Id.* at 70:21–25.

implementation of temporary facilities on heavy civil construction projects.[265]

105.     Mr. Hull opined that the temporary access roads were "completely insufficient for supporting pipe and sheet pile installation."[266] The access roads were insufficient to support the vehicles and intended equipment.[267] Based on his review, Mr. Hull explained that FEDCON ignored the requirements to support a pile-driving operation and the support required for this type of operation.[268] He opined that, because FEDCON was not self-performing this work and, therefore, not incurring daily costs, it lacked the same incentive to invest resources to plan and implement temporary facilities, such as access roads, as a contractor who is performing the work.[269]

106.     Mr. Hull further explained that, on projects with which he has familiarity, it is desirable for the work platform and the access road to be designed such that the platform flows towards the road and the road flows off to the side of the temporary well.[270] Based on his review of the project documentation, Mr. Hull opined that, with respect to the drainage and silt protection of the access roads of the 1.2a Project and 2.2 Project, there did not appear to be any drainage concept, thereby resulting in the temporary facilities falling apart during the course of project construction.[271] He testified that maintenance of the temporary access roads appeared to be nonexistent.[272]

107.     Mr. Hull also testified that, in conducting his review of the access roads, he referred to Section 4 of EM 385-1-1, which addresses temporary structures.[273] Section 04.B is

---

[265] *Id.* at 78:8–11, 79:1–24.
[266] *Id.* at 108:18–24.
[267] *Id.* at 98:24–25, 99:1–10.
[268] *Id.* at 108:25, 109:1–5.
[269] *Id.* at 109:21–25, 110:1–13, 20–25, 111:1.
[270] *Id.* at 98:3–15.
[271] *Id.* at 16–23.
[272] *Id.* at 109:11–13.
[273] *Id.* at 87:22–25, 88:1–7.

within Section 04.[274] In his review, Mr. Hull considered Section 04.B because it provides guidance on the design of haul roads and the types of items that a contractor needs to take into account in the development of temporary facilities.[275] He further testified that EM 385-1-1 has been associated with every Corps project that he has worked on, including the project WBV 4.2 Project.[276]

108.     Significantly, he opined that some type of engineering design or concept needed to be performed for the access roads, yet his review of project documentation did not indicate any analysis performed by a qualified engineer.[277]

### vii.   GLF's Claims for the Access Roads

109.     GLF submitted damage claims regarding the access roads for the 2.2 Project and the 1.2a Project.[278] As discussed herein, GLF contends that it submitted these claims in accordance with Paragraph 13.B of the subcontract agreements.

110.     In support of its damage claims for breach of the subcontract agreements for each project due to FEDCON's failure to furnish it with a temporary access road in accordance with the subcontract requirements, GLF introduced evidence in the form of summaries of its daily reports for days when it could not perform work due to the condition of the temporary access roads, its time sheets for each such day which include the labor, including supervision, and equipment for which GLF incurred cost on each such day which cost was not offset by revenue due to the condition of the access road, its payroll records for the labor cost, and equipment records reflecting the type of equipment that was to be used and Blue Book information for the daily cost of the

---

[274] (Doc. 219-815 at 3, 6).
[275] *Testimony of Donald Hull*, Doc. 239 at 88:9–25, 89:1–8.
[276] *Id.* at 89:9–18.
[277] *Id.* at 99:11–22.
[278] Docs. 219-1087 at 1; 219-1091 at 1.

equipment. GLF also introduced evidence of the equipment costs utilizing the EP 1110 equipment rates.[279] GLF also introduced into evidence a summary of the costs for each time period.[280] As addressed herein, Lorenzo Ellis testified as to the methodology that he utilized to determine the amount of the claims, including adjustments, and Patrick Brannon testified as the appropriateness of the methodology and reasonableness of the costs.

111.    The additional costs incurred by GLF due to the condition of the access roads on the 2.2 project using the EP-1110 Equipment Rates is $768,591.49.[281] The additional costs incurred by GLF due to the condition of the access roads on the 1.2a project using the EP-1110 Equipment Rates is $614,487.74.[282]

112.    For the 2.2 Project, GLF claims to have lost 43 work days due to the inability to use the temporary access road.[283] For the 1.2a Project, GLF claims to have lost 49 work days due to the temporary access road.[284]

113.    In compiling the claims for the access roads, Lorenzo Ellis of GLF relied upon daily time sheets of GLF foremen.[285] Mr. Ellis acknowledged that some of the daily reports for the projects indicated that GLF personnel did not perform work on a particular day as a result of a "rain out."[286] Mr. Ellis testified that, in preparing the claims, he looked more at the project documentation than the daily reports.[287] Even so, according to Mr. Ellis, GLF workers commonly used "rain out" to account for a situation where it had rained the day before and FEDCON had

---

[279] *See* Docs. 219-1087; 219-1091.
[280] *Id.*
[281] Doc. 219-1087 at 1.
[282] Doc. 219-1091 at 1.
[283] Doc. 219-1087 at 1.
[284] Doc. 219-1091 at 1.
[285] *E.g.*, Doc. 218-757 at 1–3.
[286] *Testimony of Lorenzo Ellis*, Doc. 242 at 64:8–14; *Testimony of Lorenzo Ellis*, Doc. 241 135:22–25, 136:1–8.
[287] *Testimony of Lorenzo Ellis*, Doc. 241 at 135:24–25, 136:1–8.

blocked off the roads.[288] Indeed, "rain out" references days when GLF personnel did not perform work as a condition of the access roads, either because the roads were impassible or shut down.[289]

114.     Mr. Ellis conceded during trial that March 12, 2015, April 28, 2015, and June 29, 2015 were rain days that should not have been included within GLF's access road claim for the 2.2 Project.[290] He also conceded that January 15, 2015 was a rain day that should not have been included in the access road claim for the 1.2a Project.[291] As such, GLF made a reduction in the amount of $67,881.17, utilizing EP 1110 rates, to account for these four days.[292]

115.     As discussed below, GLF advised FEDCON on August 7, 2015, that GLF would begin removing "all resources" from work front two on the 2.2 Project beginning on Monday, August 10, 2015, "until such time as Fedcon has a fully accepted access plan approved by the [Corps] and concurrence from GLF that it meets the intent of our subcontract agreement."[293] A November 21, 2015 e-mail from Lorenzo Ellis to Francesco Senis advised that there was not currently "any equipment sitting idle for the Chevron work," as GLF had "transferred the hammer, leads and vibro to other projects . . . ."[294]

**F.   Work Platforms**

### i.   Subcontract Language and Platforms Generally

116.     The 2.2 Project Subcontract Agreement provided that "others" would construct and maintain two temporary work platforms "on the protected side of the levee," which were required to be "approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile, and [to] be removed and extended in segments for the entire length of the levee as the

---

[288] *Id.* at 136:1–8.
[289] *Testimony of Lorenzo Ellis*, Doc. 242 at 64:8–14.
[290] *Testimony of Lorenzo Ellis*, Doc. 241 at 9:20–25, 10:1–25, 11:1-6.
[291] *Id.*
[292] *Id.*
[293] Doc. 217-116 at 1.
[294] Doc. 221-205.

Work progresses."[295] Similarly, the 1.2a Project Subcontract Agreement provided that "others" would construct and maintain

> two (2) temporary work platforms, including initial entry and final exit ramps, on the protected side of the levee as described below. The temporary work platforms will be approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile, and will be removed and extended in segments for the entire length of the levee as the Work progresses. A 25' wide earthen ramp will be provided at each of the two work platforms within the work limits to enable the Subcontractor to walk its cranes from the temporary road or entrance to the work platforms prior to commencing piling work. A similar ramp will be provided upon completion of all piling operations to enable subcontractor to demobilize its crane.[296]

117.    The subcontract between FEDCON and HDB for the 2.2 Project required HDB to furnish all labor, materials, and equipment necessary to provide all required "[c]onstruction, maintenance, and removal of two (2) temporary work platforms on the protected side of the levee" as directed by FEDCON, which included the following:

> 1.  A compacted, level earth surface for use by cranes and other heavy vehicles during construction.

> 2.  Dimensions of approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile,

> 3.  Removing and extending work platform in segments for the entire length of the levee as the Work progresses.[297]

118.    Similarly, the subcontract between FEDCON and HDB for the 1.2a Project required HDB to furnish all labor, materials, and equipment necessary to provide all required "[c]onstruction, maintenance, and removal of two (2) temporary work platforms located on the protected side of the levee" as directed by FEDCON, which included the following:

> 1.  A stabilized, compacted, and level earth surface for use by cranes and other heavy vehicles during construction.

---

[295] Doc. 216-117 at 2.
[296] Doc. 216-132 at 17.
[297] Docs. 216-114 at 14; 216-115 at 1.

2. Dimensions of approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile.

3. Removing and extending the work platforms in segments for the entire length of the levee as the Work progresses.[298]

119.    Thus, the subcontracts with HDB for the projects required HDB to provide a *compacted* level earth surface, but there was no requirement included in the subcontracts to compact the surface of the work platform to any specific density.[299]

120.    The purpose of the work platforms on each project was to provide a platform to enable GLF to perform its scope of work, which included driving sheet piling materials, driving pipe piling materials, and forming and pouring concrete T-walls. The work platforms on the projects were constructed by degrading the existing levee from elevation 22 to approximately elevation 11 and extending the footprint of the levee at elevation 11 through the installation of sloped embankment material to create a compacted level earth surface.[300] The TFP was separate but adjacent to the work platform, on the flood side.[301] The work platforms were not part of the projects included in the plans issued by the Corps.[302] The access road, which was adjacent to the levee, was typically at different elevation than elevation 11—usually elevation 6 or elevation 7.[303]

### ii.   Crane Mats and Impacts

121.    Alonzo Harrison of HDB confirmed that there was not a specific requirement for density tests of the surface of the work to be taken.[304] The work platforms that had not been compacted yielded to the weight of the cranes, causing the cranes to list and shut off.[305]HDB did

---

[298] Doc. 219-881 at 14–15.
[299] *Testimony of David Boland*, Doc. 233 at 54:22–25.
[300] *Testimony of Lorenzo Ellis*, Doc. 240 at 111:2–25, 112:1–25, 113:1–4.
[301] *Testimony of David Boland*, Doc. 233 at 52:17–22.
[302] *Id.* at 52:1–4.
[303] *Testimony of Lorenzo Ellis*, Doc. 240 at 114:4–11.
[304] *Testimony of Alonzo Harrison*, Doc. 238 at 44:17–22.
[305] Doc. 220-280 at 1; *Testimony of Jason Whitworth*, Doc. 234 at 159:5–11.

not have any input into the manner in which the work platforms were constructed to determine if they would be suitable for the use of cranes and other heavy vehicles during construction.[306]

122.    FEDCON's failure to provide a compacted work platform to GLF in accordance with the requirements of the subcontracts for both projects impacted GLF's performance of its work throughout the duration of the projects, with such impacts including: (1) costs for the purchase of crane mat materials that GLF was required to use throughout the course of the projects in order to try to provide a stable surface from which to operate its cranes to drive sheet piles, pipe pile and pour concrete; and (2) additional labor time required to remove crane mats from the muddy surface of the work platform (a crane was usually needed to pry the crane mats from the mud as opposed to using a forklift, which is typically used to move crane mats) and move them ahead of the crane to allow for continued operations.[307]

123.    Crane mats are large pieces of timber used to distribute the load of a crane over the platform.[308]

124.    Jason Whitworth testified that, in his experience, the crane mats are supplied by the contractor who supplies the cranes for the project and determines whether to use crane mats.[309] Whitworth acknowledged the presence of standing water on the work platform in pictures he reviewed during his testimony.[310] Ellis explained that there was no drainage provision and, consequently, the platforms held water.[311]

125.    On February 18, 2014, following the execution of the 2.2 Project Subcontract Agreement, but before the execution of the 1.2a Project Subcontract Agreement, Whitworth of

---

[306] *Testimony of Alonzo Harrison*, Doc. 238 at 67:2–7.
[307] *Testimony of Lorenzo Ellis*, Doc. 240 at 121:1–25, 122:1–25, 123:1–25, 124:1–25, 125:1–25, 126:1–3.
[308] *Testimony of Jason Whitworth*, Doc. 234 at 138:13–17.
[309] *Id.* at 150:9–25, 151:1–14.
[310] *Id.* at 154:9–13.
[311] *Testimony of Lorenzo Ellis*, Doc. 240 at 122:1–2.

FEDCON confirmed his understanding to Ken Yerk that FEDCON "will be furnishing temporary work platforms per the subcontract, which will be compacted soil" and that "GLF will be utilizing timber crane mats."[312] Mr. Whitworth was never advised by GLF that his understanding was incorrect.[313]

126.    On March 21, 2014, Ken Yerk sent a photograph to Jason Whitworth, which he claimed depicted an unlevel crane, with the crane mats sinking into the mud.[314] Mr. Yerk explained that situation "not only causes an unsafe condition, but causes the operator to overcompensate the swing and causes the ground crew to force and manhandle the leads into correct alignment."[315]

127.    On August 26, 2014, Ken Yerk wrote to FEDCON expressing concern about recent discussions to shorten the work platform on the 1.2a Project.[316] Mr. Yerk included a sketch that depicted the work platform and the crane sitting on a 26-foot crane mat.[317] Mr. Yerk's sketch depicted the crane mat because "all of [his] drawings included it, so [he] just kept it in there."[318] Kurt Snodgrass, General Superintendent of GLF, had also sent a sketch depicting a crane on top of a crane mat to FEDCON in February of 2014.[319]

128.    Yerk sent other sketches depicting crane mats, which pertained to the 2.2 Project, to FEDCON in March and May of 2014.[320] Indeed, Mr. Yerk provided several sketches to FEDCON in regard to the crane configuration on the work platform and in those sketches the cranes were depicted sitting on crane mats, which Mr. Yerk showed to communicate GLF's

---

[312] Doc. 220-112 at 1.
[313] *Testimony of Jason Whitworth*, Doc. 234 at 141:10–16.
[314] Doc. 219-865 at 1.
[315] *Id.*
[316] Doc. 216-144 at 1.
[317] *Testimony of Ken Yerk*, Doc. 237 at 41:25, 42:1–14.
[318] *Id.* at 42:15–17.
[319] Doc. 220-110 at 1–2; *Testimony of Jason Whitworth*, Doc. 234 at 141:23–25, 142:22–25.
[320] Docs. 220-133 at 1–2; 220-155 at 1–2.

expectations for what the crane pad—another term for the work platform[321]—would consist of.[322] Depicting a crane sitting on a crane mat demonstrated or communicated GLF's expectations for the work platform by showing that the platform needed to be stable, firm, and unyielding.[323] Regardless of whether crane mats, crushed rock, or existing earth would be utilized, the work platform needed to withstand the weather.[324] When Yerk prepared these sketches which depicted the cranes sitting on crane mats, he did not intend to communicate to FEDCON that GLF intended to provide crane mats.[325]

129.    FEDCON utilized Jersey barriers at the edge of the slope to provide support at one point.[326] GLF raised concerns regarding this use of Jersey barriers.[327] GLF retained the services of an independent engineer to perform engineering calculations regarding FEDCON's use of the Jersey barriers to support the slope down from the work platform.[328] The engineer, David O'Reilly, "examined the proposed crane access path adjacent to [Projects] 1.2a and 2.2" and concluded that a system other than the use of Jersey barriers should be utilized by FEDCON to restrain the work platform "to provide a safe working condition," which Yerk communicated to FEDCON.[329]

130.    Jeff Mairs, who served as GLF's chief estimator of GLF's roadway division at the time he left his employment at GLF, testified by deposition.[330] He explained that, in his experience, crane mats are supplied by the pile-driving contractor.[331]  While Mr. Yerk, as GLF's lead estimator

---

[321] *Testimony of Ken Yerk*, Doc. 237 at 11:10–12, 34:21–24.
[322] *Id.* at 34:15–25, 35:23–25, 36:11–14.
[323] *Id.* at 36:11–24.
[324] *Id.* at 36:20–25, 37:1.
[325] *Id.* at 37:2–6.
[326] *Id.* at 43:9–14.
[327] *Id.* at 43:21–24.
[328] *Id.* at 43:25, 44:1–3.
[329] Doc. 219-908 at 2; *Testimony of Ken Yerk*, Doc. 237 at 51:3–25, 52:1–6; Doc. 219-908 at 1.
[330] *Deposition of Jeff Mairs*, Doc. 243 at 160:3–25.
[331] *Id.* at 173:18–25, 174:1–11.

on the projects, prepared the bids, Mr. Mairs reviewed them and presented them to management.[332] Mr. Mairs did not recall discussing the need to include crane mats in the bid estimate with Yerk, but knew that GLF had included crane mats.[333]

131.    GLF's estimate for the 2.2 Project included 50 crane mats and its estimate for the 1.2a Project included 25 crane mats.[334] These quantities of crane mats included in the initial estimate and budget for each project represented the minimal amount for crane mats that GLF typically brought onto a job to assemble the cranes and move them into place.[335] The quantities and dollar amounts for crane mats included in the initial estimates was not intended to include the quantity or cost of crane mats to use with the operation of the cranes throughout the course of the work, nor was it sufficient to cover the cost of crane mats that would be needed during the entire course of the projects.[336]

132.    During the course of performing its scope of work under the subcontracts, due to the condition of the work platforms and FEDCON's failure to provide GLF with compacted and stabilized work platforms, GLF was required to utilize crane mats for all crane operations related to sheet and pipe pile driving and concrete pouring throughout the course of the work on both projects, and it necessitated the purchase of additional crane mats beyond the limited quantities included in the original estimates and budgets.[337] Mr. Ellis testified that GLF purchased approximately 90 *additional* crane mats for each job.[338]

133.    During trial, Mr. Ellis detailed the operation of moving crane mats. Each time

---

[332] *Id.* at 164:17–25, 165:1–6, 167:11–24.
[333] *Id.* at 173:12–17, 174:1–5.
[334] *Testimony of Lorenzo Ellis*, Doc. 240 at 119:23–25, 120:1–7. *See also* Docs. 219-973; 219-974.
[335] *Testimony of Lorenzo Ellis*, Doc. 240 at 119:25, 120:1–4.
[336] *Testimony of Ken Yerk*, Doc. 237 at 37:2–6; *Testimony of Lorenzo Ellis*, Doc. 240 at 120:13–21.
[337] *Testimony of Ken Yerk*, Doc. 237 at 179:11–25, 180:1; *Testimony of Lorenzo Ellis*, Doc. 240 at 120:22–25, 121:1–24.
[338] *Testimony of Lorenzo Ellis*, Doc. 240 at 121:16–17.

when GLF was ready to proceed down one of the projects, the cranes, which were sitting on a set of ten or fifteen crane mats, would need to back up, grab the mats one at a time, and swing them around to a position in front of the crane, thereby allowing the cranes to proceed to the next monolith.[339] GLF's crane operators had to exercise caution in lifting the crane mats, which were often sunken into mud, so that metal rods did not break.[340] Mr. Ellis testified that the process of moving the crane mats so that the crane could move into the next position typically took as many as three or three and one-half hours.[341] When a crane was moving crane mats, the crane was actively engaged in something other than its intended purpose—driving pile and pouring concrete.[342]

134.    On the other hand, Dustin Talley of Bo-Mac Contractors, LTD., one of the replacement subcontractors on the 2.2 Project, testified that the work platforms did not present any safety concerns, there was not a need to engineer the platforms, and the "compaction was fine."[343] Mr. Talley also testified that Bo-Mac used crane mats on the project because the ground conditions in Louisiana require the use of crane mats and its estimate included the cost of providing and moving the crane mats on a regular basis.[344]

### iii. Testimony of Lourie and Hull

135.    GLF offered the testimony of David Lourie, P.E., and Donald Hull regarding the work platforms. Mr. Lourie's observation of the work platforms, inclusive of his site visit and review of various photographs, led him to conclude, based on an absence of information, that "there wasn't necessarily a design effort put into the platforms."[345] He explained that his

---

[339] *Id.* at 124:1–15.
[340] *Id.* at 125:15–19.
[341] *Id.* at 125:20–25, 126:1.
[342] *Id.* at 126:7–12.
[343] *Deposition of Dustin Talley*, Doc. 148 at 12:4–7, 12:19–25, 13:1–5.
[344] *Id.* at 13:9–20.
[345] *Testimony of David Lourie*, Doc. 238 at 121:16–25.

observation of photographs demonstrated some indicators of failures near the edge of the slope of a work platform, which would indicate that a "problem" existed.[346] While conceding that he focused more on the access roads than the work platforms, Mr. Lourie also opined that, from a design perspective, issues that were present in the roadways also persisted in the work platforms and that some of the same design considerations used for access roads would be directly transferable to the work platforms.[347]

136.    Mr. Hull testified that the work platforms were insufficient to support the cranes for installation of the pipe piles and sheet piles.[348] He explained that workers would not have secure footing where they were stuck in the mud above their mid-shins and were prone to slips, trips, and falls.[349] Additionally, these conditions could lead to certain equipment titling or falling.[350] He also opined that crews standing in mud up to their mid-shins each day, who would therefore be unhappy with the work platform, would be less productive, whereas a well-designed platform will greatly increase a crew's productivity.[351] According to Mr. Hull, a work platform that is falling apart would result in equipment getting bogged down or otherwise prevent equipment from coming in, which would also impact productivity, as time would be spent removing the equipment from the mud, which contractors do not plan for during the estimate process.[352]

137.    As previously mentioned, Mr. Hull also considered EM 385-1-1 to be applicable. In discussing the basis for his opinion that the work platforms were insufficient to provide stable platforms to support a pile driving operation, Mr. Hull explained that, in some of the photographs that he reviewed, cranes were sitting in mud and water and that contractors with cranes must follow

---

[346] *Id.*
[347] *Id.* at 95:22–25,96:1–6.
[348] *Testimony of Donald Hull*, Doc. 239 at 87:13–16, 102:5–11.
[349] *Id.* at 100:2–13.
[350] *Id.*
[351] *Id.* at 100:20–25, 101:1–15.
[352] *Id.* at 101:16–22.

the "1% Rule."[353] This "1% Rule" is referenced within Section 16.T of EM 385-1-1, entitled "Crane-Supported Personnel (Work) Platforms," within a subsection labeled "Operational Criteria," which provides, in part, that "[t]he crane shall be uniformly level within 1% of level grade and located on firm footing. Cranes equipped with outriggers shall have them all fully developed to load chart criteria following manufacturer's specifications, as applicable, when hoisting personnel."[354] Mr. Hull explained that ensuring that cranes are within 1% on all corners going up through the boom is imperative because otherwise the crane is subject to "side load," which can result in the crane tilting, the boom having a failure in the supports, or the load shifting on the rigging.[355]

138.    Mr. Hull acknowledged that crane mats were used on the 4.2 Project.[356] Although the work platform on the 4.2 Project was constructed with soil subbase and rock covering, Mr. Hull explained that Conti utilized crane mats because he always uses crane mats in southern Louisiana.[357] He acknowledged that part of his reason for utilizing crane mats is because cranes will tear up a dirt surface or a rock surface.[358] Mr. Hull subsequently clarified that, based on some of the photographs that he reviewed, GLF had no choice but to use crane mats as a result of the temporary facilities not being properly implemented.[359] One of the problems that occurred as a result of improper implementation of the work platform was the sinking of crane mats into the mud.[360]

### iv.   GLF's Claims for the Work Platforms

---

[353] *Id.* at 102:16–25, 103:1.
[354] Doc. 216-93 at 17, 21.
[355] *Testimony of Donald Hull*, Doc. 239 at 103:22–25, 104:1.
[356] *Id.* at 115:3–5.
[357] *Id.* at 115:6–25, 116:1–3.
[358] *Id.* at 116:4–7.
[359] *Id.* at 143:4–12.
[360] *Id.* at 144:1–4.

139.     GLF submitted damage claims for the work platforms on the 1.2a Project and the 2.2 Project to FEDCON on April 29, 2016.[361]

140.     The need for crane mats throughout the course of the work on both projects was not anticipated by GLF at the time it prepared its estimates and budgets for the projects, and became necessary due to the condition of the work platforms as constructed by FEDCON.[362]

141.     GLF seeks $772,365.22 for the 1.2a Project, which accounts for direct labor, project management and supervision, equipment, material, allowable markup, bond costs, and other costs from October 12, 2014, to September 24, 2016.[363] GLF calculated this sum using the EP-1110 Equipment Rates.[364] This sum includes $135,000 for crane mats,[365] which Lorenzo Ellis testified was for approximately 90 additional crane mats.[366] Mr. Ellis testified that the remaining amount is to account for "[c]rews moving mats when they should be doing something different."[367]

142.     As discussed above, Mr. Ellis testified that the process of moving crane mats forward so that GLF's cranes could progress down each project typically took as many as three or three and one-half hours. In calculating these two damage claims, Mr. Ellis conservatively calculated the amount of time as two hours.[368]

143.     During trial, Mr. Ellis explained his calculations for the different components of the work platform claim for the 1.2a Project.[369] For example, he discussed his calculations for direct labor, including GLF's crane operators and carpenter crews.[370] For the equipment charges,

---

[361] Docs. 218-18 at 2; Doc. 218-740 at 2.
[362] *Testimony of Ken Yerk*, Doc. 237 at 179:11–25, 180:1; *Testimony of Lorenzo Ellis*, Doc. 240 at 120:22–25, 121:1–24, 122:1–23.
[363] Doc. 219-1092 at 1.
[364] *Id.*
[365] *Id.*
[366] *Testimony of Lorenzo Ellis*, Doc. 240 at 127:9–24.
[367] *Id.* at 127:25, 128:1–3.
[368] *Id.* at 125:20–25, 126:1–8.
[369] *E.g.*, *id.* at 128:4–25, 129:1–25, 130:1–25.
[370] *Id.* at 129:2–25, 130:1–5.

Mr. Ellis explained that the amounts accounted for equipment that was idle as a result of GLF personnel moving crane mats.[371] Where the cranes were active, they were moving crane mats, thereby resulting in other equipment being idle.[372]

144.    For the 2.2 Project, GLF seeks $783,313.97, which accounts for direct labor, project management and supervision, equipment, material, allowable markup, bond costs, and other costs from October 1, 2014, to May 28, 2016.[373] The work platform claim for the 2.2 Project was prepared in the same manner as the work platform claim for the 1.2a Project.[374] This sum also includes $135,000 for crane mats.[375] GLF calculated this sum using EP-1110 Equipment Rates.[376]

### G.  Availability of Two Work Fronts at All Times to GLF

#### i.  Introduction

145.    Each subcontract agreement required GLF to "furnish all labor, materials, and equipment necessary to provide all required . . . [m]anpower, materials, and equipment necessary to work two independent work fronts simultaneously."[377] David Boland confirmed that FEDCON accordingly requested that GLF provide manpower and equipment for work to be performed on two work fronts simultaneously on both projects.[378]

146.    The basis for these damage claims is that "FEDCON had predecessor work to do" and, for GLF to perform its work, FEDCON was required to "build TFP and degrade the levee to allow [GLF] to access [its] work."[379] Lorenzo Ellis also described these damage claims as claims "for idle manpower and equipment" because "there were several months" during the projects

---

[371] *Id.* at 132:19–23.
[372] *See id* at 132:24–25, 133:1–10.
[373] Doc. 219-1088.
[374] *Testimony of Lorenzo Ellis*, Doc. 240 at 137:7–11.
[375] Doc. 219-1088.
[376] *Id.*
[377] Docs. 216-117 at 1; 216-132 at 15.
[378] *Testimony of David Boland*, Doc. 233 at 55:18–22.
[379] *Testimony of Lorenzo Ellis*, Doc. 240 at 138:2–15.

where one or both work fronts were unavailable to GLF, and so GLF had "this equipment sitting out there and the manpower out [t]here at $40,000 a day just waiting."[380]

147.     During trial, David Boland agreed with the premise that FEDCON had to complete the predecessor work activities for the two work fronts on each project in order for GLF to perform its work.[381] He confirmed that FEDCON had to provide two work fronts to GLF on each project, which doubled the responsibility of FEDCON and HDB, as FEDCON's subcontractor, as well as FEDCON's material suppliers, for the predecessor work.[382]

148.     After HDB constructed the temporary access roads, it was necessary for FEDCON to perform the following predecessor work activities: (1) construct the TFP; (2) degrade the levee to elevation 8; and (3) construct the temporary work platform to provide access to GLF and the platform from which it was agreed GLF would perform its work.[383] However, Lorenzo Ellis and Patrick Brannon testified that, for various periods on each project, FEDCON failed to provide GLF with the completed predecessor activities such that work could be performed at two work fronts simultaneously.[384]

149.     GLF brings two damage claims for FEDCON's failure to make two work fronts available: a claim for the failure to make two work fronts available on the 2.2 Project and a claim for the failure to make two work fronts available on the 1.2a Project.

### ii.  2.2 Project

150.     On the 2.2 Project, GLF claims that FEDCON's failure to perform predecessor work impacted GLF's performance of the work under the 2.2 Project Subcontract Agreement

---

[380] *Id.* at 138:16–22.
[381] *Testimony of David Boland*, Doc. 233 at 56:2–9.
[382] *Id.* at 56:10–15.
[383] *See* Doc. 134 ¶19; *Testimony of Lorenzo Ellis*, Doc. 240 at 111:2–12.
[384] *Testimony of Lorenzo Ellis*, Doc. 240 at 138:2–22, 158:14–23; *Testimony of Patrick Brannon*, Doc. 243 at 23:11–12, 25, 24:1–9. *See generally* Docs. 219-1089; 219-1093.

during two periods of time: (1) from May 17, 2015, to July 11, 2015; and (2) from September 20, 2015, to May 28, 2016.[385] GLF claims that this failure impacted 147 days, all of which occurred during the second period of time and after the high river receded towards the end of September of 2015.[386] Mr. Ellis testified that the work was shut down between these two periods, from July 11, 2015 to September 20, 2015.[387] In this claim, GLF seeks $475,618.21, which utilizes EP 1110 rates.[388]

151.     The 2.2 Project Prime Contract provided that, "[a]t such time that the Mississippi River is at or above elevation +11.0 feet, NAVD 88 (2004.65) at the Carrolton gage (New Orleans District), all construction work shall cease until such time as the elevation subsides below +11.0 feet."[389] FEDCON Senior Project Manager Mark Ferguson testified that a high-river event occurred in mid-March of 2015.[390] On March 16, 2015, the Corps granted a waiver to FEDCON to continue operations on the 2.2 Project as follows: (1) allowing pile driving to continue until the river reached elevation +14.0 feet; (2) stating that no new levee degrading, slope pavement demolition, or excavation would be allowed once the river reached elevation +11.0 feet; and (3) stating that all other phases of construction were required to cease once the river reached +15.0 feet.[391] Mr. Ferguson testified that, consequently, FEDCON could not build TFP or degrade.[392]

152.     On July 8, 2015, Jeff Falati further advised FEDCON that pile driving operations had to cease when the Mississippi River reached elevation +14.5 feet and that all operations had to cease when the Mississippi River reached elevation +15 feet.[393] On July 9, 2015, the Corps

---

[385] Doc. 219-1089 at 1.
[386] *Id.*; *Testimony of Lorenzo Ellis*, Doc. 240 at 156:13–25.
[387] *Testimony of Lorenzo Ellis*, Doc. 240 at 156:17–19.
[388] Doc. 219-1089 at 1.
[389] Doc. 216-12 at 1.
[390] *Testimony of Mark Ferguson*, Doc. 234 at 107:1–9.
[391] Doc. 221-33 at 1.
[392] *Testimony of Mark Ferguson*, Doc. 234 at 107:15–18.
[393] Doc. 221-80 at 1.

directed all work on the 2.2 Project to cease because the river reached elevation +14.5 feet.[394]

153.    On August 6, 2015, in response to FEDCON's inquiry regarding whether sheet and pipe pile driving could continue from Station 40+71 (484+71) to 43+00 (487+00)—the portion of the 2.2 Project before the area between the Chevron pipe bridges, which were located at Monoliths 075 and 079—Mr. Falati advised that the issue was whether TFP could be constructed in accordance with Step 2a on C-301.[395] Mr. Falati explained that FEDCON had advised that it could not construct the TFP in accordance with Step 2a, but had not yet provided a clear plan on how the minimum protection as shown in Step 2a could be provided in this area.[396] He also advised that, although FEDCON had stated that Step 2b could be constructed from Monoliths 71 through 75, this type of TFP would not provide the protection needed for a hurricane event.[397] Mr. Falati thus instructed FEDCON to provide a plan for this area if it desired to work in the area during hurricane season.[398]

154.    Similarly, in an October 16, 2015 letter to FEDCON, GLF explained that the Corps had relaxed the TFP contract requirement from Station 480+00 to 487+00 on the 2.2 Project, but FEDCON constructed TFP from 486+00 to 487+00 that was in accordance with neither Step 2a nor Step 2b, while FEDCON's TFP construction from 480+00 to 486+00 complied with Step 2a.[399] Consequently, the Corps rejected this TFP work and, at a subsequent meeting, acknowledged that Step 2a could not be used, advised FEDCON to "think outside the box," and directed FEDCON to give the Corps an acceptable plan.[400] GLF advised that, to its knowledge, no such

---

[394] *Testimony of Lorenzo Ellis*, Doc. 240 at 144:7–12.
[395] Doc. 221-80 at 1.
[396] *Id.*
[397] *Id.*
[398] *Id.*
[399] Doc. 219-891 at 1–3.
[400] *Id.*

plan had been provided to the Corps.[401]

155.     Ellis testified that the first period of time for this claim, from May 17, 2015 to July 11, 2015, represents work front one not being available to GLF.[402] On the other hand, when the Mississippi River's elevation came down in late September of 2015, FEDCON had never performed the predecessor work for GLF to continue at work front two, which is represented by the second period of time for this claim, from September 20, 2015 to May 28, 2016.[403]

156.     On August 7, 2015, GLF advised FEDCON that it would begin removing its resources from work front two on the 2.2 Project until FEDCON had an access plan approved by the Corps with GLF's concurrence that the plan met the intent of the 2.2 Project Subcontract Agreement.[404] Although a November 21, 2015 e-mail from Lorenzo Ellis to Francesco Senis advised that GLF did not have any idle equipment for the Chevron work at that time, this recognition does not mean that GLF avoided incurring costs.[405]

157.     The Corps issued Modification No. A00016/R00019 in September of 2015, which extended the contract completion date by 137 calendar days "due to causes beyond the control and without the fault or negligence of [FEDCON], namely adverse weather, during the period from October 28, 2013 through July 31, 2015."[406] Similarly, the Corps issued Modification No. A00021/R00024 in February of 2016, which extended the contract completion time by 24 calendar days "due to causes beyond the control and without the fault or negligence of [FEDCON], namely adverse weather, during the period from August 1, 2015 through November 30, 2015."[407]

158.     Lorenzo Ellis testified that FEDCON made a "policy decision" to allow GLF to

---

[401] *Id.*
[402] *Testimony of Lorenzo Ellis*, Doc. 240 at 155:25, 156:1–2.
[403] *Id.* at 156:20–25.
[404] Doc. 217-116 at 1.
[405] Doc. 221-205 at 1.
[406] Doc. 217-66 at 9–10.
[407] Doc. 217-69 at 11–12.

sit idle instead of paying to buy some dirt and rip rap "in order to stay ahead of this river and keep [the] job moving."[408] GLF even paid HDB to conduct degrading work for the purpose of keeping the job moving.[409] Ellis testified that GLF was "bleeding" with "all this idle equipment and idle time" and was "doing anything [it] could to keep moving."[410]

### iii.  1.2 Project

159.     On the 1.2a Project, GLF claims that FEDCON's failure to perform the predecessor work impacted GLF's performance of work under the 1.2a Project Subcontract Agreement on 129 days.[411] These days span two periods of time: (1) from March 15, 2015, to July 11, 2015; and (2) from February 7, 2016, to May 21, 2016.[412] In this claim, GLF seeks $994,674.68, which utilizes EP 1110 rates.[413]

160.     The 1.2a Project Prime Contract required all construction work to cease when the Mississippi River reached or exceeded elevation +11 feet until the river subsided below such elevation. Like the 2.2 Project, the Corps granted FEDCON a limited waiver on the 1.2a Project on or about March 16, 2015, which provided that: (1) no new levee degrading, demolition of slope pavement, or excavation would be allowed once the Mississippi River reached elevation +11 feet; (2) no pile driving would be allowed once the Mississippi River reached elevation +14 feet; and (3) all other phases of construction must cease once the Mississippi River reached elevation +15 feet.[414] By letter dated March 24, 2015, GLF acknowledged that the 1.2a Project would receive a time extension of an unspecified number of additional days reflected in the scheduled updates for

---

[408] *Testimony of Lorenzo Ellis*, Doc. 240 at 144:1–4.
[409] Doc. 217-153 at 1.
[410] *Testimony of Lorenzo Ellis*, Doc. 240 at 146:7–9.
[411] Doc. 219-1093 at 1.
[412] *Id.*
[413] *Id.*
[414] Doc. 221-34 at 2.

March and April of 2015 for each day that the high river restriction was in effect.[415]

161.     As with the 2.2 Project, Jeff Falati further advised FEDCON on July 8, 2015, that pile driving operations had to cease when the Mississippi River reached elevation 14.5 and that all operations had to cease when the Mississippi River reached elevation 15.[416] On July 9, 2015, GLF advised that, as a result of the "uncertain nature of river elevation during this high river season," it would not work on the 1.2a Project until the river reached elevation +14.5 feet "and is falling," which GLF estimated to occur on or around July 27, 2015.[417] On July 17, 2015, the river reached 15 feet.[418] GLF's 1.2a Project two work front claim does not seek any damages from the period of time between July 11, 2015 and February 7, 2016.[419]

162.     Relevant to this time period in 2015, the Corps issued Amendment No. A00011/R00012, which extended the contract completion date by 107 calendar days as a result of adverse weather during the period from March 1, 2015, through June 30, 2015.[420] The Corps also issued Amendment No. A00013/R00015, which extended the contract completion date by 82 calendar days as a result of adverse weather during the period from July 1, 2015, through September 30, 2015.[421]

163.     In the beginning of 2016, GLF discussed, internally, a course for proceeding with the work, given the potential for the Mississippi River to rise again in the upcoming weeks.[422] Lorenzo Ellis cautioned that, although there were "a few pipe piles" still available to GLF, excavation at work front two of the 1.2a Project could not proceed until more TFP was constructed,

---

[415] Doc. 221-45 at 2.
[416] Doc. 221-80 at 1.
[417] Doc. 221-86  at 1.
[418] Doc. 221-95 at 1.
[419] Doc. 219-1093 at 1.
[420] Doc. 217-43 at 8–9.
[421] Doc. 217-44 at 7–8.
[422] Docs. 222-11 at 1; 222-12 at 1; 222-14 at 1; 222-20 at 1.

which would require the river's level to decrease "quite a bit more."[423]

164.     When FEDCON advised on February 16, 2016, that GLF needed to mobilize its pile driving and concrete cranes on work front two of the 1.2a Project, GLF advised that it had removed the resources as a result of the height of the Mississippi River and that, although GLF was remobilizing to perform available work, sheet piling operations were unnecessarily suspended by FEDCON until FEDCON built the TFP and degraded.[424] FEDCON responded that, after December 15, 2015, the Mississippi River had risen "to an elevation where standing water flood side impacted" degrading and TFP construction for work front two of the 1.2a Project.[425] FEDCON acknowledged that "[d]egrade/TFP construction" was still impacted by the high river level as of February 17, 2016.[426]

165.     On May 6, 2016, when asked for an update on the delivery of the pile driving crane for work front two on the 1.2a Project, GLF advised that the crane was scheduled for delivery on May 10, 2016, site conditions and weather permitting.[427]

### iv.  Both Projects

166.     FEDCON never directed GLF to perform any of GLF's work prior to the performance of the predecessor work.[428] Whenever the predecessor work activities were not complete at any particular work front, GLF's labor and equipment remained idle until such time as the predecessor work was complete.[429]

167.     Although GLF was performing work on one work front on each of the projects during the various times that are the subject of GLF's claims, FEDCON's position was that it did

---

[423] Doc. 222-11 at 2.
[424] Doc. 222-38 at 1.
[425] *Id.*
[426] *Id.*
[427] Doc. 222-121 at 1.
[428] Doc. 242 at 121:8–11.
[429] *Testimony of Lorenzo Ellis*, Doc. 240 at 138:2–22, 145:4–25, 146:1–14.

not have to provide notice under Paragraph 6B of the subcontracts to GLF that the work was being suspended on the other work front of each project.[430]

168.    According to Lorenzo Ellis, FEDCON "only wanted to use degraded material, so it was only during times of degrad[ing] that [FEDCON] wanted to build TFP or as much of TFP as [FEDCON] could build out of a degraded monolith."[431]

169.    According to Lorenzo Ellis, the daily reports and time sheets reflect that, for each day, week, or month included in GLF's REAs, work was proceeding at one work front on each project, which supports the conclusion that there was no high river condition or other impediment to GLF's ability to perform its work other than FEDCON's failure to perform the required predecessor work activities.[432] Lorenzo Ellis testified that the entire premise behind this claim was that, if GLF was driving piles on work front 1 of the 2.2 Project, there was no reason why it could not drive piles on work front 2 of the 1.2a Project, as the work was the same.[433] The only difference was that the predecessor activities had not been completed.[434] He attributed the lack of work to the incompletion of predecessor activities, not the river, explaining that the means and methods by which FEDCON chose to build the TFP—presumably to save money—resulted in GLF sitting idle for months.[435]

170.    Lorenzo Ellis performed a review of GLF's daily reports, daily time sheets, payroll reports, equipment reports and equipment rates and testified as to the labor, including supervision, and equipment that GLF had in place and prepared to work that was idle while awaiting completion of the predecessor work activities for which FEDCON had responsibility.[436]

---

[430] *Testimony of David Boland*, Doc. 243 at 212:18–25, 213:1–12.
[431] *Testimony of Lorenzo Ellis*, Doc. 240 at 143:2–6.
[432] *Id.* at 148:5–25, 149:1–7.
[433] *Id.* at 148:17–25.
[434] *Id.*
[435] *Id.* at 148:23–25, 149:1–7.
[436] *Testimony of Lorenzo Ellis*, Doc. 240 at 158:24–25, 159:1–21, 161:8–25, 162:1–6.

Pursuant to the testimony of Ellis and Brannon, discussed herein, GLF incurred direct costs of labor, including supervision, which includes labor burden, and the costs for equipment, utilizing EP 1110 rates, on the days when work could not be performed as a result of FEDCON's failure to perform the predecessor work activities.

171.    Ellis also testified that GLF "eventually mitigated the equipment."[437] Indeed, if the equipment was not owned by GLF "and there was a way to mitigate the cost, we tried to get those things off as quick[ly] as we could," balanced against the recognition that GLF awaited the availability of the work fronts.[438] GLF was still paying rent on equipment internally.[439]

### H.  Low Profile Work on the 2.2 Project

#### i.  Specialized Equipment and Restrictions

172.    The 2.2 Project Prime Contract required construction from approximately Monolith 063 to Monolith 075 to be performed outside of the time period from June 1 to November 30. At work front two of the 2.2 Project, at Monoliths 075 and 079, there were pipe bridges that extended from the Chevron plant overtop the levee and out to a dock where ships were loaded. As a result of the pipe bridges, GLF could not utilize its regular cranes and pile driving equipment to drive the sheet piles and pipe piles underneath the pipe bridges. GLF leased certain specialized equipment because such equipment was required.[440] This work was known as the "low profile" work.

173.    The specialized equipment and the procedures for using the equipment to drive the piling materials under the pipe bridges were required to be submitted by GLF to FEDCON and

---

[437] *Id.* at 139:6–7.
[438] *Id.* at 147:4–16.
[439] *Id.* at 157:1–12.
[440] *See Testimony of Mark Ferguson*, Doc. 234 at 11:19–25, 12:1–9; *Testimony of Lorenzo Ellis*, Doc. 240 at 192:16–24.

by FEDCON to the Corps for review and approval by the Corps.[441] GLF always planned to use specialty equipment in this area in anticipation of the pipe bridges.[442]

174.     GLF initially submitted a proposed plan to drive the piling materials and construct the concrete wall under the pipe bridges at Monoliths 075 and 079.  GLF's submittal of its plan was approved by the Corps and returned to GLF on March 3, 2014.[443] In or about February of 2015, while waiting for FEDCON to degrade the levee so that the low profile work could be performed, GLF developed an alternate plan for the performance of the low profile work and sent a revised submittal for the plan to FEDCON.[444] FEDCON approved the submittal in February 2015.[445] On February 12, 2015, GLF notified FEDCON that it was planning to receive the equipment needed to drive the piles underneath the overhead structures in Chevron at the end of the following week.[446] GLF also advised it would start to assemble the equipment on February 23, 2015, so that it could begin work at Monolith 075 on March 2, 2015.[447] GLF stated it would install alarm bars under the structure at Monolith 075 by the close of business on February 20, 2015, so that "HDB [could] begin excavating below the structure per the excavation plan submitted."[448] Mark Ferguson testified that, on or about February 21, 2015, GLF was "approximately 20 monoliths" away from the low profile work.[449] Nonetheless, in response to GLF's letter, Ferguson advised that the Corps was evaluating GLF's low profile plan and that the Corps was aware of "our" planned low profile start date of March 2, 2015.[450] Ferguson emphasized the need to plan

---

[441] *Testimony of Lorenzo Ellis*, Doc. 240 at 182:4–12; *Testimony of Mark Ferguson*, Doc. 234 at 43:2–10.
[442] Doc. 221-175 at 1.
[443] *See Testimony of Lorenzo Ellis*, Doc. 240 at 188:11–16; *see generally* Docs. 220-123, 220-124, 220-125, 220-126, 220-127.
[444] *See Testimony of Mark Ferguson*, Doc. 234 at 42:17–25, 43:1–10.
[445] *See* Doc. 219-962 at 1.
[446] Doc. 217-144 at 1.
[447] *Id.*
[448] *Id.*
[449] *Testimony of Mark Ferguson*, Doc. 234 at 12:10–16.
[450] Doc. 219-962 at 1.

the work before starting, given the limited space available in this area.[451] Ferguson did not object or otherwise instruct GLF not to proceed with procuring and mobilizing the low profile work.[452]

175.    The equipment arrived and GLF assembled it and made the required modifications for its use in early-March of 2015.[453]

176.    But the levee at Monolith 075 was not degraded to elevation 8 on March 2, 2015.[454] Mark Ferguson recognized that this work was "a day's work," "could have been done easily within a day," and that it was not necessary for this work to be done in sequence with the rest of the work being done on the monoliths.[455]

177.    The Corps approved GLF's alternate plan for the low profile work at the Low Profile Prep Meeting that occurred on March 11, 2015.[456] The approved low profile work plan included degrading the levee at Monoliths 75 and 79 to elevation 8.[457] The same specialized equipment and low profile plan that required the work platform be constructed at elevation 8 beneath the pipe bridges at Monoliths 075 and 079 was used by the replacement subcontractor on the 2.2 Project, Bo-Mac Contractors.[458]

178.    Additionally, as previously mentioned, the 2.2 Project Prime Contract limited the work to be performed by FEDCON, as the contractor, during high river season, which was from December 15 to June 15. As discussed, Mark Ferguson testified that a high-river event occurred in mid-March of 2015.[459] However, on March 16, 2015, the Corps granted a waiver to FEDCON to continue operations on the 2.2 Project past the elevation +11 restriction at which all construction

---

[451] *Id.*
[452] *Testimony of Mark Ferguson*, Doc. 234 at 48:23–25, 49:1–2.
[453] *Testimony of Lorenzo Ellis*, Doc. 240 at 192:16–25, 193:1; 234:2–16.
[454] *Testimony of Mark Ferguson*, Doc. 234 at 46:8–17.
[455] *Id.*
[456] *Testimony of Lorenzo Ellis*, Doc. 240 at 183:2–6, 188:11–26; Doc. 216-139 at 1–4.
[457] *Testimony of Lorenzo Ellis*, Docs. 240 at 181:25, 182:1–12; *Testimony of Mark Ferguson*, Doc. 234 at 43:2–10.
[458] *Testimony of David Boland*, Doc. 243 at 198:18–25, 199:1–25, 200:1–18.
[459] *Testimony of Mark Ferguson*, Doc. 234 at 107:1–9.

was required to cease, with such waiver: (1) allowing pile driving to continue until the river reached elevation +14.0 feet; (2) stating that no new levee degrading, slope pavement demolition, or excavation would be allowed once the river reached elevation +11.0 feet; and (3) stating that all other phases of construction must cease once the river reached +15.0 feet.[460]

179.    Despite the hurricane restriction from approximately Monolith 063 to Monolith 075, the Corps had directed FEDCON to perform work within the hurricane restricted area and work proceeded under a variance from June 1 through July 2, 2015.[461]

180.    The river rose to a level that demanded a complete stoppage of work on or about July 9, 2015, which lasted until the end of September of 2015, despite this period of time being outside high river season.[462]   On or around July 9, 2015, GLF had driven steel pipe piles at Monolith 072 and driven steel sheet piles at Monoliths 073 and 074.[463]

181.    Mark Ferguson acknowledged that the levee had not been degraded to elevation 8 at Monoliths 075 and 079 to allow the work to proceed by the time that the high river restriction went into effect, asserting that FEDCON would not perform that work until it was "ready."[464] According to Ferguson, performing this work would have "created an issue," in which FEDCON "couldn't pass through there."[465]

182.    David Boland testified that FEDCON was unable to perform work in this area in the fall of 2015 as a result of hurricane season.[466] Additionally, he claimed that FEDCON could have excavated this area if GLF had provided an indication that it was planning to remobilize when FEDCON had asked GLF to remobilize in December of 2015, but excavating this area without

[460] Doc. 221-33 at 1.
[461] Doc. 217-110 at 1; *Testimony of Lorenzo Ellis*, Doc. 241 at 20:5–22.
[462] *Testimony of Lorenzo Ellis*, Doc. 240 at 144:5–16.
[463] *Id.* at 211:17–22.
[464] *Testimony of Mark Ferguson*, Doc. 234 at 43:2–17.
[465] *Testimony of David Boland*, Doc. 243 at 203:12–25, 204:1–2.
[466] *Id.*

GLF's equipment on site would have presented a problem because it would create a hole in which water would have gathered.[467] He further testified that FEDCON did not degrade the levee to elevation 8 at Monolith 075 or Monolith 079 per the approved plan at any point between January 1, 2016, to May 26, 2016, the day of termination, because there was "no reason" to do so.[468]

183.    FEDCON was required to perform the predecessor work before GLF could perform the low profile work.[469] Ellis testified that, although GLF had procured and modified the equipment and cut the materials, the equipment was idle throughout the spring and summer up until August 7, 2015, because FEDCON never degraded the levee to elevation 8 per the plan.[470] Ferguson likewise confirmed that, as of the date when the work had to cease because of the high river restriction in July 2015, the levee at Monolith 075 had not been degraded to elevation 8.[471] Indeed, when the river rose, none of the low profile work was able to begin after July 9, 2015.[472] As a result, GLF was required to continue renting the specialty equipment for an extended period.[473]

184.    FEDCON could have degraded the levee at both Monolith 075 (outside of hurricane season) and Monolith 079 at any time to allow the low profile work to be performed by GLF, as this work needed different equipment, but failed to do so prior to the stoppage for high river.[474] Ellis testified that the levee was not degraded to elevation 8 under Monolith 075 or Monolith 079 by May 26, 2016, the date of FEDCON's termination of the 2.2 Project Subcontract Agreement.[475] The failure to degrade the levee to elevation 8 in this area impacted GLF's efforts

---

[467] *Id.*
[468] *Id.*
[469] *See Testimony of Lorenzo Ellis*, Doc. 241 at 38:8–25, 39:1–2.
[470] *Id.* at 38:2–20.
[471] *Testimony of Mark Ferguson*, Doc. 234 at 44:5–9.
[472] *Testimony of Lorenzo Ellis*, Doc. 240 at 199:16–19.
[473] *Id.* at 199:20–25, 200:1–10; *Testimony of Patrick Brannon*, Doc. 243 at 24:24–25, 25:1–8.
[474] *Testimony of Mark Ferguson*, Doc. 234 at 47:2–7, 48:1–15.
[475] *Testimony of Lorenzo Ellis*, Doc. 240 at 201:3–21.

to utilize the cut pipe pile and sheet pile, as the sheet and pipe were too long in the absence of the requisite degrading to elevation 8.[476]

185.    In an August 3, 2015 e-mail to FEDCON and others, Jeff Falati concurred with the premise that FEDCON could continue degrading and "reconfiguring the TFP" in the area between the two Chevron pipe bridges once the level of the Mississippi River went below 14.5 feet.[477] He also advised that, although FEDCON had stated that Step 2b could be constructed from Monoliths 71 through 75, this type of TFP would not provide the protection needed for a hurricane event.[478] Mr. Falati instructed FEDCON to provide a plan for this area if it wished to work here during hurricane season.[479]

### ii.  Demobilization and Obstacles to Remobilization

186.    On August 7, 2015, GLF advised FEDCON that, because FEDCON could not "provide access, in accordance with the prime contract and our subcontract agreement," GLF would "remove all resources" from work front two on the 2.2 Project beginning on August 10, 2015, "until such time as Fedcon has a fully accepted access plan approved by the [Corps] and concurrence from GLF that it meets the intent of our subcontract agreement."[480] Ellis testified that this language regarding a fully accepted access plan referred to an access plan for the area behind Chevron from Station 41+71 through 72+50 that was submitted on June 10, 2015, discussed in further detail herein.[481] GLF emphasized in the letter that it was "evident that access to work front #2, beginning at monolith 61, and continuing through Chevron," remained "unresolved."[482] The letter, entitled "Notice of Intent to Claim: Work front access," advised FEDCON to accept the

---

[476] *Id.* at 201:22–25, 202:25.
[477] Doc. 216-321 at 2.
[478] *Id.*
[479] *Id.*
[480] Doc. 217-116 at 1.
[481] *Testimony of Lorenzo Ellis*, Doc. 241 at 23:15–18.
[482] Doc. 217-116 at 1.

letter as formal notice per the 2.2 Project Subcontract Agreement that GLF reserved "its right to seek recovery of all additional costs and time, leading up to, during and moving forward resulting from any impacts associated with this issue."[483] The letter, therefore, did not specifically address the failure to degrade the levee to elevation 8.

187.   GLF accordingly demobilized on work front two around the first week of August of 2015, which included demobilizing the equipment that had been procured to perform the low profile work.[484] GLF demobilized because: (1) it was paying rental charges on idle equipment; (2) the existence of a high river period, even though high river season should have ended by then; (3) FEDCON had not degraded the levee down to elevation 8; and (4) the lack of an approved access plan.[485] The decision to demobilize was a "very tough decision" for GLF because the equipment was "very hard to come by."[486]

188.   Without an approved access plan, the only task that GLF could have completed, which is what it was working on, was to drive five or six piles at Monolith 072.[487]

189.   The river came down towards the end of September of 2015.[488]

190.   On December 18, 2015, GLF responded to a letter from FEDCON, advising that it was unable to offer a schedule for low profile activities because the "access/haul road FEDCON is contracted to provide is not yet installed."[489] GLF advised that the 2.2 Project Subcontract Agreement required FEDCON to provide an access road adjacent to the work platform on the protected side of the levee, extending the length of the levee, but FEDCON's proposed access plan

---

[483] *Id.*
[484] *Testimony of Lorenzo Ellis*, Doc. 240 at 199:21–24.
[485] *Id.* at 199:25, 200:1–14; *Testimony of Lorenzo Ellis*, Doc. 241 at 1–25; Doc. 217-116 at 1.
[486] *Testimony of Lorenzo Ellis*, Doc. 240 at 200:15–19.
[487] *Testimony of Lorenzo Ellis*, Doc. 241 at 25:3–10.
[488] *Id.* at 24:21–24.
[489] Doc. 221-243 at 1.

for access that terminated *at* the platform did not constitute access at all.[490] GLF also advised that it had previously procured the equipment to perform this work per FEDCON's direction, only for FEDCON to fail to plan or perform the predecessor activities so that the low profile pile installation could begin.[491] GLF advised that it intended to recover all costs for the previous procurement of the specialty equipment and that FEDCON should accept the letter as notice of that intention.[492]

### iii. Low Profile Claim

191.    GLF submitted a claim for the low profile work, which includes costs purportedly incurred from March 1, 2015 through August 22, 2015.[493] The claim is based on GLF's costs for the rental of the specialty equipment for that period of time and for its preparation to perform the low profile work, with costs including labor costs, the costs of modifying the equipment, the costs of preparing the sheet pile and pipe pile materials, and the rent paid to the equipment suppliers for the specialty equipment required to perform the low profile pile driving work.[494] The costs do not indicate any charges for equipment because the equipment is all specialty equipment rented by GLF; Ellis accordingly relied on the rental invoices from vendors in preparing the claim, which are listed under "other costs."[495] GLF provides two weekly cost summaries for this claim: the first is in the amount of $351,402.28, and the second is in the amount of $353,624.98.[496] GLF has failed to provide a cogent explanation of the difference between these two weekly cost summaries and relies upon the former in its proposed findings. As such, the Court construes this claim as requesting $351,402.28.

### I.    GLF's Double-Handling and Triple-Handling of Materials from Monolith 060

---

[490] *Id.*
[491] *Id.*
[492] *Id.*
[493] Docs. 218-702 at 1; 218-714 at 1.
[494] *Testimony of Lorenzo Ellis*, Doc. 240 at 202:2–25, 203:1–25, 206:23–25, 207:1–8.
[495] *Id.* at 206:23–25, 207:1–12.
[496] Docs. 218-702 at 1; 218-714 at 1.

**through Monolith 074 on the 2.2 Project**

192.    As discussed, the 2.2 Project Subcontract Agreement required GLF to be furnished with: "a temporary access road approximately 12' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee."[497] The purpose of the temporary access road was to allow for delivery of pipe piles and sheet piles adjacent to the location where the piling materials were being driven. Such delivery required GLF to handle the materials one time via crane.[498]

193.    In January of 2015, GLF and FEDCON had discussed access in the Monolith 063 to 075 area of the 2.2 Project, as this area was narrower than some other areas of the 2.2 Project.[499] Subsequently, FEDCON made the unilateral decision to combine the construction of the access road with the construction of the work platform, such that the access road transitioned into the work platform "and all you had was a work platform."[500] The Court finds Ellis' testimony that GLF did not agree to this arrangement to be credible.[501]

194.    As a result, GLF had to double-handle and triple-handle materials from approximately Monolith 060 to Monolith 074, such that delivery of the sheet pile and pipe pile materials were brought up from behind where the pile driving work was to be performed as opposed to adjacent to where the pilings were to be driven.[502]

195.    Ellis clarified that the lack of an access road in this area, which resulted in double- and triple-handling of materials, posed an access road problem, not a work platform problem: GLF was provided with a 30-foot-wide work platform with a 3:1 slope, which GLF

---

[497] Doc. 216-117 at 2.
[498] *See Testimony of Lorenzo Ellis*, Doc. 240 at 212:19–25, 213:1–5.
[499] *Id.* at 210:9–25, 211:1–16.
[500] *Id.*
[501] *Id.*
[502] *Id.* at 211:17–25, 212:1–20; *Testimony of Lorenzo Ellis*, Doc. 241 at 14:6–21.

deemed to be a safe work platform for cranes.[503] David Boland testified that GLF did not refuse to perform the work due to the lack of an access road, that GLF did not require the execution of a change order before performing the work in this area, and that GLF did not receive a written order to do the work without an access road.[504]

196.    As a result of FEDCON's unilateral decision to combine the temporary access road with the work platform, GLF was required to utilize the concrete crane to pick up the sheet piling materials and move the materials forward and drop them for the pipe pile crane to pick up, move, and drop the materials so that the sheet pile driving crane could pick up and move them around into position to be driven.[505] Thus, this practice resulted in GLF triple-handling the sheet piling materials.[506] For the pipe piles, a similar process was used: the concrete crane initially picked up the pipe piles, moved them forward, and dropped them, so that the pipe pile crane could pick up the pipe piles, swing them around, and move them forward to be driven.[507] This practice resulted in GLF double-handling the pipe piling materials.[508]

197.    This double-handling and triple-handling of materials reduced GLF's pile driving productivity, resulting in GLF taking more time to drive the same number of pile materials, because the crews were not performing the required subcontract work while engaging in the activity of picking up and moving piling materials.[509]

198.    On May 3, 2015, GLF advised FEDCON that, as GLF entered the limits of the Chevron plant, access was "diminishing" to the point where GLF was double-handling sheet piles

---

[503] *Testimony of Lorenzo Ellis*, Doc. 241 at 14:17–25, 15:1–12.
[504] *Testimony of David Boland*, Doc. 232 at 133:9–19.
[505] *Testimony of Lorenzo Ellis*, Doc. 240 at 212:2–18.
[506] *Id.* at 212:19–20.
[507] *Id.* at 217:8–17.
[508] *Id.* at 217:18–20.
[509] *See id.* at 212:7–25, 213:1–25, 214:1–10.

and pipe piles in order to deliver to the work front.[510] As such, GLF asked for FEDCON to provide "the approved access plan, which complies with [the access road and work platform provisions within the scope of work section of the 2.2 Project Subcontract Agreement] for the Chevron limits."[511] Mark Ferguson admitted during trial that materials were at least double-handled because the space limitations in this area—an area which he had previously harbored suspicions regarding the sufficiency of available space—were realized and FEDCON integrated the access road with the work platform, thereby resulting in the need to double-handle materials.[512]

199.     GLF submitted a REA for the additional hours that it took to drive pilings between approximately Monolith 060 and Monolith 074 and the costs associated with the number of hours during which the crew and equipment could not perform work.[513] Ellis described this claim as an "active equipment claim" because GLF "actually ha[d] to do something."[514] Based upon down time of the equipment due to the lack of an access road, GLF determined that it incurred additional costs equivalent to an extra twelve and one-half (12.5) days of cumulative time to deliver and unload the required number of sheet piles and pipe piles due to the need to double- and triple-handle the piling materials than it would have if the piling materials did not need to be double- and triple-handled.[515] GLF determined the number of hours each piece of equipment could not be utilized that accumulated to the twelve and one-half (12.5) days and computed the cost of the labor and equipment for those hours.[516] GLF submitted a request to

---

[510] Doc. 217-151 at 1.
[511] *Id.*
[512] *Testimony of Mark Ferguson*, Doc. 234 at 58:25, 59:1–20.
[513] *See Testimony of Lorenzo Ellis*, Docs. 240 at 52:24–25, 53:1–7, 54:12–25; 241 at 14:6–21; *Testimony of David Boland*, Doc. 232 at 185:4–7.
[514] *Testimony of Lorenzo Ellis*, Doc. 240 at 215:19–20.
[515] *See id.* at 220:11–24.
[516] *See* Docs. 218-724 at 1; 218-733 at 1.

FEDCON for payment for the number of hours that accumulated to the twelve and one-half days (12.5) days in the amount of $152,511.26 for the labor and equipment costs, including supervision and labor burden.[517] Ellis testified to his understanding that the Corps valued the claim at nine and one-half days.[518]

200.     According to David Boland, GLF later revised the estimate to $119,000 "or something."[519] He testified that the Corps believed that GLF's estimate was high, and FEDCON requested substantiation of GLF's position from GLF, but GLF never provided such substantiation.[520] FEDCON accordingly negotiated and settled the claim with the Corps for $89,562.78, and FEDCON credited this amount to GLF in its damage claim on the 2.2 Project.[521] Thus, FEDCON and the Corps settled the claim for less than the amount that GLF sought.[522]

201.     GLF provided two summaries of its damages for this double- and triple-handling claim: one in the above-mentioned amount of $152,511.26, and one in the amount of $111,953.47.[523] The former utilizes Blue Book rates, while the latter utilizes EP 1110 rates.[524] Because the Court has determined that EP 1110 rates are the proper rates, the Court will treat the latter as GLF's summary of its damages for this claim.

**J.  FEDCON's Termination of the 2.2 Project Subcontract Agreement and FEDCON's Claim that GLF Breached the Subcontract by Failing to Perform the Work Pursuant to Directions Received From FEDCON**

**i.  Proposed Access Plans and FEDCON's Notification of a Differing Site Condition**

202.     The 2.2 Project Subcontract Agreement required GLF to be provided with two

---

[517] *See* Doc. 218-724 at 1.
[518] *Testimony of Lorenzo Ellis*, Doc. 240 at 56:9–25, 57:1.
[519] *Testimony of David Boland*, Doc. 232 at 185:4–22.
[520] *Id.*
[521] *Id.*; Doc. 222-307 at 1.
[522] *Testimony of Lorenzo Ellis*, Doc. 240 at 54:25, 55:1–10; *Testimony of David Boland*, Doc. 232 at 185:4–22.
[523] Docs. 218-724 at 1; 218-733 at 1.
[524] *Testimony of Lorenzo Ellis*, Doc. 240 at 214:11– 25, 215:1– 2, 219:14–21.

temporary work platforms approximately 30 feet wide by 600 feet long and a temporary access road that was approximately 12 feet wide, extended the length of the levee, and located adjacent to the temporary work platform on the protected side of the levee in order to perform its work.

203.     Prior to May 20, 2015, one of the Corps' primary concerns was the existence of a detailed access plan for the remainder of the work south of Monolith 070 on the 2.2 Project.[525] On May 29, 2015, Jeff Falati asked FEDCON to submit its plan for access through Chevron.[526]

204.     On June 10, 2015, FEDCON sent a proposed access plan to the Corps for the area behind Chevron from Station 41+71 through 72+50, which included a written narrative, cross sections through various points on the levee, and a plan view, and detailed work for Monolith 072 through Monolith 118.[527] This plan addressed several ideas developed by Mark Ferguson, including placing a portion of the access road on top of the levee at a degraded elevation and ramping down the road on the flood side of the levee.[528] On the same day, FEDCON sent the proposed access plan to GLF, advising that FEDCON had submitted the plan to the Corps and "[w]e are all aware of the restrictions and challenges in this area."[529] This proposed access plan was the first specific access plan that FEDCON had furnished to GLF regarding the area in question.[530]

205.     On June 18, 2015, GLF responded to FEDCON's proposed access plan, advising that the proposed access plan presented "continued material changes" from the 2.2 Project Subcontract Agreement and that GLF was placing FEDCON on notice that it reserved "its right to seek recovery of all additional costs and time resulting from any impacts associated with

---

[525] *See* Doc. 216-267 at 1.
[526] Doc. 217-155 at 1.
[527] Doc. 217-105 at 1–25; *Testimony of Mark Ferguson*, Doc. 234 at 69:24–25, 70:1–7.
[528] *Testimony of Mark Ferguson*, (Doc. 234 at 70:8–16.
[529] Doc. 217-108 at 1.
[530] *Testimony of Ken Yerk*, Doc. 237 at 63:18–21.

access."[531] GLF also informed FEDCON of many issues with the proposed access plan.[532] On July 7, 2015, GLF reiterated that the lack of access, "particularly in the Chevron area," continued to impact GLF's production and that it still could not supply sheet pile, pipe pile, or concrete to its crews from Monolith 069 through Monolith 079.[533]

206.     On July 9, 2015, the Corps directed all work on the 2.2 Project to cease as the Mississippi River rose to elevation 14.5.[534] The river remained at an elevation that prohibited the performance of work until the end of September of 2015.[535]

207.     According to a subsequent GLF monthly report for the 2.2 Project, as of July 31, 2015, GLF's job cost was $11,258,531.00, while its total amount billed was only $5,669,071.68, representing a difference of $5,589,459.32.[536] Francesco Senis credibly testified that these numbers were inaccurate.[537] However, Mr. Senis also testified that he was not hiding the fact that GLF was losing money on the 2.2 Project and even more money on the 1.2a Project.[538]

208.     On August 7, 2015, GLF advised FEDCON that GLF would be removing all of its resources from work front two on the 2.2 Project beginning on August 10, 2015, "until such time as Fedcon has a fully accepted access plan approved by the [Corps] and concurrence from GLF that it meets the intent of our subcontract agreement."[539] GLF advised FEDCON to accept the letter as formal notice that GLF reserved its right to pursue recovery of all additional costs and time resulting from associated impacts.[540] GLF explained that it was "evident that access to work

---

[531] Doc. 217-37 at 2.
[532] *Id.*; *Testimony of Ken Yerk*, Doc. 237 at 63:25, 64:1–2.
[533] Doc. 217-111 at 1.
[534] *Testimony of Lorenzo Ellis*, Doc. 240 at 144:7–12.
[535] *Id.* at 144:13–16, 156:10–21.
[536] Doc. 221-170 at 4.
[537] *Testimony of Francesco Senis*, Doc. 236 at 199:23–25, 200:1–19, 201:3–10.
[538] *Id.* at 201:11–24.
[539] Doc. 217-161 at 2.
[540] Doc. 217-161 at 2.

front #2, beginning at monolith 61 and continuing through Chevron" remained "unresolved."[541] The Court previously discussed GLF's reasons for demobilizing. GLF's demobilization included the low profile work equipment at Monolith 075 and Monolith 079, which were the locations of the low-profile work and in the area of the Chevron plant area that was being affected by hurricane season, high river, and the access issues. David Boland testified that the last monolith GLF constructed was Monolith 071, while GLF drove pipe piles and sheet piles at Monolith 072 and drove some sheet piling at Monolith 073 and Monolith 074.[542]

209.   Sometime in either the end of August of 2015 or in early September of 2015, Rick Batdorf took over for Jason Whitworth as the construction manager for FEDCON on the 2.2 Project.[543] Upon beginning this position, Batdorf immediately considered concepts for providing access to work front two of the 2.2 Project.[544] The work was stopped on both projects because of the high river event on both projects at this time.[545] Ultimately, the Corps rejected FEDCON's June 2015 proposed access plan.[546]

210.   As such, beginning in August of 2015, FEDCON explored various potential access plans for the work on work front two of the 2.2 Project. One idea developed by FEDCON personnel was to place the access road on top of the TFP and widening the TFP, but this idea was not implemented.[547] Another idea was to move the TFP further out on the batture and place the access road between the levee and TFP for a portion of the work front two work.[548] However, on September 18, 2015, David Boland advised Francesco Senis that moving the location of the TFP

---

[541] *Id.*
[542] *Testimony of David Boland*, Doc. 232 at 86:1–9.
[543] *Testimony of Rick Batdorf*, Doc. 235 at 56:11–13, 57:16–19.
[544] *Id.* at 55:21–25, 56:1–10.
[545] *Id.* at 56:14–17.
[546] *Testimony of Mark Ferguson*, Doc. 234 at 70:17–20.
[547] *Testimony of Rick Batdorf*, Doc. 235 at 62:11–14.
[548] *See Testimony of Mark Ferguson*, Doc. 234 at 75:5–19, 76:4–8; 217-162 at 1.

was not a viable option because an engineering firm retained by FEDCON had determined that it could not "utilize a soil strength value as high as the [Corps] had utilized in its original design."[549] As such, Boland advised that "work front two will be moved to Monolith Number 88 and extend south, and access will be provided by a temporary access road *on the flood side of the levee* from Gate Monolith 72 south to Monolith Number 118 with the work platform on the protected side of the levee."[550] In the end, the revised access plan for work front two involved utilizing K Street inside the Chevron plant.[551] FEDCON finalized this agreement with Chevron in approximately January of 2016.[552]

211.    In the meantime, the river receded in September of 2015. Once the river receded, work by GLF proceeded on both work fronts of the 1.2a Project and work front one of the 2.2 Project.[553] Work proceeded continuously on these three work fronts, other than when interrupted by further high river impacts.[554]

212.    In October of 2015, FEDCON requested GLF to proceed with the low profile work at Monolith 079—in the area of the pipe bridges from the Chevron plant.[555] The low profile work at Monolith 075, where the other pipe bridges were located, could not be performed during hurricane season, which was ongoing at that point.[556] The levee at Monolith 076 through 079 was not degraded by HDB until December 4, 2015, so the low profile work was not available to be performed in October of 2015.[557]

213.    Significantly, on October 21, 2015, Rick Batdorf of FEDCON expressed

---

[549] Doc. 217-180 at 1.
[550] *Id.* at 1–2 (emphasis added).
[551] *Testimony of Rick Batdorf*, Doc. 235 at 62:18–22.
[552] *Testimony of Rick Batdorf*, Doc. 235 at 63:3–6; *Testimony of David Boland*, Doc. 233 at 94:21–24.
[553] *Testimony of Rick Batdorf*, Doc. 235 at 64:12–15.
[554] *Id.* at 64:16–20.
[555] *Testimony of David Boland*, Doc. 233 at 95:11–23.
[556] *See id.*
[557] *See* Doc. 216-80 at 1.

agreement that the "road down on the flood side is a change from what is required in your contract but was necessitated by a lack of physical space between the fence line and the levee."[558] He emphasized that "most areas do not have enough room for a work platform and adjacent road" and explained that FEDCON was working on a solution and had approached GLF on several occasions for its comments but was told that GLF did not have any comments or suggestions.[559] In response, Senis advised his team, internally, that GLF had been abused since the beginning of the project, that GLF needed to get David Boland "into a corner to gain an economical advantage," and that they needed to "play [their] cards very, very, very slowly."[560]

214.     On October 30, 2015, FEDCON placed the Corps on notice of a differing site condition at work front two, behind the Chevron petrochemical plant.[561] A "differing site condition" is a condition that exists on a project that differs from the conditions depicted on the contract drawings and specifications."[562] FEDCON's letter provided that "investigation into the layout of the work platform and access road" had determined that the Chevron fence and Chevron water pipeline encroached into the temporary work area easement "beginning at approximately Wall Baseline Station 41+00 to 45+00 and then again at approximately from Wall Baseline Station 49+50 past 62+00."[563] David Boland testified that the differing site condition began at approximately Monolith 060 and continued south of Monolith 090 or Monolith 095.[564] The most significant encroachment occurred in the area of Monolith 090 to Monolith 092 where "the existing levee and floodwall would change direction and take a dog leg right."[565] FEDCON

---

[558] Doc. 216-237 at 2.
[559] *Id.*
[560] *Id.* at 1.
[561] Doc. 134 ¶20.
[562] *Testimony of Rick Batdorf*, Doc. 235 at 13:23–25, 14:1–2.
[563] Doc. 221-168 at 1–2.
[564] *Testimony of David Boland*, Doc. 232 at 143:17–23.
[565] *Id.* at 143:17–25, 144:1–4.

complained in its letter to the Corps about the inability to verify "any dimensions on the drawings in that area" before bid submission and averred that a "reasonable assumption" was that the fence and pipeline would be outside of the area depicted on the drawings.[566] FEDCON concluded that (1) the access road would need to be constructed on the flood side of the TFP, thereby subject to flooding and more frequent maintenance; and (2) a "secondary access to the work platform" would be needed to allow for steel delivery, crane maintenance, and crane mobilization.[567] FEDCON also advised that its subcontractors had provided "notification that they will seek compensation for these impacts."[568]

215.    On November 10, 2015, the Corps rejected FEDCON's claim that a differing site condition existed and emphasized that "FEDCON is responsible for constructing the contract work within the physical limitations of the project site."[569]

216.    On November 13, 2015, FEDCON advised GLF that FEDCON was "ready to commence low profile operations at Monolith[s] 75 and 79."[570] GLF responded that "a visual observation of the site" confirmed that access had not been established in accordance with the 2.2 Project Subcontract Agreement and that GLF would remobilize the equipment and resources to perform this work once such access was established.[571] Ernest Howard of GLF reiterated, internally, that although GLF could access the work, it would not be in accordance with the 2.2 Project Subcontract Agreement, which called for the access road on the protected side of the levee.[572]

217.    FEDCON also agreed to issue change orders to HDB for both projects to perform

---

[566] Doc. 221-168 at 1–2.
[567] *Id.*
[568] *Id.*
[569] Doc. 221-185 at 1–2.
[570] Doc. 221-186 at 4.
[571] *Id.* at 3.
[572] Doc. 221-180 at 1.

some reconstruction work on the access roads for the low profile work on November 13, 2015. HDB did not degrade the levee at Monolith 076 through 079 until December 4, 2015.[573] Neither FEDCON nor HDB performed any additional work in regard to the work platform in this area between December 4, 2015 and May of 2016.[574]

218.    In anticipation of FEDCON taking the position that GLF should file a claim with FEDCON regarding the access and proceed with the work, Mr. Senis explained in an internal e-mail to GLF that FEDCON's failure to provide access would result in "no work at Chevron."[575]

219.    After FEDCON notified GLF in the beginning of December of 2015 that FEDCON was "ready to commence the low profile operations at Monolith[s] 79 and 75," Ernest Howard of GLF emphasized to the GLF team the need for GLF to recover all "low overhead standby equipment cost" that GLF had incurred prior to considering remobilization."[576] Ellis computed a cost estimate of $40,139.10 per day, with an additional cost for the low profile work of $9,633.09 per day, as a "reasonable daily rate for doing work at Chevron"[577] GLF ultimately responded to FEDCON by issuing the December 18, 2015 letter, which emphasized that the proposed access plan, in which the access road terminated at the work platform, did not satisfy FEDCON's obligation.[578] Mr. Senis also raised concerns with GLF personnel regarding FEDCON's licensure and even instructed GLF personnel to explore whether FEDCON had violated the storm drainage permit for the 2.2 Project.[579]

### ii.    Development of New Access Plan and FEDCON's Initial Engineering Analysis

---

[573] Docs. 216-80 at 1.
[574] *Testimony of David Boland*, Doc. 233 at 102:3–15; *Testimony of Lorenzo Ellis*, Doc. 241 at 58:1–4.
[575] Doc. 221-189 at 1.
[576] Doc. 221-227 at 1.
[577] Doc. 221-240 at 1–2.
[578] Doc. 221-243 at 1.
[579] Docs. 221-218 at 1–2; 221-205 at 1.

220.    On December 22, 2015, FEDCON informed GLF that FEDCON had negotiated, and would execute, an agreement with Chevron that allowed for access through Chevron "for the delivery and unloading of materials for the construction of the floodwall south of Station 490+00."[580] FEDCON advised that a gate would be installed at Chevron's fence to allow delivery trucks to travel along K Street and unload at the location where the work was being performed as the work progressed down the levee.[581] FEDCON also specified that a temporary access road would be constructed "over the degraded levee and ramped down to the work platform, and extended as the work front progresses, for the delivery of concrete and reinforcing steel," whereas the access through Chevron pertained to the delivery of steel sheet piling and steel pipe piling.[582] FEDCON accordingly sought GLF's proposal for "any cost impacts" that GLF anticipated "as a result of utilizing the access through the southern portion of the project."[583]

221.    On December 28, 2015, GLF acknowledged receipt of this new proposed access plan issued by FEDCON and detailed additional information that GLF needed to evaluate the new plan.[584] On December 30, 2015, GLF wrote to FEDCON, advising that under Paragraph 10.A, FEDCON was required to issue written notice of the change in the work and the 2.2 Project Subcontract Agreement would then "need[] to be modified in writing, i.e. a change order, to reflect the equitable adjustment that is required for the additional time and cost associated with the change."[585] Further, "[i]n order not to delay the process while FEDCON undertakes to do what is necessary to provide GLF with the minimum required information for the preparation of a price to perform the changed work," GLF advised that it was prepared to proceed with the changed work

---

[580] Doc. 216-209 at ).
[581] *Id.*
[582] *Id.*
[583] *Id.*
[584] *Id.* at 1–3.
[585] Doc. 217-143 at 3.

upon receipt of a change order on either the following alternative bases: (1) FEDCON's agreement to pay GLF a daily rate for completion of the work between Monolith 072 and Monolith 118; or (2) FEDCON's agreement to pay GLF on a time and equipment basis to perform the work from Monolith 072 and Monolith 118.[586] Francesco Senis testified that, as FEDCON had not finalized a specific plan at this time, GLF presented these two options and did not insist upon, or require, the issuance of a change order for a specific dollar amount in order to proceed with the work.[587]

222.    On January 4, 2016, GLF personnel expressed concerns to FEDCON regarding the use of the Chevron property for access to work front two, explaining that the Chevron plant required it to "perform a substantial amount of activities within an active petrochemical plant which was never contemplated based upon the agreed conditions" of the 2.2 Project Subcontract Agreement.[588] As such, GLF invited FEDCON to both develop and implement a solution allowing GLF to perform its work within the confines of the project, without the liabilities associated with working within a petrochemical plant.[589] Regarding a letter from FEDCON accusing GLF of being obstructive, Mr. Senis testified that, by seeking to move the access road through the Chevron plant, FEDCON sought to avoid all costs and shift the risks, problems, and liabilities to GLF, similar to FEDCON's decision to use a different sheet pile material to save costs.[590] Mr. Senis also testified that FEDCON and GLF seemed to be in agreement that this situation constituted a change to the 2.2 Project Subcontract Agreement, but FEDCON's plan to implement the change or arrive at the methodology to compensate GLF was unclear.[591] At no point between January of 2016 and May 27, 2016, which was the termination date of the 2.2 Project Subcontract Agreement, did FEDCON

---

[586] *Id.*
[587] *Testimony of Francesco Senis*, Doc. 236 at 99:13–25, 100:1–24.
[588] Doc. 217-28 at 1–3.
[589] *Id.*
[590] *Testimony of Francesco Senis*, Doc. 236 at 103:17–25, 104:1–15.
[591] *Id.* at 105:13–18.

identify a methodology for compensating GLF for the impacts resulting from FEDCON's unilateral changes.[592]

223.     On January 7, 2016, Jeff Falati advised FEDCON that, as far as he was concerned, FEDCON still did not have a "definitive plan for completing construction in work front 2 yet."[593] FEDCON ultimately decided to use the access plan utilizing K Street inside the Chevron plant and this plan was discussed during a meeting on February 3, 2016, which representatives of GLF, FEDCON, and the Corps attended.[594] GLF raised several concerns during the meeting, such as the liability posed to GLF with working within a petrochemical plant and the lack of details regarding how the access plan would be implemented.[595] GLF also raised issues regarding delivery of the pipe pile materials from inside the Chevron plant, as well as the other materials being delivered by FEDCON.[596] The minutes from the meeting demonstrate the Corps still denied the existence of a differing site condition in this area.[597] Further, the Corps did not have any concerns about GLF working within the Chevron plant because FEDCON had "obtained a private agreement" with Chevron.[598] The Corps emphasized that this plan required "a lot of communication" between FEDCON and GLF to be successful.[599] GLF also did not have a copy of the purported agreement between FEDCON and Chevron.[600] On February 4, 2016, GLF issued Request for Information No. 20, setting forth a list of issues and questions in relation to the proposed access plan.[601]

224.     On February 10, 2016, FEDCON sent an access plan to GLF, describing it as

---

[592] *Id.* at 105:13–21.
[593] Doc. 219-963 at 1.
[594] *See* Doc. 219-754 at 3–5; *Testimony of Francesco Senis*, Doc. 236 at 107:17–20; Doc. 217-33 at 2.
[595] *Testimony of Francesco Senis*, Doc. 236 at 108:3–14.
[596] Doc. 219-794 at 3–5.
[597] *Id.* at 5.
[598] *Id.*
[599] *Id.*
[600] *Id.* at 4.
[601] Doc. 217-33 at 1–6.

84

"FEDCON's Access Plan proceeding from Monolith 72 thr[ough] Monolith 118."[602] The access plan, entitled "Access Plan 3 February 2016," provided, under the "Notes" subsection of the "CHEVRON ACCESS ROAD" section, that an engineer would be "engaged to provide information in relation to the design and construction of the work platform in areas where the platform has less than a 3:1 slope at the fence line and the platform is less than 30 linear feet wide."[603] The details on plan sheet C-301 also required the slope of the embankment material from elevation 11 to the elevation of the adjacent native ground where the access road would be located to have a 3:1 slope, which FEDCON provided to GLF for most areas of the 2.2 Project.[604] Additionally, Jeff Falati referenced the 3:1 slope inversely as a "1:3" slope from "the edge of the road at elevation 11 to the natural ground at elevation 6" in an April 22, 2016 e-mail to FEDCON.[605] During trial, Ferguson unpersuasively asserted that the reference to the 3:1 slope in FEDCON's access plan was a "typo" and that Falati could have been looking at "different drawings."[606] When asked about this language during trial, Francesco Senis testified that FEDCON's introduction of a work platform without an adjacent access road resulted in "an embankment that is just a volume of dirt that is not more constrained and contained laterally by the access road," thereby raising questions as to how, if at all, the stability of the embankment was being addressed.[607]

225. The access plan contemplated using K Street, the street inside the Chevron facility that ran parallel to the levee from baseline station 34+71 to baseline station 62+00, for delivery of pipe piles, sheet piles, and rebar for portions of the work.[608] The plan listed the remaining work

---

[602] Doc. 217-178 at 1.
[603] *Id.* at 2–3.
[604] Doc. 217-204 at 1; *Testimony of Lorenzo Ellis*, Doc. 240 at 114:4–15.
[605] Doc. 219-825 at 1.
[606] *Testimony of Mark Ferguson*, Doc. 234 at 3:11–14.
[607] *Testimony of Francesco Senis*, Doc. 236 at 109:1–12.
[608] Doc. 217-178 at 2–3.

as: the Chevron Access Road; work front one (Monolith 035 through Monolith 044); work front two (Monolith M072 through Monolith 095); and work front three (Monolith 118 through Monolith 096).[609]

226.     On February 11, 2016, following its review of the proposed access plan, GLF wrote to FEDCON, in which GLF: (1) advised that the access plan constituted merely a "narrative" of FEDCON's method for proceeding with the work south of Station 490+00 and failed to provide the "requisite engineering data, analysis, calculations, construction schedule, and Chevron Agreement" for GLF to evaluate the plan for safety, risk analysis, feasibility, and additional costs and impact; (2) suggested that FEDCON pursue the work under the 2.2 Project Subcontract Agreement's terms, in light of the Corps' refusal to acknowledge the differing site condition and a lack of supporting documentation; (3) provided assurances that the work south of Station 490+00 could be installed without use of K Street or exposure of GLF's personnel and resources to potential hazards beyond the scope of GLF's work; and (4) offered FEDCON the use of GLF's engineering department to develop a plan for pursuing the work, if FEDCON did not have the capacity to develop and implement a plan within the project limits, in exchange for GLF receiving a "change order for developing such a plan along with reimbursement of the cost of any resulting impacts beyond our original scope of work, and that the plan be implemented by FEDCON."[610]

227.     On February 12, 2016, FEDCON responded that work front two was "prepared and ready for the work to commence immediately," as the temporary access road had been "upgraded" to facilitate access, the area was "appropriately graded," and the levee was "degraded from Monolith 072 through Monolith 080."[611] FEDCON represented that the work front did not

---

[609] Id.
[610] Id. at 5.
[611] Doc. 222-26 at 1.

require access through Chevron, no additional engineering was required, and the "requirements to work in the area" had not changed "since the project began."[612] FEDCON accordingly directed GLF to mobilize and begin performing immediately, advising that the failure to commence the work timely would result in a default under the 2.2 Project Subcontract Agreement.[613]

228.    On February 16, 2016, FEDCON inquired as to GLF's intention regarding resuming at work front two.[614] That same day, GLF emphasized to FEDCON that the 30-foot-wide work platform and adjacent 12-foot-wide work access road were not available on work front two, thereby resulting in work front two work remaining on hold.[615] GLF advised that it would not mobilize resources until FEDCON provided the temporary structures called for in the 2.2 Project Subcontract Agreement.[616] GLF also highlighted that it had not received an updated, approved schedule addressing the adjusted plan for the work.[617] As of the date of this letter, FEDCON had not issued an engineering plan or put into place an access road or a work platform for the remaining work on work front two.[618]

229.    FEDCON responded on February 17, 2016, by reiterating that resuming work at work front two did not require access through the Chevron plant and emphasizing that "the requirements to work in the area have not changed."[619] FEDCON advised GLF that it was providing GLF with "seventy-two hour written notice and curative period pursuant to Paragraph 8.A of the [2.2 Project] Subcontract Agreement to cure the default by mobilizing and

---

[612] *Id.*
[613] *Id.*
[614] Doc. 222-31 at 1.
[615] Doc. 216-218 at 2.
[616] *Id.*
[617] *Id.*
[618] *Testimony of Francesco Senis*, Doc. 236 at 111:12–18; *Testimony of David Boland*, Doc. 233 at 103:6–25, 104:1–5.
[619] Doc. 222-36 at 1.

recommencing the work at work front two."[620] According to FEDCON, failure to cure this default would result in FEDCON exercising remedies under Paragraph 8.A of the 2.2 Project Subcontract Agreement.[621]

230.    In response to this notice, GLF agreed that the work on work front two did not involve "access through the Chevron plant," but reiterated FEDCON's failure to address the contractually required predecessor activities, explaining that the lack of access prevented GLF from proceeding.[622] GLF described the plan as "incomplete" and "unworkable." [623] As such, GLF advised that the cure notice was "misplaced" and requested notification of a "plan to have the work platform and access/haul road constructed" so that it could proceed accordingly.[624]

231.    More letters followed. In its response to GLF's February 16, 2016 letter, FEDCON disputed GLF's assertion that no access existed to facilitate the work at work front two, claiming that, because the Chevron pipe bridges limited the available width to place the work platform and temporary access road, the temporary access road extended "to the work front" and would be "advanced as the work front move[d] forward."[625] FEDCON further claimed that "[t]his approach was discussed with, and agreed to, by GLF's project site management earlier last year prior to the first high river event" and that "[s]imilar conditions existed from Monoliths M001 to M008 and Monoliths M061 to M072 where the limited available width of the protected side of the levee required that the temporary access road extend to the work front and then move in the same direction as the work front," which FEDCON claimed that GLF performed "without any issues."[626]

232.    A February 29, 2016 letter from FEDCON to GLF, which advised that "GLF's

---

[620] Id.
[621] Id.
[622] Doc. 217-127 at 2.
[623] Id.
[624] Id.
[625] Doc. 222-42 at 2.
[626] Id.

refusal to prosecute the work at work front two" would result in FEDCON arranging to have a contractor perform the work, copied F&D, GLF's surety.[627]

233.    On February 29, 2016, twenty-six days after the February 3, 2016 meeting, Mr. Falati contacted FEDCON regarding the status of the access plan for work front two.[628] As of the end of February of 2016, there still was not a final approved plan.[629] Mr. Falati acknowledged that GLF was performing work at work front 1 on the 2.2 Project, which GLF had been doing since the end of the high river restriction.[630]

234.    During a visit to the 2.2 project in February of 2016, Mr. Senis and Mr. Ellis measured the width of the work platform at Monolith 076, discovering that it was less than 30 feet wide from the centerline of the sheets, and the 2.2 Project Subcontract Agreement required the "approximately" 30 feet.[631] Senis also did not observe any compaction, either.[632] Ellis also measured the work platform at Monolith 076 in the spring of 2016.[633] Ellis testified that, on both of these occasions, the width of the work platform was 28.2 feet.[634]

235.    On March 4, 2016, GLF advised FEDCON that it had consistently maintained that FEDCON's change in the access to GLF's work required FEDCON to issue a change order per Paragraph 10.A of the 2.2 Project Subcontract Agreement.[635] GLF claimed that the additional cost and time that would result from the change could not be determined at that time.[636] GLF explained that it was prepared to proceed with the changed work and was not refusing to perform the work

---

[627] Doc. 222-47 at 3.
[628] Doc. 219-968 at 1.
[629] *Testimony of Mark Ferguson*, Doc. 234 at 98:9–11.
[630] *Id.* at 97:22–25, 98:1–4.
[631] *Testimony of Francesco Senis*, Doc. 236 at 114:7–25, 115:1.
[632] *Id.* at 115:2–6.
[633] *Testimony of Lorenzo Ellis*, Doc. 241 at 57:16–25, 58:1–4.
[634] *Id.* at 58:12–17.
[635] Doc. 217-129 at 2.
[636] *Id.*

at work front two, but instead was awaiting receipt of a written order under the 2.2 Project Subcontract Agreement.[637] Senis testified that, through this letter, GLF did not insist upon a change order for a specific dollar amount.[638] GLF had not received any engineering design or information prior to this point, as FEDCON maintained that engineering was unnecessary.[639]

### iii. Corps' Recognition of the Differing Site Condition, FEDCON's April 11, 2016 Letter, and the First Terracon Report

236.     Despite previously denying the existence of a differing site condition at work front two, on April 7, 2016, the Corps acknowledged FEDCON's claim for differing site conditions behind the Chevron Plant on the 2.2 Project.[640] The Corps labeled this change as "CIN-019."[641] The Corps requested FEDCON to submit "a proposal detailing the cost and time impacts associated with this drawing discrepancy."[642]

237.     Four days later, on April 11, 2016, FEDCON sent correspondence to GLF, informed GLF that the Corps recognized FEDCON's claim that a differing site condition existed behind the Chevron plant.[643] FEDCON requested GLF to furnish FEDCON with GLF's proposal for CIN-019 by April 19, 2016, which was to include "a detailed, itemized estimate of the cost for the work" and an indication of "any change to [GLF's] schedule as a result" of CIN-109.[644]

238.     In the letter, FEDCON provided the following points regarding "the access plan for the work from Monolith 072 south," as had been "previously provided": (1) from Monolith 072 to approximately Monolith 085, steel sheet piles, pipe piles, concrete, and

---

[637] *Id.*
[638] *Testimony of Francesco Senis*, Doc. 236 at 115:19–23.
[639] *Testimony of David Boland*, Doc. 233 at 110: 2–7.
[640] Doc. 134 ¶21.
[641] *Id.*
[642] Doc. 216-323 at 2.
[643] Doc. 134 ¶22.
[644] Doc. 217-130 at 2.

reinforcing steel would be delivered by way of the "temporary access road leading to the work front"; (2) from monolith 085 to approximately Monolith 107, steel sheet piles, pipe piles, and reinforcing steel would be delivered by way of K Street within Chevron, while concrete deliveries would be by way of the temporary access road up to the work front; (3) from Monolith 118 to approximately Monolith 107, steel sheet piles, pipe piles, and reinforcing steel would be delivered by way of K Street within Chevron to an engineering ramp over an existing pipe rack, while concrete deliveries would be by way of the "temporary road easement in accordance with the contract documents and then to the temporary access road adjacent the work platform"; and (4) access to the equipment on the work fronts would be by way of "the temporary access road where it was adjacent to the work platform or by the temporary access road leading to the work platform."[645] FEDCON highlighted that, while deliveries of steel sheet piling, pipe piling, and reinforcing steel would be made by others, GLF would be required to load the steel pipe piling onto the truck at the lay down area and also unload the sheet piling, pipe piling, and reinforcing steel.[646] Thus, FEDCON would take over responsibility for delivering the steel pipe piling to the work front for GLF to drive.[647]

239.    FEDCON further advised in the letter that "a minimum 28 foot wide engineered work platform to support the equipment and construction operations" would be provided "where space limitations prevent a 30 foot wide work platform."[648] FEDCON explained that the letter constituted a notice to proceed and, accordingly, directed GLF to "proceed promptly with the accomplishment of the changed work by recommencing the work of work front two at Monolith M072 in order to ensure the work between Baseline Station 480+00 and 487+00,

---

[645] *Id.* at 2–3.
[646] *Id.* at 3.
[647] *Testimony of Rick Batdorf*, Doc. 235 at 74:11–20.
[648] Doc. 217-130 at 3.

that is required to be performed outside of hurricane season, is completed prior to 1 June 2016."[649]

240.     David Boland testified that FEDCON committed in this letter that it would provide engineering where there was not adequate space to provide a 30-foot-wide work platform.[650] FEDCON informed HDB that the work platform needed to be 30 feet wide to safely accommodate GLF's cranes.[651]

241.     On April 20, 2016, in another letter to GLF, David Boland reiterated FEDCON's "commitment that GLF will be provided a minimum 28 foot wide engineered work platform to support the equipment and construction operations . . . where space limitations prevent a 30 foot wide work platform."[652] Significantly, FEDCON advised that it was implementing the plan detailed in its April 11, 2016 letter because that plan was "the most cost effective and least impactful solution."[653] FEDCON advised that an equitable adjustment would be made and a change order would be issued under Paragraph 10 for "any reasonable cost and time impacts that GLF incurs as a result of the [Corps'] acknowledgement of the differing site condition and resulting change to the work."[654] FEDCON also declared that GLF was in default of the 2.2 Project Subcontract Agreement and stated that the letter constituted GLF's seventy two hours' written notice and curative period, per Paragraph 8.A of the 2.2 Project Subcontract Agreement, to cure the default by mobilizing and recommencing the work at work front two.[655]

242.     FEDCON pursued an engineering analysis. On April 1, 2016, Rick Batdorf exchanged emails with representatives of Terracon Consulting Engineers & Scientists

---

[649] *Id.* at 3.
[650] *Testimony of David Boland*, Doc. 233 at 133:2–10, at 119:7–17.
[651] *Testimony of Mark Ferguson*, Doc. 234 at 98:18–25, 99:1–7, 22–25, 100:1–3.
[652] Doc. 217-132 at 4.
[653] *Id.*
[654] *Id.*
[655] *Id.* at 4–5.

("Terracon"), an engineering firm, which addressed Terracon performing a slope stability analysis of the side slope of the work platform in the engineering analysis it was conducting.[656] In his e-mail to Terracon, Batdorf mentioned that the attached drawing showed "the work platform and the 3:1 slope."[657] FEDCON retained the services of Terracon to perform the engineering work addressed in the February 3, 2016 access plan and the April 11, 2016 letter regarding the provision of a "minimum 28 foot engineered work platform" wherever there was insufficient space for a 30 foot wide platform.[658] The "approximately" 30 foot wide platform that was required under the 2.2 Project Subcontract Agreement also included the 3:1 slope from the elevation of the degraded levee to the adjacent temporary access road or existing ground level in accordance with the detailed included in sheet C-301 of the project plans.[659]

243.    Terracon issued a memorandum with its engineering recommendations on April 18, 2016 (the "First Terracon Report") after several communications with FEDCON.[660] The recommendations included the manner in which the work platform was to be constructed wherever there was insufficient space to construct a 30-foot-wide work platform with, according to GLF, a 3:1 slope.[661]

244.    On April 26, 2016, William Junkin, P.E., an engineer employed by GLF as its vice president of engineering, issued a memorandum (the "First Junkin Memorandum"), which raised various concerns regarding the First Terracon Report's engineering recommendations for the work platform.[662] The First Junkin Memorandum addressed five points, including global

---

[656] Doc. 219-828 at 1.
[657] *Id.*
[658] *Testimony of David Boland*, Doc. 233 at 120:8–15.
[659] *Testimony of Lorenzo Ellis*, Doc. 240 at 114:4–15, 118:2–16.
[660] Docs. 219-762 at 1–2; 219-764 at 1, 3; *Testimony of Rick Batdorf*, Doc. 235 at 78:5–22.
[661] Doc. 219-764 at 3.
[662] *Testimony of William Junkin*, Doc. 239 at 169:4–23.

stability issues for GLF's cranes.[663] The First Junkin Memorandum concluded that the First Terracon Report was "not a complete engineered plan as required by the Contract to comply with the EM 385.1 specifications and to ensure the safety of GLF personnel and equipment operations in performing the work on the Project."[664]

245.     Junkin testified that the engineering performed by Terracon did not constitute a complete engineered plan and that GLF could not go forward.[665] GLF sent the First Junkin Memorandum to FEDCON on April 27, 2016,[666] and FEDCON sent the First Junkin Memorandum to Terracon on the same day.[667] Also on April 27, 2016, GLF advised FEDCON that GLF could not submit a claim for work that was excluded from the 2.2 Project Subcontract Agreement, as FEDCON had taken the position that GLF had to submit another claim for the access road and work platform.[668] GLF reiterated that, because the work platform and access road in the area of Monolith 072 were not what FEDCON was contractually required to provide, GLF was entitled to, and had to receive, a written change order acknowledging FEDCON's responsibility for properly compensating GLF in time and money for the changed work.[669]

246.     On May 2, 2016, David Boland sent a letter to GLF, which responded to issues raised in the First Junkin Memorandum.[670] Boland stated that "it should be noted the purpose of the engineering analysis contained in Terracon's [First] Report was limited to providing a design of the temporary work platform where there is insufficient space for the 30 foot width and an adequate side slope."[671] FEDCON directed Terracon to prepare a revised report addressing issues

---

[663] Doc. 219-977 at 2–3.
[664] *Id.* at 3.
[665] *Testimony of William Junkin*, Doc. 239 at 177:6–17.
[666] *See* Doc. 217-133 at 2.
[667] Doc. 219-769 at 1.
[668] Doc. 217-133 at 2; *Testimony of Francesco Senis*, Doc. 236 at 122:1–23.
[669] Doc. 217-133 at 2.
[670] Doc. 216-345 at 2.
[671] *Id.*

94

raised in the First Junkin Memorandum.[672]

### iv. Revised Terracon Report

247.     On May 9, 2016, after several further email exchanges between Terracon and Mr. Batdorf, Terracon issued a revised memorandum, dated May 3, 2016 (the "Revised Terracon Report"), which attempted to address issues and concerns raised in the First Junkin Memorandum.[673] The Revised Terracon Report provided four "crane loading configurations" that were "assumed for the analysis of the working pad," with the "pad" referring to the work platform.[674] These four conditions addressed work platforms that could not be constructed at 30 feet wide and had either a 2:1 slope or a 1.5:1 slope: two conditions addressed a 2:1 slope and the other two addressed a 1.5:1 slope, with the referenced slope being the slope from the edge of the work platform down to the adjacent property.[675] The Revised Terracon Report addressed the stability of the work platform once the cranes were placed thereon.[676] Regarding areas requiring vertical faces and the design of fabric embedment, the Revised Terracon Report included two design conditions based upon Terracon's review of the elevations and wall highs required.[677] In each condition, the Revised Terracon Report required the slope embankment material installed by FEDCON to be constructed in 6-inch compacted lifts, which would achieve 95% density, and the failure to construct the platform in that manner could result in global stability failure.[678]

248.     The purpose of each of the four conditions in the Revised Terracon Report was to ensure safe operation of cranes and avoid global stability failure.[679] Junkin concluded that the

---

[672] *Testimony of David Boland*, Doc. 233 at 124:18–22.
[673] Doc. 249-777 at 2.
[674] *Id.*; *Testimony of David Boland*, Doc. 233 at 125:12–17.
[675] Doc. 249-777 at 2; *Testimony of Rick Batdorf*, Doc. 235 at 82:1–7.
[676] *Testimony of Rick Batdorf*, Doc. 235 at 82:9–13.
[677] Doc. 249-777 at 2–3.
[678] *Id.* at 3–5; *Testimony of William Junkin*, Doc. 239 at 182:17–25, 183:1–25, 184:1–11.
[679] *Testimony of Rick Batdorf*, Doc. 235 at 84:4–22.

Revised Terracon Report "did not present a complete engineered plan, as required to comply with EM 385.1 and to ensure the safety of the personnel, equipment operations, and performing the work on the project."[680]

249.    During trial, David Boland testified that FEDCON did not instruct its surveyor or anyone else to analyze the width of the work platform or degraded levee that had been constructed from Monolith 076 to Monolith 078.[681] He did not personally measure the work platform at Monolith 076.[682] In discussing the width and the basis for his testimony, Mr. Boland referenced a survey that had been performed by GLF and acknowledged that the survey should reasonably depict the width of the platform.[683]

250.    GLF had a survey prepared of the existing work platforms that had been constructed by FEDCON through HDB from Monoliths 076 through 078 —the space between the pipe bridges—by Chustz Surveying, Inc. on December 18, 2015.[684] The December 18, 2015 survey of the work platform at Monolith 076 reflects that the outer edge of the work platform was 28.2 feet from 10' off of the centerline of the sheet pile wall at one measured point, or 1.8 feet short of the required 30-foot width, and 28.7 feet at another measured point, or 1.3 feet short of the required 30-foot width.[685] Based on the Chustz survey, the 28.2 foot and 28.7 foot dimensions of the work platform at Monolith 076 were dimensions that required engineering and construction in accordance with the Revised Terracon Report. FEDCON did not have a survey prepared in the area of Monolith 076 to Monolith 078.[686]

251.    Mr. Junkin opined that the work platform needed to be fully engineered if it was

---

[680] *Testimony of William Junkin*, Doc. 239 at 191:4–15.
[681] *Testimony of David Boland*, Doc. 233 at 133:16–20.
[682] *Id.* at 130:15–25, 131:1.
[683] *Id.* at 133:16–25, 134:1–4.
[684] Doc. 219-1085 at 1–3; *Testimony of Rick Batdorf*, Doc. 235 at 77:23–25, 78:1–3.
[685] *Testimony of Robert Benoit*, Doc. 238 at 72:19–25, 73:1–25, 74:1–4.
[686] *Testimony of Rick Batdorf*, Doc. 235 at 77:7–22.

less than 30 feet wide and that GLF's employees should not have performed work on a platform less than thirty feet in width if that platform was not engineered.[687] Mr. Junkin also opined that the information included in the Revised Terracon Report regarding the 6-inch compacted lifts of fill to 95% density was intended for the entity that would be constructing the work platform, which was HDB, and the failure to have a "clear understanding" regarding the requirements for this compacted fill could lead to global stability failure.[688]

252.     During trial, Junkin was shown a cross-section drawing of the area of Monolith 073 to Monolith 079, prepared by Thomas Coyle, a GLF draftsman, to Barry Barnes, a GLF surveyor, from September of 2015, on which Junkin was copied.[689] The cross-section depicted a 40-foot work platform for this area.[690] When asked whether this drawing depicted that a 30-foot platform could be constructed under the pipe bridges, Junkin replied that this document was not prepared at his direction, he did not know the purpose of the illustration, and that it did not constitute a survey.[691]

253.     In response to the Revised Terracon Report, Junkin prepared another response memorandum (the "Second Junkin Memorandum"), which was in "final draft" form on May 21, 2016, when he sent the document via e-mail to Francesco Senis.[692] Upon his receipt of this draft of the Second Junkin Memorandum, Senis replied that he was "inclined to hold tight" to the report and advise FEDCON that GLF had concerns regarding the loading conditions and proposed technical solutions in the Revised Terracon Report.[693] Senis also wanted to ask FEDCON to share

---

[687] *Testimony of William Junkin*, Doc. 239 at 192:23–25, 193:1–9.
[688] *See id.* at 182:17–25, 183:1–25, 184:1–11.
[689] *Id.* at 213:24–25, 214:1–18.
[690] Doc. 216-253 at 2.
[691] *Testimony of William Junkin*, Doc. 239 at 215:25, 216:1–20, 223:1–16, 226:3–7.
[692] Doc. 222-129 at 1.
[693] *Id.*

a plan view and cross section of the proposed temporary structures with GLF.[694] Ultimately, the Second Junkin Memorandum was not issued to FEDCON until June 1, 2016, after termination of the 2.2 Project Subcontract Agreement.[695]

254.    FEDCON never provided HDB with either its April 11, 2016 letter or the Revised Terracon Report, even though HDB served as FEDCON's site work subcontractor responsible for constructing the work platform.[696] Although Mr. Harrison recalled discussions regarding limiting the size of the work platform, he did not recall any discussion regarding an engineered work platform.[697] FEDCON never provided any direction to HDB to construct any of the work platforms or the stabilized slope portions using 6-inch lifts of compacted fill compacted to 95% density in accordance with the Revised Terracon Report.[698]

### v.  Change Order No. 15

255.    On May 16, 2016, FEDCON sent a letter to GLF, which purported to enclose a change order—Change Order No. 15—to the 2.2 Project Subcontract Agreement.[699] In the letter, FEDCON: (i) enclosed Change Order No. 15 for the changed work, "[n]otwithstanding that FEDCON . . . had previously provided a written order to GLF to perform the work relating to accessing the work from Monolith 072 south" and FEDCON's position that it was not required to provide a change order; (ii) advised GLF that it would need to commence the work at Monolith 076, the first monolith outside the hurricane restricted area, since GLF had failed to commence the work at Monolith 072 prior to hurricane season; and (iii) explained that, unless GLF cured its default "by re-commencing and diligently prosecuting the work at the second work front,"

---

[694] *Id.*
[695] *Testimony of William Junkin*, Doc. 239 at 191:18–23; Doc. 219-978 at 2; Doc. 217-198 at 1, 6–11.
[696] *Testimony of Alonzo Harrison*, Doc. 238 at 54:15–22, 55:21–25, 56:1–2.
[697] *Id.* at 55:6–15.
[698] *Id.* at 56:3–21.
[699] Doc. 216-346 at 2.

FEDCON would complete the work by hiring a replacement contractor and all costs incurred by FEDCON as a result of GLF's default would be charged to GLF and its surety.[700]

256.     As discussed above, GLF had consistently taken the position that the changes in access and work platform were changes to the 2.2 Project Subcontract Agreement's requirements that necessitated the issuance of a change order acknowledging the changes, even though neither the additional time nor cost resulting from the change could be determined. FEDCON initially refused to issue a change order, but ultimately acknowledged that the changes to the access road and work platform were changes to GLF's 2.2 Subcontract.[701] David Boland testified that this letter advised GLF to proceed with the work at Monolith 076 to cure GLF's alleged default.[702] Francesco Senis likewise testified that he understood this letter as an instruction for GLF to go to work at Monolith 076.[703]

257.     Francesco Senis testified that GLF did not receive Change Order No. 15 on May 16, 2016, despite the date of the accompanying letter, because FEDCON forgot to send it.[704] Instead, GLF received it a few days later.[705] GLF advised on May 24, 2016, that it had not received any change order.[706]

258.     Under Change Order No. 15, "the materials and equipment to be furnished and the work to be performed by" GLF was GLF's completion of the work from "Wall Baseline Station 41+50 south utilizing the plan for access described in the Contractor's letter dated 11 April 2016."[707] Change Order No. 15 also provided that FEDCON would provide the temporary work

---

[700] *Id.* at 2–3.
[701] *Testimony of David Boland*, Doc. 233 at 140:24–25, 141:1–13.
[702] *Id.* at 136:1–5.
[703] *Testimony of Francesco Senis*, Doc. 238 at 151:22–25.
[704] *Testimony of Francesco Senis*, Doc. 236 at 132:21–25, 133:1.
[705] *Id.*
[706] Doc. 217-196 at 3.
[707] Doc. 216-346 at 4.

platform from approximately Wall Baseline Station 51+50 to 53+50, which corresponded with Monoliths 090 to 092, in accordance with the design set forth in Terracon's condition 6.[708] Change Order No. 15 also indicated a change to the 2.2 Project Subcontract Agreement, but FEDCON issued the Change Order for $0.00, as represented by the "Total Change Order Amount" being listed as $0.00, and did not include a methodology under which FEDCON would compensate GLF for either additional money or time resulting from the change, other than to submit a Request for Equitable Adjustment.[709] By signing Change Order No. 15, GLF would agree that the Change Order fully compensated GLF for the described changes and "any and all claims" for, among other things, additional time, delay, impact, or disruption incurred by GLF as a result of Change Order No. 15 individually, and the cumulative impact collectively, with prior change orders.[710]

### vi. Notice of Default and GLF's Response

259.    The parties have stipulated that, on or about May 23, 2016, FEDCON issued a notice of default (the "Notice of Default") to GLF and directed GLF to submit "a plan setting forth how it intended to proceed with work from Monolith 076 south" on the 2.2 Project.[711] The Notice of Default was FEDCON's "final notice of default" to GLF.[712] Specifically, FEDCON advised that GLF continued "to remain in default under the terms of [the 2.2 Project] Subcontract Agreement for failing to recommence the work south of Monolith 072."[713] FEDCON advised that this failure to recommence the work at Monolith 072 had resulted in the work between Monolith 072 and Monolith 075 "being delayed until after the hurricane season ends on 30 November 2016 which has caused a six month delay to the Project Schedule."[714] FEDCON advised that it would

---

[708] *Id.*; *Testimony of Francesco Senis*, Doc. 238 at 6:15–20.
[709] Doc. 216-346 at 4; *Testimony of Francesco Senis*, Doc. 236 at 133:17–25, 134:1–8.
[710] Doc. 216-346 at 4.
[711] Doc. 134 ¶23.
[712] *Testimony of David Boland*, Doc. 233 at 136:6–12.
[713] Doc. 219-883 at 2.
[714] *Id.*

declare the 2.2 Project to be materially breached unless GLF cured its default within 72 hours of receipt of the Notice of Default "by providing a written plan demonstrating, and committing to, the recommencement of the work at the second work front beginning at Monolith 076 at the earliest reasonable time . . . ."[715] Thus, FEDCON was directing GLF to be prepared to proceed with the work at Monolith 076. FEDCON sent a copy of the Notice of Default to GLF's surety, F&D.[716]

260.     Also on May 23, 2016, GLF issued a letter to FEDCON, wherein GLF further expressed concerns regarding the Revised Terracon Report.[717] As such, GLF requested "typical sections, plan views, and cross-sections at minimum 50' intervals of the proposed temporary structures for the length of the remaining Work."[718]

261.     The Notice of Default did not offer any specifics regarding the written plan that FEDCON had requested from GLF.[719] David Boland, the author of the Notice of Default, testified that he was looking for a "commitment."[720] The "written plan" sought in the Notice of Default was a written commitment that GLF would proceed with the work at Monolith 076 at the earliest reasonable time, recognizing that GLF would have to completely mobilize "a full suite of equipment for that work front as well as the work force for it."[721] He testified that he did not want to dictate a specific date and, if it had taken GLF another three weeks to mobilize, he could have "live[d] with that."[722]

262.     On May 24, 2016, GLF responded to the Notice of Default.[723] GLF replied that the work at Monolith 072 constituted part of the work affected by the changed condition of which

---

[715] *Id. See also Testimony of David Boland*, Doc. 233 at 137:10–13.
[716] Doc. 219-883 at 3.
[717] Doc. 217-135 at 2.
[718] *Id.*
[719] *Testimony of David Boland*, Doc. 233 at 137:24–25, 138:1–5.
[720] *Id.* at 138:6–10.
[721] *Id.* at 138:18–23.
[722] *Id.* at 138:6–17.
[723] Doc. 134 ¶24.

FEDCON had notified the Corps and GLF.[724] GLF asserted that FEDCON had yet to provide GLF with "an acceptable engineering plan" demonstrating how FEDCON intended to address the changed condition, which impacted GLF's ability to perform the work at the specified locations.[725] GLF emphasized that it was "ready, willing and able to re-commence and complete all remaining work on the project just as soon as an acceptable engineered plan for the performance of the work that is the subject of the changed condition is issued, and an appropriate change order for same, is received."[726] GLF had not received Change Order No. 15 prior to the issuance of this letter. As previously mentioned, the levee at Monolith 076 through 079 was degraded by HDB on December 4, 2015, which was prior to FEDCON's commitment for a 28 foot wide engineered work platform in the areas where space limitations prevented a 30 foot wide work platform and the Revised Terracon Report.[727]

263.    FEDCON had not undertaken to perform any additional work on the work platform at Monolith 076 subsequent to the issuance of its April 11, 2016 letter, the First Terracon Report, and the Revised Terracon Report by May 27, 2016.[728] Indeed, between April 11, 2016 and May 27, 2016, neither the work platform at Monolith 076 nor any of the monoliths south thereof had been constructed in accordance with the recommendations by Terracon.[729] As such, the side slope of the work platform at Monolith 076 had not been constructed in accordance with any of the conditions included in the Revised Terracon Report where there was less than 30 feet available plus the 3:1 slope.[730] William Junkin of GLF would not have given his approval or recommendation to GLF to recommence the work on the work platform at Monolith 076 through

---

[724] Doc. 217-136 at 3.
[725] *Id.* at 2.
[726] *Id.*
[727] *Testimony of Lorenzo Ellis*, Doc. 241 at 57:20–25, 58:1–4.
[728] *Testimony of Francesco Senis*, Doc. 236 at 129:12–19; *Testimony of Lorenzo Ellis*, Doc. 241 at 60:4–10.
[729] *Testimony of Lorenzo Ellis*, Doc. 241 at 60:4–10.
[730] *Id.*; *Testimony of Lin Heath*, Doc. 240 at 13:21–25, 14:1–4.

Monolith 078 based on his observations on June 21, 2016.[731] The Chustz survey of the work platform at Monolith M076 prepared on December 18, 2015, demonstrated that the outer edge of the work platform was 28.2 feet from 10' off the centerline of the sheet pile and 28.7 feet at another measured point. As a result, the work platform at Monolith 076 was not a "minimum 28 foot wide engineered work platform," as was called for in FEDCON's April 11, 2016 letter to GLF. This same situation existed at the end of 2015 and throughout 2016 at the points in time when FEDCON sent letters to GLF directing GLF to proceed with the work front two work.[732]

264.     Notwithstanding the fact that FEDCON had issued a change order to GLF which was supposed to address additional time and compensation resulting from the changes regarding the temporary access road and work platforms from the requirements of the 2.2 Project Subcontract Agreement, and notwithstanding the fact that the work platform at Monolith 076 had not been constructed in accordance with the Revised Terracon Report and FEDCON's April 11, 2016 letter, FEDCON responded on May 25, 2016, that it would terminate the 2.2 Project Subcontract Agreement, unless GLF committed in writing to "recommence the work at the second work front beginning at Monolith 076 at the earliest reasonable time."[733]

265.     FEDCON also advised that, if GLF was truly willing to complete the remaining work, then GLF "should cure its default by positively responding to FEDCON's letter of 23 May 2016 prior to the close of business tomorrow."[734] David Boland testified that FEDCON was not looking for GLF to return to work on Thursday or Friday of that week, but instead, just a written commitment from GLF that it would return to work at Monolith 076 somewhere between three

---

[731] *Testimony of William Junkin*, Doc. 239 at 197:17–25.
[732] *Testimony of Lorenzo Ellis*, Doc. 241 at 57:20–25, 58:1–4; *Testimony of David Boland*, Doc. 233 at 133:16–25.
[733] Doc. 219-780 at 2.
[734] *Id.*

and six weeks.[735] GLF understood that it needed to respond by the following day.[736] This May 25, 2016 letter from FEDCON did not provide any additional information regarding the necessary or required contents of FEDCON's requested written plan beyond the "commitment" to which Mr. Boland testified, nor did it indicate when the earliest reasonable time would be to perform the work.[737]

266.     GLF responded to the May 25, 2016 letter on May 26, 2016, in which GLF: (1) emphasized that FEDCON had not provided a plan that could be implemented to allow the safe performance of the work or otherwise advised when it would provide such a plan; and (2) confirmed that GLF would recommence the work at "the earliest reasonable time" conditioned upon FEDCON "fulfilling all of its contractual responsibilities that are conditions precedent to GLF recommencing the work."[738] GLF also rejected Change Order No. 15, explaining that the change order was "improper" because it failed to address "the terms and conditions for compensation to GLF to the additional costs" that GLF would incur from the changed conditions.[739] GLF advised that there would "clearly be additional costs incurred" and that GLF needed a plan that reflected FEDCON's intention to address the changed conditions, which would then allow the parties to attempt to agree upon a price for the additional and changed work.[740] GLF also advised the change order needed to address the price increase and time impact resulting from the change.[741]

267.     Even though Change Order No. 15 provided for GLF to submit a REA, it acknowledged GLF's entitlement to a time extension and additional compensation, which were

---

[735] *Testimony of David Boland*, Doc. 233 at 143:14–24.
[736] *Testimony of Francesco Senis*, Doc. 236 at 137:6–10.
[737] Doc. 219-780 at 1–2; *Testimony of Francesco Senis*, Doc. 236 at 137:6–17.
[738] Doc. 217-197 at 3.
[739] *Id.*
[740] *Id.*
[741] *Id.*

rights that GLF had reserved pursuant to its notice to FEDCON on June 18, 2015, after FEDCON first notified GLF of the impact to access and changes to the temporary access plan and work platforms on work front two on the 2.2 Project.

268.    GLF also informed FEDCON that it was prepared to finish the 2.2 Project "under a properly in-house engineered plan," conditioned upon FEDCON's agreement to pay GLF for the extra costs through a "properly issued change order."[742] GLF proposed "a Monthly fee of $500K, with a cap on the overruns not to exceed $5 million above the amount currently available in the schedule of values."[743]

269.    Also on May 26, 2016, a representative of F&D sent a letter to FEDCON acknowledging receipt of the Notice of Default and requesting further information for investigative purposes, thereby demonstrating that F&D had commenced an investigation.[744]

### vii.   Notice of Termination and GLF's Response

270.    On May 27, 2016, FEDCON terminated the 2.2 Project Subcontract Agreement (the "Notice of Termination").[745] FEDCON sent a copy of the Notice of Termination to F&D.[746]

271.    The Notice of Termination provided that, despite "repeated directives" from FEDCON, GLF had failed to "recommence the work south of Monolith 071."[747] FEDCON described this refusal as a "material breach" of the 2.2 Project Subcontract Agreement that has resulted in "significant delay" to the 2.2 Project.[748] FEDCON countered that, despite GLF's claim of being ready to perform, GLF had no intention of doing so "absent FEDCON's acquiescence to

---

[742] *Id.* at 4.
[743] *Id.*
[744] Docs. 216-347 at 1–2; 134 ¶25. *See* Doc. 216-348 at 1 ("As you know from my May 26, 2016, letter, the Surety has begun its investigation into this matter.").
[745] Doc. 134 ¶26; 217-194 at 1–2.
[746] Doc. 217-194 at 2.
[747] *Id.* at 1.
[748] *Id.*

GLF's demand to be immediately paid for its yet undetermined and unsupported costs of addressing the changed work conditions due to the differing site condition."[749] FEDCON advised that the terms of the 2.2 Project Subcontract Agreement did not require FEDCON to submit to this demand and that Paragraph 10 of the 2.2 Project Subcontract Agreement expressly stated GLF's obligation "where the parties do not agree on a price to perform a change."[750] On this basis, FEDCON described GLF's refusal to recommence work without a change order containing a price acceptable to GLF as a "further material breach" of the 2.2 Project Subcontract Agreement.[751] Finally, FEDCON directed GLF to remove all equipment and personnel from the project site.[752]

272.     GLF responded to the Notice of Termination on June 1, 2016, characterizing FEDCON's termination of the 2.2 Project Subcontract Agreement as "improper."[753] GLF's response addressed several issues pertinent to the Court's analysis. First, GLF highlighted that: (1) the Notice of Default requested GLF to cure its default within 72 hours by providing GLF's written plan demonstrating, and committing to, the recommencement of the work at the second work front beginning at Monolith 076 at the "earliest reasonable time;" and (2) FEDCON's May 25, 2016 letter likewise stated that FEDCON would exercise its termination rights, unless GLF committed in writing to recommencing the work at the second work front beginning at Monolith 076 at the "earliest reasonable time."[754] GLF argued that its May 26, 2016 letter constituted GLF's provision of the "exact written commitment" that FEDCON requested, "albeit conditioned upon Fedcon fulfilling all of its contractual responsibilities."[755]

273.     Next, GLF took issue with FEDCON's basis for termination. GLF highlighted

---

[749] *Id.*
[750] *Id.*
[751] *Id.*
[752] *Id.* at 2.
[753] Doc. 217-198 at 2.
[754] *Id.* (internal quotation marks omitted).
[755] *Id.* (internal quotation marks omitted).

that, although the Notice of Termination stated that GLF had failed and refused to recommence the work "south of Monolith 071," neither the Notice of Default nor FEDCON's May 25, 2016 letter had demanded that GLF recommence the work at Monolith 072 within 72 hours of GLF's receipt of FEDCON's notice.[756] Rather, FEDCON had demanded that GLF provide written confirmation of its commitment to recommence the work at Monolith 076 at the earliest reasonable time. GLF also emphasized that the work in the area of Monolith 072 was not ready for GLF to perform because FEDCON had not completed the work platform and access road.[757]

274.     Further, GLF reiterated the issues with FEDCON's plan for the impacted work on work front two of the 2.2 Project.[758] GLF enclosed a copy of the Second Junkin Memorandum, advising that the Memorandum addressed the problems and issues with FEDCON's plan.[759] GLF asserted that, even if the Revised Terracon Report was completely acceptable, such acceptability was immaterial for purposes of termination since FEDCON had not implemented any portion of the plan, which was required for GLF to proceed with the work at issue.[760] On this basis, GLF opined that the termination of the 2.2 Project Subcontract Agreement based upon GLF's alleged failure to proceed with work that was not yet ready constituted a wrongful termination.[761]

275.     GLF also criticized the purpose and effect of FEDCON's proposed plan as being driven exclusively by its goal to minimize costs.[762] GLF explained that money constituted the only obstacle to FEDCON's provision of "adequate structures" under the 2.2 Project Subcontract Agreement.[763] Contending that the alleged encroachments do not prevent or preclude the

---

[756] *Id.* (internal quotation marks omitted).
[757] *Id.*
[758] *Id.* at 3.
[759] *Id.* at 3, 6–11.
[760] *Id.* at 3–4.
[761] *Id.* at 4.
[762] *Id.*
[763] *Id.*

construction of the temporary structures under the 2.2 Project Subcontract Agreement, but instead required such structures to be engineered, GLF asserted that this portion of the 2.2 Project could be built "exactly as originally planned, at no extra cost for GLF, albeit at greater expense to FEDCON."[764] GLF claimed that FEDCON's chosen course of action constituted the most cost-effective option for FEDCON, but resulted in FEDCON "attempting to force GLF to bear the brunt of the expense and submit a claim for equitable adjustment after-the-fact as opposed to paying of the changed work" as it progressed.[765] Additionally, GLF claimed the proposed plan changed the arrangement from a lump sum arrangement to a time and equipment arrangement, in which GLF would lose "control," as its role would morph into "a supplier of specialized equipment and personnel, operating at the directions of Fedcon," thereby representing a change to the entire scope and form of the 2.2 Project Subcontract Agreement.[766]

276.     Finally, GLF reiterated that it remained "ready, willing, and able to proceed" with the work at work front two "at the earliest reasonable time based upon either its own in-house engineered plan for which Fedcon agrees to compensate GLF, or pursuant to a properly engineered plan issued by Fedcon."[767]

277.     FEDCON responded on June 6, 2016.[768] Therein, FEDCON: (1) reiterated that GLF had failed to provide "a written plan demonstrating, and committing to, the recommencement of the work at the second work front beginning at Monolith 076 at the earliest reasonable time"; (2) argued that the 2.2 Project Subcontract Agreement did not require the issuance of a change order for GLF to perform the work; and (3) countered that the "work south of Monolith 071," as

---

[764] *Id.*
[765] *Id.*
[766] *Id.*
[767] *Id.* (original emphasis removed).
[768] Doc. 222-155 at 1.

provided in the Notice of Termination, did not differ from the work "beginning at Monolith 076" because the "work south of Monolith 071" included the work "beginning at Monolith 076."[769]

278.     FEDCON also pushed back on GLF's assertion that FEDCON had not yet provided the temporary structures, stating that the levee had been degraded and the work platform had been constructed "through Monolith 080 or approximately 540 feet."[770] Significantly, FEDCON acknowledged that, as a result of the differing site condition, the temporary access road could not be provided as contemplated under the 2.2 Project Subcontract Agreement and "deliveries for the materials for Monoliths 072 through 085 must be made by way of the work platform as outlined in [the April 11, 2016 letter] that included FEDCON's access plan for the work from Monolith 072 south."[771]

279.     FEDCON also attacked GLF's assertion that the work required by the Revised Terracon Report remained uncompleted, claiming that the work required by Terracon involved the work platform "from approximately Monolith 089 to Monolith 093," which could not be performed until GLF completed "at least five additional monoliths of work," and, according to FEDCON, advancing to Monolith 089 would take GLF "more than a month" and "only then, at that time, could the levee be degraded in that area and the work platform constructed."[772] As such, FEDCON asserted that the completion of GLF's work determined when the work required by Terracon would commence.[773]

280.     Finally, FEDCON provided GLF with "one final opportunity to proceed within the framework expressly provided in Paragraphs 10 and 13" of the 2.2 Project Subcontract

---

[769] *Id.* at 1–2. (internal quotation marks omitted).
[770] *Id.* at 2.
[771] *Id.* at 3.
[772] *Id.* at 3–4.
[773] *Id.* at 4.

Agreement "and justify vacation of the termination for default."[774] Accordingly, FEDCON allowed GLF until 5:00 p.m. on June 9, 2016 "to provide its written commitment to proceed with the physical work on a date certain no later than 20 June 2016 without further qualifications or conditions."[775]

281.    On June 9, 2016, Francesco Senis, on behalf of GLF, responded that it was unable to send its answer within FEDCON's requested time-frame, "[i]n light of the wealth of details and data contained" in FEDCON's letter.[776] As such, GLF advised that it would provide a response by June 14, 2016.[777] David Boland testified that he did not consider this response sufficient and that Francesco Senis "could have just said that [GLF would] start work on, you know, June 15th or whatever . . . ."[778]

282.    On June 9, 2016, FEDCON filed a lawsuit against both GLF and F&D in Florida's Ninth Judicial Circuit Court.[779]

283.    Additionally, FEDCON had not performed the predecessor work for the low-profile work by degrading the levee under the pipe bridges at Monoliths 075 and 079 to elevation 8 in accordance with the low-profile work plan approved by the Corps at the Low Profile Prep Meeting on March 11, 2015.[780]

284.    Also as of the May 27, 2016 termination date, FEDCON had not retained the services of any subcontractor to transport the pipe piles to work front two, a responsibility which FEDCON had assumed per its April 11, 2016 access plan.[781] Further, between the April 11, 2016

---

[774] *Id.*
[775] *Id.*
[776] Doc. 222-163 at 1.
[777] *Id.*
[778] *Testimony of David Boland*, Doc. 232 at 170:14–22.
[779] Doc. 134 ¶29.
[780] *Testimony of Lorenzo Ellis*, Doc. 241 at 36:9–18.
[781] *Testimony of Rick Batdorf*, Doc. 235 at 76:2–11.

letter and May 27, 2016, there had not been any deliveries of steel pipe piling to any work front south of Monolith 071.[782]

285.     On the date of FEDCON's termination of the 2.2 Project Subcontract Agreement, GLF was performing work at work front 1 on the 2.2 Project.[783] On this date, GLF was either working on both work fronts of the 1.2a Project or had already completed one work front and was in the process of performing work on the second work front.[784]

286.     On work front one of the 2.2 Project, FEDCON had provided a temporary access road, a work platform, and all of the predecessor work that was required for GLF to perform its work.[785] This was in contrast to work front two of the 2.2 Project, where there was insufficient space.[786] Indeed, on May 17, 2016, FEDCON had notified HDB that the work platforms were "considerably less than 30' wide," the tracks of the crane were riding over the edge of the work platform, the crane mats were "extended another 5' in midair," and that this situation posed a "very unsafe condition" that needed to be addressed.[787]

287.     On work front one of the 1.2a Project, FEDCON provided GLF with a temporary access road adjacent to the work platform for a portion of the project.[788] On both work fronts of the 1.2a Project, FEDCON also provided a 30-foot-wide work platform that was 10 feet from the centerline of the sheet piling for both work fronts of the 1.2a Project.[789] GLF completed its work under the 1.2a Project Subcontract Agreement, following FEDCON's revisions.[790]

288.     Prior to FEDCON's termination of the 2.2 Project Subcontract Agreement, GLF

---

[782] *Testimony of Lorenzo Ellis*, Doc. 241 at 58:24–25, 59:1–4.
[783] *Id.* at 153:8–11; *Testimony of Mark Ferguson*, Doc. 234 at 102:1–4.
[784] *Testimony of David Boland*, Doc. 233 at 153:22–25, 154:1.
[785] *Testimony of Mark Ferguson*, Doc. 234 at 102:13–25, 103:1–7.
[786] *Id.* at 103:5–7.
[787] Doc. 219-970 at 1.
[788] *Testimony of David Boland*, Doc. 233 at 154:2–9.
[789] *Id.* at 154:10–15.
[790] *Id.* at 154:16–25, 155:1.

had a plan in place to demobilize its equipment following the completion of the work, which involved sending the equipment to the next location in which the equipment would be used.[791] This plan had not been put into place, insofar as identifying where the equipment would next be used, when FEDCON terminated the 2.2 Project Subcontract Agreement on May 27, 2016.[792] The Notice of Termination directed GLF to remove all of its equipment from the work front. Demobilization of equipment is typically completed over time, but FEDCON's termination of the 2.2 Project Subcontract Agreement produced a "scramble" for GLF to demobilize its equipment.[793] As a result of having to demobilize all of its equipment and personnel from the 2.2 Project in an accelerated manner due to the termination, GLF "semi broke down" all of its equipment to an interim location approximately one mile from the job site.[794] From this interim location, GLF developed a plan as to where to send the equipment next and finish the demobilization of the equipment.[795] GLF's initial plan was to demobilize from the job site, not the interim location.[796]

289.    In an e-mail to the Corps on March 15, 2018, FEDCON quantified the additional time and compensation to which it believed that it was entitled as a result of the differing site condition that impacted the temporary access road and work platforms behind the Chevron plant.[797] FEDCON recognized that "the issues with access through Chevron were undoubtedly" the "driving factor as to when operations could commence at work front two, south of Chevron."[798] FEDCON also recognized that the last of the work necessary for K Street to be put into service was completed on July 20, 2016.[799] FEDCON advised that it would agree to a 224-day time

---

[791] *Testimony of Lorenzo Ellis*, Doc. 241 at 68:17–24.
[792] *Id.* at 68:25, 69:1–4.
[793] *Id.*
[794] *Id.* at 69:10–25.
[795] *Id.*
[796] *Id.* at 69:23–25.
[797] Doc. 216-325 at 1–2.
[798] *Id.* at 1.
[799] *Id.*

extension, with 213 days of those days constituting compensable days.[800]

290.     On or about May 3, 2018, the Corps issued a contract modification, Reference No. 40, pursuant to CIN-019, to FEDCON, wherein FEDCON was granted a time extension and additional compensation in relation to the differing site condition at work front two behind Chevron.[801] The parties stipulate that this modification extended the contract completion dates by 224 days and that the revised contract completion date for the 2.2 Project included the 224-day extension.[802] The contract modification granted FEDCON a 224-day extension, 213 days of which were compensable, and increased the contract amount by $1,135,000.00.[803] David Boland agreed that, as far as time extensions, that FEDCON requested from the Corps of which GLF would be the beneficiary, the differing site condition presented a time extension that would inure to the benefit of GLF, as well as FEDCON.[804] To that end, he testified that, had GLF still been on the project at the time the time extension was issued, GLF would have been the beneficiary of that time extension.[805] The period that is included in the time extension received by FEDCON from the Corps for the differing site condition to which GLF was entitled as well, includes the May 27, 2016 date on which GLF was terminated.[806] On the date of termination, FEDCON knew that additional time would be granted by the Corps, but the amount of time was unclear.[807]

291.     GLF incurred $375,197.30 to demobilize all of the equipment from the 2.2 Project to the interim location, as well as costs for renting the interim storage location.[808] GLF subsequently incurred costs to demobilize its equipment from the interim location to the final

---

[800] *Id.*
[801] Doc. 216-324 at 1–5.
[802] Doc. 134 ¶¶32, 33.
[803] Doc. 216-324 at 4–5.
[804] *Testimony of David Boland*, Doc. 233 at 77:22–25, 78:1–3.
[805] *Id.* at 78:4–12.
[806] *Id.* at 78:15–19.
[807] *Id.* at 79:24–25, 80:1–10.
[808] Doc. 218-781 at 2; *Testimony of Lorenzo Ellis*, Doc. 241 at 70:1–24, 71:23–25, 72:1–2, 23–25, 73:1–14, 20–24.

destination.[809] GLF seeks these costs for a period of time spanning from May 29, 2016, to October 1, 2016.[810] Also, the specific, identifiable amount that was to be paid to GLF for reimbursement of demobilization costs and expenses is $880,000.00.[811] At the time of its termination, GLF was unpaid for the work it performed in April of 2016 in the amount of $118,854.78.[812] This amount is represented in GLF's Application for Payment No. 34, which sought payment for April of 2016.[813] The $118,854.38 unpaid amount in Application for Payment No. 34 had been reviewed and approved by the Corps after removal of an amount for demobilization of pipe driving equipment, and the Corps ultimately paid that amount to FEDCON.[814]

### viii. F&D's Response and FEDCON's Hiring of Replacement Subcontractors

292.    Under the terms of the 2.2 Project Subcontract Agreement, GLF, as principal, and F&D, as surety, executed and delivered to FEDCON a payment and performance bond.

293.    The 2.2 Project performance bond provided that GLF and F&D were bound to FEDCON in the amount of $10,517.859.50.[815]

294.    Having received a copy of the Notice of Default, F&D responded on May 26, 2016. In this response, F&D claims counsel Lawrence Kriss advised that FEDCON's letter lacked "all of the requisite information required in a situation such as this."[816] As such, to understand "the exact situation under the contract terms," Kriss requested many materials, such as original and revised job schedules, executed copies of the bonds, and underlying contractual documents.[817] Kriss emphasized that the nature and severity of the performance

---

[809] *See id.* at 73:25, 74:1–4.
[810] Doc. 218-781 at 2.
[811] *Testimony of Lorenzo Ellis*, Doc. 241 at 75:7–25, 76:1–3.
[812] Doc. 219-976 at 1; *Testimony of Lorenzo Ellis*, Doc. 241 at 76:24–25, 77:1–9.
[813] Doc. 219-976 at 1.
[814] *Testimony of Rick Batdorf*, Doc. 235 at 89:4–25, 90:1–25, 91:1–4; Docs. 219-827 at 1; 219-975 at 1–2.
[815] Doc. 216-351 at 37.
[816] Doc. 216-347 at 1.
[817] *Id.*

issues were unclear from the Notice of Default.[818] Kriss advised that F&D's actions were taken for investigative purposes only, thereby demonstrating that F&D had commenced an investigation.[819]

295.    On May 31, 2016, F&D responded to the Notice of Termination, wherein Mr. Kriss acknowledged receipt of the Notice of Termination and reiterated that F&D had begun its investigation of the matter.[820] Kriss also emphasized that a "crucial part of the investigation, necessary to appropriately respond" to FEDCON's letter was receipt of the information and documentation previously requested by F&D.[821] Kriss requested FEDCON to forward the information and documentation to Ivette Gualdron at the "earliest opportunity."[822]

296.    On the same day, David Boland sent numerous documents to F&D in response to F&D's May 26, 2016 letter, such as executed bonds, the 2.2 Project Subcontract Agreement, contract documents, the project schedule inclusive of updates, and GLF's letters, as referenced in the Notice of Default.[823] In the letter to F&D, David Boland characterized the basis for FEDCON's termination of the 2.2 Project Subcontract Agreement as "GLF's refusal to proceed with the performance of the work that was impacted by a differing site condition which the [Corps] had recognized as a change to the contract."[824]

297.    David Boland testified that he telephoned Mr. Kriss "within a few days after the termination" because he "wanted to get a read from [Mr. Kriss] on how F&D was going to proceed on this matter."[825] Indeed, FEDCON "needed to move forward."[826] David Boland testified that,

---

[818] *Id.*
[819] *Id.*
[820] Docs. 134 ¶27; 216-348 at 1.
[821] Doc. 216-348 at 1.
[822] *Id.*
[823] Doc. 222-147 at 2.
[824] Doc. 222-147 at 2.
[825] *Testimony of David Boland*, Doc. 232 at 172:6–10, 173:13–16.
[826] *Id.* at 172:11–13.

during this telephone conversation, Mr. Kriss informed him that, based on a conversation with GLF, F&D "was taking the position that the termination was improper" and, thus, F&D "would not be proceeding."[827] Mr. Boland admitted that he did not write any letters to Mr. Kriss confirming their conversation, despite writing numerous letters during the course of the 2.2 Project.[828] Further, Mr. Boland initially could not recall any details regarding this purported telephone conversation with Mr. Kriss when he was initially deposed, but recalled "a little bit more clearly" after reviewing "all the documents."[829]

298.    F&D did not receive notice of the lawsuit filed in Florida's Ninth Judicial Circuit Court, in which FEDCON alleged that F&D had not taken any action to cure GLF's default or recommence the performance of the work, until June 15, 2016.[830] Thus, FEDCON filed the lawsuit after receiving the May 26, 2016 and May 31, 2016 letters from F&D, each of which referenced F&D's investigation and requested further information. FEDCON did not wait for any follow-up or response from F&D regarding their investigation prior to the lawsuit's filing.[831]

299.    On June 11, 2016, before it received notice of the lawsuit on June 15, 2016, F&D acknowledged receipt of FEDCON's May 31, 2016 letter and accompanying documentation and advised that it was reviewing the documentation and continuing with its investigation of the claim.[832] F&D also requested further documentation from FEDCON necessary for F&D's investigation.[833] F&D never received a response from FEDCON to this

[827] *Id.* at 172:18–22.
[828] *Testimony of David Boland*, Doc. 233 at 168:24–25, 169:1–23.
[829] *Id.* at 168:24–25, 169:1–9.
[830] Doc. 134 ¶29.
[831] *Testimony of David Boland*, Doc. 233 at 173:22–25, 174:1–2.
[832] Doc. 217-202 at 1, 3.
[833] *Id.* at 3; *Deposition of Ivette Gualdron*, Doc. 146 at 61:6–8, 62:25, 63:1–12. Ms. Gualdron's deposition was introduced into evidence during trial. Doc. 243 at 152:18–25, 153:1–5, 154:1–10.

June 11 request, which F&D needed in order to perform and complete its investigation and analysis.[834] Ivette Gualdron, surety claims counsel for Zurich American Insurance Company, an affiliated company of F&D,[835] who was involved in F&D's investigation, testified by deposition that she did not follow-up with FEDCON personnel regarding this request for documents because, given FEDCON's filing of the state court lawsuit, F&D expected these documents to "come through discovery."[836] Notably, as this request came more than "a few days after termination," it would have come after Mr. Boland's purported conversation with Mr. Kriss.

300.     Following FEDCON's termination of the 2.2 Project Subcontract Agreement, FEDCON divided GLF's remaining work into three major components and hired replacement contractors to perform those scopes of work: Kirkland Concrete, LLC performed the concrete forming and placing; Bo-Mac Contractors, LTD performed the sheet pile and pipe pile driving; and Anders Construction performed the welding or splicing of the work platforms and welding the tension connectors.[837] FEDCON split up GLF's scope of work in this manner to reduce its costs. FEDCON had an incentive to minimize costs in replacing GLF "[b]ecause that was money that was going to come directly out of [FEDCON's] pocket immediately."[838] Based on pricing that it had received from subcontractors, FEDCON was "looking at $5 million over and above GLF's remaining subcontract balance to have the work completed," in addition to any resulting delays.[839]

301.     On June 17, 2016, while F&D's investigation was still ongoing and unbeknownst to F&D, FEDCON entered into a subcontract with Kirkland Concrete to complete the concrete

---

[834] *Deposition of Ivette Gualdron*, Doc. 143 at 24:4–10, Doc. 144 at 39:18–25, 40:1–6, Doc. 146 at 61:6–8, Doc. 147 at 94:5–10.
[835] *Deposition of Ivette Gualdron*, Doc. 142 at 6:24–25, 7:1–4.
[836] *Deposition of Ivette Gualdron*, Doc. 143 at 26:3–8.
[837] *Testimony of David Boland*, Doc. 232 at 175:12–20.
[838] *Id.* at 174:22–25, 175:1–11.
[839] *Id.* at 170:6–13.

scope of the 2.2 Project Subcontract Agreement.[840] Notwithstanding its termination of the 2.2 Project Subcontract Agreement due to purported delays to the completion of the work, FEDCON did not enter into a subcontract with Bo-Mac to perform the pile driving work until July 20, 2016.[841] According to David Boland, Kirkland did not start work until late-August of 2016.[842] In selecting Bo-Mac as the completion pile driving subcontractor, FEDCON bypassed selecting Target Construction, which would have saved FEDCON money as a result of Target being willing to factor in a pay-down of its existing settlement agreement with David Boland, Inc., which involved David Boland, Inc.'s purchase of a judgment against Target and use of that judgment to avoid liability for claims of Target on a previous Corps project.[843] FEDCON did not enter into the subcontract with Anders until October 27, 2016.[844]

302.    Paragraph 11.B of the 2.2 Project Subcontract Agreement provided, in relevant part: "[FEDCON] shall have the right to terminate this Subcontract Agreement, by written notice, without the Subcontractor being at fault, for any cause or for its own convenience, and require the Subcontractor to immediately stop work."[845] This same provision was also in the respective subcontract agreements of Kirkland, Bo-Mac, and Anders.[846] As a result of these termination for convenience provisions, David Boland claimed that, if F&D had approached FEDCON, terminating these respective subcontract agreements would have been "no problem at all" and "there would have been no cost."[847] However, Mr. Boland admitted that he never wrote a letter to F&D to advise the surety of FEDCON's intention to enter into the subcontract agreements with

---

[840] Doc. 219-788 at 1.
[841] Doc. 219-787 at 1.
[842] *Testimony of David Boland*, Doc. 233 at 175:15–17.
[843] *See* (Doc. 216-174 at 1); *Testimony of David Boland*, Doc. 232 at 197:3–25, 198:1–25, 199:1–25, 200:1–25, 201:1–25, 202:1–20.
[844] Doc. 219-786 at 1.
[845] Doc. 216-116 at 6.
[846] Docs. 219-788 at 6; 219-787 at 6; 219-786 at 219-786 at 6.
[847] *Testimony of David Boland*, Doc. 175 at 11–22.

the replacement subcontractors.[848]

303.     On or about June 21, 2016, F&D's consultant, Lin Heath, visited the 2.2 Project as part of F&D's investigation.[849] Mr. Heath also took photos during his visit.[850] With respect to the completed portions of GLF's work, Mr. Heath did not observe anything that was problematic or otherwise out of the ordinary.[851] Mr. Heath had been provided with a copy of the Revised Terracon Report and, in the course of his observations of work front two in the area of the pipe bridges and the Chevron plant, he did not observe any work that had been performed in accordance with the Revised Terracon Report.[852] Mr. Heath's observations of the work that was being performed by GLF on the 1.2a Project led him to believe that the project looked like an operation where "people knew what they were doing."[853] Mr. Junkin also attended the June 21, 2016 site visit, and, based on his observations, he would not have given his approval or recommendation to GLF to recommence the work on the work platform at Monolith 076 through Monolith 078.[854]

304.     Ivette Gualdron testified that FEDCON's filing of the state court lawsuit resulted in F&D's inability to conduct its investigation "as [it] normally would."[855] Given the lawsuit's filing, "any communication would have been through counsel."[856] As an example of F&D's hampered ability to investigate, Ms. Gualdron, who also attended the site visit, testified that F&D was instructed by FEDCON's counsel not to speak with any FEDCON personnel as part of F&D's site visit.[857] Ms. Gualdron also emphasized that F&D's investigation "took a different course," but

---

[848] *Id.* at 175:23–25, 176:1–8.
[849] *Testimony of Lin Heath*, Doc. 240 at 9:16–22, 10:5–7; *Deposition of Ivette Gualdron*, Doc. 143 at 17:1–9, 21:17–18.
[850] *Testimony of Lin Heath*, Doc. 240 at 11:14–16.
[851] *Id.* at 15:5–14.
[852] *Id.* at 11:24–25, 12:1–25, 13:1–25, 14:1–4.
[853] *Id.* at 17:20–24.
[854] *Testimony of William Junkin*, Doc. 239 at 197:17–25.
[855] *Deposition of Ivette Gualdron*, Doc. 143 at 18:22–25, 19:1–4.
[856] *Id.* at 21:7–8.
[857] *Id.* at 19:5–25, 20:1–21.

did not conclude, following FEDCON's filing of the state court lawsuit.[858] F&D would not have conducted the site visit if it had decided to end the investigation.[859] Rather, after learning of the state court lawsuit on June 15, 2016, F&D asked for the site visit on June 16, 2016, and the site visit occurred on June 21, 2016.[860] F&D had communicated with GLF regarding the availability of GLF's personnel for a site visit before learning of the state court lawsuit.[861]

305.   Following the June 21, 2016 site visit, F&D held a meeting with GLF and continued communications with GLF regarding its position and defenses.[862] In mid-August, F&D learned that some of the bonded work was proceeding, when GLF informed F&D that replacement contractors were mobilizing.[863] When asked whether she made any effort in the period of time between the site visit and mid-August, either personally or through counsel, to contact FEDCON to discuss the merits of the termination, Ms. Gualdron emphasized that "everybody was very engrossed in all of the procedural wrangling going on [regarding] where the litigation would proceed . . . it took the focus on everyone because there were filings in Florida and filings" in Louisiana.[864] There were efforts to "sort[] out" these issues so that other issues, such as discovery and conferral, could proceed.[865]

306.   Once F&D learned in August of 2016 that FEDCON had hired replacement subcontractors without providing any notice to F&D, it became clear, from F&D's perspective, that FEDCON was depriving F&D of its rights to be able to elect a remedy under the bond and evaluate options under the bond.[866]

---

[858] *Id.* at 21:1–25, 22:1–2.
[859] *Id.*
[860] *Id.*
[861] *Id.*
[862] *Id.* at 22:7–19.
[863] *Id.* at 22:21–25.
[864] *Id.* at 23:1–16.
[865] *Id.*
[866] *Deposition of Ivette Gualdron*, Doc. 145 at 59:7–22.

307.     F&D's investigation into whether FEDCON's termination of GLF constituted a valid termination was ongoing as of Ms. Gualdron's departure from surety claims counsel position on August 1, 2017.[867]

308.     If F&D had been permitted to complete its investigation and had either tendered a completion contractor or undertaken completion of the work, FEDCON would not have incurred any additional costs beyond payment of the remaining subcontract balance to complete the work.[868] F&D could have opted to utilize GLF to complete the performance of the work.[869] FEDCON never notified F&D that it had entered into subcontracts with Kirkland Concrete, Bo-Mac Contractors, or any of the other replacement subcontractors.[870] Bo-Mac, the replacement pile driving subcontractor, was permitted to drive pile without the TFP in place, whereas, when GLF worked on the 2.2 Project, degrading could not occur prior to the TFP being in place beyond the stated 500 feet.[871]

### K.  Project Schedule and Delay Damages Against GLF

#### i.  Introduction

309.     FEDCON asserts delay damage claims against GLF and F&D, seeking to recover its extended field office overhead and other delay related costs and expenses due to delays allegedly caused by GLF in the performance of its work on both projects. FEDCON asserts that GLF delayed the 2.2 Project for a total of 252 days and the 1.2a Project for a total of 142 days.[872]

310.     It is undisputed that FEDCON maintained two separate schedules for each project: (1) a "project schedule," which was also referred to as "early completion schedules," as amended;

---

[867] *Deposition of Ivette Gualdron*, Doc. 144 at 37:5–17, 40:24–25, 41:1–8.
[868] *Testimony of David Boland*, Doc. 233 at 174:5–12.
[869] *Id.* at 174:22–25, 175:1.
[870] *Id.* at 175:23–25, 176:1–13.
[871] *Testimony of Alonzo Harrison*, Doc. 238 at 58:15–25, 59:1–9.
[872] *Testimony of Angela Sist*, Doc. 235 at 148:5–19.

and (2) the schedule approved by the Corps. The schedules were identical, except that the former did not include the forecasted adverse weather days that were included in the latter.[873]

311.    FEDCON bases its delay damages claims on schedules that included earlier completion dates for GLF's scope of work and the projects overall, rather than the dates included in the approved schedules between FEDCON and the Corps. These schedules were referred to as "early completion schedules."[874] FEDCON's delay claims against GLF and F&D rely upon the analyses of the early completion schedules performed by Dr. Angela Sist, who offered expert testimony on behalf of FEDCON. Dr. Sist testified that, in her twenty-four years of performing schedule analyses, she has analyzed hundreds, if not thousands, of schedules, many of which have included delay claims by contractors and subcontractors.[875] However, on only one prior occasion—a project in Trinidad—did Dr. Sist analyze, for purposes of assessing delays against a subcontractor, a schedule between a subcontractor and a contractor that contained an earlier completion date for the subcontractor's work than the approved schedule between the contractor and the owner for the full contract duration.[876] This constituted a "unique circumstance" for Dr. Sist.[877] In every other instance in which Dr. Sist analyzed delays using early completion schedules, the same completion schedule existed between the contractor and the owner and the contractor and the subcontractor.[878]

312.    Patrick Brannon, P.E., served as GLF's expert witness regarding the delay issues and claims. After reviewing all of the different versions of the schedules prepared by FEDCON, (*i.e.*, S-schedules, G-schedules, etc.), Mr. Brannon opined that, based on his thirty years as a

---

[873] *Testimony of Craig Hildebrandt*, Doc. 233 at 228:14–17.
[874] *Testimony of Angela Sist*, Doc. 235 at 155:14–20.
[875] *Id.* at 156:25, 157:1–4.
[876] *Id.* at 157:5–14.
[877] *Id.* at 157:13–14.
[878] *Id.* at 157:20–25, 158:1–8.

consultant and his prior work, using two separate schedules on each project is "extremely unusual and problematic."[879] Mr. Brannon also testified that, in addition to this practice not being customary, he did not know of any legitimate scheduling consultant or party familiar with construction who would condone such a situation.[880] Mr. Brannon further opined that the approved schedules between FEDCON and the Corps, which were used to measure the costs on the projects, measure the performance by the contractor on the projects, and address time extensions on the projects, are the schedules that should be used to evaluate any delay attributable to GLF's performance on the projects.[881]

### ii.  Lack of a Project Schedule Upon Execution

313.    GLF initially received the bid documents, which consisted of the specifications and the plans, to use in preparing its estimate of costs and bid, which GLF would submit to FEDCON for each project.[882] Each prime contract provided a number of "monthly anticipated adverse weather delay work days" based on a five-day work week, which served as the "base line for monthly weather time evaluations," as well as the procedure for determining time extensions for "unusually severe weather" in accordance with Section 00700 Contract Clause, entitled "DEFAULT (FIXED-PRICE CONSTRUCTION) (FAR 52.249-10).[883] Although the 1.2a Project and the 2.2 Project were adjacent to each other, the number of weather days for each project, as provided for in the prime contracts, differed.[884] Both the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement referenced the "Prime Contract completion date" and a

---

[879] *Testimony of Patrick Brannon*, Doc. 242 at 159:14–23.

[880] *Id.*

[881] *See Testimony of Patrick Brannon*, Doc. 243 at 20:15–25, 21:1–3.

[882] *See Testimony of Ken Yerk*, Doc. 237 at 8:9–16.

[883] Docs. 216-10 at 17; 216-49 at 11.

[884] *Id.*; *Testimony of David Boland*, Doc. 232 at 107:1–16; *Testimony of Patrick Brannon*, Doc. 243 at 126:19–25, 127:1–6.

"Project Schedule" in Paragraph 7.A.[885] Each subcontract agreement also included a section entitled "Progress of the Work" in Paragraph 6.[886] Additionally, Exhibit D to each subcontract agreement provided, in relevant part, that the "Project Schedule" represented "the Contractor's plan for controlling the performance of the work" and that it was developed to benefit all parties involved in the respective project by ensuring completion of the work "at the earliest possible time that is consistent with the orderly and efficient manner of construction."[887]

314.    Neither the 1.2a Project Subcontract Agreement nor the 2.2 Project Subcontract Agreement had specific schedules attached thereto or referenced therein.[888] Indeed, at the time GLF entered into the subcontract agreements with FEDCON, there was not a developed schedule that had been reviewed or approved.[889] Craig Hildebrandt claimed that this practice is "very common" in Corps construction projects because the Corps has "very stringent requirements relative to the level of detail in their schedules."[890] Consequently, development of the schedule "takes a significant period of time" which "generally exceeds the time allowed to issue initial subcontracts."[891]

315.    Significantly, David Boland testified that he was unaware of any document in which, prior to the execution of the subcontract agreements, FEDCON communicated to GLF any intention on FEDCON's behalf to finish these projects early.[892] Likewise, Ken Yerk testified that there were never any communications to him from representatives of FEDCON regarding any

---

[885] Docs. 216-116 at 4; 216-132 at 4.
[886] Docs. 216-116 at 3; 216-132 at 3.
[887] Docs. 216-117 at 8; 216-133 at 6.
[888] *Testimony of Joseph Beaird*, Doc. 238 at 180:23–25, 181:1–6; 233 at 65:11–25; *Testimony of Angela Sist*, Doc. 235 at 164:1–9; *Testimony of Jason Whitworth*, Doc. 234 at 160:15–25, 161:1–2.
[889] *Testimony of Angela Sist*, Doc. 235 at 163:13–25, 164:1–9.
[890] *Testimony of Craig Hildebrandt*, Doc. 233 at 210:10–19.
[891] *Id.*
[892] *Testimony of David Boland*, Doc. 233 at 67:15–25, 68:1–3.

intention on FEDCON's behalf to complete either project early.[893] Additionally, neither the 2.2 Project Subcontract Agreement nor the 1.2a Project Subcontract Agreement contained specific production rates for GLF.[894]

316.    HDB did not originally know that an early completion schedule existed and learned about it only later.[895] FEDCON did not provide this project schedule to HDB, despite several requests.[896] Ultimately, GLF provided a copy of the schedule to HDB.[897] FEDCON created the project schedules, which reflected early completion dates for the 2.2 Project and the 1.2a Project, after the execution of the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement.[898]

### iii.   FEDCON's Submission of the Schedule to the Corps

317.    The Contract Documents between FEDCON and the Corps for each project required FEDCON to submit a schedule to the Corps for approval.[899] The General Provisions of each prime contract set forth a specific number of adverse weather days for each calendar month that were to be included in the approved schedule between FEDCON and the Corps.[900] Notwithstanding the language of Section 01100, which is the "General Provisions" section of the prime contracts between FEDCON and the Corps, and the testimony of Mr. Whitworth, Craig Hildebrandt refused to acknowledge that Section 01100 required a specific number of adverse weather days to be included in the schedule.[901] Based upon FEDCON's early completion schedules, the general conditions clause that was included in the budgets included less than the

---

[893] *Testimony of Ken Yerk*, Doc. 237 at 12:17–23.
[894] *Testimony of Rick Batdorf*, Doc. 235 at 95:15–18; Doc. 219-887 at 1.
[895] *Testimony of Alonzo Harrison*, Doc. 238 at 62:25, 63:1–5.
[896] *Id.* at 63:6–22.
[897] *Id.* at 63:15–22.
[898] *Testimony of David Boland*, Doc. 233 at 396:6–15.
[899] *See id.* at 62:7–12.
[900] *Testimony of Jason Whitworth*, Doc. 234 at 174:9–20.
[901] *Testimony of Craig Hildebrandt*, Doc. 234 at 220:14–20.

full number of contract days that were set forth in the Contract Documents.[902] Indeed, based on assumptions that FEDCON made in preparing its pre-bid schedule without seeking clarification from the Corps, FEDCON included fewer days, and therefore a lesser number of general condition costs, in the bids that were submitted to the Corps on both projects.[903] Again, there was not any information, either in the form of a schedule or any other document, communicated by FEDCON to GLF regarding FEDCON's intention to complete these projects early.[904]

318.     The Corps construed Section 01100 as requiring the inclusion of a specific number of adverse weather days each month in the schedules prepared and submitted by FEDCON.[905] However, pursuant to Mr. Hildebrandt's analysis, the initial schedule that FEDCON prepared for each project, which FEDCON submitted to the Corps, did not include all of the adverse weather days.[906] Instead, FEDCON utilized "what [it had] estimated would be adverse weather days."[907] These initial schedules reflect a completion date earlier than the completion date for the work included in the Contract Documents for each project.

319.     FEDCON submitted the early completion schedules for each project to the Corps, which rejected each schedule.[908] The Corps directed FEDCON to prepare and submit new schedules that included the entirety of the contract time, which meant including all of the adverse weather days included in Section 01100 for each project.[909] FEDCON subsequently prepared and submitted new schedules to the Corps, which included the same end dates as those in the project

---

[902] Docs. 216-10 at 17; 216-49 at 11; *Testimony of Jason Whitworth*, Doc. 234 at 162:21–25, 163:1–2.
[903] *Testimony of Craig Hildebrandt*, Doc. 234 at 677:6–21.
[904] *Testimony of David Boland*, Doc. 233 at 67:15–21.
[905] *Testimony of Craig Hildebrandt*, Doc. 234 at 220:14–25, 221:1–2.
[906] *Id.* at 220:21–25, 221:1–5.
[907] *Id.* at 221:3–5.
[908] *Testimony of David Boland*, Doc. 233 at 68:4–7; *Testimony of Jason Whitworth*, Doc. 234 at 120:6–10.
[909] *Testimony of David Boland*, Doc. 233 at 68:7–19.

specifications.[910] The Corps approved these schedules.[911]

320. However, as a result of including a reduced amount of general conditions costs in its budget based upon its use of fewer days than the number of days required by the bid documents, in order for FEDCON to meet its budget, it had to complete the work on each project in some lesser number of days than the full number of contract days.[912] If FEDCON was then required to remain on the projects, either by contract or circumstances, for the full number of contract days, it would end up having a cost overrun on its general conditions costs.[913]

321. The schedules submitted to, and approved by, the Corps for each project included a prime contract completion date, as measured by activity on the final day of the duration of the project.[914] The approved schedules submitted by FEDCON to the Corps were updated monthly.[915] For update purposes, if there was a delay because of an event that would become the subject of a contract modification, the prime contract completion date would not change until a contract modification was issued.[916] The prime contract completion date was updated during the course of the projects.[917] There is no document between FEDCON and the Corps for either project that reflects that an act or omission of GLF delayed the prime contract completion date.[918]

322. Thus, while the schedules that were submitted to the Corps included all the adverse weather days that were outlined in the specifications, FEDCON also prepared project schedules, which FEDCON used to run the projects, that excluded all adverse weather days from

---

[910] *Testimony of Jason Whitworth*, Doc. 234 at 120:16–19.

[911] *Id.* at 120:20–21.

[912] *See Testimony of Jason Whitworth*, Doc. 234 at 162:21–25, 163:1–11.

[913] *Id.* at 163:12–17.

[914] *Testimony of David Boland*, Doc. 233 at 68:20–25, 69:1–14.

[915] *Id.* at 69:15–21.

[916] *Id.* at 70:3–23.

[917] *Id.* at 69:22–25, 70:1–2.

[918] *Id.* at 75:5–10.

the calendar.[919]

323.    After issuance of the early completion schedules for both projects, FEDCON used two separate schedules for each project: the approved schedule between FEDCON and the Corps and the early completion schedules.[920] GLF did not agree to use this dual schedule setup, in which FEDCON used an early completion schedule with GLF and the approved schedule with the Corps that included all contract time.[921]

324.    On March 31, 2014, Jason Whitworth sent to GLF the "schedule" for the 2.2 Project, as updated through March 1, 2014.[922] Whitworth advised that the schedule did not "account for the restricted area in Chevron," which FEDCON intended to include on the next update.[923]

325.    On April 15, 2014, FEDCON furnished GLF and HDB with the initial schedule for the 1.2a Project, stating: "The attached PDF represents our baseline schedule as presented to the [Corps] for the [1.2a Project] organized by Responsibility then early start. Contractually stipulated Anticipated Weather Days have been excluded for purposes of planning the work." [924] Thus, FEDCON provided GLF with the schedule that had been provided to the Corps, except anticipated weather days were omitted "for purposes of planning the work."

326.    On May 8, 2014, GLF requested the approved schedules for both projects from FEDCON because GLF needed the schedules to plan its work and implement its processes for installing the work.[925] GLF clarified that it sought "expanded versions"—the full versions—of the project schedules that were submitted to, and approved by, the Corps, including any updates for

---

[919] *Testimony of Jason Whitworth*, Doc. 234 at 121:1–8.
[920] *Testimony of Angela Sist*, Doc. 235 at 179:11–19.
[921] *Testimony of Ken Yerk*, Doc. 237 at 23:7–13.
[922] Doc. 220-130 at 1.
[923] *Id.*
[924] Doc. 219-735 at 1.
[925] Doc. 219-868 at 1; *Testimony of Lorenzo Ellis*, Doc. 241 at 11:15–25, 12:1–2.

review.[926] In its request, GLF also asked FEDCON to "provide a record of any weather days, holidays and time extensions granted by the [Corps] from the first chargeable contract day thr[ough] April 30, 2014."[927] GLF advised FEDCON to "include GLF monthly on weather/holidays granted (out of the days already accounted for in the Contract or any additional days) for the previous months [sic] work so that we can track the schedule for our work as it progresses."[928]

327.    On May 21, 2014, FEDCON furnished GLF with the baseline schedule for the 2.2 Project, advising that the schedule had been updated through April 30, 2014.[929] FEDCON again stated that "the version attached is an exact replica of the progress schedule submitted to the [Corps], with the only exception being that there are no anticipated weather days included in the work day calendar."[930]

328.    In each case, these schedules were sent to GLF months after the parties executed the 1.2a Project Subcontract Agreement and the 2.2 Project Subcontract Agreement. Thus, the early completion schedules upon which FEDCON presently relies as the basis for its delay claims did not exist at the time of the execution of the subcontracts.[931]

### iv.  FEDCON's July 28, 2014 Letter and Subsequent Correspondence

329.    On July 15, 2014, GLF requested "a copy of the approved Project Schedule which specifies the Time of Performance as referenced within" Paragraphs 1.A and 7.A of the 1.2a Project Subcontract Agreement and the 2.2 Project Subcontract Agreement.[932]

330.    FEDCON responded to this request on July 28, 2014, wherein FEDCON

---

[926] Doc. 219-868 at 1; *Testimony of Lorenzo Ellis*, Doc. 241 at 12:3–14.
[927] Doc. 219-868 at 1.
[928] *Id.*
[929] Doc. 216-313 at 1.
[930] *Id.*
[931] *Testimony of David Boland*, Doc. 233 at 59:23–25, 60:1–5.
[932] Doc 216-320 at 2.

explained its basis for using two schedules.[933] Significantly, FEDCON averred that it had analyzed the "expected weather based on historical weather data and actual exposure on adjacent projects" before submitting the bids for the 1.2a Project and the 2.2 Project, which resulted in FEDCON determining that the "reasonably anticipated weather" would allow FEDCON to "complete the projects early," which FEDCON represented in the general conditions that it included in its bids.[934] FEDCON admitted that, after the Corps' initial rejection of FEDCON's proposed schedule, in which the Corps demanded the "full number of days in the schedule, FEDCON re-submitted the schedule to "attain approval" from the Corps.[935] However, FEDCON claimed that, before re-submitting this schedule, FEDCON "met with GLF's management, Joe Beaird and other management at Fedcon's office and explained an approach that would enable Fedcon to obtain approval of the schedule from the [Corps] (which would enable Fedcon to receive and make payment to GLF but retain the teams [sic] plan for early completion."[936]

331.     According to FEDCON, this plan involved "revising the calendar in the schedule to include all days reflected in Specification Section 01100, which without any significant changes to the logic, reflected utilization of the entire prime contract duration."[937] Critically, FEDCON acknowledged that this plan did not represent FEDCON's plan, but instead "would be used for [Corps] submission only" and the schedule "would then be revised to remove all weather days (from the calendar)," which would represent "the schedule that the project would be worked to and evaluated against."[938] For each update, the "actual progress for the month would be compared to the planned progress" and any delay to the "forecast completion" would result in "full credit"

---

[933] Doc. 216-161 at 1–2.
[934] Id. at 1.
[935] Id.
[936] Id.
[937] Id.
[938] Id. at 1–2.

being provided for "all holidays lost to weather or high water events."[939] FEDCON represented that GLF concurred with this approach and FEDCON accordingly moved forward.[940]

332.     Craig Hildebrandt testified that FEDCON decided to use two different schedules, rather than using one schedule that included the number of weather days in accordance with the Section 01100 specifications, because FEDCON did not believe that the Section 01100 specifications "accurately reflected the planned performance of the work."[941] According to FEDCON, the number of anticipated weather days, once incorporated into the schedule, would produce few available work days in certain months, which FEDCON deemed "completely unreasonable."[942] Additionally, FEDCON determined that including a schedule without any included weather days would enable FEDCON to "track the actual weather days" and add them into the schedule.[943] Jason Whitworth testified that, in his experience, "often you're awarded a job, and you have to immediately start buying out the project so that subcontractors can begin to do their submittal process."[944] According to Whitworth, the development of the schedule regularly follows the issuance of subcontracts and is often tied to payment.[945]

333.     Ken Yerk testified that the July 28, 2014 letter from FEDCON, which was addressed to him, constituted the first instance in which he learned about the purported meeting between GLF and FEDCON or discussion regarding two schedules.[946] As previously mentioned, he testified that there were never any communications to him from representatives of FEDCON regarding any intention on FEDCON's behalf to complete either project early. On the other hand,

---

[939] *Id.* at 2.
[940] *Id.*
[941] *Testimony of Craig Hildebrandt*, Doc. 233 at 217:15–25, 218:1–3.
[942] *Id.*
[943] *Testimony of Jason Whitworth*, Doc. 234 at 121:18–25, 122:1.
[944] *Id.* at 202:18–25, 203:1–4.
[945] *Id.* at 203:5–25, 204:1–6.
[946] *Testimony of Ken Yerk*, Doc. 237 at 30:2–5.

David Boland testified that he and Jason Whitworth attended a meeting with Ken Yerk and Joseph Beaird of GLF in February of 2014, in which GLF and FEDCON personnel discussed submitting to the Corps the same schedule that had been disapproved, except utilizing the full number of days reflected in Section 1100, and using that schedule, except without the forecasted adverse weather days, to manage the project.[947] Jason Whitworth likewise testified that FEDCON advised of its intention to utilize a schedule with no weather during this meeting.[948] Both David Boland and Jason Whitworth testified that GLF did not object to this approach.[949]

334.     Joseph Beaird testified that, while it was possible that he attended such a meeting, he could not recall the details of the meeting referenced in the letter, and he knew there were discussions at one time about resubmitting the schedule for the Corps' approval.[950] Beaird also contended that FEDCON did not seek GLF's agreement, but instead merely advised GLF of the course of action it had taken.[951] He could not recall whether or not he expressed disagreement with an early completion schedule.[952]

335.     According to Jeff Falati, the baseline schedule is required for the project and the contractor may decide to pursue the project in a different manner as the project progresses, depending on the project's complexities or changes thereto, but "discussions between the contractor and the [Corps] should occur" as far as alterations in duration.[953]

336.     On August 12, 2014, GLF responded to FEDCON's July 28, 2014 letter, in which GLF: (1) advised that the subcontract agreement did not contain any referenced schedule other than the "Project Schedule"; (2) denied the communications mentioned in FEDCON's letter and

---

[947] *Testimony of David Boland*, Doc. 233 at 220:11–24.
[948] *Testimony of Jason Whitworth*, Doc. 234 at 123:20–25, 124:1–7.
[949] *Testimony of David Boland*, Doc. 233 at 220:25, 221:1; *Testimony of Jason Whitworth*, Doc. 234 at 124:13–15.
[950] *Testimony of Joseph Beaird*, Doc. 239 at 20:12–18, 22:4–10.
[951] *Id.* at 26:3–11.
[952] *Id.* at 25:15–25, 26:1–2.
[953] *Testimony of Jeff Falati*, Doc. 235 at 222:24–25, 223:1–20.

rejected any assertion regarding GLF's agreement to a schedule other than the Project Schedule, as referred to in the subcontract agreement; (3) asserted that, if a change regarding scheduling had occurred as FEDCON asserted, then such a change would have to be documented in the form of a change order or contract addendum since it would change the terms and conditions of the subcontract agreement; and (iv) opined that FEDCON was keeping the intended purpose of a second schedule a secret from GLF and likely the Corps, as well.[954]

337.    GLF wrote several additional letters to FEDCON during the course of both projects, in which GLF objected to FEDCON's use of the early completion schedules, maintained that the schedule approved by the Corps constituted the only project schedule, or both.[955] At no point following the February meeting mentioned above or upon receiving any of the early completion schedules did GLF receive a change order or contract addendum that changes the terms and conditions of the subcontract in relation to an early completion schedule.[956]

338.    GLF's production was impacted throughout the projects by the conditions of both the temporary access roads and the work platform. Beaird reiterated that there were days when the access roads were shut down or otherwise impassible.[957] Additionally, deliveries of materials using muddy and rutted access roads and workers standing up to their ankles in mud on the work platforms cause both inefficiencies and delays to the work.[958]

339.    FEDCON received extensions of time from the Corps on both projects such that the projects were completed within the revised schedules and revised prime contract completion dates.[959] Through contract modifications, time was awarded to FEDCON for adverse weather and

---

[954] Doc. 219-750 at 1–2.
[955] Docs. 219-954 at 1–2; 219-955 at 1–2; 219-882 at 1–3; 219-891 at 2;  219-959 at 1–2; 216-309 at 3–4.
[956] *Testimony of Joseph Beaird*, Doc. 239 at 63:14–20.
[957] *Testimony of Joseph Beaird*, Doc. 238 at 194:21–24.
[958] *Id.* at 194:21–24, 195:1–10.
[959] *Testimony of David Boland*, Doc. 233 at 71:5–10.

high river over what was included in the Contract Documents.[960]

340.     There were periods of time on both projects when the Mississippi River rose to a certain elevation such that a high river restriction went into effect, such that no work could be performed.[961] During these periods, FEDCON received time extensions from the Corps.[962] The number of days that these projects were impacted by the high river restrictions exceeds the number of days that FEDCON included in its pre-bid analysis for high river restriction, upon which the early completion schedules were based.[963] Pursuant to the prime contracts, FEDCON received non-compensable days of time extension from the Corps for high river days when no work could be performed, thus impacting the critical path.[964]

### v.  Dr. Sist's Analysis

341.     To provide a general overview of her analysis, Dr. Sist used the early completion schedules as the basis for her delay analysis because these schedules "were disseminated throughout the course of the project on a regular basis for the purposes of planning and tracking the work."[965] Dr. Sist opined that FEDCON's decision to use the early completion schedules to manage the projects was reasonable because these schedules were "the only schedule[s] that w[ere] used to plan and manage" the projects.[966] Dr. Sist explained that she examined these schedules, utilizing the schedules as the "plan" for each project, and compared that plan to how the work was accomplished.[967] She used these schedules to examine the course of the project, day-by-day, to determine the cause of the delays to the "critical path."[968] The "critical path method" of scheduling

---

[960] *Id.* at 71:5–21.
[961] *Id.* at 72:16–19.
[962] *Id.* at 72:20–22.
[963] *Id.* at 233 at 72:23–25, 73:1–5; *Testimony of Craig Hildebrandt*, Doc. 234 at 241:5–9.
[964] *Testimony of David Boland*, Doc. 233 at 73:6–15.
[965] *Testimony of Angela Sist*, Doc. 235 at 126:17–24, 127:1–5.
[966] *Id.* at 128:12–17.
[967] *Id.* at 114:1–7.
[968] *Id.* at 114:8–13.

is a method of linking together all of the activities to be performed on a project so that one may determine the path that drives the end of the project.[969] Once Dr. Sist determined the cause of delays, which she defined as "activities that were not performed as planned," she conducted further research to determine who was responsible for the delay or, if there was an improvement, the improvement.[970] Dr. Sist utilized the same methodology for both projects.[971]

342.    The Court finds credible Mr. Brannon's testimony and analysis regarding the flaws in Dr. Sist's analysis. Mr. Brannon identified several fundamental issues with Dr. Sist's analysis.[972] First, he opined that Dr. Sist erred in using the early completion schedules for her analysis, rather than schedules submitted to the Corps.[973] He opined that the schedules submitted to the Corps—the schedules used to measure costs and performance on the projects by the Corps and FEDCON and the schedules that both entities utilized to address extensions of contract time— were the proper schedules to use for the analysis.[974] As such, he claimed that Dr. Sist did not rely upon the analysis of the project schedule that the Corps and FEDCON used to manage the project.[975] Additionally, Dr. Sist did not reconcile her liability analysis with the position taken by FEDCON over the course of the projects regarding the causes of the delays.[976] Relatedly, Dr. Sist also failed to reconcile the analysis with all time extensions granted on the project, including extensions granted to FEDCON by the Corps.[977] The final fundamental flaw identified by Mr. Brannon was Dr. Sist's addition of weather that had not yet occurred.[978]

---

[969] *Id.* at 105:7–16.
[970] *Id.* at 114:14–20.
[971] *Id.* at 146:17–19.
[972] *Testimony of Patrick Brannon*, Doc. 243 at 51:24–25, 52:1–2.
[973] *Id.* at 52:2–17.
[974] *Id.* at 20:15–25, 21:1–4.
[975] *Id.* at 52:14–17.
[976] *Id.* at 52:18–25
[977] *Id.* at 53:22–25, 54:1, 57:11–22.
[978] *Id.* at 65:18–25, 66:1–25, 67:1–12, 68:1–7.

343.     The "follow-on weather days" included in Dr. Sist's analyses of delays being attributable to GLF, and for which FEDCON is seeking damages from GLF, are 122 days for the 2.2 Project and 92 days for the 1.2a Project.[979] These "follow on weather days" constitute either adverse weather days or high river days for which FEDCON received non-compensable days of time extension from the Corps, pursuant to the terms of the prime contracts.[980] In regard to the "observational method" performed by Dr. Sist, Mr. Brannon testified that he has never seen anyone perform this type of analysis before.[981] Mr. Brannon further testified that, in her analysis for the 2.2 Project, Dr. Sist actually assessed 116 days to GLF, but, in his belief, inadvertently added an additional six days attributed to FEDCON, thereby producing the 122 days for the 2.2 Project.[982] Mr. Brannon was unaware of any treatise or publication that supports the second component of Dr. Sist's analysis, whereby the 116-day delay on the 2.2 Project that Dr. Sist assessed to GLF became a 252-day delay.[983]

344.     A portion of FEDCON's claim based upon follow-on weather days for the 2.2 Project includes the computation of a 41-day delay in late 2015 and early 2016 stemming from a 4-day delay in May 2014.[984] Mr. Brannon testified that he has never seen anyone perform this type of analysis and knows of no basis in the relevant literature to make such a hypothetical analysis of events that nobody knows are going to happen one and one-half years into the future.[985] Brannon testified that this analysis, upon which FEDCON relies to bring its delay claim for the 2.2 Project against GLF, is "flawed" and renders the claim "untenable."[986]

---

[979] *Testimony of Angela Sist*, Doc. 235 at 161:6–25, 162:1–17.
[980] *Id*.
[981] *Testimony of Patrick Brannon*, Doc. 243 at 50:16–25, 51:1–23.
[982] *Id.* at 63:13–25, 64:1–25.
[983] *Id.*
[984] *Id.* at 67:2–25, 68:1–7.
[985] *Id.* at 68:8–14.
[986] *Id.* at 68:15–18.

136

345.    FEDCON's removal of all of the weather days from the early completion schedules, as mentioned above, deprived GLF of additional days to perform its work, *i.e.*, "float," when the actual number of weather days was less than the number of weather days that the Corps required FEDCON to include in the approved schedules.[987] In Dr. Sist's analysis, GLF did not receive the benefit of the shared float in the approved schedules between FEDCON and the Corps, and FEDCON used the removed float to create a claim against GLF when there were no delays attributable to GLF.[988]

346.    In addition to time extensions for adverse weather days and time extensions due to high river restriction periods, FEDCON also received contract modifications resulting in extensions on the 2.2 Project for the differing site condition that existed at the Chevron plant.[989]

347.    As a result of FEDCON's receipt of extensions of time from the Corps such that the 2.2 Project was completed within the revised prime contract completion date, no liquidated damages were assessed against FEDCON in regard to delay.[990]

348.    As a result of FEDCON's receipt of extensions of time from the Corps such that the 1.2a Project was completed within the revised prime contract completion date, no liquidated damages were assessed against FEDCON in regard to delay.[991]

349.    FEDCON's requests to the Corps for time extensions were made in good faith insofar as the cause or basis for the delay to the project or prime contract completion date.[992] FEDCON never requested a time extension from the Corps in good faith wherein the provided reason for the request was that more time was needed because of something GLF did not do or did

---

[987] *Testimony of Angela Sist*, Doc. 235 at 171:25, 172:1–19; *Testimony of Jason Whitworth*, Doc. 234 at 174:1–8, 176:1–23, 177:15–25, 178:1–25, 179:1–5.
[988] *Testimony of Patrick Brannon*, Doc. 243 at 73:6–25, 74:1–5.
[989] *Testimony of Patrick Brannon*, Doc. 242 at 166:15–24.
[990] *Testimony of David Boland*, Doc. 233 at 71:5–14.
[991] *Id.* at 71:5–14.
[992] *Id.* at 76:6–13.

not meet in regard to a schedule.[993] Mr. Brannon testified that there is a direct conflict between the positions that FEDCON has taken with the Corps during the projects insofar as the amount of the delay and the causation of delay and the position that FEDCON has taken as to GLF regarding quantification and liability for delay.[994]

### L.  GLF's Preparation and Submission of its Claims to FEDCON

350.    The parties stipulate that GLF submitted six (6) requests for equitable adjustment to FEDCON for alleged additional costs GLF incurred on the 2.2 Project and three (3) requests for equitable adjustment to FEDCON for alleged additional costs GLF incurred on the 1.2a Project.[995]

351.    GLF submitted its claims for the 1.2a Project to FEDCON on April 29, 2016, advising that, per its "previous notices" to FEDCON, it was providing FEDCON with its "claims for additional compensation for the additional costs that have been incurred due to impacts, actions and inaction" on the part of FEDCON regarding the 1.2a Project Subcontract Agreement work.[996] GLF identified its claims as the following: (1) "Failure to provide two work fronts concurrently"; (2) "Crane matting due to inadequate work platform construction"; (3) "Failure to provide properly designed and engineered access road"; and (4) "Impact of high river outside of high river season."[997] As set forth above, GLF's claims for the 1.2a Project are composed of the following: (1) a claim for "Deficient Design and Construction Access/Haul Road" in the amount of $614,487.74;[998] (2) a claim for "Deficient Design and Construction of Work Platform" in the amount of $772,365.22;[999] and (3) a claim for "Failure to Provide Two Work Fronts Concurrently"

---

[993] *Id.* at 77:10–19.
[994] *Testimony of Patrick Brannon*, Doc. 242 at 167:12–18.
[995] Doc. 134 ¶¶30–31.
[996] *E.g.*, Doc. 218-4 at 2.
[997] *Id.*
[998] Doc. 219-1091 at 1.
[999] Doc. 219-1092 at 1.

in the amount of $994,674.68.[1000]

352.     GLF also submitted many, but not all, of its claims for the 2.2 Project on April 29, 2016, advising that, per its "previous notices" to FEDCON, it was providing FEDCON with its "claims for additional compensation for the additional costs that have been incurred due to impacts, actions and inaction" by FEDCON regarding the 2.2 Project Subcontract Agreement work.[1001] GLF identified its claims as the following: (1) "Failure to provide two work fronts concurrently"; (2) "Failure to plan and pursue low profile work"; (3) "Multiple handling of materials due to lack of access"; (4) "Crane matting due to inadequate work platform construction"; (5) "Failure to provide properly designed and engineered access road"; (6) "Impact of high river outside of high river season"; and (7) "Impact due to unilateral decision to change sheet pile material from PZ to AZ."[1002]

353.     FEDCON had not terminated the 2.2 Project Subcontract Agreement as of April 29, 2016, and GLF provided enclosed documentation to FEDCON in support of its claim for the purportedly improper termination on June 3, 2017.[1003] Further, as mentioned above, GLF submitted its REA for the costs associated with the AZ sheet piling materials on November 4, 2014, and submitted its REA binder to FEDCON on November 25, 2014.[1004]

354.     GLF's claims for the 2.2 Project include the following: (1) a claim for "Deficient Design and Construction of Access/Haul Road" in the amount of $768,591.49;[1005] (2) a claim for "Deficient Design and Construction of Work Platform" in the amount of $783,313.97;[1006] (3) a

---

[1000] Doc. 219-1093 at 1.
[1001] *E.g.*, Doc. 219-751 at 2.
[1002] *Id.*
[1003] Doc. 218-771 at 1–2.
[1004] Doc. 134 ¶¶55–56.
[1005] Doc. 219-1087 at 1.
[1006] Doc. 219-1088 at 1.

claim for "Failure to Provide Two Work Fronts Concurrently" in the amount of $475,618.21;[1007] (4) a claim for "Failure to Plan and Pursue Low Profile Work" in the amount of $351,402.28;[1008] (5) a claim for "Multiple Material Handling Due to Lack of Access" in the amount of $111,953.47;[1009] (6) a claim for "Impact Due to FEDCON Unilateral Decision to Change Sheetpile Section from PZ to AZ" in the amount of $469,453.06;[1010] and (7) a claim for "Cost Impact of Additional Demobilization Due to Improper Termination" in the amount of $375,197.30.[1011] GLF also seeks $118,854.78 for Application for Payment No. 34 and $880,000.00 for reimbursement of demobilization costs and expenses.

355.    Lorenzo Ellis was responsible for preparing GLF's claims, except the AZ-PZ sheet pile claim, for which he gathered information and reviewed.[1012] These claims were not reviewed by Yerk, Beaird, Howard, or Senis before they were submitted to FEDCON.[1013] Mr. Ellis has experience preparing claims.[1014] Regarding his methodology to determine the basis, support, and amount for the claims, Ellis aimed to isolate the labor, equipment and supervision as he analyzed costs and time.[1015] He also aimed to capture impacts related to actions or omissions by FEDCON, not GLF.[1016] The methodology included a review of all of GLF daily timesheets, foremen's daily reports, payroll records for the labor cost and its equipment records reflecting the type of equipment that was to be used and Blue Book information for the daily cost of the equipment, as well as information from Corps EP-1110 Manual on equipment rates.[1017] Ellis

---

[1007] Doc. 219-1089 at 1.
[1008] Doc. 218-702 at 2.
[1009] Doc. 218-733 at 1.
[1010] Doc. 218-766 at 2.
[1011] Doc. 218-781 at 2.
[1012] *Testimony of Lorenzo Ellis*, Doc. 240 at 44:22–25, 46:6–13.
[1013] *Testimony of Lorenzo Ellis*, Doc. 241 at 153:9–12.
[1014] *Testimony of Lorenzo Ellis*, Doc. 240 at 45:14–17.
[1015] *Id.* at 45:14–25, 46:1–9.
[1016] *Id.*
[1017] *Id.* at 48:4–25, 49:1–11, 223:10–24.

recomputed all of the claims, with the exception of the low-profile claim (which relies upon actual invoices), utilizing EP 1110 rates.[1018] The recalculated claims are the same as the claims utilizing Blue Book rates, except to the extent that Ellis caught "minor" errors.[1019]

356.     To support its claims, GLF presented the testimony of Mr. Brannon, whom GLF tendered as an expert witness in regard to schedule and delay analysis, impact analysis, and damages.[1020] Mr. Brannon has reviewed claims for thirty years and testified that he applied the standards that he gained from his own experience, as well as published industry standards, in reviewing GLF's claims.[1021] Mr. Brannon testified that he began addressing the issues and costs pertaining to the claims with GLF's representatives following his site visit in 2015.[1022] Mr. Brannon had several discussions with Lorenzo Ellis regarding the collection of documentation and cost information to support the damages and the methodology to be utilized to compile the documentation and present it in an organized manner and fully document the costs for submission and review.[1023] Mr. Brannon further testified that, on numerous occasions, he reviewed the compilation of information and costs and supporting documentation, as well as the "methodology, the reasoning behind the claims, [and] the process in which [Lorenzo Ellis] was compiling records to support those claims over the course of the project[s] . . . ."[1024]

357.     Mr. Brannon opined, based on his experience, that GLF's claims do not constitute delay claims, but "disruption" claims:

> A delay claim is typically utilized to capture the costs related to an extension of a contract time period, and the cost the contractor incurs for that extension. There is no extension requested by GLF on this project. The full project, the original project period was extended

---

[1018] *Id.* at 223:10–15.
[1019] *Id.* at 223:25, 224:1–24.
[1020] *Testimony of Patrick Brannon*, Doc. 242 at 149:2–10.
[1021] *Testimony of Patrick Brannon*, Doc. 243 at 29:2–20.
[1022] *Id.* at 22:16–25, 23:1–6.
[1023] *Id.* at 26:19–21, 27:2–11.
[1024] *Id.* at 28:15–17, 30:5–12.

through the actual project period by modifications from the owner, at least throughout the period of GLF's performance. No, this is not a delay claim. These costs are more properly classified as a disruption claim in my opinion.[1025]

358.     Mr. Brannon reviewed the claims for reasonableness; he did not attempt to recreate Mr. Ellis' many calculations, nor did he try to reproduce the claims.[1026] Based on his review and his knowledge of the issues, Mr. Brannon opined that the claims, as calculated, were reasonable.[1027]

359.     To the extent that the Court concludes that Paragraph 13.B of the subcontract agreements is applicable, the record evidence demonstrates that FEDCON never responded to any of GLF's claims in accordance with Paragraph 13.B.[1028] However, on July 17, 2017, FEDCON asked GLF to provide additional information for the low profile claim, such as the methodology for determining the labor, project management, supervision, and equipment hours or days, to which GLF responded on July 19, 2017.[1029] GLF provided similar information to FEDCON for its multiple material handling claims on the 2.2 Project on July 19, 2017, following a June 28, 2017 request from FEDCON.[1030] FEDCON asked for even more information for this claim on September 5, 2017, so that FEDCON could "review the information and submit any applicable changes to" the Corps.[1031] Mr. Ellis testified that, despite requests for additional information, GLF did not receive a "substantive response" to its claims from FEDCON.[1032]

360.     The parties met on October 25, 2019, at the conclusion of the first week of trial, for purposes of FEDCON providing to GLF information regarding issues or concerns in response

---

[1025] *Id.* at 32:7–16.
[1026] *Id.* at 45:20–25, 46:1–2.
[1027] *Id.* at 46:2–4.
[1028] *Testimony of Lorenzo Ellis*, Doc. 240 at 58:5–12, 226:21–25, 227:1–4.
[1029] *Id.* at 52:12–23; Docs. 218-711 at 1–2; 218-712 at 1–2.
[1030] *Testimony of Lorenzo Ellis*, Doc. 240 at 52:12–23; Docs. 218-731 at 1–2; 218-730 at 1–2.
[1031] Doc. 222-315 at 1–4.
[1032] *Testimony of Lorenzo Ellis*, Doc. 241 at 7:14–19, 9:12–19.

to GLF's claims.[1033] Lorenzo Ellis testified that the information provided by FEDCON at the October 25, 2019 meeting constituted the first response that GLF had received to its claims.[1034] Based upon the information provided by FEDCON, GLF, through Mr. Ellis' efforts, undertook a review of the allotted time for supervisory personnel and equipment within the claims.[1035]

361.    FEDCON initially objected to GLF presenting evidence regarding the adjustments that were made to the claims after GLF's receipt of information from FEDCON at the October 25, 2019 meeting. After addressing the issue with the Court, the parties agreed that the evidence of GLF's adjustments to its claims would be presented to the Court through the testimony of Ellis and the use of demonstrative exhibits.

362.    GLF made the following adjustments to its claims: (1) ($67,974.19) for project management and supervision;[1036] (2) ($6,506.25) for crane hours;[1037] and (3) ($67,881.17) resulting from the removal of four days.[1038] The sum of these adjustments that arise from the October 25, 2019 meeting and information supplied by FEDCON is $142,361.61. These reductions cover both projects.

## III.    CONCLUSIONS OF LAW

### A.  Legal Standards

#### i.  Federal Civil Trial Burden of Proof

---

[1033] *See* Doc. 235 at 296:18–21.

[1034] *See Testimony of Lorenzo Ellis*, Doc. 240 at 58:5–17, 59:12–24.

[1035] *Id.* at 226:5–20, 230:20–25, 231:1–9.

[1036] *Testimony of Lorenzo Ellis*, Doc. 241 at 5:15–25, 6:1–25, 7:1–24.

[1037] *Id.* at 7:25, 8:1–25, 9:1–11. Further, Lorenzo Ellis testified that this $6,506.25 credit was calculated using the EP 1110 rates, whereas the value of the credit when utilizing the Blue Book rates is $38,534.65. *Id.* at 9:8–11. Following Mr. Ellis' testimony, the Court advised the parties that it would utilize the EP 1110 rates.

[1038] *Id.* at 9:20–25, 10:1–25, 11:1–6. As with the credit for crane hours, Lorenzo Ellis testified that this $67,881.17 credit was calculated using the EP 1110 rates, whereas the value of the credit when utilizing the Blue Book rates is $104,792.60. *Id.* at 11:1–6. Following Mr. Ellis' testimony, the Court advised the parties that it would utilize the EP 1110 rates.

In deciding the claims and defenses tried by GLF and FEDCON in this action, the Court applies the "preponderance of the evidence" standard. This standard is defined as "[t]he greater weight of the evidence . . . [a] superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other." *Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1209 (11th Cir. 2007) (alterations in original) (quoting *Black's Law Dictionary* 1220 (8th ed. 2004)). "The burden of showing something by a preponderance of the evidence, the most common standard in the civil law, simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence before he may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Concrete Pipe & Prods. Of Ca., Inc. v. Constr. Laborers Pension Tr. For S. Cal.*, 508 U.S. 602, 622 (1993) (internal quotation marks and alterations omitted). The preponderance of the evidence standard is "not a high standard of proof," but "[i]t is not, however, a toothless standard either," and a district court may not abdicate its responsibility to ensure that the party prosecuting the action meets this standard before ruling. *United States v. Askew*, 193 F.3d 1181, 1193 (11th Cir. 1999) (quoting *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995)).

### ii.  Florida Law

Although this action was brought, in part, under the Miller Act, Florida law governs whether FEDCON materially breached the subcontract agreements. *See United States for Use & Benefit of Seminole Sheet Metal Co. v. SCI, Inc.*, 828 F.2d 671, 675 (11th Cir. 1987). The parties agree that Florida law applies to the issues of this case. "For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) material breach of that contract; and (3) damages resulting from the breach." *Vega v. T-Mobile USA, Inc.*, 564 F.3d

1256, 1272 (11th Cir. 2009) (quoting *Friedman v. N.Y. Life Ins. Co.*, 985 So. 2d 56, 58 (Fla. 4th DCA 2008)). "To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *MDS (Can.) Inc. v. Rad Source Techs., Inc.*, 720 F.3d 833, 849 (11th Cir. 2013) (quoting *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)).

### B.  GLF's Breach of Contract Claims

#### i.   2.2 Project and 1.2a Project

In Counts I and II of its complaint for the 2.2 Project (Case No. 8:17-cv-2650-T-36TGW), GLF asserts claims for breach of contract and liability under the Miller Act. The Miller Act claims are discussed below. Relevant here, GLF alleges that FEDCON "failed to timely and properly design, engineer, construct and maintain the temporary access road and work platforms in conformance with the requirements" of the 2.2 Project Subcontract Agreement and the 2.2 Prime Contract requirements and that FEDCON "failed to construct temporary flood protection in a manner that would allow the work to proceed as permitted by" the Corps. *GLF II*, Doc. 1 ¶24. Regarding the May 27, 2016 termination of the 2.2 Project Subcontract Agreement, GLF alleges "FEDCON had not prepared the required engineered plan for providing access and a work platform for the work" or "actually constructed either the access road or the work platform." *Id.* at ¶35. GLF also alleges that it submitted requests for equitable adjustment "for each of the claims for additional costs incurred" by GLF resulting from FEDCON's failures to comply with the requirements of the 2.2 Project Subcontract Agreement. *Id.* at ¶36.

In its breach of contract claim, GLF alleges that FEDCON materially breached the 2.2 Project Subcontract Agreement "by failing to compensate GLF for the additional costs incurred due to FEDCON's failures to comply with" the requirements of the 2.2 Project Subcontract

Agreement, thereby resulting in "additional costs" incurred by GLF. *Id.* at ¶49. GLF also alleges that FEDCON materially breached the 2.2 Project Subcontract Agreement by "impacting [GLF's] ability to timely perform the work through its active interference with [GLF's] performance thereby causing [GLF] to incur additional costs in the performance" of its work. *Id.* at ¶50. GLF additionally alleges that "FEDCON further materially breached the [2.2 Project Subcontract Agreement] by improperly default terminating the [2.2 Project Subcontract Agreement] due to its failure to perform the contractually required predecessor work," thereby making GLF's work unavailable. *Id.* at ¶51.

In GLF's operative complaint for the 1.2a Project (Case No. 8:17-cv-1932-T-36AAS), GLF alleges that FEDCON materially breached the 1.2a Project Subcontract Agreement by: (1) failing to compensate GLF for the additional costs incurred due to FEDCON's failures to comply with the requirements of the 1.2a Project Subcontract Agreement, thereby resulting in additional costs incurred by GLF; and (2) impacting GLF's ability to timely perform the work through its active interference with GLF's performance, thereby causing GLF to incur additional costs in performing the work. Doc. 38 ¶¶41–42.

### 1. Access Roads

The Court begins with GLF's claims for the access roads on the 1.2a Project and the 2.2 Project. For the reasons set forth below, GLF has demonstrated, by a preponderance of the evidence, that FEDCON materially breached the subcontract agreements with respect to the access roads.

In the complaints for each action, GLF alleges that FEDCON materially breached the respective subcontract agreements by failing to compensate GLF for the additional costs incurred due to FEDCON's failures to comply with the requirements of the respective subcontract

agreement, thereby resulting in additional costs. Thus, the Court construes this claim as alleging that FEDCON materially breached the subcontract agreements by failing to compensate GLF for the costs incurred as a result of FEDCON's failure to construct and provide the access roads under the terms of the subcontract agreements. GLF also alleges in its complaints for each action that FEDCON materially breached the subcontract agreements by impacting GLF's ability to timely perform the work through its active interference with GLF's performance, thereby causing GLF to incur additional costs in the performance of the work. As such, the Court also construes this claim as alleging that FEDCON materially breached the subcontract agreements by actively interfering with GLF's performance, through its conduct with the access roads, which impacted GLF's timely performance of the work and caused GLF to incur additional costs in the performance of the work.

Florida law requires GLF to plead and establish (1) the existence of a contract; (2) the material breach of that contract; and (3) damages that resulted from the breach. *Vega*, 564 F.3d at 1272. "To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *MDS (Can.) Inc.*, 720 F.3d at 849. Here, the parties stipulate that the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement are valid and enforceable contracts.

Initially, the Court is not persuaded that FEDCON's failure to reimburse GLF for the access road costs goes to the essence of the subcontract agreement but, regardless, actively interfering with another party's performance undoubtedly goes to the essence of the contract, as it prevents that party from performing its contractual obligations. Before the Court turns to such active interference, however, it examines Paragraph 10.B and Paragraph 13.B.

GLF has asserted that it brought its access road claims under Paragraph 13.B, while FEDCON has consistently maintained that Paragraph 10.B and 13.B work together. In its Order on summary judgment, when discussing crane mats, the Court declined to conclude whether Paragraph 10.B or 13.B served as the proper avenue for recovery. Doc 177 at 41.

Paragraphs 10.A and 10.B fall under the heading "Changes/Claims." Docs. 216-116 at 5; 216-132 at 5. Paragraph 10.B provides:

> Any claim of the Subcontractor *for adjustment for changes in the Work or for additional time or compensation* must be made in writing and delivered to the Contractor *within ten (10) days from the date of receipt by the Subcontractor of the notification of a change or of the requirements to perform specific Work or from the date of the event that gives rise to the claim for additional time or compensation*, unless the Contractor grants in writing an additional period of time before the date of final payment under this Subcontract Agreement. If the Owner or the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Paragraph 13 hereof; but nothing provided in this clause shall excuse the Subcontractor from proceeding with the prosecution of the Work as changed or as directed or required by the Contractor. The Subcontractor shall proceed with prosecution of the Work which is the subject of a claim or dispute under this paragraph.

Docs. 216-116 at 5–6; 216-132 at 5–6 (emphasis added).

For context, Paragraph 10.A, generally, addresses changes in the work by the Contractor or the Owner. As shown above, Paragraph 10.B then requires any "claim" of GLF "for adjustment for changes in the Work or for additional time or compensation" to be made in writing and delivered to FEDCON "within ten (10) days from the date of receipt by [GLF] of the notification of a change or of the requirement to perform specific Work or from the date of the event that gives rise to the claim for additional time or compensation," unless FEDCON grants additional time. Docs. 216-116 at 5; 216-132 at 5. Paragraph 10.B previously addressed only claims "for adjustment for changes in the Work," consistent with the provisions of Paragraph 10.A, but, as

evident from the face of the subcontract agreements, the parties amended Paragraph 10.B to include claims for adjustment for additional time or compensation, too.

On the other hand, Paragraphs 13.A and 13.B fall under the heading "Disputes." Docs. 216-116 at 7; 216-132 at 7. Paragraph 13.B provides:

> Any claim arising out of or related to the Subcontract Agreement, other than those subject to Paragraph 13A, above, shall be submitted to the Contractor for an initial decision in its sole discretion. Thereafter, should the Subcontractor disagree with the Contractor's decision, such claim shall be subject to non-binding mediation, to be held in Orange County, Florida, as a condition precedent to the institution of legal or equitable proceedings by either party. The parties will endeavor to resolve their claims by mediation which, unless the parties agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. No legal or equitable proceeding may be filed until the conclusion of the mediation process and the Subcontractor agrees that it will stay any such proceeding that is instituted until the completion of the mediation.

216-116 at 7; 216-132 at 7.[1039]

Thus, Paragraph 13.B provides that *any* claim that arises out of or relates to the Subcontract Agreement, aside from those subject to Paragraph 13.A, must be submitted to FEDCON for an initial determination in FEDCON's sole discretion.[1040] Paragraph 13.B does not provide a definition for "claim," and construing the definition for "claim" under Paragraph 13.A as applying to Paragraph 13.B would render Paragraph 13.B nonsensical, as it would require the Contractor to make an initial decision, and thereafter submit to non-binding mediation if necessary, for claims for which the Owner was responsible. However, at the same time, Paragraph 10.B requires *claims*

---

[1039] The parties agreed to waive the pre-suit mediation requirement. Doc. 83 at 16 n.2.

[1040] In turn, Paragraph 13.A of the Subcontract Agreement states that the "contractual remedial procedure described in Section 00700 – Contract Clauses, 52.233-1 Disputes. (Jul 2002) of the Prime Contract *relating to claims for which the Owner may be responsible* is specifically incorporated" into each Subcontract Agreement by reference and made a part thereto. *Id.* (emphasis added). Section 00700 – Contract Clauses, 52.233-1 provides a mechanism for FEDCON to submit claims to the Corps. *See* Doc. 216-8 at 3–5. Paragraph 13.A states that "[t]he term 'claim' as utilized in this paragraph shall include any request for monetary or other relief, claim, appeal, or action arising from the subcontractor for which the Owner has, or may have responsibility." Doc. 216-116 at 7.

for adjustment in the Work or for additional time or compensation to be made in writing to FEDCON. Thus, there are two competing provisions for claim submission. Courts are required to "read provisions of a contract harmoniously in order to give effect to all portions thereof." *City of Homestead v. Johnson*, 760 So.2d 80, 84 (Fla. 2000). "The goal of contract interpretation is to arrive at a reasonable interpretation of the text in order to accomplish its stated meaning and purpose." *Walsh v. Walsh*, 262 So. 3d 212, 216 (Fla. 5th DCA 2018).

The Court construes Paragraph 10.B as pertaining to those claims of GLF for adjustments for changes in the work, and the Court construes "additional time or compensation" therein as pertaining to those claims for additional time or compensation arising from changes in the work. The recognition that Paragraph 10.B directs parties who fail to agree to follow the procedure specified in Paragraph 13 supports this interpretation, thereby identifying Paragraph 13 as a separate, rather than an identical, mechanism. The access road claim submitted by GLF was not based on a change in work, but costs that it incurred as a result of FEDCON's failure to provide certain predecessor work. GLF timely filed that claim under Paragraph 13.B.

Next, the Court concludes that FEDCON materially breached the subcontract agreements by actively interfering with GLF's performance. Actively interfering with another party's performance goes to the essence of the contract. Here, the evidence shows that FEDCON failed to construct and provide the access roads in accordance with the requirements of the subcontract agreements and the prime contracts. The Court concludes that Section 04.B of EM 385-1-1 is applicable. "Under Florida law, contract interpretation begins with plain meaning of words used, and words are 'to be given their natural, ordinary meaning." *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1251 (S.D. Fla. 2017) (quoting *Ferox, LLC v. ConSeal Int'l, Inc.*, 175 F. Supp. 3d 1363, 1371 (S.D. Fla. 2016)). "In order to determine the common usage or ordinary meaning

of a term, courts often turn to dictionary definitions for guidance." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1223 (11th Cir. 2001). "Where the contract is unambiguous, it must be interpreted in accordance with its plain meaning so as to give effect to the contract as a whole." *Id.* "The goal of contract interpretation is to arrive at a reasonable interpretation of the text in order to accomplish its stated meaning and purpose." *Walsh*, 262 So. 3d at 216.

As detailed above, the subcontract agreements provide that "others" must construct and maintain "a temporary access road approximately 12' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee." Docs. 216-117 at 2; 216-132 at 17. "Access" is defined, in relevant part, as: "permission, liberty, or ability to enter, approach  or pass to and from a place or to approach or communicate with a person or thing"; "a way or means of entering or approaching." Merriam-Webster Dictionary, *Access*, https://www.merriam-webster.com/dictionary/access (last visited January 14, 2021). "Temporary" is defined as: "lasting for a limited time." Merriam-Webster Dictionary, *Temporary*, https://www.merriam-webster.com/dictionary/temporary (last visited January 14, 2021). Thus, the Court construes the subcontract agreements as requiring "others" to provide roads, lasting for a limited time, for the purpose of entering or approaching.

The parties stipulate that EM-385-1-1 is part of the "Contract Documents." Section 04.B addresses "[a]ccess/haul roads" and requires such roads to be "designed in accordance with current engineering criteria." Doc. 216-83 at 1. The Court interprets Section 04.B as applying to both "access roads" and "haul roads", as "access roads" and "haul roads" are referred to separately therein. *See id.* at 2 ("No employer shall move, or cause to be moved, any equipment or vehicle upon an access or haul road . . . . ."). Thus, Section 04.B, which is part of the "Contract Documents," governs "access roads." The subcontract agreements call for the provision of "access

roads." The Court discerns no logical basis for why the temporary nature of the access roads in the subcontract agreements renders such roads anything other than access roads. A reasonable interpretation is that Section 04.B governs these "access roads." Further, "Haul" is defined, in relevant part, as "to cause (something) to move by pull or drawing: to exert traction on"; "to transport in a vehicle." Merriam-Webster Dictionary, *Haul*, https://www.merriam-webster.com/dictionary/haul (last visited January 14, 2021). The testimony demonstrated that the access roads were needed for the delivery of materials. Section 04.B applies to the temporary access roads.[1041]

Having determined that EM 385-1-1 is applicable to the temporary access roads, GLF has demonstrated, by a preponderance of the evidence, that the access roads were neither engineered nor sufficient for their intended purpose. The Court construes the underlying premise of GLF's claim here as the contention that FEDCON "actively interfered" with GLF's performance when it failed to perform the predecessor work. The Court begins with the testimony of Mr. Lourie and Mr. Hull. The testimony of Mr. Lourie is not particularly persuasive in light of the limited scope of his visit. However, the testimony of Mr. Hull is credible due to his familiarity with temporary facilities and the similar 4.2 Project. As discussed above, Mr. Hull opined, among other things, that the temporary access roads were entirely insufficient for supporting pipe and pile installation or for supporting the vehicles and intended equipment. The evidence demonstrates that, although FEDCON explored engineering solutions for the access roads, the roads were not engineered. David Boland was not aware of FEDCON engaging an engineer to develop the design for the

---

[1041] Although David Boland testified that Section 27.F of EM 385-1-1, addressing "Structural Steel Assembly," is applicable instead, he did not persuasively explain that driving piling into the ground constituted material being "erected." And the Court does not discern any basis for why this section should apply instead of the Section 04.B, which directly addresses access roads. The credibility of Mr. Boland's testimony is also undercut by the recognition that FEDCON did not advise GLF of the purported applicability of Section 27.F to access roads during either project.

temporary access roads. Evidence admitted at trial demonstrated that FEDCON knew that the access roads were insufficient for their purpose, such as Hildebrandt's recognition that the roads had "held up poorly to construction traffic." Doc. 219-793 at 1. FEDCON ultimately determined that the recommended engineering upgrades from Mr. Hornsby and Burns Cooley Dennis were cost-prohibitive. Even when FEDCON issued change orders to HDB to perform some reconstruction on the access roads, the solution proposed by Mr. Hornsby called for twice as much as what FEDCON provided.

Early on in both projects, GLF personnel emphasized to FEDCON the importance of access, but to no avail: as testified by Ellis, GLF was impacted by the conditions of the temporary access roads on both projects through its termination on the 2.2 Project on May 27, 2016, and through completion of its work on the 1.2a Project in October 2016. The evidence also demonstrates that there were days when GLF could not work because of the conditions of the access roads. The design of the roads even impacted HDB's maintenance obligation. Consequently, GLF incurred idle equipment and manpower costs on days when its personnel should have been able to work, but for the roads being impassible and FEDCON not allowing access. Thus, by a preponderance of the evidence, GLF has shown that FEDCON failed to provide the access roads in accordance with the subcontract agreements.

GLF has also demonstrated, by a preponderance of the evidence, that it incurred damages as a result. The testimony and evidence outlined above, including the testimony of Ellis and the accompanying documentation, highlights the incurred damages. But, this does not end the analysis. GLF's assertion that FEDCON actively interfered through its conduct and actions related to the access roads dovetails into a review of the no-damages-for-delay provision of the subcontract agreements, located at Paragraph 12.B, which provides:

> The Subcontractor expressly agrees that the Contractor shall not be liable to the Subcontractor for any damages or additional costs, whether foreseeable or unforeseeable, resulting in whole or in part from a delay, hindrance, suspension, or acceleration of the commencement of the Work, caused in whole or in part by the acts or omissions, whether negligent or not, of the Contractor, its agents, employees, or any third parties acting on behalf of the Contractor, including other Subcontractors or material suppliers to the Project. The Subcontractor's sole remedy for any such delay, hindrance, suspension, or acceleration shall be a noncompensable time extension. However, in the event of delays, suspensions, or disruptions of the Work caused by third parties acting on behalf of the Contractor, the Contractor shall endeavor to recover damages from said Contractor's third parties and the Subcontractor shall be entitled to its share of such amounts, to the extent the Contractor recovers and/or receives monies from the responsible party, and the Subcontractor shall be provided an extension of time if so recovered.

Docs. 216-116 at 7; 216-132 at 7.

Florida law provides that "no damage for delay clauses" are "valid, enforceable, and not in violation of public policy." *Marriot Corp. v. Dasta Constr. Co.*, 26 F.3d 1057, 1067 n.17 (11th Cir. 1994) (collecting cases). Although Florida courts recognize these clauses in construction cases, courts will not allow such a clause to bar recovery where "the delays were occasioned by the contractor's fraud, concealment, or active interference with the subcontractor's performance under the contract." *United States v. David Boland, Inc.*, No. 6:05-cv-549-Orl-19JGG, 2006 WL 2683304, at *3 (M.D. Fla. Sept. 18, 2006) (collecting cases); *see also Marriot Corp.*, 26 F.3d at 1067–68 (stating that Florida law would not allow the no damage for delay clause to bar recovery if the delays were occasioned by fraud, concealment, or active interference); *Newberry Sq. Dev. Corp. v. S. Landmark, Inc.*, 578 So. 2d 750, 752 (Fla. 1st DCA 1991) (providing that a no damages for delay clause does not preclude recovery for delays resulting from fraud, concealment, or active interference with performance under the contract). "These exceptions of the no damages clause are generally predicated upon an implied promise and obligation not to hinder or impede performance." *Newberry Sq. Dev. Corp.*, 578 So. 2d at 752. "Active interference may be

154

characterized as a 'knowing delay' which is 'sufficiently egregious.'" *David Boland, Inc.*, 2006 WL 2683304, at *4 (M.D. Fla. Sept. 18, 2006).

Therefore, under Paragraph 12.B, GLF agreed that FEDCON would not be liable to GLF for any damages or additional costs, whether foreseeable or not, resulting in whole or in part from "a delay, hindrance, suspension, or acceleration of the commencement or execution of the Work," caused in whole or in part by the acts or omissions of FEDCON or its agent. A "delay" is defined as "the act of postponing, hindering, or causing something to occur more slowly." Merriam-Webster Dictionary, *Delay*, https://www.merriam-webster.com/dictionary/delay (last visited January 22, 2021). "Hindrance" is defined, in relevant part, as "the state of being interfered with, held back, slowed down: the state of being hindered," Merriam-Webster Dictionary, *Hindrance*, https://www.merriam-webster.com/dictionary/hindrance (last visited January 22, 2021), and "hindered," in turn, is defined as "to make slow or difficult the progress of: hamper," or to "hold back: prevent, check." Merriam-Webster Dictionary, *Hinder*, https://www.merriam-webster.com/dictionary/hinder (last visited January 22, 2021).

As Mr. Ellis testified, the access road claims pertain to costs that GLF incurred for its idle equipment and manpower on days when its personnel should have been able to work, but for the road being impassable and FEDCON not allowing access. As such, GLF seeks damages as a result of FEDCON's failure to provide the access roads. These damages fall squarely within the language of Paragraph 12.B because GLF is seeking damages or additional costs that it incurred, in whole or in part, from being hindered in the work, as the unavailability of the access roads slowed down the work and hampered GLF's performance. Although the Court finds Mr. Brannon's testimony to be credible, the Court does not find his conclusion that GLF's claims constitute "disruption"

claims rather than delay claims to be credible, as the determination of whether Paragraph 12.B bars a claim involves a legal analysis, including examination of the contractual language.

However, GLF will recover because the evidence demonstrated active interference by FEDCON. The evidence demonstrates a "knowing delay" on behalf of FEDCON that was "sufficiently egregious." The design for the roads was clearly insufficient. Further, even though Section 04.B of EM-385-1-1 applied, the roads were not engineered. The poor condition of roads consistently prevented work. FEDCON sometimes shut down the roads when it rained. Recognizing the issues posed by the poor design, FEDCON explored engineering solutions. But, despite working with engineers to develop potential solutions and FEDCON personnel sharing their own ideas for improvements of the roadways, FEDCON did not take any action. In some instances, FEDCON personnel represented that the roadways were acceptable. Despite all of these issues and FEDCON's engagement of engineers, FEDCON ultimately decided not to perform any of the recommended upgrades because of costs. Even the replacement contractor was impacted by FEDCON's failure to properly construct and maintain the roadways. Therefore, because the evidence demonstrates active interference, GLF will recover its damages, despite the damages falling within the language of Paragraph 12.B.

Finally, GLF seeks $614,487.74 for the 1.2a Project and $768,591.49 for the 2.2 Project. GLF has provided a wealth of supporting documentation and evidence, including the testimony of Lorenzo Ellis, who prepared the claim. The Court finds Mr. Ellis' testimony regarding the preparation of the claim to be credible. Mr. Brannon also testified that the claim was reasonable based on his experience. Although there may be some difficulty proving the exact amount of damages here, it is clear that substantial damages were suffered and a reasonable basis in the

evidence exists for awarding the damages. *Centex-Rooney Constr. Co., Inc. v. Martin Cnty.*, 706 So. 2d 20, 28 (Fla. 4th DCA 1997).

Therefore, the Court will award GLF $614,487.14 for the 1.2a Project and $768,591.49 for the 2.2 Project, subject to the $67,881.17 reduction identified by Mr. Ellis.

### 2. Work Platforms

GLF also claims that FEDCON failed to provide the contractually required work platform on the 2.2 Project and the 1.2a Project. This claim fails because the damages are barred by the no-damages-for-delay provision of the subcontract agreements.

The Court construes these claims as alleging that FEDCON materially breached the subcontract agreements by failing to compensate GLF for the costs incurred as a result of FEDCON's failure to provide the contractually required work platforms to GLF. The Court also construes the claims as alleging that FEDCON materially breached the subcontract agreements by actively interfering with GLF's performance, through its conduct regarding the provision of the work platforms, which impacted GLF's timely performance of the work and caused GLF to incur additional costs in the performance of the work.

To succeed in establishing a breach of contract claim under Florida law, GLF must plead and establish (1) the existence of a contract; (2) the material breach of that contract; and (3) damages that resulted from the breach. *Vega*, 564 F.3d at 1272. The parties stipulate that both subcontract agreements are valid and enforceable. Even if the Court assumes that FEDCON materially breached the subcontract agreements by failing to compensate GLF for the costs incurred as a result of FEDCON's failure to provide the contractually required work platforms or by impacting GLF's timely performance of the work by actively interfering with GLF's performance, through its conduct regarding the contractually required work platforms, the

157

damages for this claim fall within the no-damages-for-delay provision of the subcontract agreements.

This claim is barred by Paragraph 12.B because GLF is seeking to recover damages or additional costs that it incurred as a result of being postponed, held back, slowed down, or otherwise prevented from performing the work. Mr. Ellis testified that FEDCON's failure to provide a compacted work platform to GLF under the requirements of the subcontract agreements resulted in: (1) GLF incurring costs for the purchase of additional crane mats; and (2) GLF incurring additional labor time to remove the crane mats from the muddy surface of the work platform and move them ahead of the crane to allow for continued operations. The work platforms held water, and the crane mats would sink into the mud. Mr. Ellis testified that the process of moving crane mats took as many as three or three and one-half hours and prevented the cranes from driving pile or pouring concrete, as they were actively engaged in moving the crane mats instead. Mr. Ellis further testified that each claim relating to the work platforms includes $135,000 for 90 additional crane mats and he represented that the remaining amount accounts for crew moving the mats when they should have been engaged in other activity. Further, when discussing the equipment charges, Mr. Ellis explained that equipment sat idly while GLF moved the crane mats. Therefore, the damages or additional costs result from a delay or hindrance to the execution of the work caused by FEDCON.

Although GLF may avoid the language of Paragraph 12.B if the evidence demonstrates active interference by FEDCON, the evidence does not demonstrate any active interference. While the work platforms were clearly not sufficient for their intended purpose, there is no evidence that FEDCON actively interfered to prevent GLF's work.

Therefore, because the damages sought here are barred by the no-damages-for-delay provision of the subcontract agreements and the evidence does not demonstrate any active interference by FEDCON, GLF will not recover for these claims.

### 3.   Availability of Two Work Fronts to GLF

The Court next turns to GLF's claims regarding FEDCON's failure to make two work fronts available on both the 2.2 Project and the 1.2a Project. This claim fails because the damages are barred by the no-damages-for-delay provision of the subcontract agreements.

The Court construes the claims as alleging that FEDCON materially breached the subcontract agreements by failing to compensate GLF for the costs incurred as a result of FEDCON's failure to provide two work fronts to GLF. The Court also construes the claims as alleging that FEDCON materially breached the subcontract agreements by actively interfering with GLF's performance, through its conduct regarding the availability of two work fronts, which impacted GLF's timely performance of the work and caused GLF to incur additional costs in the performance of the work.

As set forth above, GLF must plead and establish (1) the existence of a contract; (2) the material breach of that contract; and (3) damages that resulted from the breach. *Vega*, 564 F.3d at 1272. The parties stipulate that both subcontract agreements are valid and enforceable. Even if the Court assumes that FEDCON materially breached the subcontract agreements by failing to compensate GLF for the costs incurred as a result of FEDCON's failure to provide two work fronts or by impacting GLF's timely performance of the work by actively interfering with GLF's performance, through its conduct regarding the availability of two work fronts, the damages for this claim fall within the no-damages-for-delay provision of the subcontract agreements.

As Mr. Ellis testified, GLF styles the claim as one resulting from FEDCON's failures to perform the predecessor activities, thereby preventing GLF from performing work on one or both work fronts. Mr. Ellis described the damages as claims for idle manpower and equipment because there were several months during the projects where one or both of the work fronts were unavailable to GLF and, consequently, GLF's equipment and manpower was idle and incurring costs. Mr. Ellis also testified that FEDCON preferred to allow GLF to sit idly rather than paying for rip rap or dirt to keep the job moving ahead. This decision even led to GLF paying HDB to conduct degrading work for the purpose of keeping the job moving. Mr. Ellis testified that GLF was "bleeding" with "all this idle equipment and idle time" and was "doing anything [it] could to keep moving." *Testimony of Lorenzo Ellis*, Doc. 240 at 146:7–9. Therefore, GLF brings this claim for idle manpower and equipment costs that it incurred as a result of work it was unable to perform due to FEDCON's failure to perform the predecessor activities.

This claim falls within the language of Paragraph 12.B because GLF is seeking to recover damages that it incurred as a result of being held back, slowed down, or otherwise prevented from performing the work. Of course, GLF may avoid the language of Paragraph 12.B if the evidence demonstrates active interference by FEDCON. However, the evidence does not demonstrate any active interference. While the evidence demonstrates that FEDCON may have failed to perform certain predecessor work, there is no evidence that this failure constitutes active interference sufficient to bar the claim. Unlike the access road issue, in which FEDCON recognized the horrendous condition of the access roads resulting from the poor design and lack of engineering, actively engaged engineers, and subsequently refused to implement an engineering solution, the evidence here simply shows that FEDCON may not have developed a plan to proceed during high river or hurricane season. Even if the Court assumes that there was no high river condition or other

impediment to GLF's ability to perform the work, as GLF has argued, the evidence does not demonstrate active interference by FEDCON.

Therefore, because the damages sought here are barred by the no-damages-for-delay provision of the subcontract agreements and the evidence does not demonstrate any active interference by FEDCON, GLF will not recover for these claims.

### ii. Remaining 2.2 Breach of Contract Claims

#### 1. AZ Materials and PZ Materials

As discussed, the parties have stipulated to GLF's entitlement to receive payment of the reasonable costs that it incurred in its efforts to drive the AZ steel sheet piling materials for 38 days before FEDCON's decision not to proceed with the AZ materials, switch to the specified PZ materials, and remove the AZ materials. Further, the parties stipulate that FEDCON prepared and submitted a recovery schedule that revised the sequencing and logic for the work activities and reflected a revised plan to complete within the prime contract duration. The parties also agree that these revisions mitigated a portion of the prior delays to the 2.2 Project and *all* of the delays associated with the change from AZ steel sheet piling to PZ steel sheet piling. FEDCON has stipulated that it will pay GLF the reasonable costs associated with attempts to drive and remove the AZ material. As part of the stipulation, FEDCON has objected to portions of GLF's costs. Therefore, the Court must determine the proper amount of this claim.

GLF's AZ-PZ claim is in the amount of $469,453.06, which includes GLF's direct costs of labor, equipment, supervision, and reasonable mark-up, in connection with GLF's attempts to drive the AZ materials and FEDCON's subsequent direction to remove and stack the AZ materials. Although Mr. Ellis did not prepare this claim, he was involved in gathering information for the

claim, he provided input for the claim, and he reviewed the claim. The Court generally finds Mr. Ellis' testimony regarding the details of this claim to be credible.

FEDCON contends that this claim must be reduced to only $139,801.80. First, David Boland testified that this claim should be reduced because, in preparing this claim, GLF utilized Blue Book equipment rates for the equipment, rather than EP 1110 rates. The Court agrees. Mr. Ellis testified that the equipment rates in this claim "are Blue Book rates." *Testimony of Lorenzo Ellis*, Doc. 240 at 173:18–25. A review of the claim reveals that Blue Book rates are included in the supporting materials for the claim. *See generally* Doc. 218-772. However, the Court previously advised that it would utilize the EP 1110 rates. Thus, GLF's use of the Blue Book rates in calculating this claim is improper. GLF has not provided any EP 1110 rates for this claim. The total cost of equipment included in this claim is $198,754.35. Mr. Boland testified that Blue Book rates are three times higher than EP 1110 rates. *Testimony of David Boland*, Doc. 233 at 161:14–25, 162:1–6. FEDCON submitted into evidence Mr. Boland's adjustments, which he testified were in conformity with EP 1110, to the Blue Book equipment rates. Doc. 220-24 at 26–44. Mindful that the Court maintains "reasonable discretion" in making awards of damages in those instances where damages cannot be "precisely and mathematically determined," *John Hancock Mut. Life Ins. Co. v. Mark-A, Inc.*, 324 So. 2d 674, 674 (Fla. 2d DCA 1975), and in the absence of GLF's provision of EP 1110 rates for this claim, the Court will substitute Mr. Boland's equipment calculations for the Blue Book calculations utilized by GLF, with the exception of the week of 10/25/2014 – 11/1/2014, in which Mr. Boland inexplicably reduced all of GLF's incurred costs to $0. The sum of equipment costs for this claim, as calculated by Mr. Boland, is $53,951.36. The Court adds $5,495.92 to this amount, which represents one-third of GLF's claimed $16,487.75

equipment costs for the week of 10/25/2014 – 11/1/2014. As such, the Court will award only $59,447.28 in equipment costs for this claim.

Next, Mr. Boland testified, based on his review, that the labor claim amounts were not supported by GLF's certified payrolls and should be reduced because the certified payrolls were more reliable than daily reports. This is the only claim in which FEDCON mentioned looking to certified payrolls and challenged labor on the basis of certified payrolls. Mr. Boland conceded that the changes resulting from examination of the certified payrolls were "relatively minor." *Testimony of David Boland*, Doc. 232 at 186:23. FEDCON has not sufficiently articulated, through testimony or otherwise, the basis for making reductions based on certified payrolls. As such, the Court declines to make any reductions based on certified payrolls.

Third, to the extent that any damages resulting from the AZ-PZ substitution may be deemed damages under Paragraph 12.B, FEDCON's unilateral substitution of the materials constitutes active interference, thereby allowing the claim to proceed.

Finally, Mr. Boland testified that he eliminated the delay-related damages, such as extended field overhead amounts, on the basis of the "no damage for delay" clause in Paragraph 12.B. As mentioned above, the parties have stipulated that the revised schedule mitigated all of the delays associates with the change from AZ steel sheet piling to PZ steel sheet piling. Both Mr. Boland and Dr. Sist testified that delays attributed to FEDCON resulting from the use of the AZ materials were originally determined to be 45 days, but that revisions in the logic and sequencing in the schedule submitted by FEDCON reduced this delay by 39 days. However, Mr. Boland testified that the costs incurred by GLF during that over-thirty-day period constitute delay damages, notwithstanding the recognition that no delay resulted to the 2.2 Project. *Testimony of David Boland*, Doc. 233 at 164:14–22. Mr. Boland vaguely identified a "three-week period" when

GLF purportedly "refused" FEDCON's directive to remove the AZ piling materials, resulting in GLF not removing the AZ piling materials until the PZ materials arrived. In light of the parties' stipulation, FEDCON's failure to identify the specific "three-week period," and FEDCON's initial decision to substitute the AZ materials for the PZ materials, this argument fails.

Thus, the Court will award GLF only $59,447.28 in equipment costs for this claim, which represents a $139,307.07 reduction in equipment costs as a result of the provided equipment costs conforming to Blue Book rates. Accordingly, the Court will award GLF a total of $330,145.99 for this claim.

### 2.   Low Profile Work

Here, GLF seeks its costs for the rental of the specialty equipment for use on the low profile work from March 1, 2015 through August 22, 2015, as well as costs for its preparation to perform the low profile work, including labor costs, equipment modification costs, and the costs of preparing the sheet and pipe pile materials. This claim fails because the damages are barred by the no-damages-for-delay provision of the subcontract agreements.

As explained above, GLF alleges in its complaint for the 2.2 Project that FEDCON materially breached the 2.2 Project Subcontract Agreement by: (1) failing to compensate GLF for the additional costs incurred due to FEDCON's failures to comply with the requirements of the 2.2 Project Subcontract Agreement, thereby resulting in additional costs; and (2) impacting GLF's ability to timely perform the work through its active interference with GLF's performance, thereby causing GLF to incur additional costs in the performance of the work. As such, the Court construes the breach of contract claim relevant to the low profile work as alleging that FEDCON materially breached the 2.2 Project Subcontract Agreement by: (1) failing to compensate GLF for the additional costs incurred as a result of FEDCON's failure to comply with the requirements of the

2.2 Project Subcontract Agreement for the low profile work; and (2) impacting GLF's ability to timely perform the work through its active interference with GLF's performance of the low profile work, which caused GLF to incur additional costs.

Again, to establish a breach of contract claim under Florida law, GLF must show: (1) the existence of a contract; (2) material breach of that contract; and (3) damages resulting from the breach. *Vega*, 564 F.3d at 1272. Here, the parties agree that the 2.2 Project Subcontract Agreement is valid and enforceable. Next, even if the Court assumes that GLF has established, by a preponderance of the evidence, that FEDCON materially breached the 2.2 Project Subcontract Agreement by either failing to compensate GLF for the additional costs incurred as a result of FEDCON's failure to comply with contractual requirements relative to the low profile work or by impacting GLF's ability to timely perform the work through its active interference with GLF's performance of the low profile work, the damages for this claim fall within the no-damages-for-delay provision of the 2.2 Project Subcontract Agreement.

The central premise to this claim is that FEDCON failed to degrade the levee at Monolith 75 and Monolith 79 to elevation 8. Mr. Ellis testified that, although GLF had procured and modified the equipment and cut the materials, the equipment was idle throughout the spring and summer up until August 7, 2015, because FEDCON never degraded the levee to elevation 8. When the Mississippi River rose, none of the low profile work was able to begin after July 9, 2015. Consequently, according to Mr. Ellis, GLF was required to continue renting the specialty equipment for an extended period of time. Mr. Ellis testified that the claim is premised upon GLF's costs for rental of the specialty equipment from March 1, 2015 through August 22, 2015, and for its preparation to perform the low profile work, with costs including labor costs, the costs of modifying the equipment, the costs of preparing the sheet pile and pipe pile materials, and the rent

paid to the equipment suppliers for the specialty equipment required to perform the low profile pile driving work. Therefore, GLF brings this claim for the costs associated with the idle equipment as a result of work it was unable to perform due to FEDCON's failure to perform the requisite predecessor work.

This claim is barred by the language of Paragraph 12.B because GLF seeks to recover damages that it incurred as a result of being held back, slowed down, or otherwise prevented from performing the work. As previously stated, GLF may avoid the language of Paragraph 12.B if the evidence demonstrates active interference. However, the evidence does not show any active interference on behalf of FEDCON. While the evidence demonstrates that FEDCON did not degrade the levee, the evidence does not demonstrate that such failure rose to the level of active interference. For example, the evidence does not demonstrate that such failure constituted a 'knowing delay' which is 'sufficiently egregious.'" *David Boland, Inc.*, 2006 WL 2683304, at *4 (M.D. Fla. Sept. 18, 2006). "Bureaucratic bungling" is insufficient to overcome a no damages-for-delay clause. *David Boland, Inc.*, 2006 WL 2683304, at *4.

Accordingly, because Paragraph 12.B bars this claim and the evidence does not demonstrate active interference on behalf of FEDCON, GLF will not recover for this claim.

### 3.  Multiple Material Handling

Turning to GLF's claim for multiple material handling, the parties agree that the only issue for the Court to resolve here is the amount of damages to award GLF. This claim was submitted to the Corps, and FEDCON negotiated and settled the claim with the Corps for $89,562.78, which FEDCON credited to GLF in its damage claim on the 2.2 Project. As previously explained, GLF has provided two summaries of damages, the latter in the amount of $111,953.47, which utilizes

EP 1110 rates, rather than Blue Book rates. As such, the Court will treat this latter amount as GLF's summary of damages for this claim.

The damages for this claim span from April 26, 2015 through July 11, 2015. GLF has provided supporting materials and evidence, including the testimony of Mr. Ellis, who discussed the nature of the claim and the bases for the incurred costs. The Court finds Mr. Ellis' testimony regarding the claim to be credible. Although there may be some difficulty proving the exact amount of damages here, it is clear that substantial damages were suffered and a reasonable basis in the evidence exists for awarding the damages. *Centex-Rooney Constr. Co.*, 706 So. 2d at 28.

FEDCON has countered that any additional recovery beyond the $89,562.78 amount should not be permitted because GLF did not provide information upon request. First, FEDCON has pointed to Paragraph 10.D, which provides: "All documentation or supporting data required by the Owner to substantiate any claim made by the Subcontractor shall be promptly furnished by the Subcontractor. The Subcontractor agrees to be responsible for the preparation, pursuit, and prosecution of its request for equitable adjustment and claims to the extent permitted . . . ." Doc. 216-116 at 6. Similarly, Paragraph 13.A, which pertains to claims for which the Owner may be responsible, provides that "[t]he Subcontractor agrees to be responsible for preparation and active prosecution of the claims to the extent permitted . . . ." *Id.* at 7. The evidence presented by FEDCON revealed only that FEDCON had requested information for substantiation purposes from GLF after GLF had submitted the claim. There is no evidence that the Owner required such information. Further, there is no evidence that GLF, by failing to provide such information to FEDCON, failed to prepare or pursue the claim. As such, this argument fails.

Accordingly, the Court will award $111,953.47 to GLF for the multiple material handling claim.

### iii.   Improper Termination and Directives to Proceed

GLF alleges that FEDCON materially breached the 2.2 Project Subcontract Agreement by "improperly default terminating the [2.2 Project] Subcontract [Agreement] due to its failure to perform the contractually required predecessor work," thereby making GLF's work thereunder unavailable. *GLF II*, Doc. 1 ¶51. GLF has successfully established this claim.

Florida law requires GLF to plead and establish: "(1) the existence of a contract; (2) material breach of that contract; and (3) damages resulting from the breach." *Vega*, 564 F.3d at 1272. The parties agree that the 2.2 Project Subcontract Agreement is a valid contract. Turning to FEDCON's material breach, the facts established above demonstrate that FEDCON failed to provide GLF with the contractually required predecessor work. GLF has argued that FEDCON's performance of the predecessor work activities served as conditions precedent to GLF's performance under the 2.2 Project Subcontract Agreement. Regardless of how the predecessor activities are labeled, the parties stipulate that, in accordance with FEDCON's coordination and scheduling of the work to be performed by its subcontractors, construction of the access road, construction of the TFP, degrading of the levee, and construction of the work constituted predecessor work activities to GLF's performance of its work activities. In turn, FEDCON contracted with HDB to perform this work.

GLF has demonstrated, by a preponderance of the evidence, that FEDCON failed to perform predecessor work activities. The facts set forth above establish that, in the fall of 2015, FEDCON placed the Corps on notice of a differing site condition, which Mr. Boland identified as beginning at approximately Monolith 060 and continuing south to approximately Monolith 090 or Monolith 095. Specifically, "investigation into the layout of the work platform and access road" led FEDCON to conclude that the Chevron fence at water pipeline encroached into the temporary

work area easement. Doc. 221-168 at 1–2. The Corps rejected FEDCON's claim, advising that FEDCON was responsible for constructing the contract work within the project site's physical limitations. When FEDCON thereafter advised GLF in November of 2015 that FEDCON was ready to proceed with the work at Monoliths 075 and 079, GLF emphasized that access had not been established under the 2.2 Project Subcontract Agreement. GLF had already demobilized, and the levee had not been degraded to elevation 8 at Monolith 075 or Monolith 079.

FEDCON's February 3, 2016 access plan, issued to GLF on February 10, 2016, pertained to access for Monoliths 072 through Monolith 118. This access plan provided that an engineer would be engaged to supply information regarding the design and construction of the work platform where the platform had less than a 3:1 slope and was less than 30 linear feet wide. Further, this access plan provided for use of K street, inside Chevron, for delivery of pipe piles, sheet piles, and rebar for portions of the work. The access plan therefore provided for a change to the work under the 2.2 Project Subcontract Agreement.

On February 12, 2016, FEDCON directed GLF to mobilize and begin the work immediately, as the access road had been "upgraded" for access, the area "appropriately graded," and the levee "degraded from Monolith 072 through Monolith 080." However, Mr. Ellis and Mr. Boland identified Monolith 072 as being in the area where FEDCON had ended the access road at the work platform, leaving just the work platform. Indeed, the February 3 access plan provided that deliveries "will come from the north to the south on the combined work platform/temporary access road." Doc. 217-178 at 3. However, as repeatedly emphasized, the 2.2 Project Subcontract Agreement required GLF to be provided with a temporary access road "approximately 12' wide and extending the length of the levee, located adjacent to the temporary work platform on the protected side of the levee." Doc. 216-117 at 1. And, although FEDCON has argued that GLF

should have proceeded because GLF previously utilized a combined work platform and access road, the levee was not degraded to elevation 8 at Monolith 075. Thus, FEDCON was seeking to change the work in the 2.2 Project Subcontract Agreement, and the predecessor work under the 2.2 Project Subcontract Agreement had not been performed. When FEDCON directed GLF again to proceed with the work at work front two and advised that GLF was in default for failing to recommence the work on work front two, GLF again reiterated that the lack of access prevented GLF from proceeding. Indeed, FEDCON subsequently admitted that the access road extended only "to the work front" because the pipe bridges at Monolith 075 and Monolith 079 limited the available width to place the work platform and temporary access road. Doc. 222-42 at 2.

Once the Corps recognized the differing site condition on April 7, 2016, FEDCON issued the April 11, 2016 letter. Therein, FEDCON directed GLF to proceed with the work at Monolith 072. However, as explained, FEDCON had not completed the predecessor work. This conclusion is further bolstered by the language of the April 11, 2016 letter. First, the letter explained that, from Monolith 072 to approximately Monolith 085, delivery of steel and pipe piles, concrete, and reinforcing steel would be delivered by way of a "temporary access road leading *to* the work front." Doc. 217-130 at 2. Notably, this language does not specify whether the temporary access road would extend the length of the levee and be located adjacent to the temporary work platform, as called for in the 2.2 Project Subcontract Agreement. Second and relatedly, the April 11, 2016 letter stated that it "reiterated" the access plan that had been "previously provided," presumably in reference to the February 3, 2016 access plan. *Id.* Thus, as the February 3, 2016 access plan had called for deliveries for Monolith 072 through Monolith 095 to be made on the "combined work platform/temporary access road," the April 11, 2016 letter suggested the use of a combined work platform and access road. Third, the letter stated that access to equipment on the work fronts would

170

be made by way of the temporary access road where it was adjacent to the work platform *or* by the temporary access road leading *to* the work platform.

Significantly, the April 11, 2016 letter explained that a minimum 28 foot wide engineered work platform to support the construction operations and equipment would be provided where space limitations prevented the 30 foot wide work platform. David Boland testified that, by this letter, FEDCON committed to providing engineering where there was inadequate space. As such, FEDCON pursued engineering solutions through the First Terracon Report and the Revised Terracon Report. Under the April 11, 2016 letter, FEDCON would also take over responsibility for delivering the steel pipe piling to the work front for GLF to drive.

FEDCON issued Change Order No. 15 in May of 2016. FEDCON did not send Change Order No. 15 to GLF for several days; GLF still had not received it when it responded to the Notice of Default on May 24, 2016. Change Order No. 15 directed GLF to recommence the work at Monolith 076, not Monolith 072, because the hurricane restriction would go into effect on June 1, 2016.

However, the preponderance of the evidence demonstrates that, notwithstanding any subsequent modification of the 2.2 Project Subcontract Agreement, FEDCON had not performed the predecessor work activities at Monolith 076, either. The 2.2 Project Subcontract Agreement required the two temporary work platforms, another component of the predecessor work, to be located "on the protected side of the levee" and "approximately 30' wide x 600' long, located 10' from the centerline of the steel sheet pile . . . ."*Id.* Words must be given their natural, ordinary meaning in determining the plain meaning of words in the course of contract interpretation. *Hirsch*, 232 F. Supp. 3d at 1251. Courts often use dictionary definitions for guidance to determine common usage or ordinary meaning of a term. *CBS Inc.*, 245 F.3d at 1223. "Approximate" is defined as

"nearly correct or exact: close in value or amount but not precise." Merriam-Webster Dictionary, *Approximate*, https://www.merriam-webster.com/dictionary/approximate (last visited January 20, 2021). Thus, the temporary work platforms had to be nearly correct or exact to 30 feet in width.

The evidence shows that this was not the case. In December of 2015, the Chustz survey of the work platform at Monolith 076 demonstrated that the outer edge of the work platform was 28.2 feet from 10' off of the centerline of the sheet pile wall at one measured point, and 28.7 feet at another measured point. Therefore, the provided work platform was not nearly correct or exact to 30 feet in width, but more than an entire foot short. This deficiency arises in the context of the work platforms' intended purpose: to provide a platform for cranes. Mr. Ellis testified that he measured the width of the work platform in this area as 28.2 feet in December of 2015 and in the spring of 2016. Mr. Senis testified that the width was approximately 22.5 feet in the spring of 2016, and he also testified that he did not observe any compaction, which the subcontract agreement between HDB and FEDCON required. Both Mr. Ellis and Mr. Senis testified that FEDCON had not undertaken to perform any additional work on the work platform at Monolith 076 after the issuance of the April 11, 2016 letter, the First Terracon Report, or the Revised Report by May 27, 2016. There is no evidence that the work platform was prepared in accordance with the terms of the 2.2 Project Subcontract Agreement between December of 2015 and April of 2016, either. FEDCON never analyzed the width of the platform from Monolith 076 to Monolith 078. David Boland testified generally that the work platform in the area of Monolith 071 needed additional degrading, which could be done within a day. Even if this testimony pertained to Monolith 076, it only highlights that the work platform was not ready for GLF.

Given FEDCON's issuance of Change Order No. 15, the Court takes this opportunity to address GLF's argument in its responses to FEDCON's letters that the 2.2 Project Subcontract Agreement required a change order under Paragraph 10.A. Paragraph 10.A provides:

> Without invalidating this Subcontract Agreement, the Contractor and/or Owner . . . may at any time, by written order, and without notice to the Subcontractor or the sureties on the Subcontractor's bonds, make changes to the Contract Documents and/or terms or conditions of the Prime Contract. The Contractor may, by reason of such changes or otherwise, add to or reduce the Work herein without limitation and without invalidating this Subcontract Agreement. The Contractor shall furnish the Subcontractor with written notice of any such change, addition, or reduction in the Work. The Contractor may also issue change orders for unilateral deductions arising out of backcharges for which the Subcontractor is determined to be responsible by the Contractor. All backcharges shall include in addition to all costs, ten percent (10%) overhead and five percent (5%) profit. If any such change causes an increase or decrease in the Subcontractor's cost of or time required for the performance of this Subcontract Agreement, an equitable adjustment shall be made and this Subcontract Agreement modified in writing accordingly. In no case shall any adjustment or change in the Subcontract price or time of performance be binding on the Contractor for changes initiated by the Owner unless approved by the Owner . . . .

Doc. 216-116 at 5 (emphasis added).

In turn, the 2.2 Project Subcontract Agreement also provides that any "modification of this Subcontract Agreement must be made in writing and executed by the parties to this Subcontract Agreement, except as otherwise provided in this Subcontract Agreement." *Id.* at 12. Additionally, Paragraph 10.D provides, in relevant part:

> Except as otherwise provided in this Subcontract Agreement, no charge for any change in the Work will be allowed unless issued by written change order. No charges by the Subcontractor for omissions, discrepancies, or inadequacies in the plans, specifications or drawings shall be binding upon the Contractor unless accepted or approved by the Owner, and the Contractor shall not be liable to the contractor on account of such changes unless and until the Contractor shall receive payment therefor from the Owner, and then only to the extent of the Subcontractor's share of such payment.

173

*Id.* at 8.

Thus, by reason of changes to the Contract Documents or terms or conditions of the Prime Contract, FEDCON may add or reduce the Work in the 2.2 Project Subcontract Agreement. FEDCON must furnish GLF with written notice of that change, addition, or reduction in the work. If such change results in an increase or decrease in GLF's cost of or time required for the performance of the 2.2 Project Subcontract Agreement, an equitable adjustment must be made and the 2.2 Project Subcontract Agreement must be modified in writing accordingly. The written modification must be agreed to by FEDCON and GLF. And a charge for change in the work will not be allowed unless issued by change order.

In its March 4, 2016 letter, in reference to the February 3, 2016 access plan and prior to the Corps' recognition of the differing site condition, GLF claimed that a change order was needed because the work had changed. Indeed, the February 3, 2016 access plan had changed the nature of the work. For example, in accessing the site, GLF would need to proceed through a petrochemical plant. By issuing the February 3, 2016 access plan, FEDCON had issued notice of a change in the work. This change undoubtedly would result in an increase or decrease in GLF's cost, rather than the cost not changing, as the access plan called for part of the work to proceed through Chevron and the access plan would impact the use of equipment. As such, under the language of Paragraph 10.A, an equitable adjustment was needed and the 2.2 Project Subcontract Agreement needed to be modified in writing. Thus, GLF sought a change order.

The same reasoning applies to GLF's subsequent assertions that a change order was needed following FEDCON's issuance of the April 11, 2016 letter. Like the February 3, 2016 access plan, the April 11, 2016 letter changed the work and undoubtedly would have resulted in an increase or decrease in GLF's cost for the same reason as above. David Boland admitted during trial that the

changes to the access road and work platform were changes to the 2.2 Project Subcontract Agreement. Additionally, FEDCON's July 6, 2016 letter to GLF, following the Notice of Termination, admitted that, as a result of the differing site condition, the temporary access road could not be provided as contemplated under the 2.2 Project Subcontract Agreement and "deliveries for the materials for Monoliths 072 through 085 must be made by way of the work platform as outlined in the [April 11, 2016 letter] that included FEDCON's access plan for the work from Monolith 072 south." Doc. 222-155 at 3.

Although a written modification to the 2.2 Project Subcontract was required, whether any modification regarding the April 11, 2016 letter was made by the parties is unclear. Indeed, GLF's responses to FEDCON's letters reveal an assumption that the April 3, 2016 access plan validly modified the 2.2 Project Subcontract Agreement, as GLF argued that the work platform was less than 30 feet, thereby requiring engineering under FEDCON's commitment in the letter. Even if the 2.2 Project Subcontract Agreement was modified by, or to account for, the terms of the April 11, 2016 letter, FEDCON still failed to perform the predecessor work because it did not provide engineered platforms. For example, although Change Order No. 15 advised GLF that it needed to begin work at Monolith 076, the evidence discussed above shows that Monolith 076 was less than 30 feet and, therefore, required an engineered work platform. However, FEDCON did not provide an engineered platform.

On May 23, 2016, FEDCON issued the Notice of Default, in which it: (1) advised that GLF continued to remain in default under the 2.2 Project Subcontract Agreement for failing to recommence the work south of Monolith 072; and (2) demanded GLF to provide a written plan that demonstrated and committed to the recommencement of the work at Monolith 076 at the earliest reasonable time. As already detailed, FEDCON had not performed the predecessor work

at Monolith 072 or Monolith 076. At this time, GLF had not received Change Order No. 15. GLF responded that it had not received an acceptable engineered plan demonstrating how FEDCON intended to address the changed condition. GLF advised that it was ready, willing, and able to re-commence and complete the work once an "acceptable engineering plan for the performance of the work that is the subject of the changed condition" was issued and an appropriate change order for the same was received. Doc. 217-136 at 3. FEDCON again requested GLF to commit in writing to recommence the work beginning at Monolith 076 at the earliest reasonable time. GLF responded, in relevant part, that FEDCON had "yet to properly plan for or construct the temporary structures that it is required to provide pursuant to our Subcontract." Doc. 217-197 at 2. GLF stated that it would recommence the work at the earliest reasonable time conditioned upon FEDCON fulfilling its contractual responsibilities. Also, now that it had finally received Change Order No. 15, GLF rejected the change order because GLF construed it as FEDCON's attempt to force GLF to bear the expense and submit a claim for equitable adjustment after-the-fact instead of receiving payment as the work progressed. Indeed, as drafted, Change Order No. 15 indicated $0.00 as the "Total Change Order Amount" and provided that, by signing, GLF would agree that Change Order No. 15 fully compensated GLF for the described changes and any and all claims for additional time, delay, impact, or disruption incurred by GLF as a result of Change Order No. 15 individually, and the cumulative impact collectively, with prior change orders.

FEDCON terminated the 2.2 Project Subcontract Agreement on May 27, 2016, explaining that, "[d]espite repeated directives from FEDCON, GLF has failed and refused to recommence the work south of Monolith 071." Doc. 217-194 at 1. FEDCON claimed that GLF's refusal to recommence the work as directed by FEDCON constituted a material breach of the 2.2 Project Subcontract Agreement and had resulted in a significant delay to the project schedule.

FEDCON has asserted that the 2.2 Project Subcontract Agreement required GLF to proceed with the work under Paragraph 10.B, which stated, in relevant part, "If the Owner or the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Paragraph 13 hereof; but nothing provided in this clause shall excuse the Subcontractor from proceeding with the prosecution of the Work as changed or as directed or required by the Contractor. The Subcontractor shall proceed with prosecution of any portion of the Work which is the subject of a claim or dispute under this paragraph." Doc. 216-116 at 5–6. However, this argument is unavailing because the predecessor work, which had not been completed, was not the responsibility of GLF. Because the predecessor work had not been completed, the work was unavailable to GLF.

Based on the foregoing, FEDCON materially breached the 2.2 Project Subcontract Agreement.[1042] Further, GLF has established that it incurred damages as a result of FEDCON's breach. GLF seeks $375,197.30 in accelerated demobilization costs. GLF also seeks $118,854.78 for Application for Payment No. 34 and $880,000.00 for reimbursement of demobilization costs and expenses. First, upon consideration of Mr. Ellis' testimony regarding the $118,854.38 amount in Application for Payment No. 34, including his representation that the Corps approved the amount after removal of an amount for demobilization of pipe driving equipment, the Court will

---

[1042] Relying on a line of cases from the United States Court of Federal Claims regarding termination due to timeliness of performance or scheduling, GLF has also argued that FEDCON improperly terminated the 2.2 Project Subcontract Agreement because it was aware at the time of termination that it would receive time extensions and additional compensation from the Corps. The Court previously distinguished this line of cases in its Order on summary judgment. Doc. 177 at 24. Here, FEDCON terminated the 2.2 Project Subcontract for GLF's failure to recommence the work after repeated directives. As such, this line of cases is distinguishable. Further, GLF has argued that FEDCON's termination of the 2.2 Project Subcontract Agreement was improper because GLF cured the default. In response to FEDCON's requests for written confirmation that GLF would recommence the work at the earliest reasonable time, GLF agreed to recommence the work at the earliest reasonable time, but conditioned this upon FEDCON's fulfillment of its contractual responsibilities. GLF's argument that its responses cured the defaults is unavailing. For the same reason, the Court need not address FEDCON's arguments regarding the adequacy or sufficiency of GLF's responses to the Notice of Default or the Notice of Termination.

award the $118,854.78. Next, according to Mr. Ellis, the $375,197.30 amount represents incurred costs for accelerated demobilization from the 2.2 Project. According to Mr. Ellis, the damages here were damages that GLF sustained through its demobilization of its equipment from the 2.2 Project, as well as the costs for renting the interim storage location.  A review of the supporting materials reveals that Blue Book rates were used. Doc. 218-784 at 2–24. No EP 1110 rates have been provided. David Boland previously testified that Blue Book rates were three times higher. As such, the Court will award only $50,031.57 for the equipment portion of this claim, rather than $150,094.72. The remaining portions are reasonable. It is clear that "substantial damages were suffered and there is a reasonable basis in the evidence" for the amounts. *Centex-Rooney Constr. Co., Inc.*, 706 So. 2d at 28 (original emphasis removed). Accordingly, the Court will award $275,134.15 for accelerated demobilization costs.

Mr. Ellis testified that the $880,000 amount represents an agreed-upon amount, located in the schedule of values, that GLF was to be paid for demobilizing the equipment, with such amount to be paid to cover the cost of the actual demobilization to the next location of each item of equipment. Based on Mr. Ellis' testimony, the Court will award this amount.

Therefore, the Court will award $1,273,988.93 for this claim.

## C.  GLF's Miller Act Claims

In each of its claims under the Miller Act, GLF alleges that FEDCON's breaches of the respective subcontract agreement constitute breaches of the Miller Act bonds. Under the Miller Act:

> Every person that has furnished labor or material in carrying out work provided for in a contract for which a payment bond is furnished under section 3131 of this title and that has not been paid in full within 90 days after the day on which the person did or performed the last of the labor or furnished or supplied the material for which the claim is made may bring a civil action on the payment

178

> bond for the amount unpaid at the time the civil action is brought
> and may prosecute the action to final execution and judgment for the
> amount due.

40 U.S.C. § 3133(b).

In turn, Section 3131 provides: "Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal government, a person must furnish to the Government" a payment bond and a performance bond, as specified under the statute. *Id.* § 3131(b).

The Miller Act is "highly remedial in nature." *United States f/u/b/o Krupp Steel Prods., Inc. v. Aetna Ins. Co.*, 831 F.2d 978, 980 (11th Cir. 1987) (internal quotation marks omitted). "A surety's liability under the Miller Act is measured by the general contractor's liability under the construction contract." *United States ex rel. Ragghianti Founds. III, LLC v. Peter R. Brown Constr. Inc.*, 49 F. Supp. 3d 1031, 1054 (M.D. Fla. 2014). "Four elements must be proven by a plaintiff in order to collect under the Miller Act: (1) that materials were supplied for work in the particular contract at issue; (2) that the supplier is unpaid; (3) the supplier has a good faith belief that the materials were for the specified work; and (4) that jurisdictional requisites are met." *United States f/u/b/o Jack Daniels Constr., Inc. v. Liberty Mut. Ins. Co.*, No. 8:12-cv-2921-T-24TBM, 2015 WL 9460115, at *4 (M.D. Fla. Dec. 28, 2015) (citing *Krupp Steel Prods., Inc.*, 831 F.2d at 979. "Because lost profits are not out-of-pocket expenditures for labor and materials, however, they are not within the scope of remedies provided under the Miller Act." *Id.*

"A damage claim against a surety that does not flow directly and immediately from actual performance is barred by the Miller Act." *Ragghianti Founds. III, LLC*, 49 F. Supp. 3d at 1053. "A Miller Act plaintiff is entitled to recover under the bond the out-of-pocket labor and expenses attributable to delays." *Id.* at 1052. "Further, a subcontractor can recover from the Miller Act surety for labor and material furnished despite non-payment by the government to the contractor." *Id.*

But, a subcontractor cannot recover on a payment bond under the Miller Act for the cost of labor and materials provided after the termination of work under a government construction project. *Id.* at 1054.

As noted, in accordance with the Miller Act, 40 U.S.C. § 3131, FEDCON, as principal, and Western, as surety, executed and delivered a payment bond to the Corps for the 2.2 Project and a payment bond for the 1.2a Project. The payment bonds provided:

> We, [FEDCON and Western], are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum, for payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any and all of us. For other purposes, each surety binds itself jointly and severally with [FEDCON], for the payment of the sum shown . . . . If no limit is indicated, the limit of liability is the full amount of the penal sum.

Doc. 38-2 at 1; *GLF II*, Doc. 1-1 at 1.

Here, GLF has failed to carry its burden in proving the elements of its Miller Act claims. Despite providing extensive testimony and evidence regarding its damages, GLF has not sought to delineate which costs it seeks to recover under the Miller Act and the bases for entitlement to those costs under the Miller Act. The caselaw above demonstrates that a Miller Act claim is not simply a tag-along claim to a breach of contract claim, but instead a claim that provides for qualified remedial relief. As such, these claims fails.

### D.  GLF's Unjust Enrichment Claims

GLF also brings claims for unjust enrichment for the 2.2 Project and the 1.2a Project. Docs. 38 at ¶¶45–50; *GLF II*, Doc. 1 ¶¶54–59. Because GLF has succeeded on its breach of contract claims and these claims are brought in the alternative, the Court need not devote much analysis to

these claims. The Court also notes that, under Florida law, "a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter." *1021018 Alberta Ltd. v. Netpaying, Inc.*, No. 8:10-cv-568-T-27MAP, 2011 WL 1103635, at *5 (M.D. Fla. Mar. 24, 2011) (internal quotation marks omitted) (quoting *Diamond "S" Dev. Corp. v. Mercantile Bank*, 989 So. 2d 696, 697 (Fla. 1st DCA 2008)). Here, the parties have stipulated that the 1.2a Project Subcontract Agreement and the 2.2 Project Subcontract Agreement are valid and enforceable contracts. As such, these claims fail.

### E.  FEDCON's Breach of Contract Claims

FEDCON brings two claims for breach of contract in its counterclaims: one for the 2.2 Project and one for the 1.2a Project.[1043] In its breach of contract claim for the 2.2 Project, FEDCON alleges that GLF materially breached the 2.2 Project Subcontract Agreement "in a number of ways, including but not limited to failing to maintain the Project schedule and failing or refusing to abide by proper directives to recommence performance of work when so directed by FEDCON." *GLF II*, Doc. 66 ¶31. Similarly, in its breach of contract claim for the 1.2a Project, FEDCON alleges that GLF materially breached the 1.2a Project Subcontract Agreement "in a number of ways, including, but not limited to, failing to maintain the Project schedule and causing various miscellaneous defaults thereby causing FEDCON to incur damages to correct the same." Doc. 13 ¶22. For the reasons set forth below, these claims fail.

"For a breach of contract claim, Florida law requires the plaintiff to plead and establish: (1) the existence of a contract; (2) material breach of that contract; and (3) damages resulting from the breach." *Vega*, 564 F.3d at 1272. "To constitute a vital or material breach, a party's nonperformance must 'go to the essence of the contract.'" *MDS (Can.) Inc.*, 720 F.3d at 849. The

---

[1043] The Court previously recognized that GLF's amended complaint for the 1.2a Project did not moot FEDCON's counterclaim. Doc. 177 at 7 n.3.

parties agreed that the 2.2 Project Subcontract Agreement and the 1.2a Project Subcontract Agreement are valid and enforceable. Through these claims, FEDCON asserts delay damages clams against GLF and F&D, in which it seeks to recover its extended field office overhead and other delay related costs and expenses due to delays allegedly caused by GLF in the performance of its work on both projects. As for FEDCON's efforts to establish that GLF breached the 2.2 Project Subcontract Agreement by refusing to perform the work when directed, the Court addressed the viability of these claims above. Thus, the Court will focus on GLF's purported material breach of the subcontract agreements by failing or refusing to abide by the project schedules.

Paragraph 7.A of the subcontract agreements provided that "Subcontractor acknowledges that it has been informed that the Contractor must complete the Prime Contract on or before the Prime Contract completion date (including adjustments thereto) and in accordance with the project Schedule (including any adjustments thereto)." Docs. 216-116 at 4; 216-132 at 4. "It is, therefore, understood and agreed that the Work set forth herein shall be entirely completed in accordance with the Project Schedule, and any adjustments thereto . . . and it shall be the responsibility of the Subcontractor to be aware of the progress of the Project and the Project Schedule including any adjustments thereto." *Id.* Thus, GLF was required to complete the work in accordance with the Project Schedule.[1044] Neither subcontract agreement expressly defined the "Project Schedule." However, Exhibit D to each subcontract agreement provides that the Project Schedule "represents the Contractor's plan for controlling the performance of the work, and it is developed in order to

---

[1044] Paragraph 6.A required GLF to complete the work with diligence, without delay, and "in such manner and sequence that the Contractor and other subcontractors can complete the work in accordance with the *progress schedule* including any adjustments thereto and without delay to the Project as a whole." Docs. 216-116 at 3; 216-132 at 3 (emphasis added). Because "Project Schedule" is a defined term, as opposed to "progress schedule," the Court construes these terms as different terms and does not interpret the "progress schedule" as referring to the "Project Schedule."

benefit all parties involved in the Project by ensuring that the work is completed at the earliest reasonable time that is consistent with the orderly and efficient manner of construction." Docs. 216-117 at 8; 216-133 at 6. Thus, the Project Schedule represented the Contractor's plan for controlling the work.

The evidence clearly demonstrates that neither subcontract agreement had specific schedules attached thereto or referenced therein. Indeed, at the time when GLF entered into the subcontract agreements with FEDCON, there was not a developed schedule that had been reviewed or approved. Therefore, despite the subcontract agreements' reference to a "Project Schedule," a "Project Schedule" did not exist for either project.

FEDCON subsequently developed the early completion schedules and sought to use these early completion schedules for the projects, even though they differed from the schedules approved by the Corps. However, the subcontract agreements provide that any modification thereto "must be made in writing and executed by the parties" to the subcontract agreement, except as otherwise provided. Docs. 216-116 at 12; 216-132 at 12. FEDCON has failed to demonstrate by a preponderance of the evidence that the parties ever modified either subcontract agreement in writing to incorporate the early completion schedules, which were developed after the parties entered into the subcontract agreements. Indeed, the only evidence that one could construe as an agreement to the use of the early completion schedules by GLF is the testimony of Mr. Boland and Mr. Whitworth that GLF did not object to FEDCON's discussion of using different schedules at a meeting in February of 2014. But, although Mr. Beaird could not recall the details of the meeting or whether he expressed disagreement with the early completion schedules, Mr. Yerk credibly testified that he first learned of this purported meeting, at which he was alleged to be present, in a July 28, 2014 meeting. Regardless, even if the meeting occurred and GLF verbally agreed to the

use of these schedules, there is no evidence that the parties modified the subcontract agreements in writing to include the early completion schedules. Therefore, FEDCON's reliance on the early completion schedules to establish GLF's purported delays of the projects is unavailing because the early completion schedules were not part of the subcontract agreements.[1045]

Even if the early completion schedules should be used, FEDCON still fails to establish these claims in light of the many flaws in Dr. Sist's analysis. As stated above, Dr. Sist testified that she used the early completion schedules as the basis for her delay analysis. FEDCON relied upon this analysis in arguing that GLF delayed the projects. However, the Court, as trier of fact, rejects Dr. Sist's testimony for the many reasons addressed by Mr. Brannon. Mr. Brannon credibly testified regarding these deficiencies in Dr. Sist's analysis. The Court need not rehash those deficiencies here, as they are discussed in the extensive findings above. Therefore, FEDCON has failed to prove, by a preponderance of the evidence, that GLF materially breached the subcontract agreements by failing to maintain the project schedule.[1046]

Based on the foregoing, FEDCON has failed to carry its burden for each of its breach of contract claims.

### F. FEDCON's Breach of Bond Claims

---

[1045] To the extent that FEDCON relies on other purported instances of delays by GLF outside of the schedules for performance established by the early completion schedules, it has failed to establish such delays by a preponderance of the evidence.

[1046] FEDCON has also argued that GLF acquiesced to FEDCON's use of the early completion schedules to manage the projects and GLF's arguments to the contrary are barred by waiver and estoppel. "Waiver is the voluntary and intentional relinquishment of a known right, or conduct that implies the voluntary and intentional relinquishment of a known right." *Major League Baseball v. Morsani*, 790 So. 2d 1071, 1077 n.12 (Fla. 2001). Here, however, the evidence shows that GLF did not know about the early completion schedules when it entered into the subcontract agreements and, upon learning about them, immediately voiced its objections. Further, while GLF continued to perform, the Court does not find that this continued performance waived any right to object to the use of the early completion schedules in light of the contractual requirements on GLF for performance. Next, equitable estoppel "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct. The doctrine bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct." *Id.* at 1077. FEDCON has not demonstrated this by a preponderance of the evidence.

FEDCON brings two claims for breach of bond in its counterclaims, one for the 2.2 Project and one for the 1.2a Project, in each of its counterclaims. Docs. 13 ¶¶25–29, *GLF II*, Doc. 66 ¶¶34–39. These claims fail.

### i. 2.2 Project

For the 2.2 Project, FEDCON alleges that F&D materially breached the terms of the performance bond by failing to complete the performance of the work under the 2.2 Project Subcontract Agreement following the termination for default of GLF. *GLF II*, Doc. 66 ¶¶37. FEDCON alleges that failure to fulfill the obligations under the bond constitutes a material breach of the bond. *Id.* at ¶38. The performance bond provided that GLF and F&D were bound to FEDCON in the amount of $10,517.859.50. Doc. 216-351 at 37. The bond's stated purpose was to provide protection to FEDCON, as the contractor, in the event of a default by GLF, as the sub-contractor, under the 2.2 Project Subcontract Agreement. *Id.* The bond also addressed the event of such default:

> [T]here shall be no liability on the part of [GLF] or [F&D] under this bond to [FEDCON], or either of them, unless [FEDCON] shall make payments to [GLF], or to [F&D] in case it arranges for completion of the [2.2 Project] Subcontract Agreement upon default of [GLF], in accordance with the terms of said Subcontract Agreement as to payments, and [FEDCON] shall perform all the other obligations required to be performed under said Subcontract Agreement at the time and in the manner therein set forth.

*Id.*

Under the bond, the obligation was null and void if GLF:

> 1. Shall promptly and faithfully perform all of the undertakings, covenants, terms, conditions, and agreements of said [2.2 Project] Subcontract Agreement during the original term of the Subcontract Agreement and any extensions thereof; and during the life of any warranty, guaranty, and indemnification required under the Subcontract Agreement; and
>
> 2. Shall promptly pay [FEDCON] all losses, costs, and damages

185

> (including, without limitation, damages resulting from delay in the performance of the Subcontract Agreement and damages from failure to discharge warranty, guaranty, and indemnity obligations), including all litigation-related costs and attorneys' fees that [FEDCON] may suffer by reason of [GLF's] default, and shall further fully reimburse and repay [FEDCON] for all outlays and expenses that [FEDCON] may incur in curing any default or alleged default.

*Id.*

Otherwise, however, the obligation remained in full force, but subject to the following relevant condition:

> 2. Whenever [GLF] shall be, or declared by [FEDCON] to be, in default under the [2.2 Project] Subcontract Agreement, [FEDCON] having performed [FEDCON's] obligation thereunder, [F&D] shall promptly cause the default to be remedied; or shall (a) complete the Subcontract Agreement in accordance with its terms and conditions; or (b) promptly obtain a bid or bids for submission to [FEDCON] for completing the Subcontract Agreement in accordance with its terms and conditions, and upon the determination by [FEDCON] and [F&D] of the lowest responsible bidder, arrange for a Subcontract Agreement, herein after called "Subcontract of Completion," between such bidder, hereinafter called "Subcontractor," and [FEDCON], and [FEDCON], and [F&D] shall make available as such work progresses (even though there should be a default or a succession of defaults under the Subcontract or Subcontracts of Completion arranged under this paragraph) sufficient funds to pay the costs of completion under the terms of said Subcontract of Completion less the balance of the subcontract price and taking into consideration other costs and damages for which [F&D] may be liable hereunder.

*Id.*

The bond also incorporated the 2.2 Project Subcontract Agreement. In turn, Paragraph 8 of the 2.2 Project Subcontract Agreement, entitled "Default by Subcontractor," is part of the bond.

Thus, the stated purpose of the bond is to provide FEDCON with protection in the event of GLF's default under the 2.2 Project Subcontract Agreement, in which event there shall be no liability on the part of GLF or F&D under the bond, unless FEDCON makes payments to GLF, or

to F&D if it arranges for completion of the 2.2 Project Subcontract Agreement upon GLF's default, in accordance with the terms regarding payments under the 2.2 Project Subcontract Agreement and performs all other obligations required to be performed under the 2.2 Project Subcontract Agreement at the time and manner therein set forth. As a condition to the bond's obligation remaining in full force, the bond provides that, whenever GLF is, or is declared by FEDCON to be, in default under the 2.2 Project Subcontract Agreement, with FEDCON having performed its obligations thereunder, F&D must either promptly cause the default to be remedied, or (a) complete the 2.2 Project Subcontract Agreement, or (b) promptly obtain a bid or bids for submission to FEDCON for completion of the 2.2 Project Subcontract Agreement in accordance with its terms and conditions and, upon the determination by both FEDCON and F&D of the lowest responsible bidder, arrange for a subcontract agreement between such bidder and FEDCON, with F&D making available as the work progresses sufficient funds to pay the costs of completion under such subcontract agreement.

Based on the analysis above, however, FEDCON did not perform its obligations under the 2.2 Project Subcontract Agreement. Further, the facts above demonstrate that GLF maintained its obligation to: (1) promptly and faithfully perform the undertakings, terms, and conditions of the 2.2 Project Subcontract Agreement during its original term, extensions thereof, and during the life of any warranty, guarantee, and indemnification required under the 2.2 Project Subcontract Agreement; and (2) promptly pay FEDCON all losses, costs, and damages, including all litigation-related costs and attorneys' fees that FEDCON may suffer by reason of a default by GLF, as well as fully reimburse and repay FEDCON for all outlays and expenses that FEDCON may have incurred. F&D is relieved of any obligations to FEDCON under the bond for the 2.2 Project.

Accordingly, this claim fails.[1047]

### ii.  1.2a Project

For the 1.2a Project, FEDCON alleges that, by reason of GLF's breach and default on the terms and conditions of the 1.2a Project Subcontract Agreement and F&D's obligations under the bond to cure such breaches and defaults, F&D is liable to FEDCON for the payment of the delay costs and miscellaneous costs incurred as a result of GLF's default. Doc. 13 ¶28. According to FEDCON, F&D's failure to fulfill its obligations under the bond constitutes a material breach of the bond, which directly and proximately caused damages to FEDCON.

The performance bond for the 1.2a Project is identical to the performance bond for the 2.2 Project, save for the difference in the penal sum: the performance bond for the 1.2a Project was in the amount of $7,765,009.00. Doc. 222-319 at 1. This claim is premised upon FEDCON's argument that GLF breached the 1.2a Project Subcontract Agreement. However, as discussed above, GLF did not breach the 1.2a Project. Therefore, this claim fails.

---

[1047] Even if FEDCON performed its obligations under the 2.2 Project Subcontract Agreement and the bond remained in full force under the above-specified terms of the condition regarding GLF's performance and payment, FEDCON deprived F&D of its ability to protect itself pursuant to the performance options under the bond. The purpose of a performance bond, such as the bond here, "is to guarantee the completion of the contract upon default by the contractor." *Am. Home Assurance Co. v. Larkin Gen. Hosp., Ltd.*, 593 So. 2d 195, 198 (Fla. 1992). However, "[a]n obligee's action that deprives a surety of its ability to protect itself pursuant to the performance options granted under a performance bond constitutes a material breach, which renders the bond null and void." *Sch. Bd. of Escambia Cnty. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351, 1354 (N.D. Fla. 2000). As set forth above, whenever GLF is, or is declared by FEDCON to be, in default under the 2.2 Project Subcontract Agreement, with FEDCON having performed its obligations thereunder, F&D must either promptly cause the default to be remedied, or (a) complete the 2.2 Project Subcontract Agreement, or (b) promptly obtain a bid or bids for submission to FEDCON for completion of the 2.2 Project Subcontract Agreement in accordance with its terms and conditions and, upon the determination by both FEDCON and F&D of the lowest responsible bidder, arrange for a subcontract agreement between such bidder and FEDCON, with F&D making available as the work progresses sufficient funds to pay the costs of completion under such subcontract agreement. Here, however, F&D emphasized on May 26, 2016, that FEDCON's letter lacked the requisite information. F&D's subsequent May 31, 2016 letter emphasized the significance of its receipt of information in its May 31, 2016 letter to FEDCON. Although David Boland testified that Mr. Kriss informed him that F&D "would not be proceeding," this testimony was not credible, given F&D's subsequent actions, the lack of any documentation regarding this provision, and Mr. Boland's prior failure to recall. The evidence clearly shows that FEDCON's filing of the lawsuit deprived F&D of its ability to protect itself. For example, Ms. Gualdron testified that the lawsuit resulted in F&D's inability to conduct its investigation per usual and that FEDCON personnel were not asked to speak with F&D personnel. Further, FEDCON hired the replacement contractors without any notice to F&D.

## IV.    CONCLUSION

Based on the foregoing, GLF is entitled to damages on its breach of contract claim for the 1.2a Project in Case No. 8:17-cv-1932-T-36AAS in the amount of $614,487.14 (access road), subject to the reductions calculated below.

Likewise, GLF is entitled to damages on its breach of contract claim for the 2.2 Project in Case No. 8:17-cv-2650-T-36TGW for the following amounts: $768,591.49 (access road), plus $330,145.99 (AZ-PZ), plus $111,953.47 (multiple material handling), plus $1,273,988.93 (improper termination), less GLF's $67,881.17 reduction for four days on the access road claims utilizing EP 1110 rates. The subtotal of these amounts is $2,416,798.71.Thus, GLF is entitled to $2,416,798.71 on its breach of contract claim for the 2.2 Project in Case No. 8:17-cv-2650-T-36TGW.

GLF has offered two additional reductions to its claims. First, GLF has offered a reduction of $67,974.19 for project management and supervision for all "claims distributed over both projects" because there were "parts or fractions of days that [Mr. Ellis] attributed to supervision of any given claim on any given day" and, on some days, "there was more than one impact on a particular project in a day." *Testimony of Lorenzo Ellis*, Doc. 241 at 6:7–21. Mr. Ellis accordingly added up the "fractions" that exceed 1.0 for any particular day over the course of the claims. Similarly, GLF has offered a reduction of $6,506.25 for crane hours. In calculating this reduction, GLF sought to identify "the fractions of days or numbers of hours per day on any given piece of equipment across all claims on both jobs where the crane hours exceed eight hours in one day." *Id.* at 241:10–19. Thus, both of these reductions, which were offered through demonstrative exhibits and Mr. Ellis' testimony, are composed of subtotals added up across all claims on both projects. However, GLF has successfully established only some of its claims. GLF has not broken

down these reductions by claim or by project, nor has GLF offered any methodology for the Court to determine how to apply these reductions in the event that GLF did not recover for each claim.

The Court maintains "reasonable discretion" in making awards of damages in those instances where damages cannot be "precisely and mathematically determined," *John Hancock Mut. Life Ins. Co.*, 324 So. 2d at 674. GLF initially brought ten claims, and Mr. Ellis testified that he calculated these sums by evaluating *all* claims. GLF will recover on five claims: the 1.2a access road, the 2.2 access road, the multiple material handling, the AZ-PZ sheet piling, and the wrongful termination. As such, for each reduction, the Court will exercise its discretion and divide the reduction by ten to arrive at an equal sum per claim, add five of these equal sums together, and then reduce GLF's award by that amount. For the project management and supervision reduction, this process results in an amount of $33,987.09, which will be applied as a reduction against GLF's recovery. For the crane hours reduction, this process results in an amount of $3,253.12, which will be applied as a reduction against GLF's recovery. Since both reductions applied to all claims, whether the Court applies these reductions to GLF's recovery for the 1.2a Project or the 2.2 Project is immaterial. The Court will apply the deductions to the total for the 1.2a Project, resulting in a total recovery for the breach of contract claim in the 1.2a Project in Case No. 8:17-cv-1932-T-36AAS in the amount of $577,246.93.

Accordingly, it is now **ORDERED AND ADJUDGED**:

1. Plaintiff GLF Construction Corporation takes nothing on its claim under the Miller Act (Count I) in Case No. 8:17-cv-1932-T-AAS.

2. Plaintiff GLF Construction Corporation is entitled to judgment in its favor and against only Defendant FEDCON Joint Venture, Defendant David Boland, Inc., and Defendant JT

Construction Enterprise Corporation on Plaintiff's breach of contract claim (Count II) in Case No. 8:17-cv-1932-T-36AAS in the amount of $577,246.93.

3. Plaintiff GLF Construction Corporation takes nothing on its claim for unjust enrichment (Count III) in Case No. 8:17-cv-1932-T-36AAS.

4. Plaintiff GLF Construction Corporation takes nothing on its claim under the Miller Act (Count I) in Case No. 8:17-cv-2650-T-36TGW.

5. Plaintiff GLF Construction Corporation is entitled to judgment in its favor and against only Defendant FEDCON Joint Venture, Defendant David Boland, Inc., and Defendant JT Construction Enterprise Corporation on Plaintiff's breach of contract claim (Count II) in Case No. 8:17-cv-2650-T-36TGW in the amount of $2,416,798.71.

6. Plaintiff GLF Construction Corporation takes nothing on its unjust enrichment claim (Count III) in Case No. 8:17-cv-2650-T-36TGW.

7. Defendant FEDCON Joint Venture takes nothing on its claim for breach of contract (Count I) within its counterclaim in Case No. 8:17-cv-1932-T-36AAS.

8. Defendant FEDCON Joint Venture takes nothing on its claim for breach of bond (Count II) within its counterclaim in Case No. 8:17-cv-1932-T-36AAS.

9. Defendant FEDCON Joint Venture takes nothing on its claim for breach of contract (Count I) within its counterclaim in Case No. 8:17-cv-2650-T-36TGW.

10. Defendant FEDCON Joint Venture takes nothing on its claim for breach of bond (Count II) within its counterclaim in Case No. 8:17-cv-2650-T-36TGW.

11. The Clerk is directed to enter judgment accordingly as to Case No. 8:17-cv-1932-T-36AAS and as to Case No. 8:17-cv-2650-T-36TGW.

12.  The Clerk is further directed to close these cases.

**DONE AND ORDERED** in Tampa, Florida on January 28, 2021.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any